George Hofmann (10005)
Patrick E. Johnson (10771)
**Cohne Kinghorn, P.C.**
111 East Broadway, 11th Floor
Salt Lake City, Utah 84111
Telephone: (801) 363-4300

Proposed attorneys for Sorenson Media, Inc.

---

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Bankruptcy No. 18-27740 (WTT) |
| SORENSON MEDIA, INC., | Chapter 11 |
| Debtor. | |

---

**MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR (A)
TO OBTAIN POST-PETITION SECURED DIP FINANCING; (B) TO USE CASH
COLLATERAL AND GRANT ADEQUATE PROTECTION; (II) GRANTING LIENS AND
PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS; (III)
MODIFYING THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF**

---

Sorenson Media, Inc. (the "Debtor"), debtor and debtor in possession in the

above-captioned bankruptcy case, through its undersigned proposed counsel and

pursuant to Bankruptcy Code §§ 105, 361, 362, 363, 364, 503(b), and 507(a),

Bankruptcy Rules 2002 and 4001, and Rule 4001-2 of the Local Rules of Practice for

the United States Bankruptcy Court for the District of Utah, hereby moves this Court

(the "Motion") (1) to enter an interim order, substantially in the form attached as Exhibit

A (the "Interim Order"): (i) authorizing the Debtor to (a) obtain post-petition secured DIP

financing (b) to use cash collateral and provide for adequate protection for any

diminution in value of JLS's Liens in the Collateral; (ii) granting liens and providing

super-priority administrative expense status; (iii) modifying the automatic stay, (iv)

granting related relief; and (2) subsequently to enter a final order (the "Final Order"), (i)

granting the relief provided through the Interim Order on a final basis and (ii) authorizing

the Debtor to refinance certain existing secured indebtedness.  In support of the Motion,

the Debtor respectfully states as follows:

### JURISDICTION AND BACKGROUND

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The Debtor filed a voluntary petition for relief under chapter 11 of title 11

of the United States Code (the "Bankruptcy Code") on October 16, 2018 (the "Petition

Date").

3.      The Debtor continues to operate its business and manage its assets as a

debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.      No examiner or trustee has been appointed in this Case.

5.      SMI is an innovative media technology company, founded in 1995.  It

originally made its name in video compression and coding technology, known as

"Sorenson Squeeze", which reduces video file size for transmission over the internet.

But its present focus is on addressable television advertising and in particular, realizing

the potential of "smart" televisions for the benefit of television manufacturers, TV

inventory owners, and advertisers.

6.      The core of "smart" television technology is the convergence between

flatscreen television sets and the internet.  "Smart" televisions have the ability to

connect to the internet.  The vast majority of televisions now sold in industrialized

nations are "smart", but the potential of "smart" televisions is relatively untapped.  This

untapped potential can be realized as a result of SMI's technologies and team.

7.    For example, SMI's "Spark Platform" provides the opportunity for

"addressable advertising," similar to what has existed on the internet for years. As an

example, a consumer searching the internet for a vehicle will commonly find

advertisements from car manufacturers, targeting the consumer's interest in a vehicle

purchase.  "Addressable advertising" can also potentially direct advertising based on

demographic criteria, such as zip code or age.

8.    However, as applied to "smart" televisions, "addressable advertising" is a

relatively new technology, and SMI is on the cutting edge of it.  SMI's "Spark Platform"

allows the placement of different advertisements to different households while they are

watching the same program.  This permits the optimization of advertising effectiveness

by placing the most relevant advertising with the desired audience.

9.    As is common with emerging technology companies, in the early stages of

development, the capital requirements of the company are far greater than any

revenues generated.  That gap is usually filled with investment capital, and that is the

case with SMI.  Over $40 million dollars has been invested in the company by its

shareholders.  In addition, SMI has issued Series A convertible notes totaling over $96

million.

10.    While SMI's technologies and team have incredible potential, its current

capital structure presents impediments to attracting new investment that SMI intends to

address through this proceeding.  In particular, SMI intends to reject certain onerous

contractual relationships, and potentially to renegotiate others, in order to stabilize its

industry partnerships.  With a rationalized and streamlined capital structure, SMI plans

to liquidate its assets in an organized process designed to maximize returns to creditors

under the circumstances.

11.     On and after June 7, 2018, JLS Holdings, LLC ("JLS") provided bridge

financing to the Debtor in the aggregate amount of $21,988,000 (the "Pre-Petition

Debt").[1]  The manager of JLS is James L. Sorenson, an equity holder and board

member of the Debtor.  Prior to incurring the Pre-Petition Debt, the Debtor offered

noteholders the opportunity to participate in the bridge financing, and no noteholder

other than JLS expressed a willingness to participate.

12.     Central to SMI's controlled liquidation is the ability to obtain senior secured

and superpriority debtor in possession financing ("DIP") from JLS.  The Debtor

anticipates that the proceeds of DIP financing will be sufficient to fund its scaled back

operations and to maintain limited operations to preserve the Debtor's going concern

value pending a sale.

## RELIEF REQUESTED

13.     The Debtor proposes to obtain post-petition DIP financing from JLS.  As is

more fully described below, JLS has agreed to make available to the Debtor a total of

approximately $26,488,000, the actual amount of which reflects the payoff of the Pre-

Petition Debt plus another approximately $4,500,000 of additional funding.  The amount

borrowed is to be treated as a super-priority claim secured by a lien against

---

[1]      Unless otherwise noted, capitalized terms shall have the same meaning as in the Interim Order,
the Final Order, and the DIP Financing Agreement (as defined below).

substantially all property of the Debtor's estate, other than Avoidance Actions (except

solely the proceeds of Avoidance Actions brought pursuant to section 549 of the

Bankruptcy Code to recover any post-Petition Date transfer of Collateral), and subject to

a carve-out for (a) Bankruptcy Court and United States Trustee fees, (b) all Court-

approved fees of the Debtor's professionals prior to a Termination Date, (c) up to

$50,000 of allowed fees of the Debtors' professionals after a Termination Date and (d)

cash in the amount of $100,000, pursuant to Bankruptcy Code §§ 364(c) and (d).

14.     The Debtor requests entry of an Interim Order, in substantially the form

attached as Exhibit A, (a) approving the proposed financing, solely as to the $4,500,000

of additional funding and not as to the repayment of any existing indebtedness, on an

interim basis through and including the date of the final hearing on the Motion,

(b) authorizing the use of cash collateral in which JLS has an interest and providing for

adequate protection for any diminution in value of JLS's Lien in the Collateral, (c)

vacating and modifying the automatic stay to the extent necessary to implement and

effectuate the terms and provisions of the financing agreements and the Interim Order,

and (d) waiving the fourteen day stay provisions of Bankruptcy Rule 6004(h) and

providing that the Interim Order be effective immediately. The Debtor further requests

entry of a Final Order, (a) granting the relief provided through the Interim Order on a

final basis and (b) authorizing the Debtors to refinance the Pre-Petition Debt.

## **MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING**

15.     Subject to this Court's approval, the Debtor and JLS have agreed to the

terms and documentation for post-petition financing, including a Senior, Secured,

Super-Priority Debtor-in-Possession Agreement (the "DIP Financing Agreement"), a

copy of which is attached as Exhibit B.  Bankruptcy Rule 4001 requires that motions

requesting authority to incur post-petition financing begin with a concise statement of

the relief requested that summarizes the material terms and sets forth where the

material terms can be found in the documents.  In compliance with Fed. R. Bankr. P.

4001(c) and Local Rule 4001-2, the Debtor makes the following concise statement

about the relief sought through this Motion.  The Debtor believes these terms will

reasonably address the Debtor's near-term funding requirements.

16.     The significant provisions[2] of the DIP Financing Agreement, and the

proposed Interim Order and Final Order, are as follows:

a. <u>Amount</u>. The maximum amount of advances under the DIP Financing
Agreement shall be approximately $26,488,000, the actual amount of
which reflects the payoff of principal and accrued interest and fees on
the Pre-Petition Debt, plus another $4,500,000 of additional funding,
provided, however, that the Interim Order will not contemplate the
repayment of any existing indebtedness. <u>See</u> DIP Financing
Agreement at § 1.1 (defining "Interim Order" and "Term Loan
Commitments") and § 2.1(a); Interim Order at ¶ (ii)(a) and at § 2(b)(i);
Final Order at ¶ (ii)(a) and at § 2(b)(i).

b. <u>Obligors</u>.  The Debtor is the only obligor and the borrower under the
DIP Financing Agreement.  <u>See</u> DIP Financing Agreement at
Preamble.

c. <u>Payment of Prepetition Debt</u>. The DIP Financing Agreement provides
that approximately $21,988,000 of the post-petition advances under
the DIP Financing Agreement are to be used to pay off principal and
accrued interest and fees on the Pre-Petition Debt, provided, however,
that the Interim Order will not contemplate the repayment of any
existing indebtedness.  <u>See</u> DIP Financing Agreement at Recital ¶¶ C-
E, at § 1.1 (defining "Interim Order") and at § 6.9; Interim Order at ¶¶
(E)(i)-(vi), (H), (I) and at § 10(b); Final Order at ¶¶ (E)(i)-(vi), (H), (I)
and at § 10(b).  The justification for the inclusion of this provision is that
no other comparable financing reasonably is available to the Debtor,

---

[2]     This summary is qualified in its entirety by reference to the provisions of the DIP Financing
Agreement and related documents, and any order of this Court relating to the post-petition financing
proposed through the Motion.

such financing is necessary, essential and appropriate for the continued operation of the Debtor's business and the management and preservation of the Debtor's assets and property and the Debtor believe they would be unable to find financing on better terms.

d. <u>Super-Priority and Secured Status</u>.  Subject to a Carve-Out of (a) Bankruptcy Court and United States Trustee fees, (b) all Court approved fees of the Debtor's professionals, (c) up to $50,000 of allowed fees of the Debtor's professionals after the Termination Date and (d) cash in the amount of $100,000, all amounts advanced under the DIP Financing Agreement shall be deemed to have priority over any or all administrative expenses of the kind specified in Bankruptcy Code §§ 503(b) and 507(b) and shall be secured by a first position lien against all of the property of the Debtor's estate, other than Avoidance Actions (other than the proceeds of any Avoidance Action brought pursuant to Bankruptcy Code § 549 to recover any post-Petition Date transfer of collateral).  Solely to the extent of the Pre-Petition Diminution in Value of the interests of the Pre-Petition Debt Parties in their Collateral, pursuant to Bankruptcy Code §§ 361, 363(e) and 354(d) the Pre-Petition Debt shall be secured by replacement Liens and shall have super-priority status, junior only to the New DIP Liens, Permitted Liens, the DIP Superpriority Claim and the Carve-Out.  <u>See</u> DIP Financing Agreement at Recital ¶ D; § 1.1 (defining "Final Order," "Financing Orders" and "Interim Order"); §§ 2.1, 4.16, 6.13, 7.1, and 8.1(g)(xii); Interim Order at ¶¶ (iv) and (v), and at §§ 2(e), 2(f), 2(i), and 4; Final Order at ¶¶ (iv) and (v), and at §§ 2(e), 2(f), 2(i), and 4.  The justification for the inclusion of this provision is that no other comparable financing reasonably is available to the Debtor, such financing is necessary, essential and appropriate for the continued operation of the Debtor's business and the management and preservation of the Debtor's assets and property and the Debtor believes it would be unable to find financing on better terms.

e. <u>Repayment Terms and Maturity Date</u>. The entire unpaid principal amount of advances under the DIP Financing Agreement, along with all accrued and unpaid interest, fees and charges, shall be paid in full by the Debtor on the Term Loan Maturity Date, which is the earlier of: (i) acceleration of any Obligations under the DIP Financing Agreement or (ii) the Termination Date.  <u>See</u> DIP Financing Agreement at § 1.1 (defining "Term Loan Maturity Date") and § 2.1(c).

f. <u>Interest</u>. Interest on the outstanding balance of the amounts advanced under the DIP Financing Agreement accrues from the date that such advance is made until it is repaid at the per annum rate of 5%, with a

Post-Default Rate of 7% per annum.  <u>See</u> DIP Financing Agreement at § 1.1 (defining "Post-Default Rate") and at § 2.1(b).

g.  <u>Origination Fee</u>.  The Debtor shall pay a non-refundable Origination Fee in the amount of $100,000.  <u>See</u> DIP Financing Agreement at § 2.6.

h.  <u>Minimum Cash Balance</u>.  The Debtor shall maintain a minimum cash balance (after giving effect to the Wind-Down Amount) of not less than $100,000.  <u>See</u> DIP Financing Agreement at § 6.16.

i.  <u>Budget</u>.  Among other conditions to each Term Loan, the amount must be permitted by the Debtor's Budget, subject to any Permitted Variance.  <u>See</u> DIP Financing Agreement at § 1.1 (defining "Budget" and "Permitted Variance") and at § 5.2(f).

j.  <u>Expenses</u>.  The Debtor is required to repay JLS for all of its out of pocket expenses and professional fees incurred in connection with the financing, including attorneys' fees incurred in connection with the bankruptcy case.  <u>See</u> DIP Financing Agreement at § 1.1 (defining "Obligations"); Interim Order at § 19(b); Final Order at § 19(b).

k.  <u>Events of Default</u>. The following is a general summary of what constitutes an Event of Default under the DIP Financing Agreement: (a) the failure of the Debtor to timely pay principal or interest when due and payable under the DIP Financing Agreement, (b) any representation or warranty by the Debtor in connection with the DIP Financing Agreement that shall prove to have been materially incorrect when made, (c) the failure of the Debtor to perform any covenant in the DIP Financing Agreement, (d) the failure of the Debtor to timely make payments relating to obligations other than the DIP Financing Agreement, (e) the occurrence of an event or condition (other than the filing of this chapter 11 case) that results in Material Indebtedness coming due or the termination of a lease with respect to a Material Rental Obligation, (f) failure of the Debtor to achieve a Milestone, (g) the occurrence of various events in the bankruptcy case, including, among other things, events that are inconsistent with the payment and priority provisions of the DIP Financing Agreement, (h) the assertion of any claim against JLS pursuant to the Financing Orders, (i) entry of a final judgment or judgments against the Debtor for the payment of more than $100,000 in the aggregate, other than as set forth in the DIP Financing Agreement,  (j) a Change of Control, (k) the cessation of the Liens on Collateral to constitute valid and perfected Liens having a fair market value of $100,000 in the aggregate, (l) the theft, damage or destruction of any Collateral having a fair market value of $100,000 in the aggregate, (m) any Material Adverse Effect, and (n) the occurrence

of any event that permits JLS to exercise remedies under the
Financing Orders.  <u>See</u> DIP Financing Agreement at § 8.1.

l.   <u>Validity, Perfection or Amount of Pre-Petition Secured Debt.</u>  Without
     prejudice to the rights of other parties in interest as set forth in Section
     5 of the Interim Order, the Debtor stipulates (a) that prior to the entry of
     the Interim Order, the Debtor incurred the Pre-Petition Debt; (b) that as
     of the Petition Date, the Pre-Petition Debt was in the approximate
     principal amount of $21,988,000, plus interest, costs, expenses and
     fees; (c) that the portion of the Pre-Petition Debt extended by JLS was
     extended as a protective advance to maintain the Debtor's business
     while it considered restructuring options; (d) that the Pre-Petition Debt
     is secured by substantially all of the Debtor's assets and personal
     property; (e) that the liens securing the Pre-Petition Debt are not
     subject to avoidance, recharacterization or avoidance; (f) that the Pre-
     Petition Debt obligations are valid and enforceable; (g) that the Pre-
     Petition Debt constituted allowable secured claims; (h) that the Debtor
     has waived, discharged and released the Prior Lender Party of any
     right the Debtor may have to challenge the Pre-Petition Debt or to
     assert related claims.  Interim Order at ¶ (E)(i)-(vi); Final Order at ¶
     (E)(i)-(vi).   The justification for the inclusion of this provision is that no
     other comparable financing reasonably is available to the Debtor, such
     financing is necessary, essential and appropriate for the continued
     operation of the Debtor's business and the management and
     preservation of the Debtor's assets and property and the Debtor
     believes it would be unable to find financing on better terms.

m.   <u>Bankruptcy Code § 506(c)</u>.  Upon entry of the Final Order, except to
     the extent of the Carve-Out, no expenses of administration shall be
     charged against the Collateral pursuant to Bankruptcy Code § 506(c)
     without the prior written consent of JLS.  Interim Order at ¶ (G), §§ 2(f)
     and 10(a); Final Order at ¶ (G), §§ 2(f) and 10(a).  The justification for
     the inclusion of this provision is that no other comparable financing
     reasonably is available to the Debtor, such financing is necessary,
     essential and appropriate for the continued operation of the Debtor's
     business and the management and preservation of the Debtor's assets
     and property and the Debtor believes it would be unable to find
     financing on better terms.

n.   <u>Vacation and Modification of the Automatic Stay</u>.  The automatic stay
     imposed under Bankruptcy Code § 362 is vacated and modified to the
     extent necessary (a) to permit JLS to exercise, upon occurrence of the
     Termination Date and upon five business days' prior notice of such
     occurrence, all rights and remedies provided for in the DIP Financing
     Agreements (including, without limitation and without prior notice, the

right to freeze monies or balances in the Debtor's accounts or set of monies or balances of the Debtor in accounts maintained by JLS, the right to charge the Post-Default Rate, terminate commitments and cease funding under the DIP Agreement) (b) to permit the Debtor to grant the New DIP Liens and the JLS's Replacement Liens and incur all liabilities and obligations to JLS and (c) to authorize JLS to retain and apply payments made pursuant to the DIP Financing Agreement and the Interim and Final Orders.  Interim Order at §§ 14 and 16; Final Order at §§ 14 and 16.   The justification for the inclusion of this provision is that no other comparable financing reasonably is available to the Debtor, such financing is necessary, essential and appropriate for the continued operation of the Debtor's business and the management and preservation of the Debtor's assets and property and the Debtor believes it would be unable to find financing on better terms.

o.  <u>Bankruptcy Code § 364(e)</u>.  JLS is entitled to the protections provided in Bankruptcy Code § 364(e) and no modification, amendment or vacation of the Interim Order shall affect the validity and enforceability of any advances made or any Lien or priority authorized or created by the Interim Order.  Interim Order at § 19(a); Final Order at § 19(a).

p.  <u>Bankruptcy Code § 552(b)</u>.  JLS is entitled to the benefits of Bankruptcy Code § 552(b) and the "equities of the case" exception under Bankruptcy Code § 552(b) shall not apply.  Interim Order at § 19(g); Final Order at § 19(g).

q.  <u>Waiver of 14 Day Stay</u>.  The 14 day stay provisions of Bankruptcy Rule 6004(h) are waived and shall not apply to the Interim Order.  Interim Order at § 19(n); Final Order at § 19(n).

## <u>DISCUSSION</u>

**I.    The Debtor has Properly Exercised its Business Judgment in Entering into the DIP Financing Agreement, Which Should be Approved Under Bankruptcy  Code § 364(c) and (d)**

As described above, it is essential to the success of the Debtor's chapter 11 case that the Debtor immediately obtain access to sufficient post-petition financing.  The preservation of estate assets, the Debtor's continuing viability during this case and its ability to maximize distributions to creditors all depend heavily upon approval of the DIP

financing and the related actions requested through this Motion.

Bankruptcy Code § 364 distinguishes between (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or security.  If a debtor in possession cannot obtain post-petition credit on an unsecured basis, pursuant to Bankruptcy Code § 364(c) a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to super-priority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or combination of these protections.  Bankruptcy Code § 364(d) provides that a court may "prime" a lien only if a debtor in possession "is unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."

Because the Debtor proposes to obtain financing under the DIP Financing Agreement that is entitled to super-priority administrative expense status and is secured by a senior lien on property of the Debtor that already is encumbered, approval of the DIP Financing Agreement is governed by Bankruptcy Code §§ 364(c) and (d).

Bankruptcy courts routinely defer to a debtor-in-possession's business judgment on most business decisions, including the decision to borrow money.  See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943); In re Simasko Prod, Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).  As one court has noted, "[m]ore exacting scrutiny

would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

In general, bankruptcy courts often defer to the business judgment of a trustee or a debtor-in-possession regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. See In re Curlew Valley Assocs., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a trustee's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." Curlew Valley, 14 B.R., at 513-14 (footnotes omitted).

Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit, and the proposed borrowing is in the best interest of the estate. See, e.g., In re Ames Dept. Stores, 115 B.R. 34, 38 (Bankr. SDNY 1990) (observing that with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); In re Simasko Prod, Co., 47 B.R. at 448-449 (authorizing interim financing where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate).

The statutory requirement for obtaining post-petition credit under Bankruptcy Code § 364(c) is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under [Bankruptcy Code] § 503(b)(1) . . . as an administrative expense. See Ames Dept. Stores, 15 B.R. at 37-39 (reasoning

that a debtor must show that it has made a reasonable effort to seek other sources of
financing under Bankruptcy Code §§ 364(a) and (b)).  The statutory requirement for
obtaining post-petition credit under Bankruptcy Code § 364(d) is a finding, made after
notice and hearing, that the debtor in possession is "unable to obtain such credit
otherwise" and "there is adequate protection of the interest of the holder of the lien on
the property of the estate on which such senior or equal lien is proposed to be granted."
See, e.g., In re Campbell Sod, Inc., 378 B.R. 647, 652 (Bankr. D. Kan. 2007) (applying
"holistic" approach to conclude that financing was appropriate under Bankruptcy Code §
364(d)).

    "Some courts apply a three-part test to assess debtor in possession financing
requests under section 364(c), requiring a showing that (1) the debtor cannot obtain
credit unencumbered or without superpriority status under section 364(b), (2) the credit
transactions are necessary to preserve assets of the estate and (3) the terms of the
transaction are fair, reasonable and adequate, given the circumstances of the debtor in
possession-borrower and the proposed lender."   3 Collier on Bankruptcy ¶ 364.04[2]
(Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (collecting cases).  In this case, the
Agreement meets this standard and should be approved.  See id.; In re Aqua Assocs.,
123 B.R. 192, 195-196 (Bankr. E.D. Pa. 1991) (applying test to conclude that
"[o]btaining credit should be permitted not only because it is not available elsewhere,
. . . but also because the credit acquired is of significant benefit to the debtor's estate
and the terms of the proposed loan are within the bounds of reason").

    To show that the credit required is not otherwise available, a debtor need only
demonstrate "by a good faith effort that the credit was not available without" the

protections of Bankruptcy Code § 364(c) and (d).  In re Snowshoe Co., 789 F.2d 1085,

1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every

possible lender before concluding that such credit is unavailable."  Id. at 1088.  Where

few lenders are likely to be able and willing to extend the necessary credit to a debtor,

"it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive

search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. D. N.D. Ga.

1988), aff'd sub nom Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4

(N.D. Ga 1989).

        In this case, the Debtor and JLS engaged in arm's-length negotiations in the

days leading up to the Petition Date, resulting in the financing proposal discussed in this

Motion and proposed for approval by the Court.  At no time did JLS manifest a

willingness to extend the post-petition financing without the protections afforded under

Bankruptcy Code §§ 364(c) and (d).  Moreover, based on discussions with the Debtor's

advisors and the state of its own assets, the Debtor believes in its reasonable business

judgment that it is unable to obtain financing from any capital source without the

protections afforded under Bankruptcy Code §§ 364(c) and (d).  Among other things,

the Debtor recently sought secured bridge financing from its pre-petition noteholders,

and only JLS was willing to participate, thereby leaving the Debtor with no reasonable

belief as to the availability of any other source of post-petition financing.  Accordingly,

the Debtor believes that the terms and conditions detailed in the DIP Financing

Agreement are reasonable and justified under the circumstances.

        The Debtor's business judgment is that the proposed post-petition financing is

necessary to preserve the Debtor's assets and personal property and is in the best

interests of the Debtor's estates.  It is essential that the Debtor obtain the financing

necessary to continue, among other things, the orderly operation of the Debtor's

business and these bankruptcy cases, and to otherwise satisfy its working capital

requirements.  If the Debtor had not filed its bankruptcy petitions, the Debtor would have

run out of cash within a week.  Without immediate access to new borrowing relief, the

Debtor's business operations and its bankruptcy cases would grind to a halt, which

would certainly eliminate the Debtor's going concern value.

The Debtor submits that the terms of the DIP Financing Agreement are

reasonable and should be approved.  The proposed DIP Financing Agreement provides

that the security interests and super-priority claims granted to JLS are subject to the

Carve-Out described above.  Such carve-outs are not only reasonable but are

necessary to ensure the Debtors' estate is adequately assisted by counsel and other

professionals.  See Ames, 115 B.R. at 40.  Similarly, the Debtor believes that the fees

and other charges provided in the DIP Financing Agreement are reasonable and

appropriate under the circumstances.  The proposed fees under the DIP Financing

Agreement are within the parameters of market fee structures for similar post-petition

financing.  See, e.g. In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP

1992) (approving debtor in possession financing facility that included a lender

"enhancement fee").

Accordingly, the Court should approve the terms and conditions of the DIP

Financing Agreement pursuant to Bankruptcy Code § 364(c) and (d).

## II.    The Court Should Authorize the Use of Cash Collateral and the Granting of Adequate Protection Based upon Consent of the Secured Party

A debtor in possession may not use cash collateral without the consent of the secured party or court approval.  Bankruptcy Code § 363(c)(2) and (e).  In this case, the Debtor seeks authority to use cash collateral of JLS.  The Court should authorize the use of cash collateral because these parties have all consented to the Debtor's use of collateral pursuant to the terms of the DIP Financing Agreement and the proposed Orders approving the DIP financing.

As a result of the grant of the New DIP Liens, and the use of Cash Collateral authorized herein, JLS is entitled to receive adequate protection pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code for any diminution in value resulting from the automatic stay or Debtors' use, sale or lease of the JLS's Collateral (including Cash Collateral) during these bankruptcy cases.

## III.    The Court Should Modify the Automatic Stay Consistent with the Terms of the DIP Financing Agreement

Bankruptcy Code § 362 provides for an automatic stay upon the filing of a bankruptcy case.  As summarized above, the proposed DIP Financing Agreement contemplates a modification of the automatic stay (a) to permit the Debtor to grant certain liens and to perform the Debtor's obligations under the DIP Financing Agreement, (b) to permit the exercise of remedies by JLS following an event of default and (c) to authorize JLS to retain and apply payments made pursuant to the DIP Financing Agreement and the Interim and Final Orders; subject to certain notices required by the Interim and Final Orders, as applicable.  Upon the occurrence of an event of default, the DIP Lender is entitled to exercise the rights and remedies as set

forth in the DIP Financing Agreement.  The Debtor submits that, in the Debtor's

business judgment, such provisions are reasonable under the present circumstances.

Accordingly, the Debtor respectfully requests the Court to authorize the modification of

the automatic stay in accordance with the DIP Financing Agreement.

## IV.    JLS Should be Provided the Benefit and Protection of Bankruptcy Code § 364(e)

The Debtor believes that the terms and conditions of the DIP Financing

Agreement are the best possible under the circumstances of this case, and were

negotiated in good faith, at arm's length, and with the assistance of counsel on all sides.

Accordingly, JLS should be provided with the benefit and protection of Bankruptcy Code

§ 364(e), such that if any of the provisions of any order granting this Motion are later

modified, vacated, stayed, or terminated by subsequent order of this or any other court,

JLS would be fully protected with respect to any amounts advanced before such

modification, vacation, stay or termination.

## V.    Cause Exists to Waive the 14 Day Stay Otherwise Applicable Under Bankruptcy Rule 6004

Bankruptcy Rule 6004(h) provides that unless the Court orders otherwise, all orders

authorizing the sale of property under Bankruptcy Code § 363 are automatically stayed for

14 days after entry of the order.  The Debtor submits that cause exists to waive the

automatic 14 day stay otherwise applicable under Bankruptcy Rules 6004(h).  Without

an immediate infusion of working capital, the Debtor will run out of cash run within a

week.

