Michael R. Johnson (A7070)
**RAY, QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: mjohnson@rqn.com

Debra A. Dandeneau (*pro hac vice*)
Ira A. Reid (*pro hac vice*)
Frank Grese (*pro hac vice*)
**BAKER & McKENZIE LLP**
452 Fifth Avenue
New York, New York 10018
Telephone: (212) 626-4875
Telephone: (212) 891-3976
Email: debra.dandeneau@bakermckenzie.com
Email: ira.reid@bakermckenzie.com
Email: frank.grese@bakermckenzie.com

*Counsel for Gracenote, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>SORENSON MEDIA, INC.,<br><br>Debtor. | Chapter 11<br><br>Bankruptcy No. 18-27740 (WTT)<br><br>**Hearing Date: November 13, 2018 @ 11:00 A.M.**<br>**Objections Due: November 7, 2018** |

**OBJECTION BY GRACENOTE, INC. TO DEBTOR'S MOTION FOR
FINAL ORDER (I) AUTHORIZING DEBTOR (A) TO OBTAIN POST-PETITION
SECURED DIP FINANCING; (B) TO USE CASH COLLATERAL AND GRANT
ADEQUATE PROTECTION; (II) GRANTING LIENS AND PROVIDING SUPER-
PRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) MODIFYING
<u>THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF</u>**

Gracenote, Inc. ("**Gracenote**"), a creditor and party in interest, through counsel, hereby objects (the "**Objection**") to the *Motion for Final Order (I) Authorizing Debtor (A) to Obtain Post-Petition Secured DIP Financing; (B) to Use Cash Collateral and Grant Adequate Protection; (II) Granting Liens and Super-Priority Administrative Expense Status; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Doc. No. 12] *(*the "***DIP Motion***")[1] filed by Sorenson Media, Inc. (the "**Debtor**") with respect to debtor in possession financing from its shareholder, JLS Holdings, Inc. ("**JLS**"). In support of this Objection, Gracenote respectfully states as follows:

## PRELIMINARY STATEMENT

1.  The Debtor and JLS are two of the various companies indirectly owned and controlled by James L. Sorenson and his family members. JLS owns at least 10% of the Debtor's equity securities, and James L. Sorenson owns 100% of the equity of JLS.[2] Moreover, the Debtor describes James L. Sorenson as the manager of JLS and "an equity holder and board member of the Debtor." DIP Motion at para. 11. The Sorenson Capital website lists the Debtor as one of Sorenson Capital's portfolio companies. http://www.sorensoncapital.com/companies/.

2.  Through the guise of DIP financing, the Debtor and its controlling shareholder seek to bless and elevate a prepetition "loan" made by one of the Debtor's owners within months of the Petition Date – all to the detriment of the Debtor's other creditors. The Debtor has failed to establish any of the following:

    - that *any* continued operation of its business is necessary to preserve the sale value (if any) of its intellectual property assets,

---

[1] Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the DIP Motion.

[2] Debtor's Amended Corporate Ownership Statement [Doc. No. 47].

- that the Debtor is not already administratively insolvent and will not be rendered even more deeply administratively insolvent by the Court granting the DIP Motion,

- that the Debtor has *any* reasonable ability to repay the $4.5 million new money portion of the DIP Loan – much less the $22 million JLS "debt" that the Debtor seeks to roll up,

- that the value of the Debtor's assets supports the Debtor's attempted roll-up of the JLS prepetition "claim," or

- that the Debtor has made any legitimate efforts to solicit offers to extend *postpetition* DIP financing to the Debtor.

In short, the Debtor has not even attempted to show that it has made the efforts required by section 364(c)-(d) of the Bankruptcy Code and case law for the Court to approve the DIP financing requested in the DIP Motion.

