George Hofmann (10005)
Patrick E. Johnson (10771)
**Cohne Kinghorn, P.C.**
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
Telephone: (801) 363-4300

Attorneys for Sorenson Media, Inc.

---

# IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>SORENSON MEDIA, INC.,<br><br>Debtor. | Bankruptcy No. 18-27740 (WTT)<br><br>Chapter 11 |

**DEBTOR'S MOTION FOR AUTHORITY TO IMPLEMENT KEY EMPLOYEE RETENTION PLAN AND TO PAY PLAN THROUGH COLLATERAL SURCHARGE**

Sorenson Media, Inc. (the "Debtor" or "SMI"), debtor and debtor in possession in the above-captioned bankruptcy case, through its undersigned proposed counsel, pursuant to the provisions of 11 U.S.C. §§ 105(a), 363(b), 503(c)(3), and 506(c) hereby moves the court (the "Motion") for the entry of an order authorizing the Debtor to implement a Key Employee Retention Plan ("KERP") and to pay the KERP through a surcharge of a secured creditor's collateral as further explained herein. In support hereof, the Debtor respectfully represents as follows:

## JURISDICTION AND GENERAL BACKGROUND

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on October 16, 2018.

5. The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

6. No trustee or examiner has been appointed, but an official committee of creditors has been established and is represented by counsel.

## **THE KEY EMPLOYEE RETENTION PAYMENT**

7. SMI is an innovative media technology company, founded in 1995. It originally made its name in video compression and coding technology, known as "Sorenson Squeeze", which reduces video file size for transmission over the internet. But its present focus is on addressable television advertising and in particular, realizing the potential of "smart" televisions for the benefit of television manufacturers, TV inventory owners, and advertisers.

8. The core of "smart" television technology is the convergence between flatscreen television sets and the internet. "Smart" televisions have the ability to connect to the internet. The vast majority of televisions now sold in industrialized nations are "smart", but the potential of "smart" televisions is relatively untapped. This untapped potential can be realized as a result of SMI's technologies and team.

9. For example, SMI's "Spark Platform" provides the opportunity for "addressable advertising," similar to what has existed on the internet for years. As an

example, a consumer searching the internet for a vehicle will commonly find advertisements from car manufacturers, targeting the consumer's interest in a vehicle purchase. "Addressable advertising" can also potentially direct advertising based on demographic criteria, such as zip code or age.

10. However, as applied to "smart" televisions, "addressable advertising" is a relatively new technology, and SMI is on the cutting edge of it. SMI's "Spark Platform" allows the placement of different advertisements to different households while they are watching the same program. This permits the optimization of advertising effectiveness by placing the most relevant advertising with the desired audience.

11. As is common with emerging technology companies, in the early stages of development, the capital requirements of the company are far greater than any revenues generated. That gap is usually filled with investment capital, and that is the case with SMI. Over $40 million dollars has been invested in the company by its shareholders. In addition, SMI has issued Series A convertible notes totaling over $96 million.

12. While SMI's technologies and team have incredible potential, its current capital structure presents impediments to attracting new investment that SMI intends to address through this proceeding. In particular, SMI intends to reject certain onerous contractual relationships, and potentially to renegotiate others, in order to stabilize its industry partnerships. With a rationalized and streamlined capital structure, SMI plans to liquidate its assets in an organized process designed to maximize returns to creditors under the circumstances.

13. Naturally, the Debtor's employees are central to the maximize the proceeds of the organized disposition of its assets, and essential to ensure the success of this process. Prior to recent layoffs and attrition, the Debtor employed approximately 200 employees. The Debtor currently employs approximately 15 full-time and part-time critical employees, in addition to the approximately 17 employees of its wholly-owned subsidiary Sorenson Media Limited ("SML"), to develop and deliver its technology services. Without the ongoing services of these remaining critical employees, it would not be possible for the Debtor to preserve the value of its assets and core business.

14. The Debtor has determined, pursuant to its reasonable business judgment, to implement a KERP for the remaining employees of the Debtor, as well as those employees who work for SML, (collectively, the "Key Employees") because these individuals are critical to the Debtor's ability to continue operating efficiently without disruption and without the loss of valuable institutional knowledge during this case and prior to a sale.