## CONCLUSION

WHEREFORE, the Debtor respectfully request that the Court (1) enter an Interim

Order (i) authorizing the Debtor to (a) obtain post-petition secured DIP financing and (b)

to use cash collateral and grant adequate protection to JLS to the extent of any

diminution in value of JLS's Liens in the Collateral; (ii) granting liens and providing

super-priority administrative expense status; (iii) modifying the automatic stay, (iv)

granting related relief; and (2) subsequently enter a Final Order (i) granting the relief

provided through the Interim Order on a final basis and (b) authorizing the Debtor to

refinance its pre-petition secured debt.

Dated: October 18, 2018

COHNE KINGHORN, P.C.

/s/ George Hofmann
GEORGE HOFMANN
PATRICK E. JOHNSON

Proposed attorneys for the Debtor

# EXHIBIT A

***Prepared and Submitted by:***

George Hofmann (10005)
Patrick E. Johnson (10771)
**Cohne Kinghorn, P.C.**
111 East Broadway, 11th Floor
Salt Lake City, Utah 84111
Telephone: (801) 363-4300

Proposed attorneys for Sorenson Media, Inc.

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| In re: | Bankruptcy No. 18-27740 (WTT) |
|---|---|
| SORENSON MEDIA, INC., | Chapter 11 |
| Debtor. | |

## INTERIM ORDER PURSUANT TO
## 11 U.S.C. SECTIONS 105, 361, 362, 363, 364, 503(b) AND 507(a), RULES 2002, 4001 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND RULE 4001-2 OF THE LOCAL RULES OF PRACTICE FOR THE UNITED STATES BANKRUPTCY COURT, DISTRICT OF UTAH (I) AUTHORIZING THE DEBTOR (A) TO OBTAIN POST-PETITION SECURED DIP FINANCING AND (B) TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. SECTION 363 AND PROVIDING FOR ADEQUATE PROTECTION; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) MODIFYING THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF

THIS MATTER having come before this United States Bankruptcy Court for the District of Utah (the "Court") upon the motion (the "DIP Motion") by Sorenson Media, Inc. (the "Debtor"), as debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Case"), seeking, among other things, entry of an interim order (this "Interim Order"):

(i)      Authorizing the Debtor to obtain credit and incur debt, pursuant to sections 363, 364(c) and 364(d) of the Bankruptcy Code, on an interim basis for a period (the "Interim Period") from the entry of this Interim Order in this Case through and including the date of the final hearing (the "Final Hearing") to consider entry of an order (the "Final Order") granting the relief requested in the DIP Motion on a final basis up to the aggregate committed amounts set forth in the Budget (as defined below) for such period (and on terms and conditions more fully described herein), secured by, as set forth in the DIP Financing Agreement (as defined below), first priority, valid, perfected and enforceable liens (as defined in section 101(37) of chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code")) ("Liens") on all real and personal property of the Debtor's estate pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and with priority over all other administrative expenses as provided in section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained herein;

(ii)      Authorizing the Debtor to (a) establish that financing arrangement ("DIP Facility") pursuant to (I) the terms of the Senior, Secured Super-Priority Debtor-in-

Possession Credit Agreement (the "DIP Loan Agreement")[1], substantially in the form of **Exhibit "B"** to the DIP Motion, by and among the Debtor as borrower and JLS Holdings, LLC, as lender ("JLS"), and (II) all other agreements, documents, notes, certificates and instruments executed and/or delivered with, to, or in favor of JLS in connection with the DIP Loan Agreement, including, without limitation, the security agreements, notes, guaranties, mortgages and Uniform Commercial Code ("UCC") financing statements and all other related agreements, documents, instruments and certificates executed and/or delivered in connection therewith or related thereto (items (I) and (II), collectively, as the same may be amended, modified or supplemented and in effect from time to time, the "DIP Financing Agreement"); and (b) incur the Obligations under and as defined in the DIP Financing Agreement (collectively, the "DIP Obligations");

(iii)     Authorizing the use of the proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreement) in each case in a manner consistent with the terms and conditions of the DIP Financing Agreement, and in accordance with the Budget (as defined below) (subject to the terms and conditions of the DIP Financing Agreement) solely for (a) working capital and general corporate purposes and (b) payment of costs of administration of this Case, to the extent set forth in the Budget and the DIP Financing Agreement.

(iv)     Granting to JLS pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code continuing, valid, binding, enforceable, non-avoidable,

---

[1]     Capitalized terms used in this Interim Order but not defined herein shall have the meanings ascribed to such terms in the DIP Loan Agreement.

and automatically perfected post-petition security interests and Liens (the "<u>New DIP</u>
<u>Liens</u>"), senior and superior in priority to all other unsecured creditors of the Debtor's
estate, upon and to all of the Collateral granted under the terms of the DIP Financing
Agreement, which, for the avoidance of doubt, shall expressly include all real and
personal property of the Debtor now owned or hereafter acquired (excluding Avoidance
Actions of the Debtor, but including only the proceeds of Avoidance Actions brought
pursuant to section 549 of the Bankruptcy Code to recover any post-Petition Date
transfer of Collateral) and all other property of whatever kind and nature, in each case,
that is pledged as collateral under any Security Document, the Financing Orders or any
other order of the Bankruptcy Court in the Case, and all products, proceeds (cash and
non-cash), substitutions, and accessions of or to any of the foregoing;

(v)     Granting to JLS, pursuant to section 364(c)(1) of the Bankruptcy Code,
superpriority administrative claim status in respect of all DIP Obligations, subject only to
the Carve-Out as provided herein;

(vi)     Authorizing the use of "cash collateral" as such term is used in section 363
of the Bankruptcy Code ("<u>Cash Collateral</u>"), including in which JLS has an interest, in
accordance with the terms of this Interim Order and the DIP Financing Agreement;

(vii)     Granting the Replacement Liens and Superpriority Claims (each as
defined below) to JLS to the extent of any Pre-Petition Diminution in Value (as defined
below) of JLS's interest in the Pre-Petition Collateral (as defined below) as adequate
protection for the granting of the New DIP Liens to JLS, the use of Cash Collateral, and
as a result of the imposition of the automatic stay;

(viii)     Vacating and modifying the automatic stay imposed by section 362 of the

Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreement and this Interim Order; and

(ix)    Waiving the fourteen (14) day stay provisions of rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the Federal Rules of Bankruptcy Procedure are referred to herein as the "<u>Bankruptcy Rules</u>") and providing for immediate effectiveness of this Interim Order.

This Court having considered the DIP Motion, the exhibits attached thereto, the DIP Facility and the DIP Financing Agreement, and the evidence submitted at the hearing on this Interim Order (the "<u>Interim Hearing</u>"); and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), 9014 and Rule 4001-2 of the Local Rules of Practice for the United States Bankruptcy Court, District of Utah (the "<u>Local Rules</u>"), due and proper notice of the DIP Motion and the Interim Hearing having been given; an Interim Hearing having been held and concluded on October 24, 2018; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtor pending the Final Hearing and is otherwise fair and reasonable and in the best interests of the Debtor, its creditors, its estate and equity holders, and is essential for the continued operation of the Debtor's business; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    **Petition Date.**  On October 16, 2018 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code with this Court.  The

Debtor has continued in the management and operation of its business and assets as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Case.

B.  **Jurisdiction and Venue**.  This Court has jurisdiction over this proceeding, pursuant to 28 U.S.C. §§ 157(b) and 1334, and over the persons and property affected hereby.  Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for this Case and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.  **Committee Formation**.  A statutory committee of unsecured creditors has not yet been appointed in this Case.

D.  **Notice**.  The Interim Hearing was held pursuant to the authorization of Bankruptcy Rules 4001 and 6003 and Local Rule 4001-2.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtor, whether by telecopy, email, overnight courier or hand delivery on October 19, 2018, to certain parties in interest, including: (i) the Office of the United States Trustee for the District of Utah, Central Division (the "U.S. Trustee"), Attn: Vincent Cameron, 405 S Main Street # 300, Salt Lake City, UT 84111 (email: Vince.Cameron@usdoj.gov); (ii) the Internal Revenue Service and Utah State Tax Commission; (iii) the Debtors' twenty (20) largest unsecured creditors, (iv) counsel to JLS Holdings, LLC, Attn: Adelaide Maudsley (email: amaudsley@kmclaw.com), Kirton McConkie, 50 E. South Temple #400, Salt Lake City, Utah 84111, (v) counsel to J.P. Morgan Chase Bank, Attn: Daren W. Perkins, P.O. Box 655415, Dallas, Texas 75265-5415, and (vi) those parties who have filed a

notice of appearance and request for service of pleadings in this Case pursuant to Bankruptcy Rule 2002.

Under the circumstances, such notice of the Interim Hearing and the relief requested in the DIP Motion is due and sufficient notice and complies with sections 102(1), 364(c) and 364(d) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(c), 4001(d) and Local Rule 4001-2.

E.  **Debtor's Acknowledgements and Agreements.**  Without prejudice to the rights of other parties in interest as set forth in Section 7 below, the Debtor (on behalf of itself and its estate) admits, stipulates and acknowledges and agrees as indicated below that (collectively, subsections E (i) through E (vi) hereof shall be referred to herein as the "Debtor's Stipulations"):

(i)  **Pre-Petition Financing Agreements**.  The Debtor admits, stipulates, acknowledges and agrees that prior to the Petition Date, the Debtor incurred indebtedness consisting of loans and other financial accommodations pursuant to (a) the Note Purchase Agreement dated June 7, 2018 between the Debtor and JLS; (b) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $6,750,000 dated June 7, 2018 executed and delivered by the Debtor to JLS; (c) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $2,000,000 executed and delivered by the Debtor to JLS; and (d) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $1,400,000, dated July 5, 2018, executed and delivered by the Debtor to JLS; (e) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $900,000 dated July 12, 2018 executed and delivered by the Debtor to JLS; (f) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $1,200,000 dated July 18, 2018 executed and delivered by the Debtor to JLS; (g) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $1,300,000 dated July 24, 2018 executed and delivered by the Debtor to JLS; (h) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $400,000 dated August 1, 2018 executed and delivered by the Debtor to JLS; (i) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $280,000 dated

August 9, 2018 executed and delivered by the Debtor to JLS; (j) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $1,600,000 dated August 16, 2018 executed and delivered by the Debtor to JLS; (k) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $1,900,000 dated August 22, 2018 executed and delivered by the Debtor to JLS; (l) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $1,750,000 dated September 4, 2018 executed and delivered by the Debtor to JLS; (m) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $465,000 dated September 13, 2018 executed and delivered by the Debtor to JLS; (n) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $1,480,000 dated September 19, 2018 executed and delivered by the Debtor to JLS; (o) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $300,000 dated October 3, 2018 executed and delivered by the Debtor to JLS; (p) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $263,000 dated October 15, 2018 executed and delivered by the Debtor to JLS; and (q) all other agreements, documents, notes, certificates and instruments executed and/or delivered with, to, or in favor of JLS related to any of the foregoing documents, including, without limitation, all notes, mortgages, UCC financing statements and all other related agreements, documents, certificates and instruments executed and/or delivered in connection therewith or related thereto (collectively, and as the same may be amended, modified or supplemented and in effect from time to time, the "Pre-Petition Financing Agreements").

(ii)    **Pre-Petition Debt Amount.**    The Debtor admits, stipulates, acknowledges and agrees that as of October 16, 2018, the Debtor was obligated to pay JLS $21,988,000; plus interest accrued and accruing, costs, expenses, fees (including attorneys' fees and legal expenses) other charges and other obligations (the "Pre-Petition Debt").    The Debtor admits, stipulates, acknowledges and agrees that the Pre-Petition Debt owed to JLS was extended as a protective advance to maintain the Debtor's business operations while the Debtor considered and pursued various options for restructuring its business.    Without the Pre-Petition Debt, the Debtor would not have had sufficient available sources of working capital and financing to carry on the operation of its business or to seek to restructure the Debtor's business.

(iii)    **Pre-Petition Collateral.**    The Debtor admits, stipulates, acknowledges and agrees that to secure the Pre-Petition Debt, the Debtor granted security interests and Liens (the "Pre-Petition Liens") to JLS pursuant to the Pre-Petition Financing Agreements on all or substantially

all of its assets and personal property (collectively, the "Pre-Petition Collateral").

(iv)    **Pre-Petition Liens**.  The Debtor admits, stipulates, acknowledges and agrees that as of the Petition Date (i) the Pre-Petition Liens on the Pre-Petition Collateral were not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (ii) the Pre-Petition Debt constituted legal, valid and binding obligations of Debtor, enforceable in accordance with the terms of the Pre-Petition Financing Agreements (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), no offsets, defenses or counterclaims to any of the Pre-Petition Debt existed, and no portion of the Pre-Petition Debt was subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iii) the Pre-Petition Debt constituted allowable secured claims.  The Debtor admits, stipulates, acknowledges and agrees that on and as of the date that this Interim Order is entered, the Debtor has waived, discharged and released JLS, together with its affiliates, agents, attorneys, officers, directors and employees, of any right the Debtor may have (x) to challenge or object to any of the Pre-Petition Debt, (y) to challenge or object to the security for the Pre-Petition Debt, and (z) to bring or pursue any and all claims, objections, challenges, causes of action and/or choses in action arising out of, based upon or related to the Pre-Petition Financing Agreements or otherwise.

The Debtor does not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Financing Agreements or the Pre-Petition Liens, and/or security interests in the Pre-Petition Collateral, or any claim of JLS pursuant to the Pre-Petition Financing Agreements.

(v)    **Value of Pre-Petition Collateral.**  The Debtor acknowledges that after investigation it could be determined that the aggregate value of the Pre-Petition Collateral granted to JLS pursuant to the Pre-Petition Financing Agreements exceeded the amount of the Pre-Petition Debt as of the Petition Date and, accordingly, that it could be determined that all of the Pre-Petition Debt constitutes an over-secured claim within the meaning of section 506(b) of the Bankruptcy Code.

(vi)    **Cash Collateral**.  JLS has a security interest and Lien in Cash Collateral, including on all amounts on deposit in the Debtor's banking, checking, or other deposit accounts and all proceeds of the Pre-Petition Collateral to secure the Pre-Petition Debt, to the same extent and order of priority as that which was held by JLS prior to the filing of this Case.

F.      **Findings Regarding the Post-Petition Financing.**

(i)      **Need for Post-Petition Financing and Use of Collateral**.   An immediate need exists for the Debtor (A) to obtain funds from the DIP Facility in order to fund the working capital requirements and other financing needs of the Debtor, and (B) to use the Collateral, including the Cash Collateral.   The ability of the Debtor to finance its operations, to preserve and maintain the value of the Debtor's assets, and to maximize a return for all creditors requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtor, its estate, its creditors, its equity holders, and the possibility for a successful reorganization or sale of the Debtor's assets as a going concern or otherwise.

(ii)      **No Credit Available on More Favorable Terms**.   The Debtor has been unable to obtain (A) unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense, (B) credit for money borrowed secured solely by a Lien on property of the estate that is not otherwise subject to a Lien, (C) credit for money borrowed secured by a junior Lien on property of the estate which is subject to a Lien, or (D) additional post-petition liquidity or a consent to use "cash collateral" as such term is defined in section 363 of the Bankruptcy Code from or of JLS under the terms of the Pre-Petition Financing Agreements, in each case, (A) through (C) on more favorable terms and conditions than those provided in the DIP Financing Agreement and this Interim Order, and, in the case of (D), on terms other than those provided in the DIP Financing Agreement and this Interim Order.

(iii)      **Prior Liens**.   Nothing herein shall constitute a finding or ruling by this Court that any Pre-Petition Liens are valid, senior, perfected and unavoidable.   Moreover, nothing herein shall prejudice the rights of any party in interest including, but not limited to, any committee appointed pursuant to section 1102 of the Bankruptcy Code, to challenge the validity, priority, perfection and extent of any such Pre-Petition Lien, subject to the time periods set forth in Section 7 of this Interim Order.

G.      **Section 506(c) Waiver.**   Subject to and effective only upon entry of the

Final Order, except to the extent of the Carve-Out, no expenses of administration of this

Case or any future proceeding that may result therefrom, including liquidation in

bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against

or recovered from the Collateral, pursuant to section 506(c) of the Bankruptcy Code or

any similar principle of law, without the prior written consent of JLS, and no such consent shall be implied from any other action or inaction by JLS.

H.      **Roll-Up of Pre-Petition Debt.**  JLS will request approval to irrevocably repay in full an amount equal to the Pre-Petition Debt in full satisfaction and cancellation of the Pre-Petition Debt from the proceeds of the DIP Facility (the "Pre-Petition Debt Payoff") upon entry of the Final Order, which request will be delayed until the Final Hearing on the DIP Facility.  This Court specifically does not approve such Pre-Petition Debt Payoff as part of the DIP Facility at this time, but will consider the issue at the Final Hearing.

I.      **Use of Proceeds of the DIP Facility**.  Proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Financing Agreement, and in accordance with the Budget (as defined below) (subject to the terms and conditions of the DIP Financing Agreement), solely for (a) working capital and general corporate purposes, (b) payment of costs of administration of this Case, to the extent set forth in the Budget, and (c) upon entry of the Final Order, the Pre-Petition Debt Payoff in accordance with the DIP Financing Agreement, which shall constitute a roll-up under the DIP Financing Agreement.

J.      **Adequate Protection.**  As a result of the grant of the New DIP Liens, and the use of Cash Collateral authorized herein, JLS is entitled to receive adequate protection pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code for any Pre-Petition Diminution in Value (as defined below) resulting from the automatic stay or Debtor's use, sale or lease of the Pre-Petition Collateral (including Cash Collateral)

during this Case.  As adequate protection, JLS will receive: (1) the Replacement Liens

and (2) the Superpriority Claim.

K.    **Extension of Financing**.  JLS has indicated a willingness to provide

financing to the Debtor in accordance with the DIP Financing Agreement and subject to

(i) the entry of this Interim Order and a Final Order, and (ii) findings by this Court that

such financing is essential to the Debtor's estate, that JLS is a good faith financier, and

that JLS's claims, superpriority claims, security interests and Liens and other

protections granted pursuant to this Interim Order (and the Final Order) and the DIP

Facility will not be affected by any subsequent reversal, modification, vacatur or

amendment of this Interim Order or the Final Order or any other order, as provided in

section 364(e) of the Bankruptcy Code.  The New DIP Liens shall not be (i) subject or

subordinate to (A) any Lien or security interest that is avoided and preserved for the

benefit of the Debtor and its estate under section 551 of the Bankruptcy Code or (B) any

Liens arising after the Petition Date or (ii) subordinated to or made *pari passu* with any

other Lien or security interest under sections 363 or 364 of the Bankruptcy Code or

otherwise.

L.    **Business Judgment and Good Faith Pursuant to Section 364(e)**.  The

terms and conditions of the DIP Facility and the DIP Financing Agreement, and the fees

paid and to be paid thereunder are (i) fair, reasonable, and the best available under the

circumstances, reflect the Debtor's exercise of prudent business judgment consistent

with its fiduciary duties, and are supported by reasonably equivalent value and

consideration; (ii) the DIP Facility and the use of the Collateral (including, without

limitation, the Cash Collateral) was negotiated in good faith and at arms' length between

the Debtor and JLS, and (iii) use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, the consequence of which is that JLS is entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

M.   **Relief Essential; Best Interest; Good Cause.**   The relief requested in the DIP Motion (and as provided in this Interim Order), including, without limitation, the establishment of the DIP Facility and the use of the Collateral (including, without limitation, the Cash Collateral), is necessary, essential, and appropriate for the continued operation of the Debtor's business and the management and preservation of the Debtor's assets and personal property.   It is in the best interest of the Debtor's estate to be allowed to establish the DIP Facility and to use the Collateral (including, without limitation, the Cash Collateral) contemplated by the DIP Financing Agreement. Good cause has been shown for the relief requested in the DIP Motion (and as provided in this Interim Order).

N.   **Entry of Interim Order**.   For the reasons stated above, the Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

**NOW, THEREFORE**, on the DIP Motion of the Debtor and the record before this Court with respect to the DIP Motion, and with the consent of the Debtor and JLS to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.   **Motion Granted**.   The DIP Motion is granted on an interim basis in accordance with the terms and conditions set forth in this Interim Order and the DIP

Financing Agreement.

2.  **DIP Financing Agreement**.

(a)  **Approval of Entry Into DIP Financing Agreement.**  The Debtor is expressly and immediately authorized, empowered and directed to execute and deliver the DIP Financing Agreement and to incur and to perform the DIP Obligations, in accordance with, and subject to, the terms of this Interim Order and the DIP Financing Agreement (including, without limitation, the Budget), and to execute and deliver all instruments, certificates, agreements and documents which may be required or necessary for the performance by the Debtor under the DIP Facility and the creation and perfection of the New DIP Liens described in and provided for by this Interim Order and the DIP Financing Agreement; provided, however, that the Debtor need not execute any security agreement granting JLS, in its role as lender under the DIP Financing Agreement, a senior security interest in the Pre-Petition Collateral until the entry of the Final Order granting such senior security interest.  The Debtor is hereby authorized and directed to do and perform all acts, pay the principal, interest, fees, expenses and other amounts described in the DIP Financing Agreement and all other DIP Financing Agreement as such become due, including, without limitation, closing fees, administrative fees, origination fees, and reasonable attorneys', financial advisors' and accountants' fees and disbursements as provided for in the DIP Financing Agreement, which amounts shall not otherwise be subject to approval of this Court; provided, however, that unresolved disputes as to the reasonableness of any professional fees and expenses may be determined by this Court.  Upon execution and delivery, the DIP Financing Agreement shall represent valid and binding obligations of the Debtor

enforceable against the Debtor in accordance with their terms.

(b)    **Authorization to Borrow**.

(i)    In order to enable the Debtor to continue to operate its business during the Interim Period and subject to the terms and conditions of this Interim Order, the DIP Financing Agreement, the other DIP Financing Agreement, and the Budget (as defined below) (subject to any variances thereto permitted under the terms and conditions of the DIP Financing Agreement), the Debtor is hereby authorized to borrow under the DIP Facility, and subject to entry of the Final Order, Debtor shall be authorized under the DIP Facility to consummate Pre-Petition Debt Payoff, which shall constitute a roll-up under the DIP Financing Agreement, and in doing all of the foregoing, to borrow up to a total committed amount of up to $26,488,000.

(ii)    Upon execution and delivery of the DIP Financing Agreement, such DIP Financing Agreement shall constitute valid, binding and non-avoidable obligations of the Debtor enforceable against the Debtor in accordance with their respective terms and the terms of this Interim Order for all purposes during this Case, any subsequently converted case of the Debtor under chapter 7 of the Bankruptcy Code, or after the dismissal of this Case.  No obligation, payment, assignment or repayment thereof or recovery on or in respect thereof, transfer or grant of security under the DIP Financing Agreement, or this Interim Order shall be stayed, restrained, revocable, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction,

setoff, recoupment or counterclaim.

(c)     **Application of DIP Proceeds**.  The proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Financing Agreement, and in accordance with the Budget (as defined below) (subject to any variances thereto permitted under the terms and conditions of the DIP Financing Agreement) solely for (a) working capital and general corporate purposes, to the extent set forth in the Budget, (b) payment of costs of administration of this Case, to the extent set forth in the Budget, and (c) upon entry of the Final Order, the Pre-Petition Debt Payoff in accordance with the DIP Financing Agreement, which shall constitute a roll-up under the DIP Financing Agreement.

(d)     **Conditions Precedent**.  JLS shall have no obligation to make any loan or advance under the DIP Financing Agreement during the Interim Period unless the conditions precedent to make such loan under the DIP Financing Agreement have been satisfied in full or waived by JLS in its sole discretion.

(e)     **Liens.**  Effective immediately upon the entry of this Interim Order, JLS is granted pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and New DIP Liens, senior and superior in priority to all unsecured creditors of the Debtor's estate, upon and to all of the Collateral, which, for the avoidance of doubt, shall include all real and personal property of the Debtor now owned or hereafter acquired (excluding Avoidance Actions of the Debtor, but including only the proceeds of Avoidance Actions brought pursuant to

section 549 of the Bankruptcy Code to recover any post-Petition Date transfer of Collateral) and all other property of whatever kind and nature, in each case, that is pledged as collateral under any Security Document, the Financing Orders or any other order of the Bankruptcy Court in these Cases, and all products, proceeds (cash and non-cash), substitutions, and accessions of or to any of the foregoing, and that prior to the entry of the Final Order, JLS, in its role as lender under the DIP Financing Agreement, shall have a second lien security interest in the Pre-Petition Collateral (including Cash Collateral).

(f)     **DIP Lien Priority**.  The New DIP Liens created and granted to JLS, as provided herein, (a) are created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, (b) are first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or Lien or claim to any of the Collateral, subject only to: (x) the Carve-Out, (y) the Permitted Liens, and (z) until entry of the Final Order, the liens held by JLS, in its capacity as Pre-Petition Lender, in the Pre-Petition Collateral (including Cash Collateral).   The New DIP Liens shall secure all DIP Obligations (including, but not limited to, the advances under the DIP Facility used to effectuate the Pre-Petition Debt Payoff).  The New DIP Liens shall not be made subject to or *pari passu* with any Lien or security interest by any court order heretofore or hereafter entered in this Case except for the Permitted Liens and the Carve-Out; and shall be valid and enforceable against any trustee subsequently appointed in this Case, upon the conversion of this Case to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "Successor Case"), and/or upon the dismissal of this Case.  The New DIP Liens shall not be subject to sections

510, 549, 550 or 551 of the Bankruptcy Code, or if approved in the Final Order, section 506(c) of the Bankruptcy Code.   The New DIP Liens shall not be (i) subject or subordinate to (A) any Lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code or (B) any Liens arising after the Petition Date or (ii) subordinated to or made *pari passu* with any other Lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

(g)     **Enforceable Obligations**. The DIP Financing Agreement (including, without limitation, the DIP Obligations evidenced thereby) shall constitute and evidence the valid and binding obligations of the Debtor, which obligations shall be enforceable against the Debtor, its estate and any successors thereto, and its creditors, in accordance with their terms.

(h)     **Budget**.   From and after the Petition Date, the Debtor shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Financing Agreement and this Interim Order and in accordance with the Budget (subject to the terms and conditions of the DIP Financing Agreement).

(i)     **Superpriority Administrative Claim Status**.   Subject to the Carve-Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "DIP Superpriority Claim" and, together with the New DIP Liens, the "DIP Protections") with priority (except as otherwise provided in Section 8 below) in this Case or any Successor Case under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims, adequate protection claims, and

all other claims against the Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330 of the Bankruptcy Code (except as otherwise provided in Section 8 below), 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code, and, if approved in the Final Order, section 506(c) of the Bankruptcy Code), whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.  Other than the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or may be incurred in this proceeding, or in any Successor Case, and no priority claims are, or will be, senior to, prior to (subject to the Superpriority Claim as set forth in this Interim Order), or on a parity with the DIP Protections or the DIP Obligations, or with any other claims of JLS arising hereunder.

3.     **Authorization to Use Proceeds of DIP Financing Agreement**.