3. Moreover, the relief sought by the Debtor is particularly egregious in that the Debtor asks the Court to order – without proof and before any party in interest has had an adequate opportunity to conduct a proper inquiry[3] – that (a) the $21,988,000 million in purported prepetition secured financing made by its owner (the "***JLS Prepetition Funding***") is a valid claim secured by validly perfected liens and (b) the JLS Prepetition Funding should be "rolled up" into a superpriority administrative expense secured by a first lien on substantially all of the Debtor's assets. In some jurisdictions, a roll-up simply is not possible. In other cases, a roll-up is always controversial and subject to a higher standard of proof. In this case, the roll-up would be unconscionable.

4. To date, all the Debtor's actions suggest that this case is being run for the benefit of James L. Sorenson and his family of companies. The DIP Motion is no different. James L. Sorenson seeks to obtain a leg up in any sale process by blessing the JLS Prepetition Funding

---

[3] The Office of the United States Trustee has not held a meeting for the purposes of forming an official committee of unsecured creditors in this case, although it states that it is continuing to seek out creditors that are interested in serving on such committee.

and allowing James L. Sorenson to prop up the Debtor for no defined business purpose – all for approximately $4.5 million in new funding.

5. Accordingly, for the reasons set forth below, the Court should deny the DIP Motion and authorize a thorough investigation of the JLS Prepetition Funding.

## BACKGROUND

6. Gracenote is the plaintiff in a civil action against the Debtor that has been pending in the District of Utah, *Gracenote, Inc. v. Sorenson Media, Inc.*, case number 2:16-cv-00950, for the past two years (the "***Patent Infringement Litigation***"). In the Patent Infringement Litigation, which has been assigned to District Court Judge Clark Waddoups, Gracenote is asserting various claims against the Debtor as a result of the Debtor's use of dynamic ad insertion technology that infringes Gracenote's patents. Gracenote is seeking damages, including treble damages for willful infringement, as well as a permanent injunction to prevent the Debtor from continuing to infringe Gracenote's patents. If Gracenote prevails in the Patent Infringement Litigation, Gracenote would be one of the largest unsecured creditors of the Debtor's estate. Gracenote also is a party to a licensed data agreement with the Debtor, pursuant to which Gracenote licenses data to the Debtor in exchange for a monthly fee. The Debtor owes Gracenote past due monthly fees of approximately $29,000. In August, Gracenote exercised its contractual right to cut off data delivery to the Debtor due to the Debtor's non-payment of license fees.

7. As the Debtor itself acknowledges, the present focus of its business is on "addressable television advertising." It is this part of the Debtor's business that is the subject of the Patent Infringement Litigation. As a result, the value of the Debtor's assets can only be determined based upon the outcome of the Patent Infringement Litigation. Because placing any value on the Debtor's assets would be speculative at this time, the relief sought by the Debtor in

the DIP Motion is improper, especially the "roll-up" of the approximately $22 million JLS Prepetition Funding into a superpriority administrative expense secured by a first lien on substantially all of the Debtor's assets.

8.      On October 22, 2018, Gracenote filed an objection to the Debtor's motion seeking interim relief with respect to the DIP Motion. [Doc No.41].

9.      On October 29, 2018, Gracenote served the Debtor with document discovery, including in relation to the DIP Motion, seeking documents that, when produced, may provide additional information disclosing, among other things, (a) whether the Debtor made reasonable efforts to locate alternative sources of debtor in possession financing on terms more favorable than those offered by JLS and (b) the facts and circumstances relating to issuance of the JLS Loan that may be relevant to recharacterization and equitable subordination. By this limited discovery, though, Gracenote, has not sought to conduct a comprehensive examination of the facts surrounding the JLS Prepetition Funding or the proposed DIP funding.