15. The Key Employees are individuals who have valuable and, in some instances, irreplaceable institutional knowledge of the Debtor's business, systems, commercial relationships, and operations and who are integral to maintaining operational stability and driving cash flow. They are also essential to the Debtor's efforts to engage in an orderly liquidation and wind down in this case. The Key Employees would be exceptionally difficult to replace under normal circumstances, and it would be even more difficult as a practical matter given the commencement of this case. It is critical for the Debtor to do its utmost to ensure the continued commitment and service of the Key Employees during the pendency of this case in order to avoid

disruption to its ongoing business operations and irreparable harm to its efforts to maximize value for creditors through a liquidation auction sale.  Furthermore, the Debtor believes that the existing employees are the minimum number that are necessary to maintain its going concern value and to assist with the liquidation process.

16. In addition to the foregoing, the Key Employees are also functionally acting as the Debtor's investment banker or are assisting other employees who are performing those investment banker-like roles.  This includes identifying parties with a potential interest in acquiring the Debtor's technology and know-how, marketing the opportunity to these parties, providing due diligence information, and otherwise shepherding potential buyers through the sale process.  In this regard, the Key Employees represent a significant savings over the Debtor's prior investment bankers, who required a minimum $2 million transaction fee.

17. Accordingly, in consultation with its proposed secured lender JLS Holdings, LLC ("JLS"), the Debtor has developed the proposed KERP with the goal of providing sufficient incentive for the Key Employees to stay employed by the Debtor without paying an amount greater than is likely necessary to achieve that result.  In doing so, the Debtor considered, among other factors, who the Key Employees are, what specific services they provide, the potential risk of sudden, unexpected departures, and the incremental cost that the Debtor would necessarily incur to replace certain of the Key Employees if they were to leave, recognizing that some of the Key Employees are irreplaceable at this critical stage in the case.

18. As of the filing of this Motion, the Court has not approved on a final basis post-petition financing from JLS.  Accordingly, this Motion is contingent upon the Debtor

obtaining final approval of post-petition financing from JLS.  If the Debtor is unable to obtain that final approval, then the Debtor presently intends to withdraw this Motion.[1]

### RELIEF REQUESTED

19.    The Debtor respectfully requests entry of an order authorizing the Debtor to implement the KERP, pursuant to §§ 105(a), 363(b), 503(c)(3) and 506(c) of the Bankruptcy Code.

20.    Under the KERP, the Debtor seeks approval to pay the Key Employees a percentage of a portion of the sale proceeds (the "KERP Payment") following the closing a sale of the Debtor's assets pursuant to 11 U.S.C. § 363, an auction or similar process (the "Sale").

21.    The KERP Payment is calculated by applying a percentage (the "Overall Percentage") to the difference between (a) the gross sales price of a Sale transaction, and (b) $4,000,000, *provided, however*, that the Debtor shall not pay a Key Employee the KERP Payment if the employee is not employed by the Debtor at the time of the Closing of the Sale transaction, and, *provided, further*, that, with the written consent of JLS, the Debtor shall have discretion to pay a Key Employee the KERP Payment if the employee was terminated prior to the closing of the Sale transaction.

22.    The Overall Percentage for all Key Employees is 9.713%.  The respective proposed percentages payable to each individual employee, which totals the Overall Percentage, will be calculated by reference to the Debtor's pre-bankruptcy employee

---

[1] It is possible that debtor in possession financing other than through JLS will materialize, and in that event, should the replacement debtor in possession financier consent to the relief sought through this Motion, then the Debtor will continue to prosecute this Motion.

{00414368.DOCX / 2}                                    6

stock option program, which has been discontinued in light of the Debtor's bankruptcy filing.

23. For example, assuming a hypothetical Sale that generated a sale price of $15,000,000, the difference would equal $11,000,000. In this scenario, employees as a whole would receive a total KERP Payment of $1,068,375 ($11,000,000 x .09713).

24. The KERP Payment is to be paid from the proceeds of a Sale Transaction, provided, however, that if the sale price is made by a credit bid, then the purchaser shall pay the KERP Payment in addition to the credit bid. The obligation of JLS to pay the KERP Payment is contingent upon the Court approving the proposed JLS post-petition credit facility on a final basis. Accordingly, no creditors other than JLS are in any way affected by the KERP Payment, because the KERP Payment simply reduces the amount JLS would otherwise receive on account of its secured loans. JLS has consented to this relief pursuant to Bankruptcy Code § 506(c).

## BASIS FOR RELIEF REQUESTED

25. Section 363(b) of the Bankruptcy Code authorizes the Debtor to use, sell, or lease property of the estate other than in the ordinary course of business after notice and a hearing. Courts in this jurisdiction generally apply a business judgment test in considering a request to use, sell, or lease property outside of the ordinary course of business, and such a request should be authorized when a sound business purpose is set forth. *See Mountain Crane Service, LLC*, Bankruptcy Case No. 18-20225, Docket No. 320 (Bankr. D. Utah, May 16, 2018) (order granting Key Employee Retention Plan); *In re M Space Holdings, LLC*, Bankruptcy Case No. 16-24384, Docket No. 41 (Bankr. D.