(a)   The Debtor shall use the DIP Loans and the Collateral (including, without limitation, the Cash Collateral) solely as provided in this Interim Order and the DIP Financing Agreement, and in accordance with the Budget.  Pursuant to the terms and conditions of this Interim Order, the DIP Facility and the DIP Financing Agreement, and in accordance with the budget attached hereto as **Exhibit "A"** (as the same may be modified, supplemented or updated from time to time consistent with the terms of the DIP Financing Agreement and this Interim Order, the "Budget"), the Debtor is authorized to use Collateral (including, without limitation, Cash Collateral) and to use the advances

under the DIP Financing Agreement (during the period commencing immediately after
the entry of the Interim Order and terminating upon termination of the commitment to
fund the DIP Facility pursuant to the provisions of this Interim Order).  The Budget may
be updated (with the consent and/or at the request of JLS, subject to the provisions of
the DIP Financing Agreement), from time to time, provided that such updated Budget
shall be in form and substance acceptable to JLS, and the Debtor shall be required
always to comply with the Budget, subject to the Permitted Variances, and the DIP
Financing Agreement pursuant to the terms of the DIP Facility.  Nothing in this Interim
Order shall authorize the disposition of any assets of the Debtor or its estate outside the
ordinary course of business or other proceeds resulting therefrom, except as permitted
pursuant to the DIP Facility, the DIP Financing Agreement and this Interim Order.

(b)      Neither the advances under the DIP Financing Agreement nor any of the
Collateral (including, without limitation, the Cash Collateral) may be used by the Debtor,
any committee appointed pursuant to section 1102 of the Bankruptcy Code, or any
other person or entity to object to or contest in any manner, or raise any defenses to the
validity, extent, perfection, priority, or enforceability of the Pre-Petition Debt or any Pre-
Petition Liens with respect thereto or any other rights or interests of JLS, or to assert
any claims or causes of action, including, without limitation, any Avoidance Actions,
against JLS.

4.      **Adequate Protection.**  As adequate protection for the interest of JLS in
the Pre-Petition Collateral (including Cash Collateral) on account of the granting of the
New DIP Liens, the Debtor's use of Cash Collateral and other decline in value arising
out of the automatic stay or the Debtor's use, sale, depreciation, or disposition of the

Pre-Petition Collateral (the "Pre-Petition Diminution in Value"), JLS shall receive adequate protection as follows:

(a) **Replacement Liens.** Solely to the extent of the Pre-Petition Diminution in Value of the interests of JLS in the Pre-Petition Collateral, JLS shall have, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code additional and replacement security interests and Liens in the Collateral (the "Replacement Liens"), which shall be junior only to the Carve-Out as provided herein.

(b) **Superpriority Claim.** Solely to the extent of the Pre-Petition Diminution in Value of the interest of JLS in the Pre-Petition Collateral, JLS shall have an allowed superpriority administrative expense claim pursuant to Bankruptcy Code section 507(b) (the "Superpriority Claim") which shall have priority (except with respect to the New DIP Liens, the DIP Superpriority Claim, and the Carve-Out) over any other claims under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114 of the Bankruptcy Code and, if approved in the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses of claims may become secured by a judgment or other non-consensual Lien, levy or attachment.

(c) **Adequate Protection Upon Sale of Collateral.** Upon the sale of any Collateral pursuant to section 363 of the Bankruptcy Code, any such Collateral shall be

sold free and clear of any Permitted Liens, the Pre-Petition Liens and the Replacement Liens; provided, however, that such Liens shall attach to the proceeds of any such sale in the order and priority as established by final order of this Court.

5.      **Section 507(b) Reservation.**  Nothing herein shall impair or modify JLS's right to seek additional adequate protection in the event that the adequate protection provided hereunder is insufficient to compensate for the Pre-Petition Diminution in Value of the interest of JLS in the Pre-Petition Collateral during this Case or any Successor Case.

6.      **Lien Perfection**.

(a)      With respect to the New DIP Liens and the Replacement Liens approved by this Interim Order, this Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the New DIP Liens and the Replacement Liens, without the necessity of filing or recording any financing statement, deed of trust, mortgage, assignment or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreements) to validate or perfect the New DIP Liens or the Replacement Liens or to entitle the New DIP Liens or the Replacement Liens to the priorities granted herein.  Notwithstanding the foregoing, with respect to the New DIP Liens and the Replacement Liens approved by this Interim Order, JLS may, in its sole discretion, file such financing statements, mortgages, security agreements, assignments, notices of Liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and

with respect to the New DIP Liens, all such financing statements, mortgages, security agreements, assignments, notices and other documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.  Upon request, the Debtor shall execute and deliver to JLS all such financing statements, mortgages, notices and other documents as JLS may reasonably request to evidence, confirm, validate or perfect, or to ensure the contemplated priority of, the New DIP Liens and the Replacement Liens granted pursuant hereto.  JLS, in its discretion, may file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any county recorder or similar office in any jurisdiction in which the Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order.

(b) This Interim Order shall be sufficient and conclusive evidence that JLS shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee, as applicable, on each insurance policy maintained now or in the future by the Debtor which in any way relates to the Collateral.  Notwithstanding the foregoing, the Debtor is authorized and directed to take any actions that JLS shall request, in its sole and absolute discretion, to have JLS added as an additional insured and loss payee on each insurance policy.

7.    **Reservation of Certain Third Party Rights and Bar of Challenges and Claims.**  Nothing in this Interim Order or the DIP Financing Agreement, including, without limitation, the Debtor's Stipulations, shall prejudice whatever rights any committee appointed pursuant to section 1102 of the Bankruptcy Code or any other

party in interest with requisite standing, including, for the avoidance of doubt, any

subsequently appointed chapter 7 and 11 trustee (other than the Debtor) may have (a)

to file a contested matter or an adversary proceeding or otherwise to object to or

challenge the findings herein that pertain to the Pre-Petition Debt, including, but not

limited to, those in relation to (i) the validity, extent, perfection, enforceability or priority

of the Pre-Petition Liens in and to the Pre-Petition Collateral, or (ii) the validity,

allowability, priority, status or amount of the Pre-Petition Debt, or (b) to bring suit or

otherwise assert any claims or causes of action against JLS in connection with or

related to the Pre-Petition Financing Agreements, or the actions or inactions of JLS

arising out of or related to the Pre-Petition Financing Agreements; provided, however,

that, unless any committee appointed pursuant to section 1102 of the Bankruptcy Code

or any other party in interest with requisite standing commences a contested matter or

adversary proceeding raising such objection or challenge that pertains to the Pre-

Petition Debt, including, without limitation, any claim against JLS in the nature of a

setoff, counterclaim or defense to the Pre-Petition Debt (including, but not limited to,

those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code

or by way of suit against JLS), within the earlier of (a) 60 days after the formation of any

committee pursuant to section 1102 of the Bankruptcy Code, or (b), if no committee is

formed pursuant to section 1102 of the Bankruptcy Code, 75 days following entry of the

Interim Order for all other parties (collectively, (a) and (b) shall be referred to herein as

the "Challenge Period," and the date that is the next calendar day after the termination

of the Challenge Period shall be referred to herein as the "Challenge Period Termination

Date"), upon the Challenge Period Termination Date, (i) any and all such contested

matters, adversary proceedings and other objections and challenges by any party
(including, without limitation, all creditors, any committee appointed pursuant to section
1102 of the Bankruptcy Code, any chapter 11 or chapter 7 trustee appointed herein or
in any Successor Case, receivers, administrators, examiners with expanded powers,
responsible officers, other estate representatives appointed in this Case or any
Successor Case or in any jurisdiction, and all other parties in interest) as to the findings
in this Interim Order and/or the Debtor's Stipulations shall be deemed to be forever
waived and barred, (ii) the Pre-Petition Debt shall be deemed to be allowed in full and
shall be deemed to be allowed as fully secured claims within the meaning of section 506
of the Bankruptcy Code for all purposes in connection with this Case and any
Successor Case, (iii) the Pre-Petition Liens shall be deemed to have been, as of the
Petition Date, legal, valid, binding, perfected security interests and Liens, not subject to
recharacterization, subordination or otherwise avoidable, and (iv) the Debtor's
Stipulations shall be binding on all parties (including, without limitation, all creditors, any
committee appointed pursuant to section 1102 of the Bankruptcy Code, any chapter 11
or chapter 7 trustee appointed herein or in any Successor Case, receivers,
administrators, examiners with expanded powers, responsible officers, other estate
representatives appointed in this Case or in any Successor Case or in any jurisdiction,
and all other parties in interest).  To the extent any such contested matter, adversary
proceeding or other objection or challenge is filed, JLS shall be entitled to include such
costs and expenses, including, but not limited to reasonable attorneys' fees, incurred in
defending the objection or complaint as part of the Pre-Petition Debt, in each case, to
the extent allowable under section 506(b) of the Bankruptcy Code.

8.    **Carve-Out**.    During the Interim Period and subject to the terms and conditions contained in this Section 8, the New DIP Liens, the DIP Superpriority Claim, the Pre-Petition Liens, the Replacement Liens and the Superpriority Claim are subordinate only to the following items (a), (b), (c) and (d) (items (a), (b), (c) and (d), collectively, the "Carve-Out"): (a) all fees required to be paid to the Clerk of the Bankruptcy Court and the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 to the extent such interest is awarded by final order of this Court; (b) to the extent allowed fees, expenses and disbursements of professionals retained by order of this Court by the Debtor or any committee appointed pursuant to section 1102 of the Bankruptcy Code in this Case (the "Professionals") incurred (i) prior to the entry of this Interim Order and (ii) thereafter, in accordance with the Budget; and (c) up to $50,000 of allowed fees, expenses and disbursements of the Professionals (the "Professional Fee Carve-Out Cap") incurred after the occurrence of the Termination Date (defined in this paragraph below); and (d) the sum of $100,000 (the "Wind-Down Amount"); provided, however, that in each case (a), (b), (c) and (d), such fees and expenses are approved by this Court, or such lesser amount so approved.    To the extent not previously funded in accordance with the terms of this Interim Order, JLS shall deposit the Carve-Out (including, without limitation, the Wind-Down Amount) into a deposit account specified by the Debtor upon the Termination Date (as defined below).    For the purposes hereof, the "Termination Date" shall occur upon the earliest to occur of: (i) the Term Loan Maturity Date (as defined in the DIP Financing Agreement); (ii)  the occurrence and during the continuance of an Event of Default under the DIP Agreement; and (iii) a material breach by the Debtor of this

Interim Order; and, in each case, (i) through (iii) upon delivery of a written notice thereof

by JLS to the Debtor and its counsel and the counsel for any committee appointed

pursuant to section 1102 of the Bankruptcy Code specifying that such notice constitutes

a notice that the Termination Date has occurred (a "<u>Termination Notice</u>").   Upon the

delivery of a Termination Notice, the right of the Debtor to pay professional fees

incurred under clause (b) above without reduction of the Professional Fee Carve-Out

Cap in clause (c) above shall terminate and upon receipt of such notice, the Debtor

shall provide immediate notice by email to all retained professionals informing them that

the Termination Date has occurred and that the Debtor's ability to pay professionals is

subject to the Professional Fee Carve-Out Cap.    Upon the occurrence of the

Termination Date and the full and final funding of the Carve-Out (including, without

limitation, the Wind-Down Amount), there shall be no further obligations on the part of

JLS regarding the Carve-Out (including, without limitation, the Wind-Down Amount), any

Professional's fees and expenses, any U.S. Trustee Fees or any other fees and

expenses of the Debtor's estate in this Case or in any Successor Case or proceedings.

JLS's obligation to fund or otherwise pay the Carve-Out (including, without limitation, the

Wind-Down Amount), shall be added to and made a part of the DIP Obligations,

secured by the New DIP Liens, and JLS shall be entitled to all of the rights, claims

Liens, priorities, and protections under this Interim Order, the DIP Financing Agreement,

the Bankruptcy Code and/or applicable law in connection therewith.    Subject to the

provisions of this Section 8, the Carve-Out (including, without limitation, the Wind-Down

Amount) shall exclude any fees and expenses (x) incurred in connection with the

assertion or joinder in any claim, counterclaim, action, proceeding, application, motion,

objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (A) invalidating, setting aside, avoiding, or subordinating, in whole or in part, (1) the DIP Obligations, (2) JLS's Liens in the Collateral, (3) the Pre-Petition Debt or (4) the Pre-Petition Liens or (B) preventing, hindering or delaying, whether directly or indirectly, JLS's assertions or enforcement of its Liens, security interests or realization upon any Collateral, provided, however, that solely with respect to the Pre-Petition Lien in the Pre-Petition Collateral, such exclusion does not encompass any investigative work, at an aggregate expense not to exceed $10,000, conducted by the Professionals prior to bringing any action relating to the foregoing, (y) related to the proposed sale or the disposition of any other Collateral, or incurrence of indebtedness not permitted under the DIP Financing Agreement, except with JLS's express written consent or (z) arising after the conversion of this Case to a case under chapter 7 of the Bankruptcy Code.   JLS may implement reserves in accordance with the terms and conditions of the DIP Financing Agreement.   Except for a lien obligation to fund the Carve-Out (including, without limitation, the Wind-Down Amount) as set forth in this Interim Order and the DIP Financing Agreement, nothing herein shall be construed to obligate JLS, in any way, to pay the Professionals' fees or U.S. Trustee Fees, or to assure that the Debtor has sufficient funds on hand to pay any Professional Fees, U.S. Trustee Fees or other liabilities or obligations of the Debtor.

9.    **Payment of Compensation.**   Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of the Debtor, any committee appointed pursuant to section 1102 of the Bankruptcy Code or of any person

or shall affect the right of JLS to object to the allowance and payment of such fees and expenses or to permit the Debtor to pay any such amounts not set forth in the Budget.

10. **Section 506(c) Claims; Roll Up.**

(a)    Subject to and effective upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of this Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of JLS, and no such consent shall be implied from any other action or inaction by JLS; and

(b)    Subject to and effective upon entry of the Final Order, the Debtor shall be authorized to make payment to JLS in an amount necessary to accomplish the Pre-Petition Debt Payoff, which shall constitute a roll-up under the DIP Financing Agreement, in accordance with the terms of the Final Order and the DIP Financing Agreement.

11. **Collateral Rights**.  Unless JLS has provided its prior written consent or the Pre-Petition Debt and all DIP Obligations have been indefeasibly paid in full in cash (or will be paid in full in cash upon entry of an order approving indebtedness, if any, described in subparagraph (a) below), all commitments to lend have terminated, and all indemnity obligations under the DIP Financing Agreement have been cash secured to the reasonable satisfaction of JLS, there shall not be entered in this proceeding, or in any Successor Case, any order which authorizes any of the following:

(a)    the obtaining of credit or the incurring of indebtedness that is secured by a

security, mortgage, or collateral interest or other Lien on all or any portion of the Collateral and/or entitled to priority administrative status which is equal or senior to those granted to JLS; or

(b)      the use of Collateral (including, without limitation Cash Collateral) for any purpose other than to pay in full in cash the DIP Obligations or as otherwise permitted in this Interim Order and the DIP Financing Agreement; or

(c)      the Debtor's return of goods constituting Collateral pursuant to section 546(h) of the Bankruptcy Code, except as permitted in the DIP Financing Agreement.

12.      **Proceeds of Subsequent Financing.**  Without limiting the provisions and protections of Section 11 above, if at any time prior to the repayment in full of all DIP Obligations and the termination of JLS's obligations to make loans and advances under the DIP Facility, including subsequent to the confirmation of any chapter 11 plan (the "Plan") with respect to the Debtor, and the repayment in full of the Pre-Petition Debt, the Debtor's estate, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) in violation of the DIP Financing Agreement, then all of the cash proceeds derived from such credit or debt or such sale or issuance shall immediately be turned over (a) first, to JLS for application to the Pre-Petition Debt pursuant to the Pre-Petition Financing Agreements; and (b) second, to JLS for application to the DIP Obligations outstanding pursuant to the terms of the DIP Financing Agreement, in accordance with the terms of this Interim Order.

13.      **Disposition of Collateral.**  The Debtor shall not (a) sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written

consent of JLS (and no such consent shall be implied, from any other action, inaction or acquiescence by JLS or an order of this Court), except for sales of the Debtor's services in the ordinary course of business or as permitted by the DIP Financing Agreement and this Interim Order and as approved by this Court, or (b) assume, reject or assign any leasehold interest without the prior consultation with JLS, except in each case of (a) and (b), as otherwise permitted by the DIP Financing Agreement.

14.     **Remedies After Event of Default.**

(a)     The automatic stay under section 362 of the Bankruptcy Code is vacated and modified to the extent necessary to permit JLS to exercise, upon the occurrence of the Termination Date and at any time thereafter upon five (5) business days' prior notice to the Debtor, counsel to the Debtor, counsel for any committee appointed pursuant to section 1102 of the Bankruptcy Code, and the U.S. Trustee ("Default Notice Period") of such occurrence, all rights and remedies provided for in the DIP Financing Agreement (including, without limitation and without prior notice, the right to freeze monies or balances in the Debtor's accounts or set off monies or balances of the Debtor in accounts maintained by JLS, the right to charge the Post-Default Rate, terminate commitments and cease funding under the DIP Agreement).   Notwithstanding the occurrence of the Termination Date or termination of the commitments to fund under the DIP Agreement or anything herein, all of the rights, remedies, benefits, and protections provided to JLS under the DIP Financing Agreement and this Interim Order shall survive.   The Debtor and/or any committee appointed pursuant to section 1102 of the Bankruptcy Code shall be entitled to seek an expedited hearing regarding an Event of Default or termination of the commitments to fund under the DIP Agreement (a "Default

Pleading"); provided, however, that the only issue to be determined at such hearing is whether an Event of Default has occurred and is continuing. This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

(b)      Upon the Termination Date, all (i) DIP Obligations of the Debtor to JLS shall be immediately due and payable, and (ii) authority to use or borrow the proceeds of the DIP Financing Agreement shall cease.  If JLS exercises any of its rights and remedies upon the occurrence of the Termination Date, JLS may retain one or more agents to sell, lease, or otherwise dispose of the Collateral in accordance with the terms of the DIP Financing Agreement.  In any exercise of its rights and remedies upon the Termination Date, JLS is authorized to proceed under or pursuant to the DIP Financing Agreement.

15.    **Transaction Proceeds; Survival of Protections**. Any and all Net Cash Payments received from the consummation of an asset sale, debt issuance, or mandatory prepayment event pursuant to the DIP Financing Agreement shall be remitted directly to JLS upon Debtor's receipt thereof for application to the unpaid Pre-Petition Debt and the DIP Obligations (in that order) in accordance with the terms of the DIP Financing Agreement and this Interim Order.  Unless and until the Pre-Petition Debt and the DIP Obligations are irrevocably repaid in full or have been cash secured to the reasonable satisfaction of JLS, all commitments under the DIP Financing Agreement to lend have irrevocably terminated, the protections afforded to JLS pursuant to this Interim Order or the DIP Financing Agreement, as applicable, and any actions taken

pursuant thereto, shall survive the entry of any order confirming a Plan or converting this into a Successor Case, and the New DIP Liens, the DIP Superpriority Claim and the Superpriority Claim shall continue in this proceeding and in any Successor Case, and such Liens, the DIP Superpriority Claim and the Superpriority Claim shall maintain their priority as provided by this Interim Order.

16.     **Modification of Automatic Stay.**   The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of the DIP Financing Agreement as necessary to (a) permit the Debtor to grant the New DIP Liens and the Replacement Liens and to incur all liabilities and obligations to JLS under the DIP Financing Agreement, the DIP Facility, and this Interim Order, as applicable, and (b) authorize JLS to retain and apply payments hereunder.

17.     **Credit Bid.**  JLS, directly or through a designee, shall have the unqualified right to credit bid up to the full amount of the DIP Obligations, as a stalking horse bidder or otherwise, in any sale of any portion of the Collateral, whether pursuant to an action or a Plan or otherwise.

18.     **Proofs of Claim.**  JLS will not be required to file proofs of claim in this Case or a Successor Case.  This Interim Order shall constitute a proof of claim on behalf of JLS in this Case.  JLS is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) aggregate proofs of claim in this Case or any Successor Case.  Any proof of claim so filed shall be deemed to be in addition and not in lieu of any other proof of claim that may be filed by JLS.

19.    **Other Rights and Obligations**.

(a)    **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order**.  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this or any other Court, JLS is entitled to the protections provided in section 364(e) of the Bankruptcy Code and no such modification, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or Lien or priority authorized or created hereby.  Notwithstanding any such modification, amendment or vacation, any claim granted to JLS hereunder arising prior to the effective date of such modification, amendment or vacation of any DIP Protections granted to JLS shall be governed in all respects by the original provisions of this Interim Order, and JLS shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Protections granted herein, with respect to any such claim.  Since the loans made pursuant to the DIP Financing Agreement are made in reliance on this Interim Order, the obligations owed to JLS prior to the effective date of any stay, modification or vacation of this Interim Order cannot, as a result of any subsequent order in this, or in any Successor Case, be subordinated, lose their Lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the Liens and claims granted to JLS under this Interim Order and/or the DIP Financing Agreement.

(b)    **Expenses**.  As provided in the DIP Financing Agreement, all costs and

expenses of JLS in connection with the DIP Financing Agreement, whether incurred prior to or after the commencement of this Case, including, without limitation, reasonable and documented out-of-pocket legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement of fees and expenses, and other out of pocket expenses, will be paid by the Debtor; provided, however, that such costs and expenses shall be paid only after each relevant professional has provided copies of its fee and expense statements to counsel to any committee appointed pursuant to section 1102 of the Bankruptcy Code (or to the U.S. Trustee, in the event no committee is appointed) reasonably contemporaneously with the delivery of such fee and expense statements to the Debtor (which may be done no more frequently than monthly).  Such statements need not be submitted in the form of a fee application or comply with U.S. Trustee fee guidelines, but shall contain reasonable detail as to the number of hours worked and applicable hourly rates, but may be redacted to the extent necessary to delete any information subject to attorney-client privilege, any information constituting attorney work product or any other confidential information and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.  Any committee appointed pursuant to section 1102 of the Bankruptcy Code (or the U.S. Trustee, in the event no committee is appointed) may object to the reasonableness of the fees, costs and expenses included in any professional fee invoice submitted hereunder, provided that, any such objection shall be forever waived and barred unless (i) it is filed with this Court and served on counsel to the party seeking reimbursement no later than ten (10) days after the objecting party

receiving such applicable professional fee invoice, and (ii) it describes with particularity the items and categories of fees, costs and expenses that are subject to the objection and it provides for a specific basis for the objection to each such item of category of fees, costs and expenses; provided, however, further that the Debtor shall pay all amounts that are not subject of any objection within ten (10) days of the objection deadline.  Any hearing on an objection to any payment of any fees, costs and expenses of such professionals shall be limited to the reasonableness of the particular items or categories of fees, costs, and expenses which are the subject to such objection.  Under no circumstances shall professionals for JLS be required to comply with the U.S. Trustee fee guidelines.

(c)      **Binding Effect.**  The provisions of this Interim Order shall be binding upon and inure to the benefit of JLS and the Debtor and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor) whether in this Case, in any Successor Case, or upon dismissal of any such chapter 11 or chapter 7 cases; provided, however, that, except to the extent expressly set forth in this Interim Order, JLS shall have no obligation to permit the use of the DIP Facility or the Collateral (including, without limitation, the Cash Collateral) or extend and financing to any including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor.

(d)      **No Waiver**.  The failure of JLS to seek relief or otherwise exercise its rights and remedies under the DIP Financing Agreement, the DIP Facility, or this Interim Order, as applicable, shall not constitute a waiver of any of JLS's rights hereunder.

Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair JLS under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of JLS to (i) request conversion of this Case to a case under chapter 7, dismissal of this Case, or the appointment of a trustee in this Case, or (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Plan or (iii) any of the rights, claims or privileges (whether legal, equitable or otherwise) of JLS.

(e)    **No Third Party Rights**.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

(f)    **No Marshaling**.  JLS shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral.

(g)    **Section 552(b).**  JLS shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to JLS, product, offspring or profits of any of the Collateral.

(h)    **Amendment**.  The Debtor and JLS may amend, modify, supplement or waive any provision of the DIP Financing Agreement, provided that such amendment, modification, supplement or waiver, in the judgment of the Debtor and JLS, is either nonprejudicial to the rights of third parties or is not material; provided, however that, the Debtor and JLS may agree (in their respective sole discretion) to extend the Maturity Date for up to 60 days without consent of any committee appointed pursuant to section 1102 of the Bankruptcy Code).  Otherwise, such waiver, modification, or amendment of

any of the provisions hereof shall be effective only if (a) set forth in writing, signed by or on behalf of the Debtor and JLS, and (b) approved by this Court.

(i)      **Survival of Interim Order**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any Plan in this Case, (ii) converting this Case to a cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing this Case, (iv) withdrawing of the reference of this Case from this Court, or (v) providing for abstention from handling or retaining of jurisdiction of this Case in this Court, and the terms and provisions of this Interim Order as well as the DIP Protections granted pursuant to this Interim Order and the DIP Financing Agreement, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections shall maintain their priority as provided by this Interim Order until all the obligations of the Debtor to JLS pursuant to the DIP Financing Agreement are indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).  The DIP Obligations shall not be discharged by the entry of an order confirming a Plan, the Debtor having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

(j)      **Inconsistency**.  In the event of any inconsistency between the terms and conditions of the DIP Financing Agreement and of this Interim Order, the provisions of this Interim Order shall govern and control.

(k)      **Enforceability**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the filing of the DIP Motion immediately upon

execution of the DIP Financing Agreement.

(l)    **Objections Overruled**.  All objections to the DIP Motion to the extent not

withdrawn or resolved, are hereby overruled.

(m)    **No Waivers or Modification of Interim Order**.  The Debtor irrevocably

waives any right to seek any modification or extension of this Interim Order without the

prior written consent of JLS, and no such consent shall be implied by any other action,

inaction or acquiescence of JLS.

(n)    **Waiver of the Fourteen (14) Day Stay Under Bankruptcy Rule 6004(h)**.

The fourteen (14) day stay provisions of Bankruptcy Rule 6004(h) are waived and shall

not apply to this Interim Order.

(o)    **Preservation of Rights Granted Under the Order**. No claim or lien

having a priority senior to or *pari passu* with those granted by this Interim Order to JLS

shall be granted or allowed while any portion of the DIP Obligations remain outstanding,

and the New DIP Liens shall not be subject or junior to any lien or security interest that

is avoided and preserved for the benefit of the Debtor's estate under section 551 of the

Bankruptcy Code or, except as set forth in this Interim Order, subordinated to or made

*pari passu* with any other lien or security interest, whether under section 364(d) of the

Bankruptcy Code or otherwise.

(1)    Unless all DIP Obligations shall have been indefeasibly paid in full

in cash in accordance with the terms of the DIP Agreement (or, as appropriate, cash

secured to the reasonable satisfaction of JLS), in the case of clause (i) below, the

Debtor shall not seek, and in the case of clauses (i) and (ii) below, it shall constitute an

Event of Default under the DIP Agreement and a termination of the right to use

Collateral (including, without limitation, Cash Collateral) if the Debtor seeks, or if there is

entered, (i) any modification of this Interim Order without the prior written consent of

JLS, as applicable, and no such consent shall be implied by any other action, inaction or

acquiescence by JLS, or (ii) an order converting or dismissing this Case.

(2)     If any or all of the provisions of this Interim Order are hereafter

reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall,

to the extent provided in section 364(e) of the Bankruptcy Code, not affect (i) the

validity, priority or enforceability of any DIP Obligations incurred prior to the effective

date of such reversal, stay, modification or vacatur or (ii) the validity, priority or

enforceability of the New DIP Liens.   Notwithstanding any such reversal, stay,

modification or vacatur, any use of the Collateral (including, without limitation, the Cash

Collateral), any DIP Obligations incurred by the Debtor to JLS prior to the effective date

of such reversal, stay, modification or vacatur shall, to the extent provided in section

364(e) of the Bankruptcy Code, be governed in all respects by the original provisions of

this Interim Order, and JLS shall be entitled to all of the rights, remedies, privileges and

benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and the

DIP Financing Agreement (with respect to all DIP Obligations) and uses of the Collateral

(including, without limitation, the Cash Collateral).