## OBJECTIONS TO A FINAL ORDER APPROVING THE DIP MOTION

A.      **The Debtor Has Failed to Establish that a Superpriority Administrative Expense and Secured Debtor in Possession Financing under Section 364(c)-(d) of the Bankruptcy Code Are Warranted.**

10.     The Debtor cites a series of cases in Section I of the DIP Motion that set forth standards that bankruptcy courts consider in determining whether debtor in possession financing should be approved under section 364(c)-(d) of the Bankruptcy Code. Specifically, the Debtor notes that bankruptcy courts generally defer to a debtor's business judgment regarding decisions to borrow money and cites cases that state what a debtor must establish before court deference to its business judgment is warranted. *See, e.g., In re Curlew Valley Assocs.*, 14 B.R. 506, 511-14 (Bankr. D. Utah 1981) (in a case that does not involve approval of DIP financing, court notes that bankruptcy courts will defer to a debtor's business judgment "made in good faith, upon a

reasonable basis"); *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (the trustee need only show "by a good faith effort that credit was not available" without section 364(c) and (d) protection, and "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

11. Gracenote does not disagree with the basic principles about a debtor's exercise of its business judgment, but that doesn't mean that courts must respect a debtor's business judgment without evidence that its judgment is sound. *See In re DB Capital Holdings, LLC*, 454 B.R. 804, 822 (Bankr. D. Colo. 2011) ("To prevail on a motion to obtain financing on super-priority basis, *a debtor has the burden of showing* the following: 1) the proposed financing is an exercise of sound and reasonable business judgment; 2) no alternative financing is available on any other basis; 3) financing is in the best interests of the estate and its creditors; and 4) no better offers, bids, or timely proposals are before the court.") (emphasis added); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (the court must evaluate five applicable factors pertaining to DIP financing: (1) the proposed financing is an exercise of sound and reasonable business judgment; (2) the financing is in the best interests of the estate and its creditors; (3) the credit transaction is necessary to preserve the assets of the estate and necessary, essential, and appropriate for the continued operation of the debtor's business; (4) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender; and (5) the financing agreement was negotiated in good faith and at arm's length between the debtor and the lender); *In re Crouse Group, Inc.*, 71 B.R. 544, 549–51 (Bankr. E.D. Pa.1987) (debtors must show that "(1) They are unable to obtain unsecured credit per 11 U.S.C. § 364(b), i.e. by allowing a lender only an administrative claim per 11 U.S.C. § 503(b)(1)(A); (2) The "credit transaction is necessary to preserve the assets of the estate; and (3)

The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender").

12. One problem is that the Debtor is not entitled to rely upon the business judgment standard because it has not proved that it has a majority of (if any) directors who could qualify as "independent." Even if the Debtor could overcome that hurdle, the Debtor cannot demonstrate that it has satisfied the requirements of section 364(c)-(d) of the Bankruptcy Code.

13. *The Debtor's Directors Did Not Authorize the Roll-Up.* As reflected on the Unanimous Consent of the Board of Directors, dated October 15, 2018, attached to the Debtor's chapter 11 petition [Doc. No. 1], the directors who authorized the Debtor to commence this chapter 11 case (the "***Authorizing Directors***") also authorized the Debtor to "obtain additional financing from JLS Holdings, LLC as debtor-in-possession financing in connection with any case commenced by or against it under the Bankruptcy Code ***in an amount sufficient to satisfy the Company's operating and administrative expenses during such proceeding.***" (Emphasis added). This is the only language in such Unanimous Consent discussing DIP financing, and no form of DIP credit agreement or even term sheet was attached. Nowhere does the authorization address validating the JLS Prepetition Funding or rolling the JLS Prepetition Funding up into the DIP Loan. Instead, the authorization is limited to incurring debt to fund the Debtor's "operating and administrative expenses" during this chapter 11 case. Accordingly, the proposed roll-up the DIP Motion requests the Court to authorize has not actually been authorized by the Debtor's board.

14. *The Debtor Is Not Entitled to the Business Judgment Presumption.* The three Authorizing Directors are as follows: Mark Ludwig, Pat Nola, and David Simmons. The Sorenson Capital website describes Mr. Ludwig as follows:

> Mark Ludwig joined Sorenson Capital in 2003 and has led investments in healthcare, software, energy, and consumer products. Mark is committed to being a supportive and capable investment partner ***and serves in a number of high-impact roles across the portfolio.*** He has been fortunate to partner with and learn from innovative and accomplished business leaders and believes that the combination of great people with leading products and services is the key ingredient of stellar companies.