Utah, May 25, 2016) (Order granting Key Employee Retention Plan as a valid exercise of the Debtor's business judgment); *In re Psychometric Systems, Inc.*, 367 B.R. 670, 674 (Bankr. D. Colo 2007) (applying business judgment test in context of an asset sale).

26. Similarly, when "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr S.D.N.Y. 1986). If a debtor articulates a valid business justification for its use of estate property, there is a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2nd Cir. 1993). The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. *Id.* (citing *Aronson v. Lewis*, 472 A. 2d 805, 812 (Del. 1984).

27. A key employee retention payment should also meet the "facts and circumstances" test under § 503(c)(3) of the Bankruptcy Code, which prohibits payments to employees outside of the ordinary course of business that are "not justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3); *see also In re Residential Capital, LLC*, 491 B.R. 73, 84 (Bankr. S.D.N.Y. 2013); *In re Borders Group, Inc.*, 453 B.R. 459, 473-74 (Bankr. S.D.N.Y. 2011). However, courts have held that this language "creates a standard no different than the business judgment standard under section 363(b)." *Residential Capital*, 491 B.R. at 84; *Borders Group*, 453 B.R. at 473-74.

28. In determining whether a key employee retention plan meets the business judgment test under § 503(c) of the Bankruptcy Code, Courts have considered the following nonexclusive factors:

  i. Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?
  ii. Is the cost of the plan reasonable in the context of the Debtor's assets, liabilities, and earning potential?
  iii. Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?
  iv. Is the plan or proposal consistent with industry standards?
  v. What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; and what is generally applicable in a particular industry?
  vi. Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*See In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006); *Residential Capital*, 491 B.R. at 84.

29. Here, the KERP is necessary and appropriate in the Debtor's business judgment and it meets each of the foregoing factors. The KERP is a limited retention program being offered to the remaining Key Employees whose services are critical to liquidate and wind down the Debtor's affairs, and who remain employed with the Debtor and SML when a sale closes. The Debtor has determined in its business judgment that these Key Employees are essential to maintaining its going concern value and succeeding with the proposed liquidation of the Debtor's assets. Additionally, the Debtor has determined the Key Employees are either irreplaceable or who could be replaced but at a much greater cost to the Debtor and its bankruptcy estate and at the

risk of disrupting operations and the Debtor's efforts to maximize value.  The structure of the KERP is designed to be simple and straightforward — a key employee who stays employed through the closing of the Sale will receive a single payment; alternatively, if a key employee leaves or is terminated for cause before completion of a Transaction, such employee forfeits the right to receive the payment.  As such, the KERP is narrowly tailored, is reasonable in the context of the Debtor's assets and liabilities, and does not discriminate unfairly because it is focused on only those employees who, in the Debtor's judgment, are integral to maintaining operational stability and driving cash flow.

30. Given the foregoing, there is a reasonable relationship between the proposed KERP and the results to be obtained.  As the court in *Residential Capital* explained:

> As set forth in the Motion and supporting evidence, the payments are awarded to certain key employees to ensure they remain with the Debtors going forward.  Failure to retain these employees would cause the Debtors to incur significant costs replacing those employees and it would delay the wind-down, imposing further costs on the estate.  The continuity promoted, and the institutional knowledge preserved, by the retention of such employees will increase the chances of successfully implementing the Debtors' wind-down plan.

*Residential Capital*, 491 B.R. at 85 (internal citation omitted).

31. The same rationale applies here with equal force.  The Debtor anticipates pursuing a sale, or sales, of substantially all of its assets and a fulsome process to identify other potentially available alternatives that will maximize value through an orderly liquidation of assets.  The KERP is designed to assure that employees are incentivized to complete the important task of properly winding down the Debtor's operations.  The Key Employees are also functionally serving as the Debtor's

investment banker at a significant reduction over the cost to the Debtor of its prior outside, third-party investment bankers.  Therefore, the Debtor believes that these employees are necessary to wind down their operations and to assist in the administration of these Chapter 11 cases.  Accordingly, the KERP is a vital tool to ensure that the Debtor can achieve these goals.

32. To date, mostly through layoffs but also as a result of employee attrition, the Debtor has already lost approximately 150 employees, or over 75% of its staff, and is operating on a skeletal basis.  The Debtor cannot afford to lose important personnel and additional institutional knowledge at this stage.  Rather, they need to be acutely focused on their efforts to identify restructuring alternatives and to maximize value, and the proposed KERP will assist the Debtor in doing so.