(3)     Except as expressly provided in this Interim Order or in the DIP

Financing Agreement, the New DIP Liens, the Superpriority Claims and all other rights

and remedies of JLS granted by this Interim Order and the DIP Financing Agreement

shall survive, and shall not be modified, impaired or discharged by (i) the entry of an

order converting this Case to a case under chapter 7 of the Bankruptcy Code,

dismissing this Case, or (ii) the entry of an order confirming a plan of reorganization in

this Case and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor has

waived any discharge as to any remaining DIP Obligations.  The terms and provisions

of this Interim Order and the DIP Financing Agreement shall continue in this Case or in

any superseding chapter 7 case or other case under the Bankruptcy Code and/or

following dismissal of this or any subsequent case, and the New DIP Liens, the DIP

Obligations, and the Superpriority Claims, and all other rights and remedies of JLS

granted by this Interim Order and the DIP Financing Agreement shall continue in full

force and effect until all DIP Obligations are indefeasibly paid in full in cash.

(p)    **Payments Free and Clear**.  Any and all payments or proceeds remitted to

JLS pursuant to the provisions of this Interim Order or any subsequent order of this

Court shall be received free and clear of any claim, charge, assessment or other

liability.

(q)    **Limitation of Liability**.  In determining to make any loan under the DIP

Financing Agreement, permitting the use of Collateral (including Cash Collateral), or in

exercising any rights or remedies as and when permitted pursuant to this Interim Order

or the DIP Financing Agreement, JLS shall, subject to and effective upon entry of the

Final Order, not be deemed to be in control of the operations of the Debtor or to be

acting as a "responsible person" or "owner or operator" with respect to the operation or

management of the Debtor (as such terms, or any similar terms, are used in the United

States Comprehensive Environmental Response, Compensation and Liability Act, 29

U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).

Furthermore, nothing in this Interim Order or in the DIP Financing Agreement shall in

any way be construed or interpreted to impose or allow the imposition upon JLS any liability for any claims arising from the pre-petition or post-petition activities of the Debtor.

-- END OF ORDER –

## **EXHIBIT A**

(Budget)

| Week Beginning Monday / Disbursement Type | 10/22/2018 | 10/29/2018 | 11/5/2018 | 11/12/2018 | 11/19/2018 | 11/26/2018 | 12/3/2018 | 12/10/2018 | 12/17/2018 | 12/24/2018 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $ 500 | $ 100,500 | $ 100,500 | $ 100,500 | $ 100,500 | $ 100,500 | $ 100,500 | $ 100,500 | $ 100,500 | $ 100,500 | |
| **Cash Inflow** | | | | | | | | | | | |
| DIP Financing | 340,000 | 355,500 | 546,027 | 83,000 | 590,500 | 556,027 | 335,500 | 363,000 | 315,500 | 0 | 3,485,054 |
| **Total Cash Inflow** | $ 340,000 | $ 355,500 | $ 546,027 | $ 83,000 | $ 590,500 | $ 556,027 | $ 335,500 | $ 363,000 | $ 315,500 | $ 100,500 | 3,485,054 |
| **Cash Outflow** | | | | | | | | | | | |
| US Payroll Payroll - Fixed | | (312,500) | | | (312,500) | | (312,500) | | (312,500) | | (1,250,000) |
| Health/Dental/401K EE Benefits | | | | (80,000) | | | | (80,000) | | | (160,000) |
| AWS COGS | | | (265,000) | | | (265,000) | | | | | (530,000) |
| Experian COGS | | | (24,000) | | | (24,000) | | | | | (48,000) |
| Digital Envoy COGS | | | (10,500) | | | (10,500) | | | | | (21,000) |
| IPON Web COGS | | | (43,527) | | | (43,527) | | | | | (87,054) |
| DIP Closing Costs FINANCING | | | | | | | | | | | - |
| Creditor Carve Out/Wind down BANKRUPTCY COSTS | | | (50,000) | | | | | | | | (50,000) |
| Lendor Fees FINANCING | | | | | (25,000) | | | | | | (25,000) |
| LEGAL - Honigman/Kinghon/CRO PROF SERVICES | | | (100,000) | | (250,000) | | | (250,000) | | | (600,000) |
| IT -Operating Exp LICENSE/HOSTING | | | (30,000) | | | | | (30,000) | | | (60,000) |
| Rent RENT | | | (20,000) | | | | (20,000) | | | | (40,000) |
| Other OTHER G&A | | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | | (24,000) |
| UK Services Agreement Payroll - Fixed | (240,000) | (40,000) | | | | (210,000) | | | | | (490,000) |
| **Total SMI US - Cash Outflow** | (240,000) | (355,500) | (546,027) | (83,000) | (590,500) | (556,027) | (335,500) | (363,000) | (315,500) | - | (3,385,054) |
| **Net Cash** | 100,500 | 100,500 | 100,500 | 100,500 | 100,500 | 100,500 | 100,500 | 100,500 | 100,500 | 100,500 | 100,500 |

# EXHIBIT B

**[$4,500,000]**

**SENIOR, SECURED, SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

dated as of _____ ___, 2018

between

SORENSON MEDIA, INC., as Borrower,

and

JLS HOLDINGS, LLC, as Lender

# TABLE OF CONTENTS

**Page**

ARTICLE 1 Definitions.................................................................................................... 2
    1.1    Defined Terms .................................................................................. 2
    1.2    Terms Generally ............................................................................. 14
    1.3    Accounting Terms; GAAP ............................................................. 15
    1.4    Designated Financial Officers ....................................................... 15

ARTICLE 2 The Credits................................................................................................ 15
    2.1    Term Loans..................................................................................... 15
    2.2    Borrowing Procedure..................................................................... 16
    2.3    Loans and Funding of Loans. ......................................................... 16
    2.4    Payments Generally........................................................................ 17
    2.5    Prepayment of Loans. .................................................................... 17
    2.6    Fees................................................................................................. 19
    2.7    [Intentionally Omitted] .................................................................. 19
    2.8    [Intentionally Omitted.] ................................................................. 19
    2.9    Lender's Evidence of Indebtedness ............................................... 19

ARTICLE 3 [Intentionally Omitted.] ........................................................................... 19

ARTICLE 4 Representations and Warranties ............................................................... 19
    4.1    Organization; Powers .................................................................... 19
    4.2    Authorization; Enforceability ........................................................ 20
    4.3    Governmental Approvals; No Conflicts ........................................ 20
    4.4    Financial Condition; No Material Adverse Change. ...................... 20
    4.5    Properties........................................................................................ 20
    4.6    Litigation and Environmental Matters........................................... 21
    4.7    Compliance with Laws .................................................................. 21
    4.8    Investment and Holding Company Status ...................................... 22
    4.9    Taxes ............................................................................................. 22
    4.10    ERISA ........................................................................................... 22
    4.11    Disclosure ...................................................................................... 22
    4.12    Capitalization................................................................................. 22
    4.13    [Intentionally Omitted] .................................................................. 22
    4.14    Material Indebtedness, Liens and Agreements .............................. 22
    4.15    Federal Reserve Regulations ......................................................... 23
    4.16    Legality; Validity and Enforceability of Liens.............................. 23
    4.17    Force Majeure................................................................................. 23
    4.18    Labor and Employment Matters. ................................................... 23
    4.19    Bank Accounts................................................................................ 24
    4.20    OFAC ............................................................................................ 24
    4.21    Patriot Act...................................................................................... 24

ARTICLE 5 Conditions and Payments ........................................................................ 24
    5.1    Conditions to Funding of the Effective Time Term Loan Advance and the Effective
        Time................................................................................................ 24
    5.2    Conditions to each Term Loan ...................................................... 25

ARTICLE 6 Affirmative Covenants ............................................................................ 26

| 6.1 | Financial Statements and Other Information | 27 |
|---|---|---|
| 6.2 | Notices of Material Events | 27 |
| 6.3 | Existence; Conduct of Business | 27 |
| 6.4 | Payment of Obligations | 28 |
| 6.5 | Maintenance of Properties; Insurance | 28 |
| 6.6 | Books and Records; Inspection Rights | 28 |
| 6.7 | Fiscal Year | 28 |
| 6.8 | Compliance with Laws | 28 |
| 6.9 | Use of Proceeds | 29 |
| 6.10 | [Intentionally Omitted]. | 29 |
| 6.11 | [Intentionally Omitted] | 29 |
| 6.12 | Environmental Matters; Reporting | 29 |
| 6.13 | Matters Relating to Additional Real Property Collateral | 29 |
| 6.14 | Cash Deposits; Bank Accounts and Securities Accounts | 29 |
| 6.15 | Compliance with Budget; Budget Reporting; Carve-Out | 30 |
| 6.16 | Minimum Cash Balance | 30 |
| 6.17 | Certain Deliverables | 30 |
| 6.18 | Additional Deliverables. | 31 |
| 6.19 | Cooperation with Advisors | 32 |
| 6.20 | Milestones | 32 |

| ARTICLE 7 Negative Covenants | 32 |
|---|---|

| 7.1 | Indebtedness | 32 |
|---|---|---|
| 7.2 | Liens | 33 |
| 7.3 | Contingent Liabilities | 34 |
| 7.4 | Fundamental Changes; Asset Sales. | 34 |
| 7.5 | Investments. | 35 |
| 7.6 | Restricted Junior Payments | 35 |
| 7.7 | Transactions with Affiliates | 36 |
| 7.8 | Restrictive Agreements | 36 |
| 7.9 | Sale-Leaseback Transactions; Leases | 36 |
| 7.10 | Certain Employee Related Matters | 36 |
| 7.11 | Lines of Business | 36 |
| 7.12 | Other Indebtedness | 37 |
| 7.13 | Modifications of Certain Documents and Financing Orders | 37 |
| 7.14 | Critical Vendor and Other Payments | 37 |
| 7.15 | Pre-Petition Indebtedness | 37 |

| ARTICLE 8 Events of Default | 37 |
|---|---|

| 8.1 | Events of Default | 37 |
|---|---|---|

| ARTICLE 9 [Intentionally Omitted] | 41 |
|---|---|

| ARTICLE 10 Miscellaneous | 41 |
|---|---|

| 10.1 | Notices | 41 |
|---|---|---|
| 10.2 | Waivers; Amendments; Voting Rights. | 41 |
| 10.3 | Expenses; Indemnity: Damage Waiver. | 42 |
| 10.4 | Successors and Assigns. | 43 |
| 10.5 | Survival | 44 |
| 10.6 | Counterparts; Integration; References to Agreement; Effectiveness | 44 |
| 10.7 | Severability | 45 |
| 10.8 | [Intentionally Omitted.] | 45 |

4840-7765-5159
4840-7765-5159

10.9     [Intentionally Omitted.] ................................................................................ 45
10.10    Governing Law; Jurisdiction; Consent to Service of Process .................................. 45
10.11    WAIVER OF JURY TRIAL ....................................................................... 46
10.12    Headings ............................................................................................... 46
10.13    Confidentiality ....................................................................................... 46
10.14    Interest Rate Limitation ............................................................................ 46
10.15    Obligations Absolute. ............................................................................... 46
10.16    Parties including the Trustees; Bankruptcy Court Proceedings ............................. 47

## SCHEDULES & EXHIBITS

**Schedules**:

| | |
|---|---|
| Schedule 1.1 | Principals |
| Schedule 2.1 | Lender and Commitments |
| Schedule 4.4(b) | Material Adverse Change Exceptions To Specified Financial Statements |
| Schedule 4.5 | Properties; Registered Proprietary Rights; Real Property Assets |
| Schedule 4.6 | Litigation and Environmental Matters |
| Schedule 4.12 | Capitalization |
| Schedule 4.13 | Subsidiaries |
| Schedule 4.14 | Material Indebtedness, Liens and Agreements |
| Schedule 7.1 | Existing Indebtedness |
| Schedule 7.7 | Transactions with Affiliates |
| Schedule 7.8 | Restrictive Agreements |

**Exhibits**:

| | |
|---|---|
| Exhibit 1 | Form of Borrowing Request |
| Exhibit 6.15 | Budget |
| Exhibit A | Form of Term Note |
| Exhibit B | Form of Pledge and Security Agreement |
| Exhibit C | Form of Section 6.1 Compliance Certificate |
| Exhibit D | Form of Budget Compliance Certificate |

### SENIOR, SECURED, SUPER-PRIORITY
### DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**THIS SENIOR, SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT** dated as of October __, 2018 (this "Agreement") is by and among SORENSON MEDIA, INC., a Delaware corporation, as borrower (the "Borrower") and JLS HOLDINGS, LLC, a Utah limited liability company, as lender (the "Lender").

A.      On October __, 2018 (the "Petition Date"), the Borrower (the "Debtor") commenced Chapter 11 Case No. 18-_____(___) (the "Chapter 11 Case") by filing a voluntary petition for reorganization under Chapter 11, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Utah (the "Bankruptcy Court").

B.      From and after the Petition Date, Debtor has continued to operate its business and manage its property as a debtor and a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

C.      Prior to the date of this Agreement, JLS Holdings, LLC (in such capacity, "Pre-Petition Lender") provided bridge financing to the Borrower pursuant to that certain Note Purchase Agreement dated as of June 7, 2018 (as amended or supplemented prior to the date hereof, the "NPA" and more specifically (i) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $6,750,000 dated June 7, 2018 executed and delivered by the Debtor to JLS; (ii) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $2,000,000 executed and delivered by the Debtor to JLS; and (iii) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $1,400,000, dated July 5, 2018, executed and delivered by the Debtor to JLS; (iv) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $900,000 dated July 12, 2018 executed and delivered by the Debtor to JLS; (v) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $1,200,000 dated July 18, 2018 executed and delivered by the Debtor to JLS; (vi) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $1,300,000 dated July 24, 2018 executed and delivered by the Debtor to JLS; (vii) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $400,000 dated August 1, 2018 executed and delivered by the Debtor to JLS; (viii) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $280,000 dated August 9, 2018 executed and delivered by the Debtor to JLS; (ix) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $1,600,000 dated August 16, 2018 executed and delivered by the Debtor to JLS; (x) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $1,900,000 dated August 22, 2018 executed and delivered by the Debtor to JLS; (xi) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $1,750,000 dated September 4, 2018 executed and delivered by the Debtor to JLS; (xii) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $465,000 dated September 13, 2018 executed and delivered by the Debtor to JLS; (xiii) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $1,480,000 dated September 19, 2018 executed and delivered by the Debtor to JLS; (xiv) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $300,000 dated October 3, 2018 executed and delivered by the Debtor to JLS, and (xv) the Senior Secured Convertible Subordinated Promissory Note in the principal amount of $263,000 dated October 15, 2018 executed and delivered by the Debtor to JLS (the "Pre-Petition Lender Notes," together with the NPA, the "Pre-Petition Credit Agreement"). The obligations of the Borrower under the Pre-Petition Credit Agreement are hereinafter referred to as the "Bridge Financing."

D.      The Borrower has requested that the Lender provide a senior, secured, super priority debtor-in-possession credit facility to the Borrower in an aggregate principal amount of up to $26,488,000: (i) to fund the working capital requirements and other financing needs of Borrower during the pendency of the Chapter 11 Case; (ii) upon entry of the Final Order (as defined herein), to repay in full the Bridge Financing; and (iii) to be otherwise used in accordance with Section 6.9 of this Agreement.

1

E.       The Lender is willing to provide such financing subject to the terms and conditions hereof, including, without limitation, that: (i) upon entry of the Final Order, a portion of such new loans are used to pay off and fully satisfy the Bridge Financing; and (ii) upon entry of the Final Order, the Pre-Petition Credit Agreement and related loan documents (as identified or defined in the Pre-Petition Credit Agreement) shall be terminated and released, except for provisions therein that survive repayment of obligations, termination and release in accordance with their respective terms.

**NOW, THEREFORE**, in consideration of the foregoing, and for other good and valuable consideration, the receipt, sufficient and adequacy of which hereby are acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1

### Definitions

**1.1     Defined Terms**.  As used in this Agreement, the following terms have the meanings specified below:

"363 Sale" means a sale of all or substantially all of the assets of the Borrower pursuant to Section 363 of the Bankruptcy Code.

"Accepted Bid" has the meaning assigned to such term in Section 6.20.

"Advisors" shall mean outside legal counsel (including local counsel), auditors, accountants, consultants, appraisers and/or other advisors of the Lender.

"Affiliate" means, with respect to a specified Person, another Person that Controls or is Controlled by or is under common Control with the Person specified.

"Availability Period" means the period from and including the Effective Time to but excluding the earlier of: (a) the Term Loan Maturity Date; and (b) the date of termination of the Commitment(s) of Lender as set forth in this Agreement.

"Avoidance Actions" shall mean any and all claims or causes of action arising under Chapter 5 (other than Section 506(c) or Section 724(a)) of the Bankruptcy Code to avoid transfers, preserve or transfer liens or otherwise recover property of the estate and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise.  "Avoidance Actions" do not include claims or causes of action pursuant to Section 549 of the Bankruptcy Code and the proceeds thereof, to the extent the transfer avoided was of an asset otherwise constituting Collateral.

"Bankruptcy Code" has the meaning assigned to such term in the preamble hereof.

"Bankruptcy Court" has the meaning assigned to such term in the preamble hereof.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning assigned to such term in the introductory paragraph hereof.

"Borrowing" means, individually and collectively, as the context may require, each advance of a portion of the Term Loans hereunder.

"<u>Borrowing Availability</u>" means (a) prior to the entry of a Final Order, the Interim Amount, or (b) upon and after entry of the Final Order, the Commitment(s) then in effect; less, the sum of (i) in the case of each of clause (a) and (b), the Loan Exposure plus (ii) in the case of clause (b) the Carve-Out Reserve, subject to any limitations contained in the Financing Orders.

"<u>Borrowing Request</u>" shall mean a request by the Borrower in accordance with the terms of Section 2.2 and substantially in the form of <u>Exhibit 1</u>, or such other form as shall be approved by the Majority Lender.

"<u>Bridge Financing</u>" has the meaning assigned to such term in the preamble hereof.

"<u>Budget</u>" means that certain statement of sources and uses of the Credit Party, broken down by week, commencing with the week ended as of October 19, 2018, including the anticipated uses of the facility for such period, in form and substance satisfactory to the Lender; it being understood and agreed that as used herein, "Budget" shall initially refer to the Budget which is attached hereto as Exhibit 6.15 and thereafter shall refer to the most recent Budget delivered by the Borrower in accordance with Section 6.1(c) which is acceptable to the Majority Lender.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed.

"<u>Capital Lease Obligations</u>" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"<u>Carve-Out</u>" has the meaning assigned to such term in the Interim Order or, upon entry of the Final Order, in the Final Order, and for the avoidance of doubt, the Carve-Out includes the Wind-Down Amount and in no case (inclusive of the Wind-Down Amount) shall exceed $150,000.  The Carve-Out shall be funded at the times and in the manner set forth in the Financing Orders and Section 2.3 of this Agreement.

"<u>Carve-Out Reserve</u>" means, as of any date of determination, a reserve in an amount equal to the unpaid portion of the Carve-Out.

"<u>Casualty Event</u>" means, with respect to any Property of any Person, any loss of or damage to, or any condemnation or other taking of, such Property for which such Person or any of its Subsidiaries receives insurance proceeds, or proceeds of a condemnation award or other compensation.

"<u>Change in Law</u>" means (a) the adoption of any law, rule or regulation after the Effective Time, (b) any change after the Effective Time in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority or (c) compliance by any Lender (or, for purposes of Section 2.7(b), by any lending office of the Lender, by an Affiliate of the Lender or by the Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law), other than a request or directive to comply with any law, rule or regulation in effect at the Effective Time, of any Governmental Authority made or issued after the Effective Time.

"<u>Change of Control</u>" means any event, transaction or occurrence as a result of which a majority of the seats (other than vacant seats) on the board of directors of Borrower shall be occupied by Persons who were neither (i) nominated by the board of directors of such Credit Party, (ii) appointed by directors so nominated nor (iii) designated by one or more of the Principals; or (c) the sale of all or substantially all of the business or assets of the Credit Party (other than any such sale permitted by Section 7.4(c)(i) through (ii) or any other sale approved by the Lender).

"Chapter 11 Case" has the meaning assigned to such term in the preamble hereof.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means, collectively, all of the Property in which Liens are purported to be granted under the Security Documents as security for the Obligations of the Credit Party hereunder, and for the avoidance of doubt, shall include all real and personal property of the Borrower now owned or hereafter acquired and all other property of whatever kind and nature, in each case, that is pledged as collateral under any Security Document, any Financing Order or any other order of the Bankruptcy Court in the Chapter 11 Cases.

"Commitments" means the Term Loan Commitment of the Lender.

"Committee" means any official committee of unsecured creditors formed in the Chapter 11 Case.

"Continuum" means Continuum Media Network, Inc., a Delaware corporation.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto. A Person who owns or holds capital stock, beneficial interests or other securities representing ten percent (10%) or more of the Total Voting Power of another Person shall be deemed, for purposes of this Agreement, to "control" such other Person.

"Copyrights" means all copyrights, whether statutory or common law, owned by or assigned to the Credit Party, and all exclusive and nonexclusive licenses to the Credit Party from third parties or rights to use copyrights owned by such third parties, including the registrations, applications and licenses listed on Schedule 4.5, along with any and all (a) renewals and extensions thereof, (b) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (c) rights to sue for past, present and future infringements thereof, and (d) foreign copyrights and any other rights corresponding thereto throughout the world.

"Credit Party" means the Borrower.

"Debtor" has the meaning assigned to such term in the preamble hereof.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Designated Financial Officer" means any person who is the chief executive officer, chief financial officer, treasurer or president of Borrower.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 4.6.

"Disposition" means any sale, assignment, transfer or other disposition of any property (whether now owned or hereafter acquired) by Credit Party to any Person excluding (a) the granting of Liens permitted hereunder and (b) any sale, assignment, transfer or other disposition of (i) any property sold or disposed of in the ordinary course of business and on ordinary business terms, (ii) any property no longer used or useful in the business of the Credit Party and (iii) any Collateral pursuant to an exercise of remedies by the Lender hereunder or under any other Loan Document.

"Effect of Bankruptcy" means, with respect to any obligation, contract or agreement to which the Credit Party is a party, any default or other legal consequences arising on account of the commencement or the filing of the Chapter 11 Case, as applicable (including the implementation of any stay), or the rejection of any

such obligation, contract or agreement with the approval of the Bankruptcy Court if required under applicable law.

"Effective Time" means the date when the conditions specified in Article 5.1 are satisfied (or waived in accordance with Section 10.2). For the avoidance of doubt, the Effective Time shall not occur prior to the time when the Interim Order has been entered by the Bankruptcy Court, in form and substance satisfactory to the Lender, as more fully described in Section 5.1.

"Effective Time Term Loan Advance" means the portion of the Term Loans funded at the Effective Time.

"Environmental Laws" means all applicable laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Credit Party directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Rights" means, with respect to any Person, any subscriptions, options, warrants, commitments, preemptive rights or agreements of any kind (including any stockholders' or voting trust agreements) for the issuance or sale of, or securities convertible into, any additional shares of capital stock of any class, or partnership or other ownership interests of any type in, such Person.

"Event of Default" has the meaning assigned to such term in Section 8.1.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Taxes" means, with respect to the Lender or any other recipient of any payment to be made by or on account of any Obligation hereunder, (a) income, net worth or franchise taxes imposed on (or measured by) its net income or net worth by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its lending office is located or in which it is taxable solely on account of some connection other than the execution, delivery or performance of this Agreement or the receipt of income hereunder, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located.

"Existing Debt" means (i) the Bridge Financing, (ii) Indebtedness of the Credit Party existing as of the Effective Time which is being repaid in full with the proceeds of the Loans made by the Lender upon entry of the Final Order, and (iii) Indebtedness of the Credit Party existing as of the Effective Time which is permitted to remain outstanding after the Effective Time under Section 7.1 and is listed on Schedule 7.1.

"Extraordinary Receipts" means any cash received by any Credit Party not in the ordinary course of business, including without limitation (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) proceeds of insurance (including key man life insurance and business interruption insurance, but excluding proceeds of Casualty Events), (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (e) indemnity payments and (f) any purchase price adjustment

received in connection with any purchase agreement to the extent not needed to reimburse the Credit Party for any reasonable and customary out-of-pockets costs and expenses previously incurred by the Credit Party with respect to which such purchase price adjustment was received.

"FAC Regulations" has the meaning assigned to such term in Section 4.21.

"FCPA" has the meaning assigned to such term in Section 4.21.

"Final Order" shall mean, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be substantially in the form of the Interim Order and shall otherwise be in form and substance reasonably satisfactory to the Majority Lender, and from which no appeal or motion to reconsider has been timely filed (or any such appeal or motion has been conclusively resolved in favor of the Borrower) and such order in any respect is not the subject of a stay or injunction pending appeal (unless the Majority Lender waives such requirement), together with all extensions, modifications, amendments or supplements thereto, in form and substance reasonably satisfactory to the Majority Lender, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur (or guaranty) Indebtedness, grant Liens under this Agreement and the other Loan Documents, as the case may be, approves this Agreement and the other Loan Documents and grants Superpriority Claims to Lender.

"Financing Orders" means the Interim Order, the Final Order and any amendment, modification or supplement thereto in form and substance reasonably acceptable to the Majority Lender.

"FIRREA" shall mean the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"First Day Orders" means, the First Day Orders, as amended, restated supplemented or otherwise modified prior to the date hereof, in form and substance reasonably acceptable to the Majority Lender.

"First Priority" means, with respect to any Lien purported to be created in any Collateral pursuant to any Loan Document, that such Lien is the most senior Lien to which such Collateral is subject.

"GAAP" means generally accepted accounting principles in the United States of America.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" means a guarantee, an endorsement, a contingent agreement to purchase or to furnish funds for the payment or maintenance of, or otherwise to be or become contingently liable under or with respect to, the Indebtedness, other obligations, net worth, working capital or earnings of any Person, or a guarantee of the payment of dividends or other distributions upon the stock or equity interests of any Person, or an agreement to purchase, sell or lease (as lessee or lessor) property, products, materials, supplies or services primarily for the purpose of enabling a debtor to make payment of such debtor's obligations or an agreement to assure a creditor against loss, and including causing a bank or other financial institution to issue a letter of credit or other similar instrument for the benefit of another Person, but excluding endorsements for collection or deposit in the ordinary course of business.  The terms "Guarantee" and "Guaranteed" used as a verb shall have a correlative meaning.  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the primary obligations in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder).

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature, in each case regulated or subject to regulation pursuant to any Environmental Law.

"Indebtedness" means, for any Person, without duplication: (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, advance, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services, other than (i) trade accounts payable (other than for borrowed money) arising in the ordinary course of business, and (ii) accrued expenses and deferred taxes incurred and paid in the ordinary course of business; (c) Capital Lease Obligations of such Person; (d) obligations of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such Person; (e) Indebtedness of others secured by a Lien on the Property of such Person, whether or not the respective Indebtedness so secured has been assumed by such Person; and (f) Indebtedness of others Guaranteed by such Person.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means all Taxes other than (a) Excluded Taxes and Other Taxes and (b) amounts constituting penalties or interest imposed with respect to Excluded Taxes or Other Taxes.

"Interim Amount" means the maximum amount of Term Loans permitted by the Interim Order.

"Interim Order" shall mean collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), which, among other matters, but not by way of limitation, grants a Superpriority Claim to Lender, authorizes, on an interim basis, the Borrower to execute and perform under the terms of this Agreement and the other Loan Documents and is not subject to any stay or injunction or otherwise subject to reversal on appeal as to any Loans funded hereunder, together with all extensions, modifications, amendments and supplements thereto, in form and substance reasonably satisfactory to the Majority Lender.