http://www.sorensoncapital.com/team_member/mark-ludwig/ (emphasis added). Pat Nola joined the Debtor as its CEO in May of this year, but Mr. Nola has held positions within the Sorenson family of companies, including at Sorenson Communications and CaptionCall, since 2000. https://www.prnewswire.com/news-releases/sorenson-media-appoints-pat-nola-as-ceo-300655678.html. Although David Simmons does not appear to have a direct relationship with the Sorenson family of companies, not enough is known about his relationship with James L. Sorenson or other related Sorenson entities to determine if Mr. Simmons is truly independent. At a minimum, though, the relationships that Mr. Ludwig and Mr. Nola have and have had with the Sorenson family of companies suggest that their relationships are "so close that one could infer that [each of Mr. Ludwig and Mr. Nola] would be more willing to risk his ... reputation than risk the relationship with" Mr. Sorenson and his companies. *Robotti & Co. v. Liddell*, 2010 Del. Ch. LEXIS 4, 2010 WL 15474, at *12 (Del. Ch. Jan. 14, 2010). Accordingly, with two Sorenson family members comprising the rest of the Debtor's board and Messrs. Ludwig and Nola constituting interested directors, it is clear that the Debtor lacks sufficient independent directors to make up a board majority.

15. "If a director-by-director analysis leaves insufficient [independent] directors to make up a board majority, then" the business judgment presumption does not apply, and "the court will review the board's decision for entire fairness." *Cumming v. Edens*, 2018 Del. Ch. LEXIS 54, 2018 WL 992877, *51 (Del. Ch. Feb. 20, 2018) (quoting *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 Del. Ch. LEXIS 67, 2017 WL 1437308 (Del. Ch. Apr. 24, 2017)). That

"entire fairness" is not present here. The DIP Motion simply falls back on the usual "business judgment" platitudes and offers no proof that the DIP Loan satisfies the "entire fairness" standard. The Debtor simply states, without any support, that the proposed DIP Loan was the result of "arm's-length negotiations in the days leading up to the Petition Date." DIP Motion at Section I, page 14. This is a bit difficult to imagine, and the Debtor makes no effort whatsoever to explain in the DIP Motion any procedures that it might have utilized to create an at least arguable arm's-length process. On this basis alone, the Court must deny the DIP Motion.

16. *The DIP Motion Fails to Demonstrate that the DIP Loan Is Necessary to Preserve Property of the Estate.* The DIP Motion does not address whether any value of the Debtor's assets is predicated upon the Debtor continuing to operate as a going concern or can otherwise be preserved in a "mothball" state. The DIP Motion also does not address the Debtor's plan for liquidating the Debtor and how the Debtor expects to achieve any value for the benefit of creditors other than its affiliates, JLS, and its UK affiliate, Sorenson Media Limited. In the absence of such explanations, the Court should consider whether it is appropriate to approve any level of senior secured DIP financing at this stage.

17. *The DIP Motion Does Not Explain How the Debtor Expects to Repay the DIP Loan, Much Less the Roll-up of the JLS Prepetition Funding.* As the Debtor has conceded, the Debtor's operations are not generating, and not expected to generate, any meaningful cash flow during the course of the Debtor's chapter 11 case. Moreover, the Debtor has stated its intention to liquidate in chapter 11, but the Debtor has not stated that it has any potential purchaser that has expressed an interest in purchasing the Debtor's assets, and the Debtor has not provided any details of how such liquidation might proceed. This should concern the Court. The Debtor apparently has concluded that the JLS Prepetition Funding of approximately $22 million is a

valid claim secured by a validly perfected security interest in the Debtor's assets. The Debtor has offered no evidence, however, that it or – more importantly – any other party believes that the value of the Debtor's assets exceeds the amount of the JLS Prepetition Funding. Indeed, the Debtor has not even shown that any party believes that the value of the Debtor's assets exceeds $4.5 million, the amount of new money the Debtor seeks to incur.