33. As described above, the KERP was developed in consultation with the Debtor's proposed DIP lender, who is in agreement that the terms of the KERP are reasonable and is supportive of the relief requested in this Motion.

34. Secured creditors may stipulate to permit their collateral to be surcharged pursuant to Bankruptcy Code § 506(c).  *See In re Nuclear Imaging Systems, Inc.*, 270 B.R. 365, 372-73 (Bankr. E.D. Pa. 2001) ("The axiom that a secured creditor may consent to permit its collateral to be surcharged and paid to an administrative claimant, though not stated in section 506(c), is unchanged under the Code."); 4 Collier on Bankruptcy ¶ 506.05[6] (Rev. ed. 2006).  Since JLS has stipulated to the KERP Payment being made from the proceeds of its collateral, and other creditors are not affected by this arrangement, it should be approved.

35. Furthermore, section 105(a) of the Bankruptcy Code empowers a bankruptcy court to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code. 11 U.S.C. § 105(a). The Debtor respectfully submits that an order approving the KERP is necessary and appropriate under the circumstances because it will assist the Debtor in performing its duties under the Bankruptcy Code and its duty to maximize value by incentivizing the Key Employees to remain with the Debtor and continue supporting the Debtor's efforts to liquidate its assets in an orderly manner and maximize the value of assets for creditors.

36. Based on the foregoing, the Debtor submits that the KERP is supported by the proper exercise of the Debtor's business judgment, is justified by the facts and circumstances of the case, and that implementing the KERP is in the best interests of the Debtor, its estate, creditors, and all other stakeholders. The KERP should be approved.

**WHEREFORE**, the Debtor moves this Court to enter an order granting the Motion and permitting the Debtor to implement the KERP.

Dated: December 3, 2018

**COHNE KINGHORN, P.C.**

   /s/ George Hofmann
GEORGE HOFMANN
PATRICK E. JOHNSON

Attorneys for the Debtor

# CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of December, 2018, the foregoing **DEBTOR'S MOTION FOR AUTHORITY TO IMPLEMENT KEY EMPLOYEE RETENTION PLAN AND TO PAY PLAN THROUGH COLLATERAL SURCHARGE** was electronically filed with the United States Bankruptcy Court for the District of Utah by using the CM/ECF system.

I further certify that the parties of record in this case, as identified below, are registered CM/ECF users and will be served through the CM/ECF system.

- Michael Ronald Brown     mbrown@parsonsbehle.com
- T. Edward Cundick     tec@princeyeates.com, docket@princeyeates.com;pam@princeyeates.com
- Tim Dance     tdance@swlaw.com, docket_slc@swlaw.com;snielsen@swlaw.com;bhatch@swlaw.com
- Debra A. Dandeneau     debra.dandeneau@bakermckenzie.com, lori.seavey@bakermckenzie.com
- Frank Grese     frank.grese@bakermckenzie.com
- George B. Hofmann     ghofmann@cohnekinghorn.com, dhaney@cohnekinghorn.com;mparks@cohnekinghorn.com
- Michael R. Johnson     mjohnson@rqn.com, docket@rqn.com;dburton@rqn.com
- Patrick E Johnson     pjohnson@cohnekinghorn.com, jdannenmueller@cohnekinghorn.com
- Jacob M. Kaplan(no e-mail provided)
- David E. Leta     dleta@swlaw.com, wkalawaia@swlaw.com;csmart@swlaw.com
- Adelaide Maudsley     amaudsley@kmclaw.com, tslaughter@kmclaw.com
- John T. Morgan tr     john.t.morgan@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Suzanne.Verhaal@usdoj.gov
- Ellen E Ostrow     eeostrow@hollandhart.com, intaketeam@hollandhart.com;lahansen@hollandhart.com
- Ira A. Reid     (no e-mail provided)
- Mark C. Rose     mrose@mbt-law.com, markcroselegal@gmail.com
- Joseph R. Sgroi     jsgroi@honigman.com
- Engels Tejeda     ejtejeda@hollandhart.com, tjones@hollandhart.com,slclitdocket@hollandhart.com,intaketeam@hollandhart.com
- Jeff D. Tuttle     jtuttle@swlaw.com, jpollard@swlaw.com;docket_slc@swlaw.com
- United States Trustee     USTPRegion19.SK.ECF@usdoj.gov
- Brent D. Wride     bwride@rqn.com, docket@rqn.com;pbrown@rqn.com

/s/ George Hofmann