"Investment" means, for any Person: (a) the acquisition (whether for cash, Property, services or securities or otherwise) of capital stock, bonds, notes, debentures, partnership, limited liability company or other ownership interests or other securities of any other Person or any agreement to make any such acquisition (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale); (b) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit representing the purchase price of inventory or supplies sold by such Person in the ordinary course of business, *provided* that in no event shall the term of any such inventory or supply advance, loan or extension of credit exceed 180 days); or (c) the entering into of any Guarantee of, or other contingent obligation with respect to, Indebtedness or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"Investment Transaction" means one or more transactions pursuant to which a Person proposes a plan to finance the Borrower's business operations that shall generate liquidity in an amount sufficient to enable the Borrower to satisfy the Obligations, including, without limitation, the Bridge Financing, to the Lender in full in cash or on such other terms and in such other amounts to which the Majority Lender consents, and, in all

events, on terms and conditions reasonably satisfactory to the Majority Lender and approved by an order of the Bankruptcy Court by the Termination Date.

"Knowledge" means actual knowledge of the Credit Party's officers and directors, after diligent investigation.

"Landlord's Waiver and Consent" means, with respect to any Leasehold Property, if applicable, a letter, certificate or other instrument in writing from the lessor under the related lease, in form approved by the Lender in its sole discretion.

"Leasehold Property" means any leasehold interest of Credit Party as lessee under any lease of real property, other than any such leasehold interest designated from time to time by the Lender in its sole discretion as not being required to be included in the Collateral and not being of material importance to the business or operations of the Credit Party.

"Lender" has the meaning assigned to such term in the introductory paragraph hereof; provided that if any Person provides a Term Loan Commitment, such Person shall be included in the term "Lender" (and Lender shall refer to both each such Person and the Persons collectively, as the case may be).

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing), other than an operating lease, relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" means this Agreement, the Term Notes, the Security Documents, the Financing Orders and any other instruments, certificates or documents executed and delivered or to be delivered from time to time pursuant to this Agreement, as the same may be supplemented and amended from time to time in accordance with their respective terms.

"Loan Exposure" shall mean the aggregate principal amount at any time of all outstanding Term Loans of the Lender.  The outstanding Term Loans referenced herein shall include any amounts applied by the Lender to refinance the loans and other obligations under the Pre-Petition Credit Agreement.

"Loans" means, individually and collectively, the Term Loans.

"Majority Lender" shall mean the Lender holding at least fifty-one percent (51%) of the Term Loan Commitments.

"Material Adverse Effect" means, any event, circumstance, happening or condition, which has resulted or is reasonably likely to result in a material adverse effect on (a) the business, assets, financial condition or results of material operations of (i) the Borrower, (b) the ability of the Borrower to pay or perform any of its obligations under this Agreement or the other Loan Documents, (c) the validity or enforceability of (i) this Agreement or any Security Document, individually, or (ii) the Loan Documents, taken as a whole, or (d) any of the rights of or benefits available to the Lender under this Agreement or any of the other Loan Documents; provided, however, that a Material Adverse Effect shall not be deemed to exist as a result of the Chapter 11 Case or the Effect of Bankruptcy.

"Material Indebtedness" means Indebtedness (other than the Loans) in an aggregate principal amount exceeding $50,000.

"<u>Material Leasehold Property</u>" means (a) the Leasehold Property of the Credit Party at the Effective Time and (b) any Leasehold Property acquired by the Credit Party after the Effective Time (i) having a fair market value in excess of $100,000 or (ii) at which the Credit Party maintains any books and records or Collateral with a fair market value in excess of $100,000 in the aggregate or which is otherwise reasonably determined by the Lender to be of material importance to the operations of the Credit Party.

"<u>Material Owned Property</u>" means any real property owned by Credit Party that (a) has a fair market value in excess of $100,000 or (b) is reasonably determined by the Lender to be of material importance to the operations of the Credit Party.

"<u>Material Rental Obligations</u>" means obligations of the Credit Party to pay rent under any one or more operating leases with respect to any Material Leasehold Property.

"<u>Milestones</u>" shall mean each of the actions and deliverables required of the Credit Party in Section 6.20.

"<u>Mortgage</u>" means a security instrument (whether designated as a deed of trust or a mortgage, leasehold mortgage, assignment of leases and rents or by any similar title) executed and delivered by any Credit Party to the Lender in form and substance satisfactory to the Lender, in its sole discretion, in order to grant to the Lender, a Lien on any Real Property Asset, in each case with such changes thereto as may be recommended by the Lender's local counsel based on local laws or customary local practices.

"<u>Mortgaged Property</u>" means any Material Owned Property or Material Leasehold Property that is now owned or leased, or hereinafter acquired, by the Credit Party, which the Lender reasonably determines to acquire a Mortgage on following the Effective Time.

"<u>Net Cash Payments</u>" means,

(a)     with respect to any Casualty Event, the aggregate amount of cash proceeds of insurance, condemnation awards and other compensation received by the Credit Party in respect of such Casualty Event net of (i) reasonable and customary out-of-pocket expenses incurred by the Credit Party in connection therewith and (ii) contractually required repayments of Indebtedness to the extent secured by a Lien on such property which is senior to the Lien held by the Lender and (iii) any income and transfer taxes payable by the Credit Party in respect of such Casualty Event;

(b)     with respect to any Disposition, the aggregate amount of all cash payments received by the Credit Party directly or indirectly in connection with such Disposition, whether at the time of such Disposition or after such Disposition under deferred payment arrangements or Investments entered into or received in connection with such Disposition, net of (i) the amount of any reasonable and customary legal, title, transfer and recording tax expenses, commissions and other fees and reasonable and customary out-of-pocket expenses payable by the Credit Party in connection therewith, (ii) any Federal, state and local income or other Taxes estimated to be payable by the Credit Party as a result thereof, (iii) any repayments by the Credit Party of Indebtedness to the extent that such Indebtedness is secured by a Lien on the property that is the subject of such Disposition, such Lien is senior to the Lien held by the Lender on such property and the transferee of (or holder of a Lien on) such property requires that such Indebtedness be repaid as a condition to the purchase of such property, and (iv) any repayments by the Credit Party to minority stockholders if and to the extent permitted hereby; and

(c)     with respect to any incurrence of Indebtedness, offering of equity securities (other than Equity Rights) or consummation of any 363 Sale or Reorganization Plan, the aggregate amount of all cash proceeds received by the Credit Party therefrom less (x) all reasonable and customary legal, underwriting and similar fees and reasonable and customary out-of-pocket expenses incurred in

connection therewith and (y) all Federal, state and local income or other Taxes required to be paid by the Credit Party under the Bankruptcy Code or by an order of the Bankruptcy Court.

"Obligations" means (a) the aggregate outstanding principal balance of and all interest on the Loans made by the Lender to the Borrower (including any interest accruing after the commencement of any proceeding by or against the Borrower under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal, state or foreign bankruptcy, insolvency or other similar law, and any other interest that would have accrued but for the commencement of such proceeding, whether or not any such interest is allowed as a claim enforceable against the Borrower in any such proceeding), and (b) all fees, costs, charges, expenses and other obligations from time to time owing to the Lender by the Credit Party hereunder or under any other Loan Document, whether such obligations are now existing or hereafter arising or incurred, due or to become due, direct or indirect or absolute or contingent.

"OFAC Regulations" has the meaning assigned to such term in Section 4.20.

"Origination Fee" has the meaning assigned to such term in Section 2.6.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement and the other Loan Documents, *provided* that there shall be excluded from "Other Taxes" all Excluded Taxes.

"Patents" means all patents issued or assigned to and all patent applications made by the Credit Party and all exclusive and nonexclusive licenses to the Credit Party from third parties or rights to use patents owned by such third parties, including the patents, patent applications and licenses listed on Schedule 4.5, along with any and all (a) inventions and improvements described and claimed therein, (b) reissues, divisions, continuations, extensions and continuations-in-part thereof, (c) income, royalties, damages, claims and payments now and hereafter due and/or payable under and with respect thereto, including damages and payments for past or future infringements thereof, (d) rights to sue for past, present and future infringements thereof, and (e) any other rights corresponding thereto throughout the world.

"Pension Plan" means any Plan that is a defined benefit pension plan subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Credit Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Petition Date" has the meaning assigned to such term in the preamble hereof.

"Permitted Investments" means:

     (a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

     (b)     investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from Standard and Poor's Ratings Service or from Moody's Investors Service, Inc.;

     (c)     investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank

organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $250,000,000;

(d)      fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(e)      advances, loans and extensions of credit to any director, officer or employee of the Credit Party, if the aggregate outstanding amount of all such advances, loans and extensions of credit (excluding travel advances in the ordinary course of business) does not at any time exceed $10,000;

(f)      investments in money market mutual funds that are rated AAA by Standard & Poor's Rating Service;

(g)      trade credit extended by the Borrower and its Subsidiaries in the ordinary course of business, on ordinary business terms and consistent with past practice; and

(h)      the endorsement of negotiable instruments for deposit or collection in the ordinary course of business.

"Permitted Liens" has the meaning set forth in Section 7.2.

"Permitted Variances" means that the Credit Party may have a variance of the Budget which would have an adverse financial effect on the Credit Party, individually or in the aggregate, so long as (a) actual cash receipts are not less than ninety percent (90%) of the projected amounts set forth in the Budget, in the aggregate, tested weekly and on a cumulative basis commencing with the week ended October 19 2018; or (b) actual cash disbursements that are not greater than one hundred and ten percent (110%) of the projected amounts set forth in the Budget, in the aggregate, tested weekly and on a cumulative basis commencing with the week ended October 19, 2018, *provided* that savings accrued during any applicable period may be utilized either or both of the next two succeeding weekly tests, and *provided further* that expenses of the Lender which are not reflected in the Budget but are charged to the Credit Party by the Lender or the Committee pursuant to this Agreement shall be excluded from the calculation of the actual cash disbursements for purposes of calculating the variance.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA in which any Credit Party or any ERISA Affiliate is an "employer" as defined in Section 3(5) of ERISA, including, but not limited to, any Pension Plan.

"Plan Transaction" has the meaning assigned to such term in Section 6.22.

"Post-Default Rate" means, a rate per annum equal to seven percent (7%) per annum.

"Pre-Petition" means the time period ending immediately prior to the filing of the Chapter 11 Case.

"Pre-Petition Credit Agreement" has the meaning assigned to such term in the preamble hereof.

"Pre-Petition Lender" has the meaning assigned to such term in the preamble hereof.

"Pre-Petition Lender Notes" has the meaning assigned to such term in the preamble hereof.

"Principals" means (a) those Persons listed on Schedule 1.1 and any of their Affiliates (together, the "Permitted Holders") and (b) any group constituting a person (as such term is used in Rule 13(d)-5(b)(1) under the Exchange Act) the membership of which includes any Permitted Holder, *provided* that the Total Voting Power of Borrower on a fully diluted basis represented by the equity interests in Borrower beneficially owned by such Permitted Holder is at least 50.1% of the Total Voting Power of Borrower on a fully diluted basis represented by the equity interests in Borrower beneficially owned by all members of such group.

"Property" means any interest of any kind in property or assets, whether real, personal or mixed, and whether tangible or intangible, including patents, trademarks, copyrights and other intellectual property rights.

"Qualified Equity Interest" means any equity interest of an issuer other than an equity interest that is mandatorily redeemable or purchasable, in whole or in part, at the option of the holder, pursuant to a sinking fund obligation or otherwise, or exchangeable or convertible into debt securities of the issuer thereof or which entitles the holder thereof to dividend, interest or other payments, in each case, prior to the date which is 180 days after payment in full of all Obligations of the Credit Party under the Loan Documents.

"Real Property Asset" means, at any time of determination, any and all real property owned or leased by the Credit Party and the Subsidiaries of the Credit Party.

"Registered Proprietary Rights" has the meaning assigned to such term in Section 4.5(b).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Reorganization Plan" shall mean a plan of reorganization in the Chapter 11 Case of the Debtor.

"Restricted Junior Payment" means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of, or other equity interest in, the Credit Party or any Subsidiary now or hereafter outstanding, except a dividend payable solely in shares of common stock or other equity interests, (ii) any redemption, put, retirement, cancellation, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of, or other equity interest in or Equity Right in respect of, the Credit Party or any Subsidiary now or hereafter outstanding, (iii) any payment made to retire, to cancel, or to obtain the surrender of or in connection with the exercise of any put right with respect to, any outstanding warrants, options or other rights to acquire shares of any class of stock of, or other equity interest in or Equity Right in respect of, the Credit Party or any Subsidiary, (iv) any payment or prepayment of principal of, premium, if any, or interest on, or redemption purchase, retirement, defeasance (including economic or legal defeasance), sinking fund or similar payment with respect to, any Subordinated Indebtedness, and (v) any payment made to any Affiliate of the Credit Party or any Subsidiary, in each case, in respect of management, consulting or other similar services provided to the Credit Party or any Subsidiary.

"Restrictive Agreements" has the meaning assigned to such term in Section 4.13(b).

"Restructuring Transaction" means a Sale Transaction or an Investment Transaction.

"Sale Transaction" means a Disposition of all or substantially all of the assets of the Borrower whether in a 363 Sale, pursuant to a Reorganization Plan or otherwise provided that such Sale Transaction shall generate liquidity in an amount sufficient to enable the Borrower to satisfy the Obligations, including, without limitation, the Bridge Financing, to the Lender in full in cash or on such other terms and in such other amounts to which the Majority Lender consents, and, in all events, on terms and conditions reasonably satisfactory to the Majority Lender and approved by an order of the Bankruptcy Court by the Termination Date.

"Security Agreement" means the Pledge and Security Agreement dated as of the Effective Time, substantially in the form of Exhibit B, among the Lender and the Credit Party, as amended, supplemented or otherwise modified from time to time.

"Security Documents" means, collectively, the Security Agreement, the Financing Orders, and each other security agreement, pledge agreement, or other instrument or agreement executed and delivered to or in favor of the Lender to secure any of the Obligations.

"Subordination Agreement" means a subordination agreement between the Lender and any lender providing any Subordinated Indebtedness to the Credit Party permitted by Section 7.1(h) in form and substance satisfactory to the Lender.

"Subordinated Indebtedness" means any unsecured Indebtedness of the Credit Party incurred after the Effective Time with the consent of the Lender that by its terms (or by the terms of the instrument under which it is outstanding and to which appropriate reference is made in the instrument evidencing such Subordinated Indebtedness) is made subordinate and junior in right of payment to the Loans and to the other Obligations of the Credit Party pursuant to a Subordination Agreement.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent and/or one or more subsidiaries of the parent.  References herein to "Subsidiaries" shall, unless the context requires otherwise, be deemed to be references to Subsidiaries of Borrower.

"Superpriority Claim" means a claim against any Debtor which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Termination Date" shall mean December 31, 2018, unless otherwise extended or altered by an order of the Bankruptcy Court.

"Term Loan Advance" means any extension of a portion of the Term Loans made after the Effective Time, and, upon the Termination Date, also an extension of a final portion of the Term Loan in an amount equal to the Carve-Out.

"Term Loan Commitments" means, during the Availability Period, the aggregate commitment of the Lender to fund the Term Loans, as the same may be reduced, modified or terminated from time to time pursuant to this Agreement.  Subject to the Financing Orders, the aggregate amount of the Term Loan Commitments of the Lender shall not exceed $26,488,000.

"Term Loan Maturity Date" means, in accordance with the terms of this Agreement, the earliest to occur of: (a) the acceleration (whether automatic or by written notice) or default of any Obligations; and (b) the Termination Date.

"Term Loans" shall mean, individually and collectively as the context may require, the term loans evidenced by each Borrowing made by the Lender to Borrower pursuant to this Agreement, and all obligations related thereto.

"Term Notes" means the promissory notes, substantially in the form of Exhibit A annexed hereto, issued by the Borrower in favor of the Lender and evidencing the Term Loans pursuant to Section 2.10.

"Total Voting Power" means, with respect to any Person, the total number of votes which holders of securities having the ordinary power to vote, in the absence of contingencies, are entitled to cast in the election of directors of such Person.

"Trademarks" means all trademarks (including service marks), federal and state trademark registrations and applications made by the Credit Party, common law trademarks and trade names owned by or assigned to the Credit Party, all registrations and applications for the foregoing and all exclusive and nonexclusive licenses from third parties of the right to use trademarks of such third parties, including the registrations, applications, unregistered trademarks, service marks and licenses listed on Schedule 4.5, along with any and all (a) renewals thereof, (b) income, royalties, damages and payments now and hereafter due and/or payable with respect thereto, including damages, claims and payments for past or future infringements thereof, (c) rights to sue for past, present and future infringements thereof, and (d) foreign trademarks, trademark registrations, and trade name applications for any thereof and any other rights corresponding thereto throughout the world.

"Transactions" means, collectively, the various transactions occurring at or immediately after the Effective Time pursuant to the Loan Documents and the Chapter 11 Case, including: (a) the execution, delivery and performance of the Loan Documents, including without limitation, the incurrence of the Obligations hereunder; (b) the repayment of the Bridge Financing; and (c) the payment of all fees and expenses to be paid on or prior to the Effective Time and owing in connection with the foregoing.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"U.S. Dollars" or "$" refers to lawful money of the United States of America.

"Wind-Down Amount" has the meaning assigned to such term in the Interim Order or in any successor Financing Order, as applicable.

 **1.2 Terms Generally**.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**1.3** **Accounting Terms; GAAP**.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided* that, if the Borrower notifies Lender that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Lender notifies the Borrower that the Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision shall have been amended in accordance herewith.

**1.4** **Designated Financial Officers**.  The Credit Party hereby authorizes each of the Designated Financial Officers to act as agent for the Credit Party and to execute and deliver on behalf of the Credit Party such notices, requests, waivers, consents, certificates and other documents, and to take any and all actions required or permitted to be delivered or taken by the Credit Party hereunder.  The Credit Party may replace any of the Designated Financial Officers or add any additional Designated Financial Officers by delivering written notice to the Lender specifying the names of each new Designated Financial Officer and the offices held by each such Person.  The Credit Party hereby agree that any such notices, requests, waivers, consents, certificates and other documents executed, delivered or sent by any Designated Financial Officer and any such actions taken by any Designated Financial Officer shall bind the Credit Party.

## ARTICLE 2

### The Credits

**2.1** **Term Loans**.

(a)     <u>Term Loan</u>.  Subject to the terms and conditions set forth herein, Lender agrees on and after the Effective Time and during the Availability Period to make Term Loans to the Borrower in dollars in an aggregate amount not to exceed, its Commitment; *provided* that in no event shall Term Loans be issued and outstanding hereunder on any date in excess of Borrowing Availability.  The Term Loans are not a revolving credit facility and may not be drawn, repaid and redrawn, and payments of principal on the Term Loans shall permanently reduce the Term Loans.  If at any time the then outstanding principal balance of the Loans exceeds Borrowing Availability, then the Borrower shall immediately prepay the outstanding Term Loans in an amount sufficient to eliminate such excess in accordance herewith.

(b)     <u>Interest on the Term Loans</u>.  The outstanding principal amount of the Term Loans shall bear interest until paid in full at the rate of five percent (5.0%) per annum.  Notwithstanding the foregoing: (i) any portion of the Term Loans which is not paid when due or within any applicable grace or cure period shall automatically bear interest until paid in full at the Post-Default Rate; and (ii) in addition to and not in limitation of the foregoing, during the period when any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Term Loans shall automatically bear interest, after as well as before judgment, at the Post-Default Rate; in each case (i) and (ii), commencing on the date such Event of Default first occurred and ending on the date such Event of Default is cured or waived in accordance with the terms of this Agreement.  Accrued interest on the outstanding principal balance of Term Loans shall be payable on each date that any portion of the principal of such Term Loan shall be payable hereunder and on the Term Loan Maturity Date; *provided* that interest accrued at the Post-Default Rate shall be payable on demand, subject to the terms of the Financing Orders.  All interest hereunder shall be computed on the basis of a year of 360 days, and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)     <u>Repayment of the Term Loans</u>.  The Borrower hereby unconditionally promises to pay to the Lender the entire unpaid principal balance of the Term Loans and all accrued and unpaid interest,

fees and charges thereon on the Term Loan Maturity Date without further application to or order of the Bankruptcy Court, subject to the terms of the Loan Documents and the Financing Orders.

(d)    No Discharge; Survival of Claims.    The Borrower agrees that: (i) the Obligations hereunder shall not be discharged by the entry of an order confirming a Reorganization Plan in the Chapter 11 Case (and the Borrower pursuant to Section 1141(d)(4) of the Bankruptcy Code hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Lender pursuant to the Financing Orders and described in the Loan Documents and the Liens granted to the Lender pursuant to the Financing Orders and described in the Loan Documents shall not be affected in any manner by the entry of an order confirming a Reorganization Plan in the Chapter 11 Case.

(e)    Loan Accounts.    The Lender shall maintain in accordance with its usual practice an account evidencing the indebtedness of the Borrower to the Lender in respect of the Term Loans made by the Lender, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.  The entries made in the account maintained by the Lender pursuant to this Section 2.1(e) shall be prima facie evidence of the existence and amounts of the obligations recorded therein; *provided* that the failure of the Lender to maintain such account or any error therein shall not in any manner affect the obligation of the Borrower to repay the Term Loans in accordance with the terms of this Agreement.

2.2    **Borrowing Procedure**.    To request a Borrowing, the Borrower shall deliver, by hand delivery, electronic mail or telecopier, a duly completed and executed Borrowing Request to the Lender not later than 10:00 a.m. prevailing Mountain Time, on the Business Day immediately prior to the date of the proposed Borrowing.  Borrowing Requests shall not be submitted more frequently than bi-weekly, provided each Borrowing Request may cover a two-week period, subject to the other terms and conditions of this Agreement.  Each Borrowing Request shall be irrevocable and shall specify the following information in compliance with Section 2.1:

(a)    the aggregate amount of such Borrowing;

(b)    the date of such Borrowing, which shall be a Business Day;

(c)    the location and number of Borrower's account to which funds are to be disbursed; and

(d)    that the conditions set forth in Sections 5.1 and 5.2 have been satisfied as of the date of such Borrowing Request.

2.3    **Loans and Funding of Loans**.

(a)    Loans and Borrowings.    The Term Loans comprising any Borrowing shall be: (i) in an aggregate principal amount that is an integral multiple of $100,000 and not less than $200,000; or (ii) equal to the remaining available balance of the applicable Commitments.  The Commitments shall terminate, if not earlier in accordance with this Agreement, then automatically on the Term Loan Maturity Date; *provided, however*, that upon the Term Loan Maturity Date and notwithstanding the occurrence thereof, the Lender agrees to make available to Borrower an additional Term Loan Advance to fund the Carve-Out in accordance with the terms of this Agreement and the Financing Orders.  In furtherance thereof, the Carve-Out shall be funded into an account specified by the Debtor promptly upon the Term Loan Maturity Date; *provided, however*, that any or all of the Carve-Out that constitutes fees and expenses incurred by professionals or professional firms shall be paid only to the extent authorized by the Bankruptcy Court and otherwise pursuant to procedures approved by the Bankruptcy Court, and unutilized amounts, if any, shall be returned to Lender and Lender for application to the Obligations as soon as practicable.

(b)     Funding of Loans.  At the Effective Time, the Lender will fund the Term Loans to be funded on such date, subject to the Borrowing Availability.  So long as any and all condition precedent herein specified shall have been met, the Lender shall make each Term Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to an account as directed by the Borrower in the applicable Borrowing Request maintained with the Lender.

**2.4     Payments Generally**.

(a)     Payments Generally.  The Borrower shall be obligated to make each payment required to be made by the Borrower hereunder (whether of principal, interest, fees or otherwise) prior to 2:00 p.m. prevailing Mountain Time, on the date when due, in immediately available funds, in U.S. Dollars, without set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All payments shall be made to the Lender directly using the wire transfer instructions provided by the Lender. If any payment shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

(b)     Application of Payments.  If at any time insufficient funds are received by and available to the Lender to pay fully all amounts of principal, interest and fees then due hereunder under any circumstances, including during, or as a result of the exercise by the Lender of remedies hereunder or under any other Loan Document and applicable law, such funds shall be applied: (i) first, to pay interest, fees, costs and expenses then due hereunder ratably among the parties entitled thereto in accordance with the amounts of interest, fees, costs and expenses then due to such parties; (ii) second, to pay principal of the Loans then due hereunder; and (iii) third, to any other Obligations then due.

**2.5     Prepayment of Loans**.

(a)     Optional Prepayments of Loans.  The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior notice in accordance with Section 2.5(d), *provided* that each such prepayment of any Borrowing shall be in an amount that is at least equal to $100,000 or any greater multiple of $100,000.

(b)     Mandatory Prepayments.  The Borrower shall be obligated to, and shall, make prepayments of the Loans hereunder as follows:

(i)     Incurrence of Debt; Sale or Offering of Securities.  Without limiting the obligation of the Borrower to obtain the consent of the Lender to any incurrence of Indebtedness not otherwise permitted hereunder and subject to the Financing Orders, the Borrower agrees on the closing of any incurrence of Indebtedness by the Credit Party (other than Indebtedness permitted under Section 7.1 or the closing of any offering or sale of Equity Securities by the Credit Party from and after the date of this Agreement) to prepay the Loans hereunder upon the date of such incurrence of Indebtedness or issuance of such Equity Securities, as applicable in an aggregate amount equal to 100% of the amount of the Net Cash Payments from such incurrence of Indebtedness or issuance of Equity Securities received by any Credit Party, such prepayment to be effected in each case in the manner and to the extent specified in Section 2.5(c) below.

(ii)     Sale of Assets.  Without limiting the obligation of the Borrower to obtain the consent of the Lender to any Disposition not otherwise permitted hereunder and subject to the Financing Orders, the Borrower agrees, on the date of any Disposition by the Credit Party (other than Dispositions permitted by Section 7.4 and Dispositions consisting of subleases of real property by the Credit Party permitted by Section 7.4(b)), to prepay the Loans hereunder upon the date of such Disposition, in an aggregate amount equal to 100% of the amount of such Net Cash Payments from

such Disposition received by the Credit Party on the date of such Disposition, such payment to be effected in each case and in the manner and to the extent specified in Section 2.5(c) below.

(iii) <u>Proceeds of Casualty Events</u>. Upon the receipt by the Credit Party of the proceeds of insurance, condemnation award or other compensation in respect of any Casualty Event affecting any property of the Credit Party and subject to the Financing Orders, the Borrower shall prepay the Loans in an aggregate amount equal to 100% of the Net Cash Payments from such Casualty Event, such prepayment to be effected in each case in the manner and to the extent specified in Section 2.5(c) below.

(iv) <u>Excess Amounts</u>. If: (a) the Commitments are partially reduced for any reason, then (x) at or prior to the effective date of such reduction, the Lender shall notify the Borrower of the sum of the Loan Exposure after giving effect thereto and (y) if the sum of the Loan Exposure would exceed the aggregate amount of the Commitments less the Carve-Out Reserve after giving effect to such reduction, then the Borrower shall on the date of such reduction, repay or prepay the Term Loans in an aggregate amount sufficient to eliminate such excess; or (b) at any time the then outstanding principal balance of the Term Loans exceeds the Borrowing Availability, then the Borrower shall immediately prepay the outstanding Term Loans in an amount sufficient to eliminate such excess.

(v) <u>Extraordinary Receipts</u>. Upon the receipt by the Credit Party of any Extraordinary Receipts (other than (A) proceeds from any key man life insurance policy not constituting Collateral, (B) liability insurance proceeds which are payable to a third party as a result of any liability of a Credit Party and (C) workers' compensation insurance, directors' and officers' insurance and health insurance payable to workers, directors, officers or employees), subject to the Financing Orders, the Borrower shall prepay the Loans in an amount equal to 100% of such Net Cash Payments, such prepayment to be effected in each case in the manner and to the extent specified in Section 2.5(c) below.