18. In the absence of such proof, it is evident that the Debtor is going deeper and deeper into debt without any evidence that the Debtor believes that it will be able to generate sufficient proceeds to cover its administrative expenses in its chapter 11 case. The Court should require more evidence than a hope and a prayer before allowing the Debtor to become even more administratively insolvent than it is today.

19. *The DIP Motion Does Not Explain the Debtor's Efforts to Solicit DIP Proposals.* Similarly, the Debtor fails to establish that its decision to accept the JLS DIP Loan proposal was made after a "good faith effort" to determine that credit was not otherwise available. Indeed, the Debtor admits that it conveniently concluded that its owner was the only source of DIP financing. The DIP Motion merely states that "the Debtor recently sought secured bridge financing from its pre-petition noteholders, and only JLS was willing to participate, thereby leaving the Debtor with no reasonable belief as to the availability of any other source of post-petition financing." *See* DIP Motion at Section I, page 14. A failed single attempt to obtain *prepetition* financing from prepetition creditors does not demonstrate that there is no "availability of any other source of post-petition financing" and certainly does not demonstrate that the Debtor made reasonable efforts.

20. The Debtor justifies a number of controversial protections it seeks to include in the DIP order (including the section 506(c) waiver, the validation of a so-called prepetition loan

from the Debtor's owner, and the roll-up of such prepetition funding) by repeating the mantra, "The justification for the inclusion of this provision is that no other comparable financing reasonably is available to the Debtor." This statement rings hollow, however, when it is unaccompanied by evidence that no better financing is available or even that the Debtor made any efforts to obtain DIP financing from any other source. *See* DIP Motion at para 16, under subparagraphs: "c" (Payment of Prepetition Debt); "d" (Super-Priority and Secured Status); "l" (Validity, Perfection or Amount of Pre-Petition Secured Debt); and "m" (Bankruptcy Code § 506(c)).

21. *The Court Should Not Approve Waiver of the 506(c) Surcharge.* It is hard to see how the proposed DIP Loan, especially with the proposed roll-up of the Prepetition JLS Funding, benefits any party in interest other than JLS. The Debtor asks for advance permission for JLS to credit bid its prepetition funding and its DIP Loan in connection with any sale. If the JLS Prepetition Funding constitutes a valid secured obligation that is not subject to recharacterization or subordination, then Gracenote has no objection to JLS being able to credit bid its secured claim. The Debtor provides no evidence, however, that any sale of the Debtor's assets will benefit any creditor other than JLS. Where the chapter 11 case yields no benefit to any parties other than the prepetition secured creditor, the cost of the sale process – and, indeed this chapter 11 case – should be borne by the prepetition secured creditor.

22. The Debtor and JLS may say that they don't know whether the sale process will yield proceeds in an amount sufficient to pay any amounts to creditors other than JLS. That's fine. It also is precisely the point. The Debtor and JLS cannot have it both ways. If they cannot demonstrate that this case and the as-yet unarticulated sale process that the Debtor seeks to pursue likely will benefit other parties in interest, then the Debtor should not be asking the Court

to approve a waiver of the Debtor's right to ask that the proceeds of JLS's collateral be surcharged to pay for the process.

**B.     Roll-up of the JLS Prepetition Funding Through the DIP Loan Is Neither Warranted nor Appropriate.**

23.     Within the Tenth Circuit, at least one court has held that cross collateralization, which is a form of roll-up, is impermissible. *See Gallegos Research Group*, 193 B.R. at 585 ("A postpetition lien used to secure a prepetition unsecured indebtedness is impermissible") (citing *Matter of Saybrook Manufacturing Co.*, 963 F.2d 1490, 1496 (11th Cir. 1992)). *See Matter of Saybrook Manufacturing Co.*, 963 F.2d 1490, 1496 (11th Cir. 1992) ("Cross-collateralization is not authorized by section 364"). In *Saybrook*, the Eleventh Circuit reasoned as follows:

> We conclude that cross-collateralization is inconsistent with bankruptcy law for two reasons. First, cross-collateralization is not authorized as a method of post-petition financing under section 364. Second, cross-collateralization is beyond the scope of the bankruptcy court's inherent equitable power because it is directly contrary to the fundamental priority scheme of the Bankruptcy Code.