(vi) <u>363 Sales or Reorganization Plan</u>. Not later than one (1) Business Day following the closing of any 363 Sale or the confirmation of any Reorganization Plan, including, without limitation, any Reorganization Plan that provides for a Disposition, subject to the Financing Orders, the Borrower shall make prepayments of the Loans, if any are then outstanding, in an amount equal to 100% of such Net Cash Payments, such prepayment to be effected in the manner and to the extent specified in Section 2.5(c) below.

(c) <u>Application</u>. In the event of any mandatory prepayment of Loans pursuant to this Section 2.5, the proceeds shall be applied to reduce the installment of principal of the Term Loans due on the Term Loan Maturity Date.

(d) <u>Notification of Certain Prepayments</u>. The Borrower shall notify the Lender by telephone (confirmed by telecopy) of any voluntary prepayment of the Term Loans not later than 1:00 p.m. prevailing Mountain Time three Business Days before the date of such prepayment. The Borrower shall notify the Lender of any mandatory prepayment of the Loans pursuant to Section 2.5(b) hereunder as soon as practicable. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Loans or portion thereof to be prepaid; *provided, however*, that a notice of a voluntary prepayment in full of the Term Loans in connection with a proposed refinancing of the Term Loans may be conditioned on the consummation of such refinancing and may be revoked if such refinancing transaction is not consummated.

(e) <u>Prepayments Accompanied by Interest</u>. All prepayments of the Term Loans pursuant to this Section 2.5 shall be accompanied by accrued interest through the date of prepayment.

**2.6**     **Fees**.

        (a)     <u>Origination Fee</u>.  The Borrower agrees to pay to the Lender at the Effective Time, a non-refundable origination fee ("<u>Origination Fee</u>") equal to One Hundred Thousand Dollars ($100,000), which fee shall be fully earned and due and payable at the Effective Time in addition to any other fee from time to time payable under the Loan Documents and paid in cash at the Effective Time from the Effective Time Term Loan Advance.

        (b)     <u>Non-Refundable Nature of Fees</u>.  All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Lender.  Fees paid shall not be refundable under any circumstances, absent manifest error in the determination thereof.

**2.7**     **[Intentionally Omitted.]**

**2.8**     **[Intentionally Omitted.]**

**2.9**     **Lender's Evidence of Indebtedness**.  The Borrower agrees that: (a) upon written notice by the Lender to the Borrower that a promissory note is requested by such Lender to evidence the Loans and other Obligations owing or payable to, or to be made by, such Lender, the Borrower shall promptly (and in any event within five (5) Business Days of any such request) execute and deliver to the Lender an appropriate Term Note (substantially in the form of <u>Exhibit A</u> annexed hereto), as applicable, and (b) upon the Lender's written request, and in any event within five (5) Business Days of any such request, the Borrower shall execute and deliver to the Lender new notes and/or divide the notes in exchange for then existing notes in such smaller amounts or denominations as such Lender shall specify in its reasonable discretion; *provided*, that, the aggregate principal amount of such new notes shall not exceed the aggregate principal amount of the applicable Term Note outstanding at the time such request is made; and *provided, further*, that such notes that are to be replaced shall then be deemed no longer outstanding hereunder and replaced by such new notes and returned to the Borrower upon the Lender's receipt of the replacement notes.  If any promissory note being replaced has been mutilated, the Lender holding such promissory note shall surrender such promissory note to the Borrower after the Lender's receipt of the replacement promissory note and if any such replaced promissory note has been destroyed, lost or stolen, the holder of such promissory note shall furnish the Borrower with an indemnity in writing reasonably acceptable to the Borrower and such holder to hold the Borrower harmless in respect of such destroyed, lost or stolen promissory note.

## ARTICLE 3

### [Intentionally Omitted.]

## ARTICLE 4

### Representations and Warranties

        Until the Term Loan Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, the Credit Party represents and warrants to the Lender, at all times, that:

**4.1**     **Organization; Powers**.  The Credit Party has been duly formed or organized and is validly existing and in good standing under the laws of its jurisdiction of organization.  The Credit Party has, upon the entry of the Financing Orders by the Bankruptcy Court, all requisite power and authority to carry on its business as now conducted and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure to have such power or authority or to be so qualified or in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**4.2     Authorization; Enforceability**.  Upon the entry of the Financing Orders by the Bankruptcy Court, the Transactions are within the power and authority of the Credit Party and have been duly authorized by all necessary action on the part of the Credit Party.  Subject to the entry of the Financing Orders, this Agreement and the other Loan Documents have been duly authorized, executed and delivered by the Credit Party and constitute legal, valid and binding obligations of the Credit Party, enforceable in accordance with their respective terms, subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**4.3     Governmental Approvals; No Conflicts**.  Upon entry of the Financing Orders by the Bankruptcy Court, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority which has not been obtained, (b) will not violate any applicable law, policy or regulation or the organizational documents of the Credit Party or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Credit Party, or any assets, or give rise to a right thereunder to require any payment to be made by the Credit Party that could reasonably be expected to result in a Material Adverse Effect,  and (d) except for the Liens created by the Loan Documents, will not result in the creation or imposition of any Lien on any asset of the Credit Party, except Liens created by the Loan Documents and Permitted Liens (including pursuant to the Financing Orders).

**4.4     Financial Condition; No Material Adverse Change**.

(a)     The Credit Party has heretofore delivered to the Lender the following financial statements:

(i)     the consolidated balance sheets and statement of operations, shareholders' equity and cash flows of Borrower and its Subsidiaries as of and for the fiscal year ended December 31, 2017 accompanied by a report of Borrower's independent public accountants; and

(ii)     the unaudited consolidated balance sheets and statement of operations, and cash flows of Borrower and its Subsidiaries for the fiscal quarter ended June 30, 2018.

Such financial statements present fairly, in all material respects, the respective consolidated financial position and results of operations and cash flows of the respective entities as of such respective dates and for such periods in accordance with GAAP in all material respects, subject to year-end audit adjustments and the absence of footnotes in the case of such unaudited statements.

(b)     Except as set forth in Schedule 4.4(b) and other than the commencement of the Chapter 11 Case and Effect of Bankruptcy there are no post-Petition Date liabilities of Borrower of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise that would be required by GAAP to be reflected on the financial statements of the Credit Party other than those which would not reasonably be expected to result in a Material Adverse Effect.  Subsequent to June 30, 2018 and as of the Effective Time, there has been no Material Adverse Effect on the Borrower.

(c)     The forecasts of financial performance of the Credit Party, including the Budget delivered at the Effective Time, projected income statements, statements of cash flows and balance sheets, furnished to the Lender have been prepared in good faith by the Credit Party, and based on estimates and assumptions believed by the Credit Party to be reasonable as of the date when such projections are made; *provided, however*, that such projections are not to be viewed as facts and the actual results during the period or periods covered thereby may differ from such projections and the differences may be material.

**4.5     Properties**.

(a)     The Credit Party has good and marketable title to, or valid and subsisting leasehold interests in, all its Property material to its business subject to the Liens listed on part (b) of Schedule 4.14 or as permitted by Section 7.2.  All machinery and equipment material to the business of the Credit Party and the Subsidiaries is in good operating condition (for the purpose for which it is used) and repair (normal wear and tear and immaterial loss from casualty and condemnation excepted), and all necessary replacements of and repairs thereto have been made so as to preserve and maintain in all material respects the value and operating efficiency of such machinery and equipment.

(b)     Set forth on Schedule 4.5 is a complete list of all federally registered Patents, Trademarks and Copyrights of the Credit Party ("Registered Proprietary Rights") as of the date of this Agreement.  The Registered Proprietary Rights have been properly maintained and renewed in accordance with all applicable provisions of law and administrative regulations in the United States.  The Credit Party has taken commercially reasonable steps to protect its Registered Proprietary Rights.

(c)     As of the Effective Time, Schedule 4.5 contains a true, accurate and complete list of all Real Property Assets, whether owned or leased as of the date of this Agreement.  Each lease, sublease or assignment of lease (together with all amendments, modifications, supplements, renewals or extensions thereof) affecting any Leasehold Property of the Credit Party is in full force and effect and the Credit Party has no Knowledge of any material default that has occurred and is continuing thereunder, and each such agreement constitutes the legal, valid and binding obligation of the Credit Party or Subsidiary, as applicable, enforceable against the Credit Party or Subsidiary in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

**4.6     Litigation and Environmental Matters.**

(a)     Except for the Chapter 11 Case, the Disclosed Matters set forth in part (a) of Schedule 4.6 and for litigation that is stayed by the commencement and continuation of the Chapter 11 Case, as of the date of this Agreement, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the Knowledge of the Credit Party, threatened against or affecting the Credit Party or any Subsidiary: (i) in which any Person has alleged that the use by the Credit Party or any Subsidiary of any Patent, Trademark or Copyright violates or infringes on the rights of any Person; (ii) that challenge the enforceability or validity of any Loan Document or any part of the Transactions; or (iii) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than the Disclosed Matters set forth in part (a) of Schedule 4.6).

(b)     Except for the Disclosed Matters set forth in part (b) Schedule 4.6 or except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, the Credit Party: (i) has not failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required in connection with the operation of the Credit Party's business to be in compliance with all applicable Environmental Laws; (ii) has not become subject to any Environmental Liability; (iii) has not received notice of any claim with respect to any Environmental Liability or any inquiry, allegation, notice or other communication from any Governmental Authority which is currently outstanding or pending concerning its compliance with any Environmental Law; or (iv) does not know of any basis for any Environmental Liability.

**4.7     Compliance with Laws.**  The Credit Party is in compliance in all material respects with all laws, regulations, policies and orders of any Governmental Authority applicable to it or its property; except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**4.8     Investment and Holding Company Status**.  The Credit Party is not (a) an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended, or (b) a "bank holding company" as defined in, or subject to regulation under, the Bank Holding Company Act of 1956, as amended.

**4.9     Taxes**.  The Credit Party has timely filed or caused to be filed all federal, state, foreign and material local Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except for any Taxes the nonpayment of which is required or permitted by the Bankruptcy Code.

**4.10     ERISA**.  The Credit Party does not have any Pension Plans.

**4.11     Disclosure**.  The information, reports, financial statements, exhibits and schedules furnished at or prior to the Effective Time in writing by or on behalf of the Credit Party to the Lender in connection with the negotiation, preparation or delivery of this Agreement and the other Loan Documents or included herein or therein or delivered pursuant hereto or thereto, at the Effective Time, when taken as a whole do not contain any untrue statement of material fact or omit to state any material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not materially misleading.  All written information furnished after the Effective Time by the Credit Party to the Lender in connection with this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby will be true, complete and accurate in all material respects when taken as a whole.  Any projections at any time delivered to the Lender shall be prepared by the Credit Party in good faith and based on estimates and assumptions that are reasonable as of the date when such projections are made; *provided, however*, that such projections are not to be viewed as facts and the actual results during the period or periods covered thereby may differ from such projections and the differences may be material.  There is no fact known to the Credit Party that could reasonably be expected to have a Material Adverse Effect that has not been disclosed herein, in the other Loan Documents or in a report, financial statement, exhibit, schedule, disclosure letter or other writing furnished to the Majority Lender for use in connection with the transactions contemplated hereby.

**4.12     Capitalization**.  As of the Effective Time, after giving effect to the Transactions, the capital structure and ownership of the Credit Party and its Subsidiaries is as set forth on Schedule 4.12.  As of the Effective Time, after giving effect to the Transactions, the authorized, issued and outstanding capital stock and equity interests of the Credit Party and its Subsidiaries consists of the capital stock and equity interests described on Schedule 4.12, all of which is duly and validly issued and outstanding, and in the case of any corporation, fully paid and nonassessable.  Except as set forth on Schedule 4.12, as of the Effective Time, (x) there are no outstanding Equity Rights with respect to the Credit Party or any Subsidiary and, (y) there are no outstanding obligations of the Credit Party or any Subsidiary to repurchase, redeem, or otherwise acquire any shares of capital stock of or other equity interest in the Credit Party or any Subsidiary, nor are there any outstanding obligations of the Credit Party or any Subsidiary to make payments to any Person, such as "phantom stock" payments, where the amount thereof is calculated with reference to the fair market value or equity value of the Credit Party or any Subsidiary.

**4.13     [Intentionally Omitted]**.

**4.14     Material Indebtedness, Liens and Agreements**.

(a)     Part (a) of Schedule 4.14 contains a complete and correct list, as of the Effective Time, of all Material Indebtedness or any extension of credit (or commitment for any extension of credit) to, or guarantee by, the Credit Party or any Subsidiary the aggregate principal or face amount of which equals or exceeds (or may equal or exceed) $50,000, and the aggregate principal or face amount outstanding or that may become outstanding with respect thereto is correctly described on Schedule 4.14.

(b)    Part (b) of <u>Schedule 4.14</u> is a complete and correct list, as of the date of this Agreement, of each Lien (other than the Liens in favor of Lender) securing Indebtedness of any Person and covering any property of the Credit Party or its Subsidiaries, and the aggregate Indebtedness secured (or which may be secured) by each such Lien and the Property covered by each such Lien is correctly described in the appropriate part of <u>Schedule 4.14</u>.

(c)    Part (c) of <u>Schedule 4.14</u> is a complete and correct list, as of the date of this Agreement, of each contract and arrangement to which the Credit Party or any Subsidiary is a party for which breach, nonperformance, cancellation or failure to renew would have a Material Adverse Effect other than purchase orders made in the ordinary course of business and subject to customary terms.  All such agreements are valid, subsisting, in full force and effect, are currently binding and will continue to be binding upon the Credit Party or any Subsidiary that is a party thereto and, to the Knowledge of the Credit Party, binding upon the other parties thereto in accordance with their terms.  The Credit Party is not in default in any material respect under any such agreements.

**4.15    Federal Reserve Regulations**.  The Credit Party is not engaged principally or as one of its important activities in the business of extending credit for the purpose of purchasing or carrying margin stock (as defined in Regulation U of the Board).  The making of the Loans hereunder at the Effective Time, the use of the proceeds thereof as contemplated hereby, and the security arrangements contemplated by the Loan Documents and the Financing Orders, will not violate or be inconsistent with any of the provisions of Regulations T, U, or X of the Board of Governors of the Federal Reserve System.

**4.16    Legality; Validity and Enforceability of Liens**.  Upon entry of the Financing Orders by the Bankruptcy Court, the Lender will have legal, valid and enforceable Liens having the priority specified in the Financing Orders on, and security interests in, all of the Credit Party's right, title and interest in and to the Collateral and the proceeds thereof.

**4.17    Force Majeure**.  Since June 30, 2018, the business, properties and other assets of the Credit Party [and its Subsidiaries] have not been materially and adversely affected in any way as the result of any fire or other casualty, strike, lockout or other labor trouble, embargo, sabotage, confiscation, contamination, riot, civil disturbance, activity of armed forces or act of God.

**4.18    Labor and Employment Matters**.

(a)    (A) as of the date of this Agreement, no employee of the Credit Party or any Subsidiary is represented by a labor union, no labor union has been certified or recognized as a representative of any such employee, and the Credit Party and its Subsidiaries does not have any obligation under any collective bargaining agreement or other agreement with any labor union or any obligation to recognize or deal with any labor union, and there are no such contracts or other agreements pertaining to or which determine the terms or conditions of employment of any employee of the Credit Party; (B) there are no pending or threatened representation campaigns, elections or proceedings, except such as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; (C) the Credit Party does not have Knowledge of any strikes, slowdowns or work stoppages of any kind, or threats thereof, and no such activities occurred during the 24-month period preceding the date hereof, except such as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and (D) the Credit Party has not engaged in, admitted committing or been held to have committed any unfair labor practice, except such as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Credit Party is in compliance in all material respects with, all applicable laws, rules and regulations respecting employment, wages, hours, compensation, benefits, and payment and withholding of taxes in connection with employment.

(c)    Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Credit Party is in compliance with, all applicable laws, rules and regulations respecting occupational health and safety, whether now existing or subsequently amended or enacted, including the Occupational Safety & Health Act of 1970, 29 U.S.C. Section 651 et seq. and the state analogies thereto, all as amended or superseded from time to time, and any common law doctrine relating to worker health and safety.

**4.19    Bank Accounts**.  Upon any request by Agent, the Credit Party shall furnish the Lender with a list of all banks, securities intermediaries and other financial institutions at which the Credit Party maintains any deposit account, bank account, securities account and/or other account.

**4.20    OFAC**.  No Credit Party, nor any Subsidiary of the Credit Party (i) is a person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such person in any manner violative of Section 2, or (iii) is a person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order.  The regulations and executive orders described in clauses (i) through (iii) of the preceding sentence are referred to herein as "OFAC Regulations".

**4.21    Patriot Act**.  The Credit Party is in compliance, in all material respects, with the (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto (collectively, the "FAC Regulations"), and (ii) the Uniting And Strengthening America By Providing Appropriate Tools Required To Intercept And Obstruct Terrorism (USA Patriot Act of 2001).  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended (the "FCPA").

# ARTICLE 5

## Conditions and Payments

**5.1    Conditions to Funding of the Effective Time Term Loan Advance and the Effective Time**.  The obligations of the Lender to make the Effective Time Term Loan Advance and for the Effective Time to occur are subject to the satisfaction or waiver of each of the following conditions precedent:

(a)    No Defaults.  At the time of, and immediately after giving effect to the making of the Term Loans, no Default shall have occurred and be continuing.

(b)    Representations and Warranties.  The representations and warranties of the Credit Party set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of the making of the Term Loans, both before and after giving effect thereto and to the use of the proceeds thereof, except: (i) to the extent any such representation or warranty is expressly stated to have been made as of a specific date, in which case, such representation or warranty shall be true and correct in all material respects as of such date; and (ii) that any representation or warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects, subject to the materiality qualification contained therein.

(c)    Counterparts of Agreement.  The Lender shall have received from each party hereto either: (i) a counterpart of this Agreement executed on behalf of such party; or (ii) written evidence satisfactory

to the Lender (which may include telecopy transmission of an executed signature page of this Agreement) that such party has executed a counterpart of this Agreement.

(d)     Security Agreement. The Lender shall have received from each party thereto a counterpart of the Security Agreement executed on behalf of such party.

(e)     Notes.  The Lender shall have received a duly completed and executed Term Note if the Lender has requested that its Term Loans be evidenced by a promissory note.

(f)     Financial Officer Certificate.  The Lender shall have received a certificate, dated the Effective Time and executed by a Designated Financial Officer, confirming compliance with the conditions set forth in this Article 5 at the Effective Time.

(g)     Interim Order.  Entry by the Bankruptcy Court of the Interim Order, in form and substance satisfactory to the Lender (and such entry shall occur no later than the close of business on October 24, 2018).

(h)     Budget.  The Lender shall have received the Budget referred to in Section 6.15 hereof and attached hereto as Exhibit 6.15.

(i)     Evidence of Insurance.  The Lender shall have evidence from the Credit Party or its insurance brokers that all insurance required to be maintained pursuant to Section 6.5 is in full force and effect.

(j)     Other Documents.   The Lender shall have received all material contracts, instruments, opinions, certificates, assurances and other documents as the Lender shall have reasonably requested and the same shall be reasonably satisfactory to each of them.

(k)     No Material Adverse Effect.  There shall have occurred no Material Adverse Effect (other than the commencement of the Chapter 11 Case) since the Petition Date.

(l)     Fees and Expenses.  At or prior to the Effective Time, the Lender shall have received all fees and other amounts due and payable to the Lender, including, to the extent invoiced, reimbursement or payment of all reasonable and documented out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder.

(m) Authorization.  The Lender shall have received such documents and certificates as the Lender may reasonably request relating to the authorization of the transactions contemplated hereby and any other legal matters relating to the Credit Party, this Agreement or the other Loan Documents, all in form and substance reasonably satisfactory to the Lender.

All obligations of the Lender under this Agreement shall automatically terminate without any further action if the conditions required under this Section 5.1 have not been satisfied on or before the close of business on October 24, 2018 or waived by the Lender in its sole discretion.

**5.2     Conditions to each Term Loan**.  The obligations of the Lender to make any Term Loan (including the Effective Time Term Loan Advance) are subject to the satisfaction or waiver of each of the following conditions precedent:

(a)     Notice.  The Lender shall have received a Borrowing Request as required by Section 2.2 (or such notice shall have been deemed given in accordance with Section 2.2) if Term Loans are being requested.

(b)      No Defaults.  At the time of, and immediately after giving effect to the making of the Term Loans, no Default shall have occurred and be continuing.

(c)      Representations and Warranties.  The representations and warranties of the Credit Party set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of the making of the Term Loans, both before and after giving effect thereto and to the use of the proceeds thereof, except: (i) to the extent any such representation or warranty is expressly stated to have been made as of a specific date, in which case, such representation or warranty shall be true and correct in all material respects as of such date; and (ii) that any representation or warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects, subject to the materiality qualification contained therein.

(d)      No Legal Bar.  No order, judgment or decree of any Governmental Authority shall purport to restrain the Lender from making any Term Loans to be made by it.

(e)      Bankruptcy Matters.  At the time of such Borrowing: (i) if such Borrowing is prior to the entry and effectiveness of the Final Order, the Interim Order shall not have terminated or expired, and the date of such Borrowing shall not be more than twenty six (26) days from the Petition Date; (ii) if such Borrowing is after the entry and effectiveness of the Final Order, the Final Order shall be effective, and shall not have been terminated or expired; (iii) no Financing Order shall have been vacated, reversed, stayed, amended, supplemented or otherwise modified (without the consent of the Lender); (iv) no motion for reconsideration of any Financing Order shall be pending; and (v) no appeal of any Financing Order shall be pending and no Financing Order shall be the subject of a stay pending appeal or a motion for a stay pending appeal.

(f)      Budget.  At the time of such Borrowing, the amount of such Borrowing shall not be in excess of the amounts necessary to fund expenditures (in the aggregate) permitted under the Budget for such period, subject to any Permitted Variance and shall be for a purpose permitted under Section 6.9.

(g)      Commitment; Borrowing Availability.  After giving effect to such Borrowing, the aggregate then outstanding principal amount of the Term Loans shall not exceed the Commitment, and in no event shall the outstanding principal amount of the Term Loans be in excess of the Borrowing Availability at any time.

(h)      Other Documents.  The Lender shall have received all material contracts, instruments, opinions, certificates, assurances and other documents as the Lender shall have reasonably requested and the same shall be reasonably satisfactory to it.

Each delivery of a Borrowing Request and the acceptance by the Borrower of the proceeds of such Borrowing shall constitute a representation and warranty by the Borrower that on the date of such Borrowing (both immediately before and after giving effect to such Borrowing and the application of the proceeds thereof) the conditions contained in this Section 5.2 have been satisfied.  The Borrower shall provide such information as the Lender may reasonably request to confirm that the conditions in this Section 5.2 have been satisfied.

# ARTICLE 6

## Affirmative Covenants

Until the Term Loan Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, the Credit Party covenants and agrees with the Lender that:

**6.1**     **Financial Statements and Other Information**.  The Credit Party will furnish to the Lender:

(a)     as soon as available and in any event within 30 days after the end of each month:

(i)     consolidated statements of operations and free cash flows of Borrower and its Subsidiaries for such month and for the period from the beginning of the respective fiscal year to the end of such month, and the related consolidated balance sheets of Borrower and its Subsidiaries as at the end of such period, setting forth in each case in comparative form the corresponding consolidated figures for the corresponding period in the preceding fiscal year, and the corresponding figures for the forecasts most recently delivered to Lender for such period; and

(ii)     a certificate of a Designated Financial Officer in the form of <u>Exhibit C</u>, which certificate shall state that said consolidated financial statements referred to in the preceding clause (i) fairly present in all material respects the consolidated financial condition and results of operations of Borrower and its Subsidiaries, in each case in accordance with GAAP, consistently applied, as at the end of, and for, such period (subject to normal quarter-end adjustments and year-end audit adjustments and the omission of footnotes).

(b)     promptly upon receipt thereof, copies of all management letters and accountants' letters received by the Credit Party; and

(c)     on the Friday of the fifth week and the ninth week after the Petition Date, an updated Budget; and

(d)     promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Credit Party, or compliance with the terms of this Agreement, as the Lender may reasonably request.

**6.2**     **Notices of Material Events**.  The Credit Party will furnish to the Lender prompt written notice of the following:

(a)     the occurrence of any Default;

(b)     the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Credit Party or Affiliate that could reasonably be expected to result in a Material Adverse Effect;

(c)     any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect (other than the initial commencement of the Chapter 11 Case); and

(d)     the incurrence of any material Lien (other than Permitted Liens and the Carve-Out) on, or claim asserted against any of the Collateral (other than as a result of filing proofs of claims in the Chapter 11 Cases).

Each notice delivered under this Section 6.2 shall be accompanied by a statement of a Designated Financial Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

**6.3**     **Existence; Conduct of Business**.  Except as resulting from the Chapter 11 Case, the Credit Party shall continue to, and shall continue to cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect (a) its legal existence and (b) the rights, licenses, permits, privileges and franchises material to the conduct of its business, except, in the case of this clause (b), such as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect;

*provided* that the foregoing shall not prohibit any merger, consolidation, liquidation, dissolution or any discontinuance or sale of such business permitted under Section 7.4.

**6.4    Payment of Obligations**.  Subject to the approval of the Bankruptcy Court in the Chapter 11 Case, the Credit Party shall pay its obligations, including Tax liabilities before the same shall become delinquent or in default, except where: (a) the validity or amount thereof is being contested in good faith by appropriate proceedings; (b) the Credit Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, which reserves shall be acceptable to the Majority Lender; and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**6.5    Maintenance of Properties; Insurance**.  The Credit Party shall (a) keep and maintain all property material to the conduct of its business in good working order and condition (for the purpose for which it is used), ordinary wear and tear and immaterial loss from casualty and condemnation excepted, and (b) maintain insurance, with financially sound and reputable insurance companies, as may be required by law and such other insurance in such amounts and against such risks as are customarily maintained by similarly sized companies engaged in the same or similar businesses operating in the same or similar locations, including business interruption insurance, product liability insurance and, in the event that any Collateral is located in any area that has been designated by the Federal Emergency Management Agency as a "Special Flood Hazard Area", flood insurance on such Collateral; *provided* that the Lender agrees that the Credit Party's insurance policies and coverage levels existing as of the Effective Time is satisfactory to the Lender as of the Effective Time.  Without limiting the generality of the foregoing, the Credit Party shall maintain or cause to be maintained replacement value casualty insurance on the Collateral under such policies of insurance, in each case with such insurance companies, in such amounts, with such deductibles, and covering such terms and risks as are at all times satisfactory to Lender in its commercially reasonable judgment.  As soon as practicable and in any event on or before the date that is seven (7) Business Days after the Effective Time, all general liability and other liability policies with respect to the Credit Party shall name the Lender as an additional insured thereunder as its interests may appear, and all business interruption and casualty insurance policies shall contain a loss payable clause or endorsement, satisfactory in form and substance to the Lender as the loss payee thereunder.  All policies of insurance shall provide that the insurer shall endeavor to provide at least 30 days prior written notice to Lender of any modifications or cancellation of such policy.

**6.6    Books and Records; Inspection Rights**.  The Credit Party shall keep proper books of record and account in which entries are made of all dealings and transactions in relation to its business and activities which fairly record in all material respects such transactions and activities.  The Credit Party shall permit any representatives of the Lender upon reasonable prior notice (or, if a Default or Event of Default has occurred and is continuing, any independent examiners or advisors designated by the Lender) to visit, inspect and audit its properties, to examine, audit and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants as frequently as the Lender deems appropriate.  The Credit Party shall reimburse the Lender for all reasonable and documented examination, audit and inspection costs (including all reasonable and documented fees, costs and expenses charged by independent inspectors, auditors or examiners during the occurrence and continuance of a Default or Event of Default), and all reasonable and documented out-of-pocket expenses incurred in connection with such examinations, inspections and audits.