*In re Saybrook*, 963 F.2d at 1495 (internal citations omitted).

24.     In other jurisdictions, courts may permit a roll-up, but they impose requirements to ensure that the roll-up is necessary and does not confer an unfair advantage on the prepetition creditor. *See, e.g., In re Lyondell Chem. Co.*, 2009 Bankr. LEXIS 5739, *96, *102-*105 (Bankr. S.D.N.Y. 2009) (finding that (a) the aggregate value of the prepetition collateral exceeded the value of the prepetition debt, (b) the debtors needed the full amount of the financing to permit operation of their business, (c) the terms of the financing were fair and reasonable, (d) the financing terms, including the roll-up, were negotiated at arm's length and in good faith and (e) the roll-up was on a dollar for dollar basis with respect to new money loans); *Ames Dep't Stores*, 115 B.R. at 39 ("proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *In re Barbara K. Enters., Inc.*, No.

1396089-v9\NYCDMS

12

08-11474, 2008 WL 2439649, at *8 (Bankr. S.D.N.Y. June 16, 2008) ("Any proposal should provide a pre-petition secured creditor with 'the same level of protection it would have had if there had not been post-petition superpriority financing.'") (quoting *In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996)). Stated differently, postpetition financing must not be used in a manner that "pervert[s] the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit" of only a subset of creditors. *In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989)).

25. In general, courts should weigh the following factors in determining whether to approve a roll-up:

- Alternative financing is not able to be reasonably sourced on better terms, or at all: As discussed above, there is no evidence of any real attempts by the Debtor to find alternative financing.

- The proposed facility is in the best interests of the Debtor and its estate and is not just a veiled attempt to allow the prepetition lender to strengthen its collateral position: Again, the Debtor offers no evidence of how the proposed DIP financing will benefit creditors other than JLS.

- The prepetition lender is advancing a significant amount of funds over and above the balance of the prepetition facility: Indeed, the most common approach is to allow a prepetition lender to roll up $1 of prepetition debt for every $1 of DIP financing. The amount of new money proposed to be advanced to the Debtor in this case, however, is about 17% of the total proposed "DIP Loan."

- The prepetition lender is oversecured: The Debtor certainly has not offered any proof on this point. Moreover, its Schedules and Statements, filed on November 1, 2018 [Doc. No. 75], show that JLS is substantially *undersecured*. Specifically, the Debtor lists *total assets* having a value of only $2,274,362.20, or approximately 10% of the JLS Prepetition Funding!

As is evident, the proposed roll-up does not satisfy a single one of these points, and the proposed roll-up of the JLS Prepetition Funding is inappropriate, even by the standards of the jurisdictions that permit roll-ups. The outstanding balance of the JLS Prepetition Funding, as of the Petition Date, was reportedly $21,988,000. *See* DIP Motion at para. 11. The DIP

Motion seeks DIP financing of up to "$26,488,000, the actual amount of which reflects the payoff of the Prepetition Debt [$21,988,000] plus another approximately $4,500,000 of additional funding." DIP Motion at para. 13. Thus, if the Court approves the DIP Motion, JLS, an insider of the Debtor, will effectively replace a nearly $22 million prepetition purportedly secured loan that may be subject to recharacterization or subordination with an unassailable superpriority administrative expense secured by a first priority lien on the Debtor's assets. In effect, if the Court were to approve the DIP Motion, the Debtor would receive $1.80 in new/additional financing for every $10 in potentially disputed JLS Prepetition Funding amount that is rolled up.