**6.7    Fiscal Year**.  The fiscal year of the Credit Party ends on December 31 of each year and, the Credit Party shall maintain such fiscal year end.

**6.8    Compliance with Laws**.  The Credit Party shall comply with (i) all permits, licenses and authorizations, including environmental permits, licenses and authorizations, issued by a Governmental Authority, except to the extent that any failure to comply therewith could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (ii) all laws, rules, regulations and orders including Environmental Laws, all OFAC Regulations, the Trading with the Enemy Act, the FAC Regulations, the USA Patriot Act of 2001 and the FCPA, of any Governmental Authority and (iii) all

contractual obligations, in each case applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**6.9    Use of Proceeds**.  The Borrower will use the proceeds of the Term Loans in a manner consistent with the Budget (subject to the Permitted Variance) and the Financing Orders for payment of: (a) the Bridge Financing, (b) post-petition operating expenses and other working capital and financing requirements of the Borrower; (c) certain transaction and bankruptcy related fees, costs and expenses (including the fees, expenses and disbursements of professionals retained by order of the Bankruptcy Court and payable under Sections 328, 330 and 331 of the Bankruptcy Code in accordance with the Financing Orders and standing orders of the Bankruptcy Court applicable to the Chapter 11 Case; (d) the Carve-Out; and (e) Pre-Petition claims permitted by the Bankruptcy Court.  For the avoidance of doubt, all expenditures (including, without limitation, all capital expenditures) of the Borrower may not exceed the expenditures set forth in the Budget (subject to the Permitted Variance) at any time.  No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.

**6.10    [Intentionally Omitted]**.

**6.11    [Intentionally Omitted]**.

**6.12    Environmental Matters; Reporting**.  The Credit Party shall observe and comply with all Environmental Laws, except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.  The Credit Party will give the Lender prompt written notice of any violation as to any Environmental Law by the Credit Party and of the commencement of any judicial or administrative proceeding relating to Environmental Laws which shall, or could reasonably be expected to, have a Material Adverse Effect.

**6.13    Matters Relating to Additional Real Property Collateral**.

(a)    From and after the Effective Time, in the event that the Credit Party acquires any Mortgaged Property or in the event that the Lender determines that any Real Property Asset has become a Mortgaged Property, if requested by the Lender, the Credit Party shall: (i) deliver to the Lender, as soon as practicable after the Lender has notified the Credit Party that a Real Property Asset is a Mortgaged Property, fully executed and notarized Mortgages, in proper form for recording in all appropriate places in all applicable jurisdictions, encumbering the interest of the applicable Credit Party in such Mortgaged Property, together with mortgagee title insurance policies or commitments therefor, and copies of all surveys, deeds, title exception documents, flood hazard certificates and other documents as Lender may reasonably require with respect to such Mortgaged Property, all of which shall be in form and substance satisfactory to Lender and provided at the sole cost and expense of the Credit Party; and (ii) take or cause to be take all such other actions as the Lender may reasonably require in order to provide the Lender with a perfected, First Priority Lien (subject to Permitted Liens and the Carve-Out) on such Mortgaged Property, all of which actions shall be taken in a manner satisfactory to the Lender and at the sole cost and expense of the Credit Party.

(b)    From and after the Effective Time, in the event that the Credit Party enters into any lease with respect to any real property, the Credit Party shall provide prompt written notice thereof to the Lender and, if requested by the Lender, the Credit Party shall deliver promptly to the Lender copies of the lease, and all amendments thereto, between the Credit Party and the landlord or tenant, and, if such real property constitutes Material Leasehold Property, the Credit Party shall deliver to the Lender a Landlord's Waiver and Consent with respect thereto and where required by the terms of any lease, the consent of the mortgagee, ground lessor or other party.

**6.14    Cash Deposits; Bank Accounts and Securities Accounts**.  Upon request made upon the occurrence and during the continuation of an Event of Default, the Credit Party shall take all actions

reasonably requested by the Lender to maintain, preserve and protect the rights and interests of the Lender with respect to all cash deposits of the Credit Party and all other proceeds of Collateral.

      **6.15**    **Compliance with Budget; Budget Reporting; Carve-Out**.

      (a)    The Credit Party shall meet and comply, in all respects and at all times, with the Budget, subject to the Permitted Variance, including, without limitation, as to actual disbursements, cash receipts and expenditures.

      (b)    Beginning with the first full week after the Petition Date and continuing on each Friday thereafter, the Credit Party shall furnish to the Lender, a budget compliance certificate of a Designated Financial Officer in the form of <u>Exhibit D</u> certifying that the Credit Party is in compliance with the Budget (subject to the Permitted Variance), accompanied by: (i) a report of the net aggregate unfavorable variances under the Budget, including, without limitation, as to cash flow, actual cash receipts and actual cash disbursements, in form and substance satisfactory to Lender; and (ii) a report containing a summary of accrued, but unpaid, professional fees and expenses of the Borrower and the Committee incurred in the Chapter 11 Case as of such date.

      (c)    No portion of the Carve-Out or any other proceeds of any Borrowing under this Agreement may be used to litigate, investigate, object, contest or challenge in any manner or raise any defenses or offsets to the Obligations, security interests or Liens of the Lender under this Agreement or the other Loan Documents or any other claims against the Lender, whether by challenging the validity, perfection or priority of any Security Document, security interest or Lien with respect thereto or any other rights or interests or replacement Liens with respect thereto or any other or interests of the Lender (in such capacity), or by seeking to subordinate or recharacterize the Obligations or disallow any claim, Security Document, security interest or Lien by asserting any claims or causes of action, including without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the Lender or any of its officers, directors, agents, attorneys, representatives or employees.  In addition, the Carve-Out and any other proceeds of any Borrowing under this Agreement shall not be used in connection with: (i) preventing, hindering or delaying (directly or indirectly) the Lender's enforcement or realization upon the Collateral once an Event of Default has occurred; (ii) selling or otherwise disposing of the Collateral without the written consent of the Lender; (iii) using or seeking to use any insurance proceeds related to the Collateral without the written consent of the Lender; or (iv) incurring indebtedness senior to the Liens granted to Lender under the Loan Documents or Financing Orders, other than in accordance with the Loan Documents.

      **6.16**    **Minimum Cash Balance**.  After giving effect to the Wind-Down Amount to be funded on the dates and in the manner set forth in the Financing Orders, the Borrower shall have access to aggregate amount of unrestricted cash in deposit accounts (other than any payroll or other special accounts) of the Borrower of not less than $100,000 at all times.

      **6.17**    **Certain Deliverables**.  The Credit Party shall, at its own expense, deliver or cause to be delivered, to the Lender the items set forth below, in form and substance satisfactory to the Lender, on or prior to the corresponding dates set forth below (or such later date or dates as may be approved by the Lender in its sole discretion in writing):

      (a)    On or before the date that is seven (7) Business Days after the Effective Time, all general liability and other liability policies with respect to the Credit Party shall name the Lender as an additional insured thereunder as its interests may appear, and all business interruption and casualty insurance policies shall contain a loss payable clause or endorsement, satisfactory in form and substance to the Lender that names the Lender as the loss payee thereunder;

(b)      On or before the date that is seven (7) Business Days after the Effective Time, the following possessory Collateral: all promissory notes or other instruments (duly endorsed, where appropriate, in a manner reasonably satisfactory to the Lender) evidencing any Collateral.

**6.18      Additional Deliverables**.

(a)      <u>Documents Filed with the Bankruptcy Court or Delivered to the U.S. Trustee or Committee</u>.  Promptly, upon their being filed with the Bankruptcy Court, provide copies of all monthly reports as well as all pleadings, motions, applications, judicial information or other information with respect to the Credit Party's financial condition filed by or on behalf of the Credit Party with the Bankruptcy Court or served by the Credit Party to or upon the United States Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Case) or any Committee, at the time such document is filed with the Bankruptcy Court or served by the Credit Party to or upon the United States Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Case) or any Committee, to the extent such document has not otherwise been served pursuant to an order of the Bankruptcy Court establishing notice procedures in the Chapter 11 Case or otherwise.

(b)      <u>Additional Security Documents</u>.   As soon as reasonably practicable, upon the reasonable request of the Lender, at the Credit Party's expense, execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Security Documents, the Financing Orders or otherwise deemed by the Lender reasonably necessary for the continued validity, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except Permitted Liens and the Carve-Out, or use commercially reasonable efforts to obtain any consents or waivers as may be necessary in connection therewith.  In addition, the Credit Party shall deliver or cause to be delivered to the Lender from time to time such other documentation, consents, authorizations, approvals and orders in form and substance reasonably satisfactory to the Lender as the Lender shall reasonably deem necessary to perfect or maintain the Liens on the Collateral pursuant to the Security Documents or the Financing Orders.  Upon the exercise by the Lender of any power, right, privilege or remedy pursuant to any Loan Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority execute and deliver all applications, certifications, instruments and other documents and papers that the Lender may reasonably require.  If the Lender determines that it is required by law or regulation to have appraisals prepared in respect of the Mortgaged Property of the Credit Party constituting Collateral, the Credit Party shall provide to the Lender appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA and are otherwise in form and substance reasonably satisfactory to the Lender.

(c)      <u>Information Regarding Status of Restructuring Transaction</u>.  The Credit Party shall promptly provide the Lender with copies of all financial reports, schedules and other materials or information related to the Collateral at any time furnished by the Credit Party, or on behalf of the Credit Party, to any purchaser of or investor in the Credit Party's business operations or assets, any Committee or any of the Credit Party's shareholders, concurrently with the delivery thereof.  The Credit Party shall keep the Lender fully informed of the Credit Party's efforts to consummate a Restructuring Transaction, and upon the Lender's request, shall promptly provide the Lender with copies of all material documents, schedules or materials provided to any purchaser of, or investor in, the Credit Party's business operations or assets.  In addition to and not in lieu of the foregoing, the Credit Party shall provide the Lender with copies of any and all notices of default or other material events under any purchase or investment agreement or other similar agreement, simultaneously with the issuance or receipt thereof, as applicable.

(d)      <u>Other Information</u>.  As soon as reasonably practicable, from time to time, such other information regarding the operations, business affairs and financial condition of the Borrower, or compliance with the terms of any Loan Document, as the Lender may reasonably request.

**6.19**    **Cooperation with Advisors**.  The Credit Party will use commercially reasonable efforts to cooperate and assist Advisors hired by or at the discretion of the Lender to enable such Advisors to perform the services for which they were engaged, including, without limitation, promptly providing such information and documents as such Advisors may reasonably request.

**6.20**    **Milestones**.  The Credit Party shall deliver to the Lender the following: (i) The Credit Party will arrange a call among the Credit Party, the Majority Lender and Samsung by October 19, 2018 to confirm, to the Majority Lender's satisfaction, that Samsung will support a sale or investment to/by a media company; (ii) The Credit Party will deliver an Investor Package to the Majority Lender on or prior to Oct 19, 2018 including: (a) Sorenson Media Investor Presentation (PowerPoint); (b) Investor Model (spreadsheet); (c) Key Terms Sheet items defined - valuation with rationale from investor model above; and (d) Investor Summary report that describes the Credit Party and covers the material issues of bankruptcy, patent suit, Samsung contract; (iii) The Credit Party will finalize the Investor Package, on terms approved by the Majority Lender in its discretion, by October 22, 2018; (iv) On Friday of each week beginning October 19, 2018, the Credit Party will provide to the Majority Lender weekly summary engagement reports which demonstrate sufficient progress toward engagement of an investor or sale of the company that are satisfactory to the Majority Lender in its discretion; (v) The Credit Party will contact at least 5 major media (or media provider) companies and provide the Investor Package for their review by October 26, 2018 to ascertain their interest in acquiring or taking a majority position in the Credit Party; (vi) The Credit Party will obtain indications of interest, acceptable to the Majority Lender in its discretion, from at least two media partners (or providers) by November 20, 2018, which will include, at a minimum: (a) Conducting meetings or calls with clients and obtaining written feedback (indication of interest) from the appropriate senior decision makers of the media company (or provider) that they have evaluated the Investor Package and wish to proceed with the acquisition or majority buyout process; (vii) 7.          The Credit Party will obtain an executed Letter of Intent on terms acceptable to the Majority Lender in its discretion by December 6, 2018; and (viii) The Credit Party will have executed a definitive agreement incorporating the terms of the Letter of Intent and otherwise acceptable to the Majority Lender in its discretion by January 31, 2019.

## ARTICLE 7

### Negative Covenants

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder have been paid in full, the Credit Party covenants and agrees with the Lender that:

**7.1**    **Indebtedness**.  The Credit Party shall not create, incur, assume or permit to exist any Indebtedness, except:

(a)    Indebtedness created hereunder (including, without limitation, the Effective Time Term Loan Advance and any other Term Loan Advances);

(b)    Existing Debt at the Effective Time, including that which is set forth in <u>Schedule 7.1</u>;

(c)    Subordinated Indebtedness of the Credit Party, *provided* that (i) the principal amount of all such Indebtedness incurred by the Credit Party from and after the Effective Time shall not exceed $50,000 in the aggregate, (ii) at the time of and immediately after giving effect to the incurrence of such Subordinated Indebtedness, no Default shall have occurred and be continuing, (iii) such Indebtedness shall be unsecured and (iv) the proceeds of such Indebtedness (less any portion thereof required to be applied to prepay the Loans pursuant to Section 2.5(b)(i)) shall be used by the Credit Party for working capital purposes of the Credit Party;

(d)    Indebtedness consisting of netting services, overdraft protection and similar arrangements in connection with deposit accounts in the ordinary course of business; and

(e)        Indebtedness consisting of trade payables.

Notwithstanding the foregoing, no Indebtedness shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or *pari passu* with the Superpriority Claims of the Lender, except as specifically set forth herein or in the Financing Orders.

**7.2**    **Liens**.  The Credit Party shall not create, incur, assume or permit to exist any Lien on any Property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except (the following being called "Permitted Liens"):

(a)        Liens created in favor of the Lender hereunder or under the other Loan Documents or pursuant to the Financing Orders;

(b)        any Lien on any property or asset of the Credit Party existing on the date hereof and set forth in Schedule 7.1 (excluding, however, following the making of the Loans hereunder, the Liens in favor of any Person other than the Lender securing Indebtedness not designated on said schedule as Indebtedness to remain outstanding following the funding of the Loans), *provided* that (i) such Lien shall not apply to any other property or asset of the Credit Party and (ii) such Lien shall secure only those obligations which it secures on the date hereof and extensions, renewals, refinancing and replacements thereof that do not increase the outstanding principal amount thereof;

(c)        Liens imposed by any Governmental Authority for taxes, assessments or charges not yet delinquent or which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the Credit Party in accordance with GAAP;

(d)        landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens, and vendors' Liens imposed by statute or common law not securing the repayment of Indebtedness, arising in the ordinary course of business which are not overdue by more than 60 days or which are being contested in good faith and by appropriate proceedings and Liens securing judgments (including pre-judgment attachments) but only to the extent for an amount and for a period not resulting in an Event of Default under Section 8.1(i) hereof;

(e)        pledges or deposits under worker's compensation, unemployment insurance and other social security legislation and pledges or deposits to secure the performance of bids, tenders, trade contracts (other than for borrowed money), leases (other than capital leases), utility purchase obligations, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(f)        easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and encumbrances consisting of zoning restrictions, easements, licenses, restrictions on the use of Property or minor imperfections in title thereto which, in the aggregate, are not material in amount, and which do not, in the aggregate, materially detract from the value of the Property of any Credit Party or materially interfere with the ordinary conduct of the business of the Credit Party;

(g)        Liens consisting of bankers' liens and rights of setoff, in each case, arising by operation of law, and Liens on documents presented in letter of credit drawings;

(h)        Any interest or title of a lessor, sublessor, licensor or sublicensor under any operating lease or license entered into by any Credit Party as lessee, sublessee, licensee or sublicensee in the ordinary course of business and any precautionary UCC financing statements filed in connection therewith;

(i)        Liens of a collecting bank arising under Section 4-210 of the UCC on items in the course of collection; and

(j)        the Carve-Out;

 Notwithstanding the foregoing, Liens permitted under Sections 7.2(b) through (j) shall at all times be junior and subordinate to the Liens under the Loan Documents and the Financing Orders, other than the Carve-Out. The prohibition provided for in this Section 7.2 specifically includes, without limitation, a prohibition on and against the Credit Party, any Committee, or any other party-in-interest in the Chapter 11 Case or in any successor case priming or creating *pari passu* to any claims, Liens or interests of the Lender any Lien (other than for the Carve-Out) irrespective of whether such claims, Liens or interests may be "adequately protected" (unless the Obligations and adequate protection claims will be paid in full in cash upon the granting of any such Lien and the Commitments hereunder terminated).

       **7.3**     **Contingent Liabilities**.  The Credit Party shall not Guarantee the Indebtedness or other obligations of any Person, or Guarantee the payment of dividends or other distributions upon the stock of, or the earnings of, any Person, except:

       (a)        endorsements of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business; and

       (b)        Guarantees and letters of credit in effect on the date hereof which are disclosed in Schedule 7.1, and any replacements thereof in amounts not exceeding such Guarantees.

       **7.4**     **Fundamental Changes; Asset Sales**.

       (a)        The Credit Party shall not enter into any transaction of merger or consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution).  The Credit Party shall not acquire any business or property from, or capital stock of, or other equity interests in, or be a party to any acquisition of, any Person except for purchases of property in the ordinary course of business, Investments permitted under Section 7.5, provided that the Lien on and security interest in such property granted or to be granted in favor of the Lender pursuant to the Financing Orders or under the Security Documents shall be maintained or created in accordance with the terms of this Agreement.  The Credit Party shall not form or acquire any Subsidiary without the express prior written consent of the Lender.

       (b)        The Credit Party shall not convey, sell, lease, transfer or otherwise dispose (including any Disposition) of, in one transaction or a series of transactions, any part of its business or property, whether now owned or hereafter acquired (including receivables, Patents, Trademarks, Copyrights and leasehold interests but excluding (x) obsolete or worn-out tangible property (including leasehold interests other than Material Leasehold Property), or tools, equipment or other tangible property (other than any Material Leasehold Property or Material Owned Property) no longer used or useful in their business and (y) any inventory or other property (other than receivables) sold or disposed of in the ordinary course of business and on ordinary business terms), *provided* that the Credit Party may sublease real property to the extent such sublease would not interfere with the operation of the business of the Credit Party.  The Credit Party shall not offer to issue or issue any capital stock or other equity interests, *provided* that Borrower may issue Qualified Equity Interests so long as (A) the proceeds thereof are applied to prepay the Loans to the extent required by Section 2.5(b)(i) and (B) no Change of Control results therefrom.

       (c)        Notwithstanding the foregoing provisions of this Section 7.4:

       (i)        the Credit Party may consummate other Dispositions not otherwise permitted by clauses (i) through (ii) of this Section 7.4(c), *provided* that the aggregate fair market value of all such assets sold or otherwise disposed of during the term of this Agreement does not exceed $10,000;

(ii)     the Credit Party may consummate Dispositions pursuant to a 363 Sale, through a confirmed Reorganization Plan in the Chapter 11 Case, or otherwise (including, without limitation, a Sale Transaction), provided that the Obligations are paid in full in cash or cash equivalents concurrently with the closing or confirmation thereof and the Lender's Commitments terminate hereunder; and

(iii)    the Credit Party may consummate an Investment Transaction.

To the extent the Lender waives the provisions of this Section 7.4 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 7.4, such Collateral shall be sold free and clear of the Liens created pursuant to the Financing Orders or by the Security Documents.

**7.5     Investments**.

(a)     The Credit Party shall not make or permit to remain outstanding any Investment, except:

(i)      Investments existing on the date hereof by the Credit Party in the equity interests of its Subsidiaries;

(ii)     Investments consisting of Guarantees permitted by Section 7.3;

(iii)    Permitted Investments, subject to the Budget (subject to the Permitted Variance);

(iv)     Checking and deposit accounts with banks used in the ordinary course of business;

(v)      Investments consisting of capital stock received in satisfaction of disputes or in connection with the bankruptcy of a customer; and

(vi)     Deposits or pledges permitted under Section 7.2(e).

**7.6     Restricted Junior Payments**.  The Credit Party shall not declare or make any Restricted Junior Payment at any time; *provided, however*, that:

(a)     so long as no Default has occurred and is continuing or would result therefrom, Borrower may redeem its capital stock solely in exchange for other capital stock of Borrower constituting Qualified Equity Interests;

(b)     so long as the Lender has provided its written consent in writing in advance in its sole discretion, Borrower may redeem any of its capital stock or warrants or options to acquire any of its capital stock owned by any terminated employee, *provided* that: (i) no Default or Event of Default has occurred and is continuing or would arise as a result of such payment; (ii) the aggregate amount of all such payments (whether made in cash, by the issuance of Indebtedness or otherwise) shall not exceed $10,000 during the term of this Agreement; and (iii) the aggregate amount of all such payments made in cash shall not exceed $10,000 during the term of this Agreement; and

(c)     To the extent permitted under the applicable Subordination Agreement, the applicable Credit Party may pay as and when due and payable regularly scheduled interest in respect of Subordinated Indebtedness.

**7.7** **Transactions with Affiliates**.  Except for the Transactions contemplated by this Agreement and as expressly permitted by this Agreement, the Credit Party shall not directly or indirectly (a) make any Investment in an Affiliate; (b) transfer, sell, lease, assign or otherwise dispose of any property to an Affiliate; (c) merge into or consolidate with an Affiliate, or purchase or acquire property from an Affiliate; or (d) enter into any other transaction directly or indirectly with or for the benefit of an Affiliate (including guarantees and assumptions of obligations of an Affiliate); *provided* that:

(i) any Affiliate who is an individual may serve as a director, officer, employee or consultant of the Credit Party, receive reasonable compensation for his or her services in such capacity and benefit from Permitted Investments to the extent specified in clause (e) of the definition thereof;

(ii) the Credit Party may engage in and continue the transactions with or for the benefit of Affiliates which are described in Schedule 7.7 or are referred to in Section 7.6 (but only to the extent specified in such section); and

(iii) the Credit Party may engage in transactions with Affiliates in the ordinary course of business on terms which are no less favorable to the Credit Party than those likely to be obtained in an arms' length transaction between the Credit Party and a non-affiliated third party.

**7.8** **Restrictive Agreements**.  The Credit Party shall not, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement (other than this Agreement) that prohibits, restricts or imposes any condition upon (a) the ability of the Credit Party to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary of the Credit Party to pay dividends or other distributions to the Credit Party with respect to any shares of its capital stock or other equity interests or to make or repay loans or advances to the Credit Party; *provided* that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by this Agreement, (ii) the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on Schedule 7.8 (but shall apply to any extension or renewal of, or any amendment or modification materially expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of stock or assets of a Subsidiary of the Credit Party pending such sale, *provided* such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (v) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts (excluding license agreements) restricting the assignment thereof.

**7.9** **Sale-Leaseback Transactions; Leases**.  The Credit Party shall not directly or indirectly: (a) enter into any arrangements with any Person whereby the Credit Party shall sell or transfer (or request another Person to purchase) any property, real, personal or mixed, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property from any Person; and/or (b) enter into any arrangements with any Person whereby the Credit Party shall enter into any lease of any property, real, personal or mixed without the prior written consent of the Lender, which consent may be granted or withheld by the Lender in its sole discretion.

**7.10** **Certain Employee Related Matters**.  The Credit Party shall not, directly or indirectly, enter into any arrangements with workers, directors, officers or employees in respect of employment, separation or severance matters without the prior written consent of the Lender, which consent may be granted or withheld by the Lender in its sole discretion.

**7.11** **Lines of Business**.  The Credit Party shall not engage to any substantial extent in any line or lines of business activity other than (a) the types of businesses engaged in by the Credit Party as of the

Effective Time and businesses substantially related or incidental thereto, and (b) such other lines of business as may be consented to by the Lender.

**7.12     Other Indebtedness**.

(a)     The Credit Party shall not purchase, redeem, retire or otherwise acquire for value, or set apart any money for a sinking, defeasance or other analogous fund for the purchase, redemption, retirement or other acquisition of, or make any voluntary payment or prepayment of the principal of or interest on, or any other amount owing in respect of any Subordinated Indebtedness, except to the extent permitted by Section 7.6 or the Financing Orders.

(b)     The Credit Party shall not make any payments or transfer, or agree to any setoff or recoupment, with respect to any Pre-Petition claim, Pre-Petition Lien or Pre-Petition Indebtedness, except as approved by order of the Bankruptcy Court.

**7.13     Modifications of Certain Documents and Financing Orders**.  The Credit Party shall not consent to or effect any amendment, modification, supplement or waiver of any of the provisions of any organizational documents of the Credit Party, any documents or agreements evidencing, governing or securing any Subordinated Indebtedness; *provided, however*, that the Credit Party may amend any term or provision of their organizational documents so long as such amendment does not materially and adversely affect the interests or rights of the Lender.  The Credit Party shall not consent to or effect any amendment, modification, supplement or waiver of any of the provisions of (i) any Financing Order without the prior written consent of the Lender or (ii) any First Day Order except for amendments or modifications which are not in any way adverse in any material respect to the interests of the Lender in such capacity.

**7.14     Critical Vendor and Other Payments**.  The Credit Party shall not make: (a) any pre-petition "critical vendor" payments or other payments on account of any creditor's Pre-Petition unsecured claims; (b) payments on account of claims or expenses arising under Section 503(b)(9) of the Bankruptcy Code; or (c) payments under any plan or on account of any claim that requires approval pursuant to Section 503(c) of the Bankruptcy Code; except in each case in amounts and on terms and conditions that (x) are approved by order of the Bankruptcy Court and (y) are expressly permitted by the terms of the Loan Documents and the Budget (subject to the Permitted Variance) or as otherwise expressly permitted under the First Day Orders.

**7.15     Pre-Petition Indebtedness**.  Except as provided in the Financing Orders or other orders entered by the Bankruptcy Court, the Credit Party shall not make any adequate protection payments on account of any Pre-Petition Indebtedness.