26.    The controversy surrounding roll-ups led the ABI Commission to Study the Reform of Chapter 11, in its Final Report and Recommendations (2014) (the "*ABI Final Report*"), to propose that a court should only approve postpetition financings that contain a roll-up of prepetition debt in limited circumstances:

> A court should not approve any proposed postpetition financing under section 364 of the Bankruptcy Code that contains a provision to roll up prepetition debt into the postpetition facility or to pay down prepetition debt in part or in full with proceeds of the postpetition facility. This provision should not apply to postpetition financing, including a facility that refinances in part or in full prepetition debt, *to the extent that* —
>
> - the postpetition facility (a) is provided by lenders who do not directly or indirectly through their affiliates hold prepetition debt affected by the facility or (b) repays the prepetition facility in cash, extends substantial new credit to the debtor, and provides more financing on better terms than alternative facilities offered to the debtor; and
>
> - the court finds that the proposed postpetition financing is in the best interests of the estate.

*See* ABI Final Report, at page 73. Thus, given the facts in this case, roll-up of the JLS Prepetition Funding should not be approved by the Court.

27. Moreover, even if the Court were inclined to approve the roll-up, it must provide a mechanism for unwinding the roll-up if it later turns out that the JLS Prepetition Funding was undersecured (which appears to be the case here, based on the Debtor's Schedules and Statements) or should be recharacterized or subordinated. To this end, it is worth noting that Rule 4001-2(g)(5) of the Local Bankruptcy Rules for the Southern District of New York requires the following provision to be included in any proposed order that would include a roll-up:

> A proposed order approving cross-collateralization or a rollup shall include language that reserves the right of the Court to unwind, after notice and hearing, the postpetition protection provided to the prepetition lender or the pay down of the pre-petition debt, whichever is applicable, in the event that there is a timely and successful challenge to the validity, enforceability, extent, perfection, or priority of the pre-petition lender's claims or liens, or a determination that the prepetition debt was undersecured as of the petition date, and the cross-collateralization or rollup unduly advantaged the lender.

At the very minimum, a similar provision should be included here if the Court were inclined to approve the roll-up.

### C. The JLS Prepetition Funding Is Potentially Subject to Recharacterization as an Equity or Capital Contribution.

28. The Tenth Circuit has recognized that bankruptcy courts have the power to recharacterize a claim from debt to equity. In determining whether recharacterization is warranted, the Tenth Circuit looks to the following thirteen factors: (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) thin or inadequate capitalization; (9) identity of interest between the creditor and stockholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the

extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement. *Sender v. Bronze Group, Ltd. (In re Hedged-Investments Assocs.)*, 380 F.3d 1292, 1298 (10th Cir. 2004) (citing *Stinnett's Pontiac Serv., Inc.*, 730 F.2d 634, 638 (11th Cir. 1984)). None of these factors is dispositive, and their significance varies depending upon the circumstances. *Hedged-Investments Assocs.*, 380 F.3d at 1298-1299.

29. Any determination as to whether a secured claim should be recharacterized requires an investigation and substantial fact discovery. Gracenote began this process by serving its initial document request on the Debtor, but this request was an abbreviated version of the discovery Gracenote would seek in connection with a thorough investigation that was not constrained by the need to finish before the final DIP hearing. Gracenote has not yet received the requested documents critical to beginning this analysis, let alone had an opportunity to engage in follow-up document requests or conduct depositions. In this case, Gracenote and any unsecured creditors' committee must have an opportunity to fully investigate the extent to which the factors cited by case law exist with respect to the JLS Prepetition Funding, particularly before the Court permits any such claim to be rolled-up into the proposed DIP Loan.

**D.    The JLS Prepetition Funding Is Potentially Subject to Equitable Subordination.**

30. In addition to potential recharacterization of the JLS Prepetition Funding as an equity or capital contribution, the JLS Prepetition Funding may be subject to equitable subordination to the claims of all non-insider unsecured creditors, pursuant to section 510(c)(1)[4]

---

[4] Section 510(c)(1) of the Bankruptcy Code provides as follows:

> Notwithstanding subsection (a) and (b) of this section, after notice and a hearing, the court may—
>
> under principals of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.

of the Bankruptcy Code, to the extent of any inequitable conduct by JLS that further investigation may uncover.