# ARTICLE 8

## Events of Default

**8.1     Events of Default**.  The occurrence of any of the following events shall be deemed to constitute an "<u>Event of Default</u>" hereunder:

(a)     the Credit Party shall fail to pay to the Lender (i) any principal of any Loan when the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration of such due or prepayment date, or otherwise or (ii) any interest on any Loan or any other Obligation (other than any Obligation specified in clause (i) of this Section 8.1(a)) of the Credit Party to the Lender within three (3) Business Days after same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration of such due or prepayment date, or otherwise;

(b)     any representation or warranty made or deemed made by or on behalf of the Credit Party in or in connection with this Agreement, any of the other Loan Documents or any amendment or

modification hereof or thereof, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement, any of the other Loan Documents or any amendment or modification hereof or thereof, shall prove to have been untrue in any material respect when made or deemed made;

(c)     the Credit Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement and such failure described in this clause (ii) shall continue unremedied for a period of ten (10) Business Days after the earlier of (x) Knowledge by any Credit Party or (y) written notice thereof from the Lender to the Borrower;

(d)     the Credit Party shall fail to make any payment (whether of principal, interest or otherwise and regardless of amount) in respect of any Material Indebtedness or any Material Rental Obligation incurred or entered into after the Petition Date, when and as the same shall become due and payable, after giving effect to any grace period with respect thereto;

(e)     any event or condition (other than the commencement of the Chapter 11 Cases on the Petition Date or the Bankruptcy Effect) occurs that results in (i) any Material Indebtedness of the Credit Party incurred prior to the Petition Date becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause such Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity, or (ii) the lease with respect to any Material Rental Obligation of the Credit Party being terminated prior to its scheduled expiration date or that enables or permits (with or without the giving of notice, the lapse of time or both) the counterparty to such lease to cause such lease to be terminated prior to its scheduled expiration date; provided that this clause (e) shall not apply to (x) any Indebtedness outstanding hereunder, (y) any such Indebtedness unless such Indebtedness has been accelerated and the enforcement of remedies shall not have been stayed or (z) secured Indebtedness that becomes due as result of a voluntary Disposition of Property which Disposition is permitted hereunder;

(f)     the Credit Party shall fail to achieve the Milestones set forth in Section 6.20 by the dates specified therein (or such later date as may be agreed to by the Majority Lender in its sole discretion);

(g)     the occurrence of any of the following in the Chapter 11 Case:

(i)     the entry of an order or ruling (which has not been withdrawn, dismissed or reversed): (a) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement (unless such financing is proposed to refinance and pay in full the Obligations due under this Agreement with the termination of all related Commitments hereunder); (b) to grant any Lien other than Permitted Liens and the Carve-Out upon or affecting any Collateral without the prior written consent of the Lender (unless the granting of such Lien is simultaneous with a refinancing to pay in full in cash all Obligations due under this Agreement and the termination of the Lender's Commitments hereunder); or (c) except as provided in the Financing Orders, to use cash collateral of the Lender under Section 363(c) of the Bankruptcy Code without the prior written consent of the Lender;

(ii)     the filing of any Reorganization Plan or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by the Credit Party which plan does not propose to provide for the payment in full in cash of all Obligations under this Agreement and the termination of the Lender's Commitments hereunder, in each case to which the Lender does not consent or otherwise agree to the treatment of its claims;

(iii)     the entry of an order in the Chapter 11 Case confirming a Reorganization Plan that does not contain a provision for termination of the Commitments and repayment in full in

cash of all of the Obligations under this Agreement, to which the Lender does not consent or otherwise agree to the treatment of its claims;

(iv)     the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or any other Financing Order (except with respect to ministerial changes) without the written consent of the Lender or the filing of a motion for reconsideration with respect to any Financing Order;

(v)     the entry of an order allowing any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Lender or any of the Collateral;

(vi)     the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, the reorganization of the Credit Party (or the Credit Party seeks or acquiesces in such relief);

(vii)     the sale without the Lender's consent, of all or substantially all of the assets of the Credit Party through a 363 Sale, through a confirmed Reorganization Plan in the Chapter 11 Case, or otherwise (or the Credit Party seeks or acquiesces in such relief) that does not provide for payment in full in cash of the Obligations and termination of the Lender's Commitments, to which the Lender does not consent or otherwise agree to the treatment of its claims;

(viii)     the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code (except as consented to by the Lender) or the Credit Party files a motion or other pleading seeking the dismissal of the Chapter 11 Case under Section 1112 of the Bankruptcy Code, conversion of the Chapter 11 Case or otherwise;

(ix)     other than pursuant to the First Day Orders or the Financing Orders, the entry of a final order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code: (a) to allow any creditor to execute upon or enforce a Lien on any Collateral having value in excess of $150,000; or (b) with respect to any Lien on or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a Material Adverse Effect;

(x)     the entry of an order in the Chapter 11 Case avoiding or requiring disgorgement of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(xi)     the failure of the Credit Party to perform any of its material obligations under the Interim Order, the Final Order or any other Financing Order, which materially and adversely affects the interests of the Lender, as reasonably determined by the Lender;

(xii)     except as otherwise provided by the Financing Orders, the entry of an order in the Chapter 11 Case granting any other super priority administrative claim or Lien equal or superior to that granted to the Lender;

(xiii)     the Credit Party's return of goods constituting Collateral pursuant to Section 546(g) of the Bankruptcy Code other than in accordance with any such program (a) approved pursuant to a First Day Order, or (b) otherwise approved by the Bankruptcy Court.

(xiv)     the failure of the Credit Party to obtain approval in the Final Order for a portion of the Term Loans to be used to pay off and fully satisfy the Bridge Financing.

(h)      any claim is asserted against the Lender pursuant to [Section 7] of the Interim Order or any successor provision in any subsequent Financing Order;

(i)      a final judgment or judgments for the payment of money in excess of $100,000 in the aggregate (exclusive of judgment amounts fully covered by insurance where the insurer has not denied liability in respect of such judgment) shall be rendered by one or more courts, administrative tribunals or other bodies having jurisdiction against the Credit Party and the same shall not be discharged (or provision shall not be made for such discharge), bonded, or a stay of execution thereof shall not be procured, within 60 days from the date of entry thereof and the Credit Party or any Subsidiary shall not, within said period of 60 days, or such longer period during which execution of the same shall have been stayed, appeal therefrom and cause the execution thereof to be stayed during such appeal;

(j)      the failure of the Credit Party to obtain any consents and approvals required by applicable law to consummate the Transaction;

(k)      there shall occur any Change of Control;

(l)      any of the following shall occur: (i) the Liens created hereunder or under the other Loan Documents, Security Documents or Financing Orders shall at any time (other than by reason of Lender relinquishing such Lien) cease to constitute valid and perfected Liens on Collateral intended to be covered thereby having a fair market value of $100,000 in the aggregate; (ii) except for expiration in accordance with its respective terms, (A) this Agreement, (B) any Note, (C) any Security Document, (D) the Loan Documents or (E) the Financing Orders, taken as a whole, shall for whatever reason be terminated, or shall cease to be in full force and effect; or (iii) the enforceability of any Loan Document shall be contested by the Credit Party;

(m)      the failure of the Credit Party to obtain a second position pledge of the equity of Continuum in favor of the Majority Lender in conjunction with entry of the Final Order;

(n)      [Intentionally Omitted];

(o)      there shall occur any Material Adverse Effect, subject to reasonable allowances for: the commencement of the Chapter 11 Case or the Effect of Bankruptcy; and (ii) the Budget and limitations under this Agreement; or

(p)      the occurrence of any condition or event that permits the Lender to exercise any of the remedies set forth in any Financing Orders, including, without limitation, any event which causes the occurrence of the Termination Date (as defined in any Financing Order), in each case, without any notice, grace and/or cure period of any kind (except to the extent, if any, required or permitted under any Financing Order or any other order of the Bankruptcy Court);

then, and in every such event, and at any time thereafter during the continuance of such event (notwithstanding anything herein to the contrary, but subject in each case to the provisions of the Loan Documents and the Financing Orders), the Majority Lender shall, by notice to the Credit Party, take any or all of the following actions, at the same or different times (i) terminate the Commitments and declare a Termination Date (as defined in any Financing Order), and thereupon the Commitments shall terminate immediately, but without affecting the Obligations or Liens granted to Lender hereunder, in any Loan Document or any Financing Order, (ii) notify the Borrower that the outstanding principal of the Loans shall bear interest at the Post-Default Rate, and thereupon the outstanding principal of the Loans shall bear interest at the Post-Default Rate, (iii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Credit Party, (iv) the Lender may exercise all of

the rights as secured party and mortgagee hereunder or under the other Loan Documents or Financing Agreements, subject in all respects to the provisions of those Loan Documents, and the Lender shall have relief from the automatic stay in order to do so (v) direct the Credit Party to sell or otherwise dispose of any or all of the Collateral on terms and conditions reasonably acceptable to the Majority Lender pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code and the Lender shall have the right to "credit bid" the allowed amount of the Lender's claims during any sale of all or substantially all of the Collateral, including, without limitation, in any 363 Sale or included as part of any Reorganization Plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code (and, without limiting the foregoing, direct the Credit Party to assume and assign any lease or executory contract included in the Collateral to the Lender or the Lender's designee(s) in accordance with and subject to Section 365 of the Bankruptcy Code, (vi) enter onto the premises of the Credit Party in connection with an orderly liquidation of the Collateral, and/or (vii) exercise any rights and remedies provided to the Lender under the Loan Documents or at law or in equity, including all remedies provided for under the UCC and, pursuant to the Interim Order, the Final Order or any other Financing Order.

Upon the occurrence and during the continuance of an Event of Default and the exercise by the Lender of its rights and remedies under this Agreement and the other Loan Documents: (a) the Credit Party shall use commercially reasonably efforts to assist the Lender in effecting a sale or other disposition of the Collateral upon such terms as are reasonably acceptable to the Majority Lender; and (b) the Credit Party will be deemed to have assumed and assigned to the Lender all executory contracts and leases to which the Credit Party is a party (without further order or action of the Bankruptcy Court or any other Person), other than executory contracts or leases specifically excepted by the Lender by written notice to the Credit Party.

## ARTICLE 9

### [Intentionally Omitted]

## ARTICLE 10

### Miscellaneous

**10.1    Notices**. Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by electronic mail, as follows:

(a)    if to the Credit Party, [_____], with a copy to counsel: [_____];

(b)    if to the Lender, [_____], with a copy to counsel.

Any party hereto may change its physical address or email address for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

**10.2    Waivers; Amendments; Voting Rights**.

(a)    No failure or delay by the Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Lender hereunder

and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that it would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Credit Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 10.2, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Lender may have had notice or knowledge of such Default at the time.

(b)     None of this Agreement, any other Loan Document, any Security Document, the Budget or any provision of any of the foregoing may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Lender.

(c)     To the extent that the Lender becomes owner of the assets or equity of the Credit Party through the formation of a new corporation or organizational entity following the exercise of any rights or remedies by the Lender, including, without limitation, through a foreclosure, sale or other similar action, then the voting provisions and rights of the equity interests in and to such new corporation or organizational entity shall be consistent with the voting rights of the Lender set forth herein.

**10.3    Expenses; Indemnity: Damage Waiver.**

(a)     The Credit Party agrees to pay, or reimburse the Lender for paying, (i) all reasonable and documented out-of-pocket expenses incurred by the Lender, including the reasonable and documented fees, charges and disbursements of Advisors to the Lender, in connection with the preparation of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable and documented out-of-pocket expenses incurred by the Lender including the reasonable and documented fees, charges and disbursements of any Advisors for the Lender, in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents or any right or Lien granted under any Financing Order, including their rights under this Section 10.3, or in connection with the Loans made hereunder, including in connection with any workout, restructuring or negotiations in respect thereof, (iii) all reasonable and documented fees and expenses incurred by the Lender (including the reasonable and documented fees and expenses of Advisors and professionals engaged by the Lender) in connection therewith in connection with the monitoring of Collateral, and any reviews or appraisals of Collateral (including field examination fees, environmental reviews to the extent reimbursable pursuant to Section 6.6), (iv) all reasonable and documented costs, expenses, taxes, assessments and other charges incurred in connection with any filing, registration, recording or perfection of any security interest contemplated by any Loan Document or any other document referred to therein and (v) all of the reasonable out-of-pocket fees and expenses of the Advisors incurred from and after the Effective Time in connection with the preparation, reproduction, delivery and review of pleadings, documents and reports related to the Chapter 11 Case (including, without limitation, the Loan Documents) and any subsequent case under Chapter 7 of the Bankruptcy Code, attendance at meetings, court hearings or conferences related to the Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, and general monitoring of the Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code.

(b)     The Credit Party agrees to indemnify the Lender (in its capacity as a Lender and not in any other capacity) and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses actually incurred, including the reasonable and documented fees, charges and disbursements of any Advisors for any Indemnitee and settlement costs, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, the other Loan Documents or any agreement or instrument contemplated hereby, the performance by the parties hereto and thereto of their respective obligations hereunder or thereunder or the consummation of the Transactions or any other transactions contemplated hereby or thereby, (ii) any Loan or the use of the proceeds

therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned, leased or operated by the Credit Party or any Subsidiary, or any Environmental Liability related in any way to the Credit Party or any Subsidiary, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (A) are determined by a court of competent jurisdiction by final and nonappealable judgment to have (i) resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or (ii) a material breach of any obligation of such Indemnitee under any Loan Document or (B) arise solely from claims among Indemnitees.

(c)      [Intentionally Omitted.]

(d)      TO THE EXTENT PERMITTED BY APPLICABLE LAW, NONE OF THE PARTIES SHALL ASSERT, AND EACH PARTY HEREBY WAIVES, ANY CLAIM AGAINST ANY OTHER PARTY HERETO, ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE TRANSACTIONS CONTEMPLATED HEREBY, ANY LOAN OR THE USE OF THE PROCEEDS THEREOF.

(e)      All amounts due under this Section 10.3 shall be payable promptly after written demand therefor.

**10.4      Successors and Assigns**.

(a)      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Credit Party may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      The Lender may at any time and from time to time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it).

(c)      From and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.7, 2.8 and 10.3).  Notwithstanding anything therein to the contrary, no Approved Fund shall be entitled to receive any greater amount pursuant to Sections 2.7 and 2.8 than the transferor Lender would have been entitled to receive in respect of the assignment effected by such transferor Lender had no assignment occurred.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with paragraph (b) of this Section 10.4 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (f) of this Section.

(d)     [Intentionally Omitted.]

(e)     [Intentionally Omitted.]

(f)     The Lender may, without the consent of or notice to the Borrower, sell participations to one or more banks or other entities (a "<u>Participant</u>") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower shall continue to deal solely and directly with the Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which the Lender sells such a participation shall provide that the Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that the Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 10.2(b), that affects such Participant. Subject to paragraph (g) of this Section 10.4, the Borrower agree that each Participant shall be entitled to the benefits of Sections 2.7 and 2.8 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 10.4. In the event that the Lender sells participations in a Loan, such Lender shall, acting for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name of all participants in such Loan and the principal amount (and stated interest thereon) of the portion of such Loan that is the subject of the participation. A Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on such participant register (and each registered note shall expressly so provide). Any participation of such Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on such participant register. Such participant register shall be available for inspection by the Borrower and the Lender at any reasonable time and from time to time upon reasonable prior notice.

(g)     A Participant shall not be entitled to receive any greater payment under Section 2.7 or 2.8 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.8 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.8(e) as though it were a Lender.

**10.5     Survival**. All covenants, agreements, representations and warranties made by the Credit Party and Subsidiaries herein and in the other Loan Documents, and in the certificates or other instruments delivered in connection with or pursuant to this Agreement and the other Loan Documents, shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the other Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect so long as the principal of or any accrued interest on any Loan or any fee or any other Obligation payable under this Agreement or the other Loan Documents is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Sections 2.7, 2.8, and 10.3 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any other Loan Document or any provision hereof or thereof.

**10.6     Counterparts; Integration; References to Agreement; Effectiveness**. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and any separate letter agreements with respect to fees payable to Lender and its counsel constitute the entire

contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Whenever there is a reference in any Loan Document or UCC Financing Statement to the "Credit Agreement" to which Lender and the Credit Party are parties, such reference shall be deemed to be made to this Agreement among the parties hereto. Except as provided in Article 5, this Agreement shall become effective when it shall have been executed by the Lender and the Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterpart of this Agreement.

**10.7    Severability**. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**10.8    [Intentionally Omitted.]**

**10.9    [Intentionally Omitted.]**

**10.10    Governing Law; Jurisdiction; Consent to Service of Process**.

(a)    This Agreement shall be construed in accordance with and governed by the law of State of Delaware.

(b)    The Credit Party hereby consents and agrees that the Bankruptcy Court (or if the reference is withdrawn, the applicable United States District Court) shall have exclusive jurisdiction to hear and determine any claims or disputes between the Credit Party and the Lender pertaining to this Agreement or any of the other Loan Documents related to this Agreement or to any other matter arising out of or relating to this Agreement; *provided*, that the Lender and the Credit Party acknowledge that any appeals from the Bankruptcy Court may have to be heard by a court other than the Bankruptcy Court; *provided, further*, that nothing in this Agreement shall be deemed or operate to preclude the Lender from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations, or to enforce a judgment or other court order in favor of the Lender. The Credit Party expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any court, and the Credit Party hereby waives any objection that the Credit Party may have based upon lack of personal jurisdiction, improper venue or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court. The Credit Party hereby waives personal service of the summons, complaint and other process issued in any such action or suit and agrees that service of such summons, complaint and other process may be made by registered or certified mail addressed to the Credit Party at the address set forth in Section 10.1 of this Agreement and that service so made shall be deemed completed upon the earlier of the Credit Party's actual receipt thereof or three (3) days after deposit in the United States mail, proper postage prepaid.

(c)    Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any court referred to in paragraph (b) of this Section 10.10. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 10.1. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

**10.11    WAIVER OF JURY TRIAL**.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.11.

**10.12    Headings**.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**10.13    Confidentiality**.  The Lender agrees to keep confidential information obtained by it pursuant hereto and the other Loan Documents confidential in accordance with its customary practices and agrees that it will only use such information in connection with the transactions contemplated by this Agreement and not disclose any of such information other than (a) to the Lender, (b) to its employees, representatives, directors, attorneys, auditors, agents, professional advisors, trustees or Affiliates who are advised of the confidential nature of such information or to any direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section 10.13), (b) to the extent such information presently is or hereafter becomes available to the Lender on a non-confidential basis from any source of such information that is in the public domain at the time of disclosure, (c) to the extent disclosure is required by law (including applicable securities law), regulation, subpoena or judicial order or process (*provided* that notice of such requirement or order shall be promptly furnished to the Borrower unless such notice is legally prohibited) or requested or required by bank, securities, insurance or investment company regulators or auditors or any administrative body or commission to whose jurisdiction Lender may be subject, (d) to any rating agency to the extent required in connection with any rating to be assigned to such Lender, (e) to assignees or participants or prospective assignees or participants who agree to be bound by the provisions of this Section 10.13, (f) to the extent required in connection with any litigation between the Credit Party and the Lender with respect to the Loans or this Agreement and the other Loan Documents or (g) with the Borrower's prior written consent.

**10.14    Interest Rate Limitation**.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "<u>Charges</u>"), shall exceed the maximum lawful rate (the "<u>Maximum Rate</u>") which may be contracted for, charged, taken, received or reserved by the Lender in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 10.14 shall be cumulated and the interest and Charges payable to Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Maximum Rate to the date of repayment, shall have been received by Lender.

**10.15    Obligations Absolute**.

To the fullest extent permitted by applicable law, all obligations of the Credit Party hereunder or the granting of any Lien on any property shall be absolute and unconditional irrespective of:

        (a)      any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of the Credit Party;

        (b)      any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against the Credit Party;

        (c)      any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

        (d)      any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Obligations;

        (e)      any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

        (f)      any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Credit Party.

**10.16    Parties including the Trustees; Bankruptcy Court Proceedings**. This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon the Credit Party, the bankruptcy estate of the Credit Party, and any trustee, other bankruptcy estate representative or any successor-in-interest of the Credit Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Lender and its respective assigns, transferees and endorsees. The Liens created by this Agreement and the other Loan Documents and Security Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of the Credit Party to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Lender file financing statements or otherwise perfect its Liens under applicable law. The Credit Party may not assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents or Security Documents without the express written consent of the Lender. Any such purported assignment, transfer, hypothecation or other conveyance by the Credit Party without the prior express written consent of Lender shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the Credit Party and the Lender with respect to the transactions contemplated hereby and no person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the parties hereto have caused this senior, Secured, Super-Priority Debtor-In-Possession Credit Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

<u>BORROWER, DEBTOR AND CREDIT PARTY</u>

SORENSON MEDIA, INC., a Delaware corporation

By: _____
Name:
Title:

[SIGNATURES CONTINUE ON NEXT PAGE]

<u>LENDER</u>

JLS HOLDINGS, LLC, a Utah limited liability company

By: _____
Name:
Title:

**<u>SCHEDULE 2.1</u>**

**(Lender and Commitments)**

| Term Lender | Term Loan Commitments |
|---|---|
| **JLS Holdings, LLC** | [$_____], subject to the terms and conditions of the Agreement. |
| **For Payments to above-referenced Lender, please use:** | |
| [Wire transfer information] | |
| **Total Term Loan Commitments:** | [$_____] |

## **EXHIBIT 1**

## **(FORM OF BORROWING REQUEST)**

JLS HOLDINGS, LLC
[INSERT ADDRESS]

_____ __, 20__

Re: Sorenson Media, Inc. Chapter 11 Case No. _____.

Ladies and Gentlemen:

Reference is made to the Senior, Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated as of [_____ ___, 2018] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among SORENSON MEDIA, INC., a Delaware corporation (the "Borrower") and JLS HOLDINGS, LLC (the "Lender") (each such term and each other capitalized term used but not defined herein having the meaning given to it in Article I of the Credit Agreement). Borrower hereby gives you notice pursuant to Section 2.2 of the Credit Agreement that it requests a borrowing under the Credit Agreement, and in that connection sets forth below the terms on which such borrowing is requested to be made:

A)      Principal amount of borrowing[1]                                    _____

(B)      Date of borrowing
          (which is a Business Day)                                              _____

(C)      Interest Period and the last day thereof                       _____

(D)      Funds are requested to be disbursed to Borrower's account
          with _____ (Account No. _____).

(E)      The conditions set forth in Section 5.2 and 5.2 are
          satisfied both before and after giving effect to such
          Borrowing:                                      Yes ____        No____

[Remainder of Page Intentionally Left Blank]

---

[1] Loans must be in an amount that is at least $200,000 and an integral multiple of $100,000 or equal to the remaining available balance of the applicable Commitments.

{00408219.DOCX /}
28919556.9
4840-7765-5159

[SIGNATURE PAGE TO BORROWING REQUEST]

SORENSON MEDIA, INC., as the Borrower

By: _____

Name:
Title:

## EXHIBIT A

## (FORM OF TERM NOTE)

### SENIOR, SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION TERM NOTE

$_____                                                                                    _____, 20__

      FOR VALUE RECEIVED, the undersigned, SORENSON MEDIA, INC., a Delaware corporation (the "Borrower"), promises to pay to the order of JLS HOLDINGS, LLC (the "Lender"), at the place and times provided in the Credit Agreement referred to below, the principal sum of _____ DOLLARS ($_____) together with all accrued interest, pursuant to that certain Senior, Secured, Super-Priority Debtor-In-Possession Credit Agreement dated as of [_____ ___, 2018] (together with all amendments and other modifications, if any, from time to time hereafter made thereto, the "Credit Agreement") among the Borrower and the Lender.  This Senior, Secured, Super-Priority Debtor-In-Possession Term Note (this "Term Note") is being executed and delivered by the Borrower pursuant to Section 2.10 of the Credit Agreement. Capitalized terms used herein and not defined herein shall have the meanings ascribed to them in the Credit Agreement.

      The Borrower is obligated to pay the unpaid principal balance of this Term Note to the Lender on the Term Loan Maturity Date, as provided in Section 2.1(c) of the Credit Agreement.  In addition, the unpaid principal amount of this Term Note from time to time outstanding is subject to mandatory prepayment from time to time as provided in the Credit Agreement and shall bear interest as provided in the Credit Agreement. All payments of principal and interest on this Term Note shall be payable in lawful currency of the United States of America in immediately available funds to Lender.

      This Term Note is entitled to the benefits of, and evidences obligations incurred under, the Credit Agreement, to which reference is made for a description of the security for this Term Note and for a statement of the terms and conditions on which the Borrower is permitted and required to make prepayments and repayments of principal of the obligations evidenced hereby and on which such obligations may be declared to be immediately due and payable.

      THIS TERM NOTE SHALL BE GOVERNED, CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE [STATE OF UTAH], WITHOUT REFERENCE TO THE CONFLICTS OR CHOICE OF LAW PRINCIPLES THEREOF.

      The Borrower hereby waives all requirements as to diligence, presentment, demand of payment, protest and (except as required by the Credit Agreement) notice of any kind with respect to this Term Note.

IN WITNESS WHEREOF, the undersigned Borrower has executed this Senior, Secured, Super-Priority Debtor-In-Possession Term Note under seal as of the day and year first above written.

**SORENSON MEDIA, INC.**


By: _____

Name:

Title:

**<u>EXHIBIT B</u>**

**(FORM OF PLEDGE AND SECURITY AGREEMENT)**

<u>**EXHIBIT C**</u>

**(FORM OF SECTION 6.1 COMPLIANCE CERTIFICATE)**

**SECTION 6.1 COMPLIANCE CERTIFICATE**

***[Under Review]***

I, _____, the Designated Financial Officer of SORENSON MEDIA, INC. (in such capacity and not in my individual capacity), hereby certify that, with respect to Section 6.1 of that certain Senior, Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated as of [_____ __, 2018] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), by and among SORENSON MEDIA, INC., a Delaware corporation (the "<u>Borrower</u>") and JLS HOLDINGS, LLC (the "<u>Lender</u>") (each such term and each other capitalized term used but not defined herein having the meaning given to it in Article I of the Credit Agreement):

      a.      Attached hereto as <u>Schedule 1</u> are the consolidated statements of operations and free cash flows of Borrower and its Subsidiaries for the month ended _____ and for the period from the beginning of the respective fiscal year to the end of such month, and the related consolidated balance sheets of Borrower and its Subsidiaries as at the end of such period, setting forth in each case in comparative form the corresponding consolidated figures for the corresponding period in the preceding fiscal year, and the corresponding figures for the forecasts most recently delivered to Lender for such period (the "<u>Subject Financials</u>");

      b.      The Subject Financials fairly present in all material respects the consolidated financial condition and results of operations of Borrower and its Subsidiaries, in each case in accordance with GAAP, consistently applied, as at the end of, and for, such period (subject to normal quarter-end adjustments and year-end audit adjustments and the omission of footnotes); and

      c.      No Default or Event of Default has occurred under the Credit Agreement which has not been previously disclosed, in writing, to the Lender.[2]

---

[2] If a Default shall have occurred, an explanation specifying the nature and extent of such Default shall be provided on a separate page together with an explanation of the corrective action taken or proposed to be taken with respect thereto (include, as applicable, information regarding actions, if any, taken since prior certificate).

[SIGNATURE PAGE TO SECTION 6.1 COMPLIANCE CERTIFICATE]

Dated this _____ day of _____ ___, 2018.

SORENSON MEDIA, INC., as the Borrower

By: _____
Name:
Title: _____,
a Designated Financial Officer

## <u>EXHIBIT D</u>

## (FORM OF BUDGET COMPLIANCE CERTIFICATE)

## BUDGET COMPLIANCE CERTIFICATE

I, _____, the Designated Financial Officer of SORENSON MEDIA, INC. (in such capacity and not in my individual capacity), hereby certify that, with respect to that certain Senior, Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated as of [_____ ___. 2018] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), by and among SORENSON MEDIA, INC., a Delaware corporation (the "<u>Borrower</u>") and JLS HOLDINGS, LLC (the "<u>Lender</u>") (each such term and each other capitalized term used but not defined herein having the meaning given to it in Article I of the Credit Agreement):

a.   The Credit Party is in compliance with the Budget (subject to the Permitted Variance);

b.   Attached hereto as <u>Schedule 1</u> is a report of the net aggregate unfavorable variances under the Budget, including, without limitation, as to cash flow, actual cash receipts and actual cash disbursements, in form and substance satisfactory to Lender;

c.   Attached hereto as <u>Schedule 2</u> is a report containing a summary of accrued, but unpaid, professional fees and expenses of the Borrower and the Committee incurred in the Chapter 11 Case as of such date; and

d.   No Default or Event of Default has occurred under the Credit Agreement which has not been previously disclosed, in writing, to Lender.[3]

[Remainder of page left blank intentionally]

---

[3] If a Default shall have occurred, an explanation specifying the nature and extent of such Default shall be provided on a separate page together with an explanation of the corrective action taken or proposed to be taken with respect thereto (include, as applicable, information regarding actions, if any, taken since prior certificate).

[SIGNATURE PAGE TO SECTION 6.1 COMPLIANCE CERTIFICATE]

Dated this _____ day of _____ ___, 2018.

SORENSON MEDIA, INC., as the Borrower

By: _____
Name:
Title: _____,
a Designated Financial Officer