31. For cases involving non-insiders, courts within the Tenth Circuit historically have followed the general rule that requires a showing of inequitable conduct as a condition to subordinating a claim. *See, e.g., Hedged-Investments Assocs.*, 380 F.3d at 1301 ("We adhere to the general rule, therefore, that equitable subordination is not justified absent a finding that the party sought to be subordinated engaged in inequitable conduct"); *In re Mid-Town Produce Terminal, Inc.*, 599 F.2d 389, 392 (10th Cir. 1979) (modern cases generally hold that claims for loans by majority shareholders will not be subordinated to claims of other creditors absent inequitable conduct). Inequitable conduct for subordination purposes falls under three categories: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; and (3) use of the debtor as a mere instrumentality or alter ego. *See, e.g., Hedged-Investments Assocs.*, 380 F.3d at 1301 (inequitable conduct for subordination purposes encompasses three categories of misconduct) *citing Fabricators Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1467 (10th Cir. 1991).

32. Notwithstanding its decision in *Midtown Produce Terminal*, the Tenth Circuit now applies a different standard to claims of insiders of a debtor. *See, e.g., Hedged-Investments Assocs.*, 380 F.3d at 1301 ("this Circuit has joined other Courts of Appeals in applying different levels of scrutiny to 'insiders' and 'non-insiders' of the debtor corporation"). "Where the claimant is an insider or a fiduciary, the party seeking subordination need only show some unfair conduct, and a degree of culpability, on the part of the insider" rather than the "more egregious conduct such as gross misconduct tantamount to fraud, misrepresentation, overreaching, or spoliation." *Id.* at 1301-02.

33. Because both JLS and the Debtor are controlled by the same person, and because the Debtor is seeking to roll up the JLS Prepetition Funding into the DIP Loan, even if roll-up otherwise were permissible, it is entirely appropriate to decline to approve the roll-up until Gracenote and/or an unsecured creditors' committee has had the opportunity to complete its investigation of the Debtor.

WHEREFORE, for all of the reasons set forth in this Objection, Gracenote respectfully requests that the Court deny the DIP Motion or, in the alternative and to the extent the Court determines that debtor in possession financing is indeed necessary, deny roll-up of the JLS Claim into the DIP Loan.

Dated: November 7, 2018
    Salt Lake City, Utah

Respectfully submitted,

/s/ Michael R. Johnson
Michael R. Johnson (A7070)
**RAY, QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone: (801) 323-3363

**BAKER & McKENZIE LLP**
Debra Dandeneau (*pro hac vice*)
Ira A. Reid (*pro hac vice*)
Frank Grese (*pro hac vice*)
452 Fifth Avenue
New York, New York 10018
Telephone: (212) 626-4100

*Counsel for Gracenote, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2018, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which sent notification of such filing to the electronic filing users in this case as follows:

- **Debra A. Dandeneau**   debra.dandeneau@bakermckenzie.com, lori.seavey@bakermckenzie.com
- **Frank Grese**   frank.grese@bakermckenzie.com
- **George B. Hofmann**   ghofmann@cohnekinghorn.com, dhaney@cohnekinghorn.com; mparks@cohnekinghorn.com
- **Michael R. Johnson**   mjohnson@rqn.com, docket@rqn.com; dburton@rqn.com
- **Patrick E Johnson**   pjohnson@cohnekinghorn.com, jdannenmueller@cohnekinghorn.com
- **Jacob M. Kaplan**
- **Adelaide Maudsley**   amaudsley@kmclaw.com, tslaughter@kmclaw.com
- **John T. Morgan tr**   john.t.morgan@usdoj.gov, James.Gee@usdoj.gov; Lindsey.Huston@usdoj.gov; Suzanne.Verhaal@usdoj.gov
- **Ira A. Reid**
- **Joseph R. Sgroi**   jsgroi@honigman.com
- **United States Trustee**   USTPRegion19.SK.ECF@usdoj.gov

I further certify that on November 7, 2018, I served a true and correct copy of the foregoing document on the following via first class mail, postage prepaid:

Cherlynn Hayman
Parr Brown Gee & Loveless
101 S 200 E, Suite 700
Salt Lake City UT 84111


/s/ Dianne Burton