**This order is SIGNED.**



**Dated February 13, 2019**
George Hofmann (10005)
Patrick E. Johnson (10771)
**Cohne Kinghorn, P.C.**
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
Telephone: (801) 363-4300

_William J. Thurman_

**WILLIAM T. THURMAN**
**U.S. Bankruptcy Judge**

bc

Attorneys for Sorenson Media, Inc.

---

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Bankruptcy No. 18-27740 (WTT) |
| SORENSON MEDIA, INC., | Chapter 11 |
| Debtor. | |

### ORDER: (A) AUTHORIZING THE SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (B) WAIVING THE 14-DAY STAY OTHERWISE APPLICABLE UNDER BANKRUPTCY RULES 6004 AND 6006; AND (C) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

This matter is before the Court on the motion of the Sorenson Media, Inc., debtor

and debtor-in-possession (the "**Debtor**") for the entry of an order pursuant to sections

105, 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and

Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"): (a) approving the sale (the "**Sale**") of certain of the Debtor's

assets (as described and defined in the APA, the "**Acquired Assets**"), pursuant to the

terms of that certain Asset Purchase Agreement,[1] dated as of February 13, 2019 (the

"**APA**"), between the Debtor and The Nielsen Company (US), LLC ("**Purchaser**"), free

and clear of all liens, claims, encumbrances and other interests; (b) approving the

assumption and assignment of certain executory contracts and unexpired leases that

are to be assumed and assigned as part of the Sale (as described and defined in the

APA, the "**Purchased Contracts**"); and (c) granting related relief [Dkt. No. 171] (the

"**Sale Motion**").  As noted below, other aspects of the Sale Motion have been approved

previously by separate order of the Court.

The Court having considered the Sale Motion, having heard statements of

counsel and the evidence presented in support of the relief requested by the Debtor in

the Sale Motion at a hearing before the Court on February 13, 2019 (the "**Sale

Hearing**"), and it appearing that the Court has jurisdiction over this matter; and it further

appearing that the legal and factual bases set forth in the Sale Motion and at the Sale

Hearing establish just cause for the relief granted herein; and after due deliberation

thereon,

THE COURT HEREBY FINDS AND DETERMINES THAT:

I.       **Jurisdiction, Final Order and Statutory Predicates**

A.       The Court has jurisdiction to hear and determine the Sale Motion pursuant

to 28 U.S.C. §§ 157(b)(1) and 1334(a).  This is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(A), (N) and (O).  Venue is proper in this District and in the Court pursuant to

28 U.S.C. §§ 1408 and 1409.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
APA, a copy of which is attached hereto as Exhibit A.

B.      This Order constitutes a final and appealable order within the meaning of

28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to

any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules

of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly

finds that there is no just reason for delay in the implementation of this Order and cause

exists to waive all applicable stays and expressly directs entry of judgment as set forth

herein.

C.      The statutory predicates for the relief requested in the Sale Motion are

sections 105(a), 363(b), (f), and (m), and 365 of the Bankruptcy Code and Bankruptcy

Rules 2002(a)(2), 6004(a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9007 and 9014.

D.      The Court entered the *Order Approving Bid Procedures for Sale of*

*Substantially All of Debtor's Assets* on December 26, 2018 [Dkt. No. 252] (the "**Sale**

**Procedures Order**"), pursuant to which the Court approved certain procedures for the

Debtor with its professionals to, among other things, market and provide notice of a sale

of the Debtor's assets and the potential assumption and assignment of executory

contracts and unexpired leases to interested parties (the "**Sale Procedures**").

E.      The findings of fact and conclusions of law set forth herein constitute the

Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made

applicable to this proceeding pursuant to Bankruptcy Rule 9014.

F.      To the extent any of the following findings of fact constitute conclusions of

law, they are hereby adopted as such.  To the extent any of the following conclusions of

law constitute findings of fact, they are hereby adopted as such.  Findings of fact and

conclusions of law stated by the Court on the record at the Sale Hearing are hereby

incorporated, to the extent they are not inconsistent herewith.

G.      In the absence of a stay pending appeal, Purchaser will be acting in good

faith pursuant to section 363(m) of the Bankruptcy Code in closing the transaction

contemplated by the APA (as such term is defined herein) at any time on or after entry

of this Order, and cause has been shown as to why this Order should not be subject to

the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

**II.      Notice of the Sale, Auction and the Cure Costs**

A.      Actual written notice of the Sale Hearing, the Auction, the Sale Motion, the

Sale, the assumption, assignment and sale of the Purchased Contracts (as described

and defined in the APA) and a reasonable opportunity to object or be heard with respect

to the Sale Motion and the relief requested therein and granted by this Order has been

afforded to all known interested persons and entities, including, but not limited to the

following parties (the "**Notice Parties**"): (i) the United States Trustee; (ii) counsel to JLS

Holdings, LLC; (iii) counsel to the Official Committee of Unsecured Creditors appointed

in the Case (the "**Committee**"), (iv) counsel to all known parties asserting an interest in

or lien on the Acquired Assets; and (vi) all parties that have requested special notice

pursuant to Bankruptcy Rule 2002.

B.      In accordance with the provisions of the Sale Procedures Order, the

Debtor filed and served an *Amended Notice Regarding Executory Contracts and*

*Unexpired Leases and Deadline to Object to Cure Amount and Related Matters; and*

*Notice of Hearing* on January 15, 2019 (the "**Cure Notice**") [Dkt. No. 278], upon certain

non-debtor parties to contracts or leases of the Debtor, (the "**Contract**

**Counterparties**"): (i) giving notice of certain executory contracts and unexpired leases (the "**Executory Contracts**") that the Debtor may seek to assume and sell and assign in connection with the Sale to the extent the purchaser elects to acquire such Executory Contracts (as); (ii) giving notice of the relevant Cure Costs; and (iii) giving notice of the provision of adequate assurances of future performance.  Pursuant to Bankruptcy Rule 6006(c), the Court finds that the service of such Cure Notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of establishing a cure amount for the Purchased Contracts.  The Contract Counterparties have had an opportunity to object to the Cure Costs set forth in the Cure Notice, and no objections were filed.

C.    The Debtor has articulated good and sufficient reasons for the Court to grant the relief requested in the Sale Motion regarding the Sale and the sale process.

D.    The Cure Notice provided the Contract Counterparties with proper notice of the potential assumption and sale and assignment of the Purchased Contracts, any cure amount relating thereto, and the provision of adequate assurances of future performance, and the procedures set forth therein with regard to any such cure amount to satisfy the provisions of Bankruptcy Code section 365 and Bankruptcy Rule 6006.

E.    As evidenced by the certificates of service previously filed with the Court [Dkt. Nos. 171, 178, 205, 252, 256, 274, 279, 298], proper, timely, adequate, and sufficient notice of the Sale Motion, Sale Procedures, Auction, Sale Hearing, and Sale has been provided to all interested parties in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and all applicable Local Rules of Practice of the United States Bankruptcy Court for the District of Utah

(the "**Local Rules**").  The Debtor also has complied with all obligations to provide notice of the Auction, Sale Hearing, and Sale required by the Sale Procedures Order.  The notices described in paragraphs A to D above and this paragraph E were good, sufficient and appropriate under the circumstances, and no other or further notice of the Sale Motion, Auction, Sale Hearing, Sale, or assumption, assignment and sale of the Purchased Contracts is required.

F.     The disclosures made by the Debtor concerning the Sale Motion, APA, Auction, Sale, and Sale Hearing, including but not limited to those provided through the testimony received at the Sale Hearing, are good, complete and adequate.

## III.    Good Faith of Purchaser

A.     Purchaser submitted the APA in accordance with the Sale Procedures. Purchaser is not an "insider" or "affiliate" of the Debtor, as those terms are defined in the Bankruptcy Code.  Purchaser did not collude with others in violation of section 363(n) of the Bankruptcy Code.

B.     The APA, as amended as a result of Purchaser's participation in the Auction, provides for the following consideration: (a) cash payment in the amount of $11,250,000, (b) the assumption of certain liabilities (as described and defined in the APA, the "**Assumed Liabilities**"); (c) payment of Cure Costs; and (d) waiver of claims of Purchaser's affiliate Gracenote, Inc. ("**Gracenote**"), including any administrative expense claims as a result of the Debtor's postpetition infringement of certain of Gracenote's patents, as memorialized by that certain *Settlement and Mutual Release Agreement* (the "**Mutual Release Agreement**"), by and between the Debtor and Gracenote, which is an ancillary document to the APA.

{00425367.DOCX /}                                          6

C.      Purchaser is purchasing the Acquired Assets in good faith and is a good

faith buyer within the meaning of section 363(m) of the Bankruptcy Code and is,

therefore, entitled to the full protection of that provision, and otherwise has proceeded in

good faith in all respects in connection with this bankruptcy case in that, inter alia: (i)

Purchaser recognized that the Debtor was free to deal with any other party interested in

acquiring the Acquired Assets; (ii) Purchaser complied with the provisions in the Sale

Procedures Order; (iii) all payments to be made by Purchaser and other agreements or

arrangements entered into by Purchaser in connection with the Sale have been

disclosed; (iv) Purchaser has not violated section 363(n) of the Bankruptcy Code by any

action or inaction; (v) no common identity of directors or controlling equity holders exists

between Purchaser and the Debtor; (vi) Purchaser participated in good faith at the

Auction; and (vii) the Debtor and Purchaser engaged in substantial arm's length

negotiations, in good faith, and the APA is the product of this bargaining among the

parties.

## IV.     Highest or Best Offer

A.      The Debtor solicited offers to acquire the Acquired Assets from a wide

variety of parties.  In addition to such solicitations, the Debtor scheduled an auction in

accordance with the provisions of the Sale Procedures Order.  The Auction afforded a

full, fair and reasonable opportunity for any Qualified Bidder as defined in the Sale

Procedures Order, to make a higher or otherwise better offer to purchase the Acquired

Assets.  The Auction was duly noticed and commenced at 10:00 a.m. on February 7,

2019.

B.      The Auction (i) was held as provided in the Sale Procedures Order on February 7, 2019 and then, in the business judgment of the Debtor and in consultation with the Committee, was continued to February 8, 2019; (ii) was conducted pursuant to procedures established in good faith and in compliance with the Sale Procedures Order, and (iii) afforded a full, fair, and reasonable opportunity for any Qualified Bidder to make a higher or otherwise better offer for the Acquired Assets than that of Purchaser.  At the conclusion of the Auction, the Debtor, in consultation with the Committee, determined that Purchaser's bid for the Acquired Assets, as described in the APA, as modified by the Purchase Price fixed at Auction and any other modifications stated on the record at the Auction, was the highest and best bid to purchase the Acquired Assets. Accordingly, the Purchaser was declared the Successful Bidder (as defined in the Sale Procedures). The Debtor, in consultation with the Committee, further determined that the next highest and/or otherwise best bid was made by JLS Holdings, LLC (the "**Alternate Bidder**").

C.      The APA constitutes the highest and best offer for the Acquired Assets, and it will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative.  The Debtor's determination that the APA constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtor's business judgment.

D.      The APA represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of this bankruptcy case.  No other person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtor's estate, considering all relevant factors, than Purchaser.

{00425367.DOCX /}                                      8

E.    Approval of the Sale Motion and the APA and the consummation of the transactions contemplated thereby is in the best interests of the Debtor, its creditors, its estate and other parties in interest.

F.    The Debtor has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification to enter into the APA, sell the Acquired Assets pursuant thereto and assume and assign the Purchased Contracts and such actions are an appropriate and reasonable exercise of the Debtor's business judgment.  The Debtor has also demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization or liquidation.

**V.          No Fraudulent Transfer**

A.    The consideration provided by Purchaser pursuant to the APA, including without limitation the assumption of the Assumed Liabilities, is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia in exchange for the Acquired Assets.

**VI.         Validity of Transfer**

A.    The Debtor has full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, including the Mutual Release Agreement, and no further consents or approvals are required for the Debtor to consummate the transactions contemplated by the APA, except as otherwise set forth in the APA.

{00425367.DOCX /}                                                9

Case 18-27740   Doc 332   Filed 02/16/19   Entered 02/16/19 22:32:02   Desc Imaged
Certificate of Notice   Page 10 of 211

B.      The transfer of each of the Acquired Assets by the Debtor to Purchaser will be as of the Closing Date a legal, valid, and effective transfer of such asset, and vests or will vest Purchaser with all right, title, privilege and interest of the Debtor to the Acquired Assets free and clear of all Liens, Claims, Interests, and Encumbrances accruing, arising or relating to any time prior to the Closing Date, except for certain permitted liens (as described and defined in the APA, the "**Permitted Liens**") and the Assumed Liabilities.

**VII.      Section 363(f) Is Satisfied**

A.      The Debtor may sell the Acquired Assets free and clear of all Liens, Claims, Interests, and Encumbrances against the Debtor, its estate or any of the Acquired Assets (except for any Assumed Liabilities and Permitted Liens under the APA) if, in each case, one or more of the following standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied: (a) applicable non-bankruptcy law permits the sale of such property free and clear of such interest (section 363(f)(1)); (b) the entity holding the alleged lien, claim, interest, or encumbrance consents (section 363(f)(2)); (c) such interest is a lien, and the price at which such property is to be sold is greater than the  aggregate value of all liens on such property (section 363(f)(3)); (d) such lien, claim, interest, or encumbrance is subject to a *bona fide* dispute (section 363(f)(4)); or (e) such entity could be  compelled, in a legal or equitable proceeding, to accept a money satisfaction of such lien, claim,  interest, or encumbrance (section 363(f)(5)).

B.      For the following reasons, the provisions of section 363(f) of the Bankruptcy Code have been satisfied:

{00425367.DOCX /}                                          10

a. No alleged holders of Liens, Claims, Interests, or Encumbrances objected to the transaction contemplated by the APA and are deemed to have consented.

b. The Debtor is not aware of any remaining interests in the Acquired Assets, and, if any such interests exist, they are in *bona fide* dispute as to the extent, validity, perfection and viability of those interests.

c. Any other parties could be compelled to accept a money satisfaction of their Liens, Claims, Interests, or Encumbrances.

C. Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Acquired Assets will be transferred to Purchaser free and clear of all Liens, Claims, Interests and Encumbrances (except and only to the extent expressly provided in the APA with respect to the Assumed Liabilities and Permitted Liens) with all such Liens, Claims, Interests, and Encumbrances attaching to the proceeds of the Sale to the same extent and with the same validity and priority as such Liens, Claims, Interests, and Encumbrances enjoyed as of the Petition Date.

D. Purchaser would not have entered into the APA and would not consummate the transactions contemplated thereby (by paying the Purchase Price, assuming the Assumed Liabilities and having its affiliate Gracenote enter into the Mutual Release Agreement) if the sale of the Acquired Assets by the Debtor to Purchaser, and the assumption, assignment and sale of the Purchased Contracts to Purchaser, were not, except as otherwise provided in the APA with respect to the Assumed Liabilities and Permitted Liens, free and clear of all Liens, Claims, Interests,

and Encumbrances of any kind or nature whatsoever, or if Purchaser would, or in the

future could (except and only to the extent expressly provided in the APA with respect to

the Assumed Liabilities and Permitted Liens), be liable for any of such Liens, Claims,

Interests, and Encumbrances.

**VIII.   No Successor Liability**

A.      Purchaser is not holding itself out to the public as a continuation of the

Debtor, is not an "insider" or "affiliate" of the Debtor, as those terms are defined in the

Bankruptcy Code, and no common identity of incorporators, directors or stockholders

exists now or has ever existed between Purchaser, on the one hand, and the Debtor, on

the other.  Purchaser and the Debtor are not entering into the APA fraudulently or in

order to escape liability for the Debtor's obligations.

B.      The conveyance of the Acquired Assets does not amount to a

consolidation, merger or *de facto* merger of Purchaser and the Debtor and/or the

Debtor's estate, there is no substantial continuity between Purchaser and the Debtor,

there is no continuity of enterprise between the Debtor and Purchaser, Purchaser is not

a mere continuation of the Debtor or its estate, and Purchaser does not constitute a

successor to the Debtor or its estate.  Purchaser's acquisition of the Acquired Assets

will be free and clear of any "successor liability" claims of any nature whatsoever,

whether known or unknown and whether asserted or unasserted as of the Closing Date.

Purchaser's operations are not a continuation of the Debtor's business as a result of the

acquisition of the Acquired Assets.

**IX.    Assumption and Assignment of the Executory Contracts and Unexpired Leases**

C.      The assumption and assignment of the Purchased Contracts pursuant to the terms of this Order is integral to the APA and is in the best interests of the Debtor and its estate, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtor.

D.      The amounts set forth on the Cure Notice are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all monetary defaults and pay all actual pecuniary losses under the Purchased Contracts (the "**Cure Costs**").

E.      Pursuant to the terms of the APA, Purchaser will: (i) cure and/or provide adequate assurance of cure of any Cure Costs under any of the Purchased Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (ii) provide adequate assurance of its future performance under the relevant Purchased Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

**X.    Compelling Circumstances for an Immediate Sale**

A.      To enhance the Debtor's level of liquidity, to reduce the amount of post-petition debtor-in-possession financing borne by the Debtor, and to maximize the amount of funding available to provide for a timely exit from this chapter 11 case, it is essential that the Sale of the Acquired Assets occur within the time constraints set forth in the APA.  Time is of the essence in consummating the Sale.

{00425367.DOCX /}                                        13

B.      As of the Sale Hearing, the DIP Financing was almost fully drawn.  The

Debtor currently does not have access to any additional financing.  As a result, the

Debtor and its estate have an immediate need to close the Sale as soon as possible

and will be harmed if this Order is not entered and all applicable stays respecting the

effect and enforcement of this Order are not waived permitting the Closing to occur

promptly following the entry of this Order.

C.      Given all of the circumstances of this bankruptcy case and the adequacy

and fair value of the Purchase Price under the APA, the proposed Sale of the Acquired

Assets to Purchaser constitutes a reasonable and sound exercise of the Debtor's

business judgment and should be approved.

D.      The consummation of the Sale is legal, valid and properly authorized

under all applicable provisions of the Bankruptcy Code, including, without limitation,

sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable

requirements of such sections have been complied with in respect of the transaction.

NOW, THEREFORE, IT IS HEREBY **ORDERED, ADJUDGED AND DECREED**

THAT:

**General Provisions**

1.      The relief requested in the Sale Motion is granted and approved, and the

Sale contemplated thereby in light of the results of the Auction is approved as set forth

in this Order.

2.      This Court's findings of fact and conclusions of law, set forth in the Sale

Procedures Order, are incorporated herein by reference.

3.      No party objected to the Sale Motion or the relief requested therein, and

any reservation of rights filed by any party with respect to the relief requested in the

Sale Motion have either been waived or have been rendered moot given the outcome of

the Auction, as no such party objects to the Sale to the Purchaser.

**Approval of the APA**

4.      The APA and all other ancillary documents, including the Mutual Release

Agreement, and all of the terms and conditions thereof, are hereby approved.

5.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is

authorized, empowered and directed to take any and all actions necessary or

appropriate to (i) consummate the Sale of each of the Acquired Assets to Purchaser

pursuant to and in accordance with the terms and conditions of the APA, (ii) close the

Sale as contemplated in the APA and this Order, and (iii) execute and deliver, perform

under, consummate, implement and close fully the APA, together with all additional

instruments, documents and actions that may be reasonably necessary or desirable to

implement the APA and the Sale, including any other ancillary documents (including the

Mutual Release Agreement), or as may be reasonably necessary or appropriate to the

performance of the obligations as contemplated by the APA and such other ancillary

documents.

6.      This Order and the APA (and all rights and obligations hereunder and

thereunder along with any ancillary documents, including the Mutual Release

Agreement) shall be binding in all respects upon the Debtor, its estate, any holders of

Liens, Claims, Interests, or Encumbrances (whether known or unknown) against the

Debtor or against or on all or any portion of the Acquired Assets sold by the Debtor, all

Contract Counterparties, Purchaser and all successors and assigns of Purchaser, the

Acquired Assets and any trustees, if any, subsequently appointed in the Debtor's

chapter 11 case or upon a conversion to chapter 7 under the Bankruptcy Code of the

Debtor's case.  This Order and the APA shall inure to the benefit of the Debtor, its

estate, its creditors, Purchaser and their respective successors and assigns.

**Transfer of the Acquired Assets**

7.      Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the

Bankruptcy Code, the Debtor is authorized, empowered and directed to transfer the

Acquired Assets owned by the Debtor on the Closing Date.  Such Acquired Assets shall

be transferred to Purchaser upon and as of the Closing Date and such transfer shall

constitute a legal, valid, binding and effective transfer of such Acquired Assets

conveying good, marketable and insurable title to Purchaser, and upon the Debtor's

receipt of the Purchase Price, shall be free and clear of all Liens, Claims, Interests, and

Encumbrances, except Assumed Liabilities and Permitted Liens under the APA.  Any

Liens, Claims, Interests, and Encumbrances that exist on or in any of the Acquired

Assets shall attach to the proceeds of the Sale to the same extent and with the same

validity and priority as such Liens, Claims, Interests, and Encumbrances enjoyed as of

the Petition Date.  Upon the Closing, Purchaser shall take title to and possession of the

Acquired Assets subject only to the Assumed Liabilities and Permitted Liens.  Pursuant

to section 363(f) of the Bankruptcy Code, the transfer of title to the Acquired Assets

owned by the Debtor and the Purchased Contracts shall be free and clear of any and all

Liens, Claims, Encumbrances, and Interests, including, without limitation, any and all

Liens, Claims, Interests, or Encumbrances pursuant to any successor or successor-in-

interest liability theory or otherwise, under the Purchased Contracts arising prior to the

Closing Date, or any liabilities calculable by reference to the Debtor or its assets or

operations or relating to continuing conditions existing at or prior to the Closing Date;

provided, however, that Purchaser shall not be relieved of liability with respect to the

Assumed Liabilities or Permitted Liens, including any obligations accruing under the

Purchased Contracts from and after the Closing.

8.      Except as expressly provided by the APA with respect to Assumed

Liabilities and Permitted Liens, all persons and entities holding Liens, Claims, Interests,

or Encumbrances in all or any portion of the Acquired Assets arising under or out of, in

connection with, or in any way relating to the Debtor, the Acquired Assets, the operation

of the Debtor's business prior to the Closing Date or the transfer of the Acquired Assets,

hereby are forever barred, estopped and permanently enjoined from asserting against

Purchaser or its successors or assigns, their property or the Acquired Assets, such

persons' or entities' Liens, Claims, Interests, or Encumbrances against the Debtor or in

and to the Acquired Assets sold by the Debtor to Purchaser, and all such persons or

entities holding such Liens, Claims, Interests, or Encumbrances shall be deemed to

have released the Acquired Assets to Purchaser and limit the assertion of their Liens,

Claims, Interests, or Encumbrances to the sale proceeds the Debtor receives for the

sale of the Acquired Assets and any other available property of the Debtor's estate that

does not constitute Acquired Assets.

9.      All persons and entities are hereby forever prohibited and enjoined from

taking any action that would adversely affect or interfere with the ability of the Debtor to

sell and transfer the Acquired Assets to Purchaser and Purchaser taking title to, and the

use and enjoyment of the Acquired Assets, in accordance with the terms of the APA

and this Order.

10.     All persons and entities that are in possession of some or all of the
Acquired Assets sold by the Debtor on the Closing Date are directed to surrender
possession of such Acquired Assets to Purchaser or its assignee at the Closing.
Purchaser is acquiring as an Acquired Asset all accounts receivables and notes
receivable of the Debtor.  All account and note debtors are directed to remit payment on
account thereof after the Closing to Purchaser.

11.     A certified copy of this Order may be filed with the appropriate clerk and/or
recorded, with the recorder to act to cancel any of the Liens, Claims, Interests or
Encumbrances of record.

12.     If any person or entity which has filed statements, instruments or other
documents or agreements evidencing Liens or Encumbrances on, Claims or Interests
in, all or any portion of the Acquired Assets shall not have delivered to the Debtor or
Purchaser prior to the Closing, in proper form for filing and executed by the appropriate
parties, termination statements, instruments of satisfaction, releases of liens and
easements, and any other documents necessary or desirable to Purchaser for the
purpose of documenting the release of all Liens, Claims, Interests, or Encumbrances,
which the person or entity has or may assert with respect to all or any portion of such
Acquired Assets, the Debtor is hereby authorized and directed, and Purchaser is hereby
authorized, to execute, record and file such statements, instruments, releases and other
documents on behalf of such person or entity with respect to such Acquired Assets.

13.     This Order is and shall be binding upon and govern the acts of all persons
and entities, including, without limitation, all filing agents, filing officers, title agents, title

companies, recorders of mortgages and deeds of trust, recorders of deeds, registrars of

deeds, registrars of patents, trademarks or other intellectual property, administrative

agencies, governmental departments, secretaries of state, federal, state, and local

officials, and all other persons and entities who may be required by operation of law, the

duties of their office, or contract, to accept, file, register or otherwise record or release

any documents or instruments, or who may be required to report or insure any title or

state of title in or to any lease; and each of the foregoing persons and entities is hereby

directed to accept for filing any and all of the documents and instruments necessary and

appropriate to consummate the transactions contemplated by the APA.  Gil Miller and

Scott Klossner are authorized and directed to sign and deliver any and all documents

and instruments or take any other further actions by the Debtor necessary or desirable

to consummate the transactions contemplated by the APA or otherwise comply with the

APA or this Order, including, if applicable, paying, whether before or after the Closing,

any expenses or costs that are required to be paid in order to consummate the

transactions contemplated by the APA or to perform its obligations under the APA or

any related agreements.

**Purchased Contracts**

14.    Upon the Closing of the Sale, the Debtor is authorized and directed to

assume and assign and sell the Purchased Contracts to Purchaser free and clear of all

Liens, Claims, Interests, and Encumbrances, as described herein.  The payment of the

applicable Cure Costs (if any) by Purchaser shall (a) effect a cure of all defaults existing

thereunder as of the Closing Date, (b) compensate for any actual pecuniary loss to such

Contract Counterparty resulting from such default, and (c) together with the assumption

of the Purchased Contracts by Purchaser and any statements of counsel or other

evidence presented at the Sale Hearing, constitute adequate assurance of future

performance thereof.  The Debtor shall then have assumed the Purchased Contracts

and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtor

to Purchaser of such Purchased Contracts shall not be a default thereunder.  After the

payment of the relevant Cure Costs by Purchaser, neither the Debtor nor Purchaser

shall have any further liabilities to the Contract Counterparties other than Purchaser's

obligations under the Purchased Contracts that accrue and become due and payable on

or after the Closing Date.

15.    Any provisions in any Purchased Contract that prohibit or condition the

assignment of such Purchased Contract or allows the party to such Purchased Contract

to terminate, recapture, impose any penalty, condition on renewal or extension or

modify any term or condition upon the assignment of such Purchased Contract,

constitute unenforceable anti-assignment provisions that are void and of no force and

effect.  All other requirements and conditions under sections 363 and 365 of the

Bankruptcy Code for the assumption by the Debtor and assignment and sale to

Purchaser of the Purchased Contracts have been satisfied.  Upon the Closing, in

accordance with sections 363 and 365 of the Bankruptcy Code, Purchaser shall be fully

and irrevocably vested with all right, title and interest of the Debtor under the Purchased

Contracts and shall enjoy all of the rights and benefits under each such Purchased

Contract as of the Closing without the necessity of obtaining the Contract

Counterparty's written consent to the assumption or assignment of the relevant

Purchased Contract.

{00425367.DOCX /}                                      20

16.     Upon the Closing and the payment of the relevant Cure Costs, if any, Purchaser shall be deemed to be substituted for the Debtor as a party to the applicable Purchased Contract and the Debtor shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Purchased Contracts.

17.     Upon the payment of the applicable Cure Costs, if any, the Purchased Contracts will remain in full force and effect, and no default shall exist under the Purchased Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

18.     There shall be no rent accelerations, assignment or consent fees, increases (including advertising rates) or any other fees charged to Purchaser or the Debtor as a result of the assumption and assignment and sale of the Purchased Contracts.

19.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all Contract Counterparties are forever barred and permanently enjoined from raising or asserting against Purchaser any assignment or consent fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Purchased Contracts existing as of the Closing Date or arising by reason of the Closing.

20.     To the extent the Closing does not occur and the APA is terminated, the assumption and assignment of the Purchased Contracts will not be effectuated.

**Other Provisions**

21.     Effective upon the Closing Date and except as otherwise provided by stipulations filed with or announced to the Court with respect to a specific matter (if any), to the fullest extent permitted by applicable law, all persons and entities are forever

prohibited and permanently enjoined from commencing or continuing in any manner any

action or other proceeding, whether in law or equity, in any judicial, administrative,

arbitral or other proceeding against Purchaser, its successors and assigns, or the

Acquired Assets, with respect to any (a) Lien, Claim, Interest, or Encumbrance arising

under, out of, in connection with or in any way relating to the Debtor, Purchaser, the

Acquired Assets, or the operation of the Acquired Assets prior to the Closing of the Sale

(other than Assumed Liabilities and Permitted Liens), or (b) successor liability, including,

without limitation, the following actions: (i) commencing or continuing in any manner any

action or other proceeding against Purchaser, its successors or assigns, assets or

properties; (ii) enforcing, attaching, collecting or recovering in any manner any

judgment, award, decree or order against Purchaser, its successors or assigns, assets

or properties including Purchaser Employees; (iii) creating, perfecting or enforcing any

Lien, Claim, Interest, or Encumbrance against Purchaser, its successors or assigns,

assets or properties; (iv) asserting any setoff, right of subrogation or recoupment of any

kind against any obligation due Purchaser or its successors or assigns; (v) commencing

or continuing any action, in any manner or place, that does not comply or is inconsistent

with the provisions of this Order or other orders of the Court, or the agreements or

actions contemplated or taken in respect thereof; or (vi) revoking, terminating or failing

or refusing to renew any license, permit or authorization to operate any of the Acquired

Assets or conduct any of the businesses operated with the Acquired Assets.

22.     Except for the Assumed Liabilities and Permitted Liens as expressly

provided in the APA, Purchaser shall not have any liability or other obligation of the

Debtor arising under or related to any of the Acquired Assets or the Debtor's operations

or use of the Acquired Assets.  Without limiting the generality of the foregoing, and

except for the Assumed Liabilities and Permitted Liens expressly provided in the APA,

Purchaser shall not be liable for any Liens, Claims, Interests, or Encumbrances against

the Debtor or any of its predecessors or affiliates, and Purchaser shall have no

successor or vicarious liabilities of any kind or character, by reason of any theory of law

or equity including, but not limited to, any theory of antitrust, environmental, successor

or transferee liability, labor law, de facto merger or substantial continuity, whether

known or unknown as of the Closing Date, now existing or hereafter arising, whether

fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising

prior to the Closing Date, including, but not limited to, liabilities on account of any taxes

arising, accruing or payable under, out of, in connection with, or in any way relating to

the operation of any of the Acquired Assets by the Debtor prior to the Closing.

Purchaser has given substantial consideration under the APA for the benefit of the

holders of any Liens, Claims, Interests, or Encumbrances.  The consideration given by

Purchaser shall constitute valid and valuable consideration for the releases of any

potential claims of successor liability of Purchaser, which releases shall be deemed to

have been given in favor of Purchaser by all holders of Liens, Claims, Interests, or

Encumbrances against or interests in the Debtor or any of the Acquired Assets owned

by the Debtor.

       23.    Without limiting the generality of the foregoing, and except as otherwise

expressly provided in the APA with respect to the Assumed Liabilities and the Permitted

Liens, Purchaser shall not be liable or responsible, as a successor or otherwise, for the

Claims, Liens, Interests, or Encumbrances, whether calculable by reference to the

Debtor or its operations or under or in connection with (a) any employment or labor agreements, (b) any pension, welfare, compensation, fringe benefit or other employee benefit plans, trust arrangements, agreements, practices and programs, including, without limitation, any pension plan of the Debtor, any medical, welfare and pension benefits payable after retirement or other termination of employment or any responsibility as a fiduciary, plan sponsor or otherwise for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including, without limitation, pension plans) or the termination of or withdrawal from any such plan, arrangement or agreement; (c) the cessation of the Debtor's operations, dismissal of employees or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Age Discrimination and Employment Act of 1967, (v) the Federal Rehabilitation Act of 1973, (vi) the National Labor Relations Act, or (vii) the Consolidated Omnibus Budget Reconciliation Act of 1985; (d) worker's compensation, occupational disease, or unemployment or temporary disability insurance Claims; (e) environmental Claims, Liens, or Encumbrances arising from conditions first existing on or prior to the Closing Date (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or waste) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*; (f) any bulk sales or similar law; (g) any tax

statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; or (h) any litigation.

24.     To the fullest extent permitted by applicable law, neither Purchaser nor its affiliates, successors or assigns shall, as a result of the consummation of the transactions set forth in the APA: (i) be a successor to the Debtor or the Debtor's estate; (ii) have, de facto or otherwise, merged or consolidated with or into the Debtor or the Debtor's estate; (iii) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor; or (iv) be a joint employer or co-employer with, or successor employer of the Debtor.  Purchaser shall not assume, other than the Assumed Liabilities and Permitted Liens, nor be deemed to assume or in any way be responsible for any Claim, Lien, Encumbrance, liability or obligation of the Debtor and/or its estate.

25.     The transactions contemplated by the APA are undertaken by Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment and sale of the Purchased Contracts), unless such authorization and such Sale are duly stayed pending such appeal. Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

26.     The sale of the Acquired Assets pursuant to the APA, all covenants in and conditions thereto (including any ancillary document to the APA, including the Mutual Release Agreement), and all relief requested in the Sale Motion and this Order are an

integrated transaction, meaning that each component is an essential part of every other component and that the entire transaction can be consummated only if all of its components are  consummated.  Accordingly, the entire transaction is subject to, and is protected by, the  provisions of section 363(m) of the Bankruptcy Code.

27.     To the greatest extent available under applicable law, Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtor with respect to the Acquired Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been transferred to Purchaser as of the Closing Date.

28.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (i) this bankruptcy case, (ii) any subsequent chapter 7 case into which any such chapter 11 case may be converted, or (iii) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the APA or the terms of this Order.

29.     Notwithstanding Bankruptcy Rules 7062, 9014, 6004(h) and 6006(d) or any applicable Local Rules, this Order shall be effective immediately upon entry and the Debtor and Purchaser are authorized to close the Sale immediately upon entry of this Order.

30.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

31.     The failure specifically to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

32.     The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

33.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

34.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

35.     To the extent the Closing does not occur, the findings of fact and conclusions of law set forth herein in this Order shall have no further force or effect.

36.     If Purchaser fails to consummate the approved Sale because of a breach or failure to perform on the part of Purchaser, then the Alternate Bidder will be deemed to be Purchaser for all purposes under this Order, and the Debtor is authorized, but not required, without further notice or a hearing, to consummate the Sale with the Alternate Bidder.  In that event, and unless otherwise specified herein, all references to Purchaser and the APA herein shall be deemed to apply to the Alternate Bidder and the asset purchase agreement it last proposed at the Auction and entered into with the Debtor.

--------END OF ORDER--------

{00425367.DOCX /}

## DESIGNATION OF PARTIES TO BE SERVED

Service of the foregoing **ORDER: (A) AUTHORIZING THE SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (B) WAIVING THE 14-DAY STAY OTHERWISE APPLICABLE UNDER BANKRUPTCY RULES 6004 AND 6006; AND (C) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** shall be served to the parties and in the manner designated below:

**By Electronic Service**:  I certify that the parties of the record in this case as identified below, are registered CM/ECF users and will be served notice of entry of the foregoing Order through the CM/ECF system:

- Michael Ronald Brown      mbrown@parsonsbehle.com
- T. Edward Cundick      tec@princeyeates.com, docket@princeyeates.com;pam@princeyeates.com
- Tim Dance      tdance@swlaw.com, docket_slc@swlaw.com;snielsen@swlaw.com;csmart@swlaw.com
- Debra A. Dandeneau      debra.dandeneau@bakermckenzie.com, lori.seavey@bakermckenzie.com
- Frank Grese      frank.grese@bakermckenzie.com
- George B. Hofmann      ghofmann@cohnekinghorn.com, dhaney@cohnekinghorn.com;mparks@cohnekinghorn.com
- Phillip M. Hudson
- Michael R. Johnson      mjohnson@rqn.com, dock-et@rqn.com;dburton@rqn.com
- Patrick E Johnson      pjohnson@cohnekinghorn.com, jdannen-mueller@cohnekinghorn.com
- Jacob M. Kaplan
- David E. Leta      dleta@swlaw.com, wkala-waia@swlaw.com;csmart@swlaw.com
- John T. Morgan tr      john.t.morgan@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Suzanne.Verhaal@usdoj.gov
- Ellen E Ostrow      eeostrow@hollandhart.com, intake-team@hollandhart.com;lahansen@hollandhart.com
- Ira A. Reid
- Mark C. Rose      mrose@mbt-law.com, markcroselegal@gmail.com
- Joseph R. Sgroi      jsgroi@honigman.com
- Engels Tejeda      ejtejeda@hollandhart.com, tjones@hollandhart.com,slclitdocket@hollandhart.com,intaketeam@hollandhart.com
- Jeff D. Tuttle      jtuttle@swlaw.com, jpol-lard@swlaw.com;docket_slc@swlaw.com
- United States Trustee      USTPRegion19.SK.ECF@usdoj.gov
- Brent D. Wride      bwride@rqn.com, docket@rqn.com;pbrown@rqn.com

**By U.S. Mail**:  In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

Cheylynn Hayman
Parr Brown Gee & Loveless
101 South 200 East
Suite 700
Salt Lake City, UT 84111

Phillip Hudson
Saul Ewing Arnstein & Lehr LLP
200 S. Biscayne Boulevard, Suite 3600
Miami, FL 33131

_____

# **EXHIBIT A**

# ASSET PURCHASE AGREEMENT

# DATED AS OF FEBRUARY 13, 2019

# BETWEEN

# SORENSON MEDIA, INC., DEBTOR-IN-POSSESSION

# AND

# THE NIELSEN COMPANY (US), LLC

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS ........................................................................................................1

    1.1    Certain Terms Defined ................................................................................1
    1.2    Interpretation ...........................................................................................11

ARTICLE 2 PURCHASE AND SALE OF THE ACQUIRED ASSETS ...............................12

    2.1    Purchase and Sale of Assets......................................................................12
    2.2    Excluded Assets ........................................................................................14
    2.3    Assumption of Liabilities..........................................................................15
    2.4    Excluded Liabilities. .................................................................................15
    2.5    Real Property Lease and Contract Designation; Cure Costs. ...................18

ARTICLE 3 CONSIDERATION ...............................................................................................20

    3.1    Purchase Price. ..........................................................................................20
    3.2    Allocation of Purchase Price .....................................................................20
    3.3    Assignment to Subsidiaries of Purchaser..................................................20
    3.4    Withholding ...............................................................................................20

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER ...............................21

    4.1    Organization, Qualification and Corporate Power....................................21
    4.2    Subsidiaries and Investments ....................................................................21
    4.3    Authorization of Agreement .....................................................................22
    4.4    Conflicts; Consents of Third Parties. .......................................................22
    4.5    Title to Acquired Assets............................................................................23
    4.6    Contracts. ..................................................................................................23
    4.7    Leased Real Property. ...............................................................................23
    4.8    Intellectual Property. .................................................................................24
    4.9    Taxes. ........................................................................................................26
    4.10    No Collective Bargaining Agreements, Employment Agreements, etc. .................27
    4.11    Employee Benefit Plans. ...........................................................................27
    4.12    Environmental Matters...............................................................................28
    4.13    Financial Statements. ................................................................................28
    4.14    No Brokers or Finders ...............................................................................28
    4.15    Affiliate Transactions................................................................................28
    4.16    Litigation; Proceedings .............................................................................28
    4.17    Compliance with Laws .............................................................................29
    4.18    Accounts Receivable .................................................................................29
    4.19    Inventory ...................................................................................................29
    4.20    Warranties Are Exclusive .........................................................................29

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF PURCHASER ...........................30

| | | |
|---|---|---|
| 5.1 | Organization | 30 |
| 5.2 | Authorization and Validity | 30 |
| 5.3 | No Conflict or Violation | 30 |
| 5.4 | Consents and Approvals | 30 |
| 5.5 | No Brokers or Finders | 31 |
| 5.6 | Financial Wherewithal | 31 |
| 5.7 | Litigation; Proceedings | 31 |
| 5.8 | As Is Transaction, No other Representations and Warranties | 31 |

ARTICLE 6 COVENANTS AND OTHER AGREEMENTS ............................................. 31

| | | |
|---|---|---|
| 6.1 | Pre-Closing Covenants of Seller | 31 |
| 6.2 | Pre-Closing Covenants of Purchaser | 35 |
| 6.3 | Transfer of Permits | 35 |
| 6.4 | Employment Covenants and Other Undertakings | 35 |
| 6.5 | Casualty | 38 |
| 6.6 | Name Change | 38 |
| 6.7 | Transition Services | 38 |
| 6.8 | Alternate Transactions | 38 |
| 6.9 | Post-Closing Access | 38 |
| 6.10 | Release of Claims | 38 |
| 6.11 | Business Confidential Information | 39 |

ARTICLE 7 TAXES ........................................................................................................ 39

| | | |
|---|---|---|
| 7.1 | Tax Matters. | 39 |

ARTICLE 8 BANKRUPTCY COURT MATTERS ....................................................... 40

| | | |
|---|---|---|
| 8.1 | Sale Motion | 40 |
| 8.2 | Sale Order | 40 |
| 8.3 | Procedure | 40 |

ARTICLE 9 CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES ........ 41

| | | |
|---|---|---|
| 9.1 | Conditions Precedent to Performance by Seller | 41 |
| 9.2 | Conditions Precedent to the Performance by Purchaser | 42 |

ARTICLE 10 CLOSING AND DELIVERIES ............................................................... 43

| | | |
|---|---|---|
| 10.1 | Closing | 43 |
| 10.2 | Seller's Deliveries | 43 |
| 10.3 | Purchaser's Deliveries | 44 |

ARTICLE 11 TERMINATION ....................................................................................... 44

| | | |
|---|---|---|
| 11.1 | Conditions of Termination | 44 |
| 11.2 | Effect of Termination | 45 |

ARTICLE 12 MISCELLANEOUS ..................................................................................46

| | | |
|---|---|---|
| 12.1 | Survival | 46 |
| 12.2 | Further Assurances | 46 |
| 12.3 | Successors and Assigns | 46 |
| 12.4 | Governing Law; Jurisdiction | 46 |
| 12.5 | Expenses | 46 |
| 12.6 | Severability | 46 |
| 12.7 | Notices. | 47 |
| 12.8 | Amendments; Waivers | 48 |
| 12.9 | Entire Agreement | 48 |
| 12.10 | Seller Disclosures | 48 |
| 12.11 | Headings | 48 |
| 12.12 | Electronic Delivery; Counterparts | 48 |
| 12.13 | Waiver of Jury Trial. | 49 |
| 12.14 | Third Party Beneficiaries | 49 |
| 12.15 | Specific Performance | 49 |
| 12.16 | Non-Recourse | 49 |
| 12.17 | Interpretation | 50 |

## EXHIBITS

Exhibit A    Form of Assignment and Assumption Agreement
Exhibit B    Form of Sale Order
Exhibit C    Form of Bill of Sale
Exhibit D    Form of Mutual Release

## SCHEDULES

Schedule 1.1          Acquired Subsidiary Director
Schedule 2.1(d)       Purchased Contracts
Schedule 2.1(g)       Purchased Intellectual Property
Schedule 2.2(g)       Excluded Assets
Schedule 2.2(h)       Excluded Contracts
Schedule 2.3(e)       Assumed Liabilities of the Acquired Subsidiary
Schedule 2.5(a)       Designated Contracts
Schedule 4.1          Directors & Officers of the Acquired Subsidiary
Schedule 4.2          Subsidiaries
Schedule 4.4(a)       Conflicts
Schedule 4.4(b)       Consents of Third Parties
Schedule 4.5(a)       Title to Acquired Assets of the Seller
Schedule 4.5(b)       Title to Assets of the Acquired Subsidiary
Schedule 4.6          Contracts
Schedule 4.7(a)       Leased Real Property
Schedule 4.7(c)       Security Deposits
Schedule 4.8(a)       Intellectual Property
Schedule 4.8(b)       License Agreements
Schedule 4.8(c)       Exceptions to IP Ownership
Schedule 4.8(e)       Infringement
Schedule 4.10(a)      Employment Agreements
Schedule 4.10(b)      Defaults in Employment Agreement
Schedule 4.10(c)      Employee Compensation
Schedule 4.13         Financial Statements
Schedule 4.14         Brokers or Finders
Schedule 4.15         Affiliate Transactions
Schedule 4.16         Litigation; Proceedings
Schedule 9.2(h)       Required Consents and Approvals

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of February 13, 2019 (the "Execution Date"), is made by and among (i) The Nielsen Company (US), LLC, a Delaware limited liability company ("Purchaser"), and (ii) Sorenson Media, Inc., a Delaware corporation ("SMI") or ("Seller")

## RECITALS

WHEREAS, the Seller commenced a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") by filing a voluntary petition for relief (the "Bankruptcy Case") with the United States Bankruptcy Court for the District of Utah (the "Bankruptcy Court") on October 16, 2018, Bankruptcy Case No. 18-27740 (the "Petition Date");

WHEREAS, the Seller has agreed to sell and transfer to Purchaser, and Purchaser has agreed to purchase and assume, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Acquired Assets and the Assumed Liabilities from Seller, upon the terms and subject to the conditions contained in this Agreement, including obtaining an order of the Bankruptcy Court pursuant to Sections 105, 363 and 365 of the Bankruptcy Code authorizing the transactions contemplated by this Agreement;

WHEREAS, the Parties acknowledge and agree that the purchase by the Purchaser of the Acquired Assets, and the assumption by the Purchaser of the Assumed Liabilities are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Seller and its affiliates and in accordance with the Bidding Procedures Order (as defined below) and the Sale Order (as defined below);

WHEREAS, the board of directors of Seller has determined that it is advisable and in the best interests of Seller's estate and the beneficiaries of such estate to consummate the transactions provided for herein pursuant to the Bidding Procedures Order and the Sale Order and has approved this Agreement; and

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order to be entered in the Bankruptcy Case.

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Seller and Purchaser hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    Certain Terms Defined.  As used in this Agreement, the following terms have the following meanings:

"Acquired Assets" are those assets described in Section 2.1.

"Acquired Subsidiary" means Sorenson Media Limited, a private limited company organized under the laws of England and Wales.

"Acquired Subsidiary Director" means the member of the Acquired Subsidiary's board of directors listed on Schedule 1.1.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Allocation Statement" has the meaning set forth in Section 3.2.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Seller (a) accepts a bid, other than that of Purchaser, as the highest or best offer in the Auction or (b) sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization, or bankruptcy plan of reorganization or liquidation, or other similar transaction (by Seller or otherwise), including a Court-approved stand-alone plan of reorganization or refinancing, all or substantially all of the Acquired Assets (or agrees to do any of the foregoing) to a party or parties other than Purchaser.

"Ancillary Agreement" means the Bill of Sale, the Assignment and Assumption Agreement and any other agreement or instrument (other than this Agreement) that Seller or Purchaser, as applicable, enters into or delivers pursuant to this Agreement in connection with the consummation of the transactions contemplated hereby.

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement in substantially the form annexed hereto as Exhibit A evidencing the assignment to and assumption by Purchaser of all rights and obligations under the Purchased Contracts.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Plans" has the meaning set forth in Section 6.4(g).

"Assumption Order" means an order of the Bankruptcy Court approving the assumption or the assumption and assignment of a Contract pursuant to Section 365 of the Bankruptcy Code, which, for the avoidance of doubt, may be the Sale Order.

"Audited Financial Statements" means the audited consolidated balance sheets (including the consolidating balance sheet), and the related consolidated statements of operations, consolidated statement of changes in stockholders' equity and consolidated statement of cash flows, of Seller as of and for the fiscal years ended December 31, 2016 and 2017, together with the notes thereto.

"Avoidance Action" means any claim, right or cause of action of Seller arising under sections 544 through 553 of the Bankruptcy Code.

"Auction" means the auction for the sale of Seller's assets conducted by Seller pursuant to the Bidding Procedures Order.

"Bankruptcy Case" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bidding Procedures Order" means that certain order dated December 23, 2018 [Docket No. 252] issued by the Bankruptcy Court that, among other things, established procedures for an auction process to solicit competing bids in accordance with the terms and subject to the conditions in such order.

"Bill of Sale" means the Bill of Sale in all material respects in the form of Exhibit C conveying to Purchaser title to all of the Acquired Assets.

"Budget" means the "Budget" as defined in the DIP Credit Agreement.

"Business" means Seller's addressable television advertising business, including the design, development and sale of the automatic content recognition and dynamic ad insertion technologies, but excluding the business of Continuum Media Networks, Inc.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York are authorized by Law or other governmental action to close.

"Claim" has the meaning ascribed by Bankruptcy Code § 101(5), including all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at Law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"Closing" has the meaning set forth in Section 10.1.

"Closing Date" has the meaning set forth in Section 10.1.

"COBRA" has the meaning set forth in Section 6.4(f).

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

"Contract" means any agreement, contract, lease, sublease, purchase order, arrangement, license, commitment or other binding arrangement or understanding, whether written or oral, and

any amendments, modifications or supplements thereto, including, for the avoidance of doubt, any Real Property Lease and any customer agreement or contract.

"Contract & Cure Schedule" has the meaning set forth in Section 2.5(c).

"Copyrights" means any non-United States or United States copyright registrations and applications for registration thereof, and any nonregistered copyrights, including copyrights in compilations, collective works and all content and information contained on any website and "mask works" (as defined under 17 U.S.C. § 901) and any registrations and applications for "mask works."

"Cure Cost" means any amounts required by Section 365(b)(1) of the Bankruptcy Code under any applicable Designated Contract as determined in accordance with the procedures established by the Bidding Procedures Order.

"Designated Contracts" means all Contracts set forth on Schedule 2.5(a).

"Designee" has the meaning set forth in Section 3.3.

"DIP Credit Agreement" means that certain Amended and Restated Senior, Secured Debtor-In-Possession Credit Agreement dated as of November 30, 2018, between SMI, as Borrower, and JLS Holdings, LLC, as Lender.

"DIP Obligations" means all Indebtedness as of the Closing outstanding under the DIP Credit Agreement.

"DIP Orders" means the interim and final orders of the Bankruptcy Court approving Seller's entry into the DIP Credit Agreement.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (including design specifications, functional requirements, operating instructions, logic manuals and flow charts), user documentation (including installation guides, user manuals, training materials, release notes and working papers), marketing documentation (including sales brochures, flyers, pamphlets, Internet Web pages and any Internet Web page content), cost and pricing information, business plans, quality control records and procedures, blueprints, accounting and Tax files, customer files and documents (including credit information), personnel files for employees, supplier lists, records, literature and correspondence, including materials relating to inventories, services, marketing, advertising, promotional materials, documents evidencing or constituting Intellectual Property, and other similar materials to the extent related to, used in, or held for use in, the Business, the Acquired Assets or the business of the Acquired Subsidiary, in each case whether or not in electronic form, whether or not physically located on any of the Leased Real Property, but excluding (a) personnel files for Employees who are not hired by Purchaser as of the Closing Date (except records necessary for Purchaser to provide COBRA coverage if required by Law) and (b) any materials exclusively related to any Excluded Assets.

"Electronic Delivery" has the meaning set forth in Section 12.12.

"Employee" means any employee of Seller as of the Closing Date.

"Employee Benefit Plans" has the meaning set forth in Section 4.11.

"Encumbrances" means, to the extent not considered a Lien, any security interest, lien, collateral assignment, right of setoff, debt, pledge, levy, charge, encumbrance, option, right of first refusal, restriction (whether on transfer, disposition or otherwise), other similar agreement terms tending to limit any right or privilege of Seller or the Acquired Subsidiary under any Contract, conditional sale contract, title retention contract, mortgage, lease, deed of trust, hypothecation, indenture, security agreement, easement, license, servitude, proxy, voting trust, transfer restriction under any shareholder or similar agreement, or any other agreement, arrangement, contract, commitment or binding obligation of any kind whatsoever, whether written or oral, or imposed by any Law, equity or otherwise.

"Environmental Laws" means any applicable Law relating to (i) the protection, investigation or restoration of the environment, public health and safety or natural resources or (ii) the exposure to, generation, handling, use, storage, disposal, release or threatened release of any Hazardous Material.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliates" means all employers (whether incorporated or note) that would be treated together with the Seller or any of its Affiliates as a "single employers" within the meaning of Section 414 of the Code.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means (a) the Contracts set forth on Schedule 2.2(h) and (b) Contracts relating to the Excluded Assets and the Excluded Liabilities.

"Excluded Environmental Liabilities" means any Liability or other investigatory, corrective or remedial obligation, whenever arising or occurring, arising under Environmental Laws with respect to Seller, the Business, the Acquired Assets, the Facilities or the Leased Real Properties (including any arising from the on-site or off-site Release, threatened Release, treatment, storage, transportation, processing, disposal, or arrangement for disposal of Hazardous Materials) whether or not constituting a breach of any representation or warranty herein and whether or not set forth on any schedule attached hereto, but only to the extent related to pre-Closing conditions.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Execution Date" has the meaning set forth in the Preamble.

"Facilities" means all facilities owned or leased by the Seller at which the Business is conducted including all Leased Real Property.

"Financial Statements" means, collectively, the Audited Financial Statements and the Unaudited Financial Statements.

"FF&E" means all equipment, machinery, fixtures, furniture and other tangible property owned by Seller (unless sold to any third party in the ordinary course of business and not in violation of this Agreement), located at any of the Facilities, stored in any offsite location or used, held for use or useful in the operation of the Business or the Acquired Assets (including all such property that is damaged), including all work in process, raw materials, inventory, stores and supplies, tools, finished products, spare parts, packaging and shipping containers, and other materials.

"GAAP" has the meaning set forth in Section 4.13(a).

"Governmental Authority" means any U.S. or foreign, federal, state or local, court, tribunal, governmental department, agency, board or commission, regulatory, taxing or supervisory authority, or other administrative, governmental or quasi-governmental body, subdivision or instrumentality.

"Hazardous Materials" means (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, pollutant, or a contaminant, or otherwise regulated under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation, and polychlorinated biphenyls.

"Improvements" means, with respect to any Real Property, all buildings, fixtures, structures, systems, facilities, easements, rights-of-way, privileges, improvements, licenses, hereditaments, appurtenances and all other rights and benefits belonging, or in any way related, to such Real Property.

"Inbound IP Licenses" has the meaning set forth in Section 4.8(b).

"Indebtedness" with respect to any Person means any obligation of such Person for borrowed money, and in any event shall include (a) any obligation of such Person incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the ordinary course of business, (b) the face amount of all letters of credit issued for the account of such Person, (c) obligations of such Person secured by Liens or Encumbrances, (d) capitalized lease obligations of such Person, (e) all guarantees and similar obligations of such Person, (f) all accrued interest, fees and charges in respect of any indebtedness of such Person and (g) all prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any indebtedness of such Person.

"Intellectual Property" means all: (a) Trademarks; (b) Patents; (c) Copyrights; (d) Software; (e) rights of publicity and privacy relating to the use of the names, likenesses, voices, signatures and biographical information of real persons; (f) inventions (whether or not patentable), discoveries, improvements, know-how, formulae, methodologies, business methods, processes, technology, drawings, specifications and data, and applications, registrations or grants in any jurisdiction pertaining to the foregoing, including re-issues, continuations, divisions,

continuations-in-part, reexaminations, renewals and extensions; (g) Internet websites, web pages, domain names and applications and registrations pertaining thereto and all intellectual property used in connection with or contained in websites; (h) trade secrets, inventions and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, assembly, test, installation, technical, operating and service and maintenance manuals and data, hardware reference manuals and engineering, programming, service and maintenance notes and logs), (i) any and all other intellectual property and proprietary rights; (j) all rights under agreements relating to the foregoing; (k) all books and records pertaining to the foregoing; (l) all claims or causes of action arising out of or related to past, present or future infringement or misappropriation of the foregoing and (m) goodwill related to all of the foregoing.

"Interest" means "interest" as that term is used in Bankruptcy Code Section 363(f).

"Inventory" means all raw materials, work-in-process, inventory, supplies, finished goods and goods in transit, packaging materials and other consumables of Seller, including inventory (i) in the possession of the Seller or (ii) that is to be delivered by the vendor of such inventory to Seller pursuant to an order made by or on behalf of Seller prior to the Closing, but in each case excluding inventory, supplies, finished goods and goods in transit of the Seller that are (x) damaged or otherwise designated as "return to vendor" or (y) designated to be sold as part of a bulk sale.

"IRS" means the U.S. Internal Revenue Service.

"KERP Payment" means the aggregate amount due and payable to Seller's key employees in accordance with that certain order dated January 3, 2019 [Docket No. 258] issued by the Bankruptcy Court authorizing Seller to implement a key employee retention plan and to pay plan through collateral surcharge.

"Law" means any law, statute, ordinance, regulation, rule, code or rule of common law or otherwise of, or any order, judgment, injunction or decree issued, promulgated, enforced or entered by, any Governmental Authority.

"Leased Real Property" means all Real Property leased, subleased or licensed by Seller or the Acquired Subsidiary, as lessee, sublessee or licensee, all of which are identified on Schedule 4.7(a).

"Liability" means any liability or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes.

"License Agreements" has the meaning set forth in Section 4.8(b).

"Lien" has the meaning given to that term in the Bankruptcy Code.

"Material Adverse Effect" means a state of facts, event, change or effect with respect to the Business, the Acquired Assets or the Assumed Liabilities, or the business, assets or liabilities of the Acquired Subsidiary, that results in or would reasonably be expected to result in a material adverse effect on the results of operations or condition (financial or otherwise) of the Seller, the Acquired Subsidiary, the Acquired Assets and the Business, taken as a whole, but excludes any state of facts, event, change or effect relating to (a) changes or conditions affecting the industries in which Seller or the Acquired Subsidiary operates generally; (b) changes in economic, regulatory or political conditions generally; (c) changes in financial, banking or securities markets; (d) changes in applicable Law or GAAP or interpretations thereof; (e) any act of war, terrorism or armed conflict; (f) the public announcement, pendency or completion of the transactions contemplated by this Agreement and (g) the filing of the Bankruptcy Case and the effect thereof; provided, in each of clauses (a) through (e), that any such change does not have a disproportionate effect on the Acquired Assets and the Business taken as a whole.

"Material Contracts" has the meaning set forth in Section 4.6.

"Mutual Release" means the Settlement Agreement and Mutual Release in substantially the form of Exhibit D.

"Non-Assignable Contracts" has the meaning set forth in Section 2.5(f).

"Orders" means the Sale Order and the Bidding Procedures Order.

"Outbound IP Licenses" has the meaning set forth in Section 4.8(b).

"Owned Intellectual Property" means all Intellectual Property that is owned, created, acquired, licensed or used by Seller or the Acquired Company at any time prior to and through the Closing Date that is owned by Seller or the Acquired Company, including the Intellectual Property required to be listed in Schedule 4.8(a)(i), Schedule 4.8(a)(ii), Schedule 4.8(a)(iii) and Schedule 4.8(a)(iv), but excluding the Third Party Intellectual Property.

"Patents" means all patents, patent applications and non-United States counterparts thereof, and industrial designs (including any continuations, divisionals, continuations-in-part, renewals, reissues, and applications for any of the foregoing).

"Permits" means all certificates of occupancy or other certificates, permits, authorizations, filings, approvals and licenses.

"Permitted Lien" means: (a) Liens and Encumbrances for Taxes not yet due and payable or which are being contested in good faith by appropriate Proceedings and for which adequate reserves with respect thereto are maintained on the books of Seller; (b) statutory Liens of carriers, warehousemen, mechanics, repairmen, workmen, suppliers or materialmen imposed by Law and arising in the ordinary course of business that are not delinquent and that do not, individually or in the aggregate, materially affect the ownership, lease, value or use of the affected asset or of the Acquired Assets as a whole; (c) pledges or deposits in connection with workers' compensation, unemployment insurance and other social-security Laws; (d) with respect to Real Property, any Lien or Encumbrance which a reputable title insurance company

would be willing to omit as an exception, or affirmatively insure, in its title insurance policy for the applicable parcel of Real Property; (e) Liens and Encumbrances that will be released prior to or as of Closing; (f) with respect to leased or licensed property (including the Leased Real Property), the terms and conditions of the lease or license applicable thereto to the extent constituting a Purchased Contract; (g) all defects, exceptions, restrictions, and other similar encumbrances of record other than monetary encumbrances, judgments and monetary Liens that in each case (1) would not in any case, individually or in the aggregate, reasonably be expected to materially and adversely impair the ownership or lease of nor materially and adversely detract from the value or use of the property subject thereto or (2) would not be reasonably expected to materially interfere with the ordinary conduct of the Business at the property subject thereto; (h) any right, title or interest of a lessor, sublessor or licensor under any of the Real Property Leases; and (i) in the case of the Leased Real Property, any Lien or Encumbrance to which the fee simple interest (or any superior leasehold interest) is subject.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, sole proprietorship, unincorporated organization, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the Recitals.

"Proceeding" means any action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, and whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchased Contracts" has the meaning set forth in Section 2.1(d).

"Purchaser" has the meaning set forth in the Preamble and includes each Designee in accordance with Section 3.3.

"Purchaser Employees" means the Employees of Seller who accept an offer of employment with Purchaser based on the initial terms and conditions set by Purchaser.

"Real Property" means all the Leased Real Property, together with all buildings and Improvements thereon and all appurtenances and rights thereto.

"Real Property Leases" means, collectively, (a) that certain Real Property Lease Agreement by and between Seller and Kirton McConkie PC, a Utah professional corporation, dated April 18, 2017, as amended, (b) that certain Lease by and between the Acquired Subsidiary and Baran Group Limited dated 2017, and (c) that certain Lease by and between the Acquired Subsidiary and Baran Group Limited dated 2016.

"Related Person" means, with respect to any Person at any time of determination, all directors, officers, members, managers, stockholders, employees, controlling Persons, Affiliates, agents, professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

4392908-v16A\CHIDMSI                                      9

"Release" shall have the meaning set forth in CERCLA.

"Sale Order" means an order, in all material respects in the form and substance of Exhibit B, entered by the Bankruptcy Court, which Sale Order shall be acceptable to Purchaser.

"Schedules" has the meaning set forth in the first sentence of Article 4.

"Seller" has the meaning set forth in the Preamble.

"Seller Intellectual Property" means Owned Intellectual Property and Third Party Intellectual Property.

"Seller's Knowledge" means the actual (and not constructive) knowledge of Mark Bonham, Scott Klossner, Dane Clark and Gil Miller, in each case, after due inquiry.

"SMI" has the meaning set forth in the Preamble.

"Software" means any computer program, operating system, application, system, firmware or software of any nature, point-of-entry system, peripherals, and data whether operational, active, under development or design, nonoperational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, tests scripts, user manuals and other documentation therefor, whether in machine-readable form, virtual machine-readable form, programming language, modeling language or any other language or symbols, and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature, and all databases necessary or appropriate in connection with the operation or use of any such computer program, operating system, application, system, firmware or software.

"Straddle Period Property Tax" has the meaning set forth in Section 7.1(d).

"Subsidiary" means, with respect to any Person: (a) any corporation of which more than 50% of the total voting power of all classes of the equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors is owned by such Person directly or through one or more other Subsidiaries of such Person and (b) any Person other than a corporation of which at least a majority of the equity interests (however designated) entitled (without regard to the occurrence of any contingency) to vote in the election of the governing body, partners, managers or others that will control the management of such entity is owned by such Person directly or through one or more other Subsidiaries of such Person.

"Tax" or "Taxes" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Governmental Authority, whether payable by reason of contract, assumption, transferee liability, operation of Law or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law), which taxes shall include all net or gross income, gross receipts, net proceeds, sales, use, ad valorem, value added, franchise, bank shares, withholding, payroll, Medicare, employment, excise, property, abandoned property, escheat,

deed, stamp, alternative or add-on minimum, environmental, profits, windfall profits, transaction, license, lease, service, service use, occupation, severance, energy, sales, use, transfer, real property transfer, recording, documentary, stamp, registration, stock transfer taxes and fees, unemployment, social security, workers' compensation, capital, premium, and other taxes, assessments, customs, duties, fees, levies, or other governmental charges of any nature whatever, whether disputed or not, and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

"Tax Authority" means any Governmental Authority with responsibility for, and competent to impose, collect or administer, any form of Tax.

"Tax Return" means any report, return, information return, filing declaration, statement, or claim for refund, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed, distributed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Third Party Intellectual Property" has the meaning set forth in Section 4.8(a).

"Trademarks" means any trademarks, service marks, trade names, corporate names, Internet domain names, designs, trade dress, product configurations, logos, slogans, and general intangibles of like nature, together with all translations, adaptations, derivations and combinations thereof, all goodwill, registrations and applications in any jurisdiction pertaining to the foregoing.

"Transfer Taxes" means all sales, use, value added, transfer, stamp, registration, documentary, excise, real property transfer or gains, or similar Taxes incurred as a result of the transactions contemplated by this Agreement.

"Treasury Regulation" means any of the regulations promulgated by the U.S. Department of the Treasury under the Code.

"Unaudited Financial Statements" means the (a) unaudited consolidated balance sheets, and the related unaudited consolidated statements of operations, consolidated statement of changes in stockholders' equity and consolidated statement of cash flows, of Seller as of and for the six month period ended September 30, 2018, and (b) the unaudited consolidated balance sheets (including the consolidating balance sheet), and the related unaudited consolidated statements of operations, consolidated statement of changes in stockholders' equity and consolidated statement of cash flows, of Seller as of and for the six-month period ended June 30, 2018.

"WARN Act" means the Worker Adjustment and Retraining Notification Act, as amended, or any similar applicable state or local Law.

1.2    Interpretation.  When a reference is made in this Agreement to a section or article, such reference shall be to a section or article of this Agreement unless otherwise clearly indicated to the contrary.

4392908-v16A\CHIDMS1                    11

(a)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)    The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

(c)    The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(d)    A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(e)    A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefor, and all regulations and statutory instruments issued thereunder or pursuant thereto.

(f)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(g)    Any reference in this Agreement to $ shall mean U.S. dollars.

(h)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE 2
## PURCHASE AND SALE OF THE ACQUIRED ASSETS

2.1    Purchase and Sale of Assets.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, all of Seller's right, title and interest in, to and under the Acquired Assets, free and clear of all Liens, Claims, Interests or Encumbrances (other than Permitted Liens).  "Acquired Assets" shall mean all of the, direct or indirect, right, title and interest of Seller in and to all tangible and intangible assets, properties, rights, claims and Contracts (but excluding Excluded Assets) as of the Closing, including, but not limited to:

(a)    all accounts receivable, rebates, refunds (whether related to Taxes or otherwise) and other receivables of Seller however evidenced;

4392908-v16A\CHIDMS1                                      12

(b)     all Inventory of Seller;

(c)     all deposits (including, with respect to the Acquired Assets, customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), credits and prepaid charges and expenses of Seller that relate to the Acquired Assets;

(d)     all Contracts set forth on Schedule 2.1(d) to the extent they are assumed by Seller and assigned to Purchaser pursuant to an Assumption Order (the "Purchased Contracts"), together with all rights thereunder from and after the Closing Date, and any causes of action relating to past or present breaches of the Purchased Contracts;

(e)     all of Seller's interests in and to all Improvements located on the Leased Real Property subject to each Real Property Lease, any other appurtenances thereto, and all of Seller's rights in respect thereof;

(f)     all FF&E;

(g)     all Seller Intellectual Property, including the Patents and Software set forth on Schedule 2.1(g);

(h)     all telephone and facsimile numbers, websites, and all email addresses; all Documents;

(i)     all Permits possessed by Seller, or through which Seller has rights, that are used, useable or useful in the operation of the Business or the use or enjoyment or benefit of the Acquired Assets;

(j)     all rights, tort claims, recoveries, refunds and rights of set-off against third parties;

(k)     the capital stock or other equity interests of the Acquired Subsidiary;

(l)     all rights under or arising out of all insurance policies relating to the Business or the Acquired Assets, unless determined by a court of competent jurisdiction to be non-assignable as matter of Law;

(m)     other than with respect to the Excluded Contracts, all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Purchaser Employees or agents of Seller or with third parties (other than with Purchaser or any of its Affiliates under this Agreement or any Ancillary Agreements), including non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the Auction;

(n)     all rights, claims or causes of action of Seller or otherwise relating to the Business and the Acquired Assets, but excluding all Avoidance Actions.

4392908-v16A\CHIDMS1                              13

(o)     all rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to Seller or to the extent affecting any Acquired Assets other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(p)     all interests of Seller in, and all assets relating to, the Assumed Plans (if any);

(q)     subject to Section 2.5(f), any asset that requires the consent of a third party to be transferred, assumed or assigned notwithstanding the provisions of Section 365 of the Bankruptcy Code, as to which such consent has not been obtained as of the Closing Date; upon receipt of such consent on or after the Closing Date and entry of an appropriate Assumption Order as provided in Section 2.5(f); and

(r)     all goodwill and other intangible assets associated with the Business and the Acquired Assets.

2.2     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller shall retain all right, title and interest to, in and under, and all obligations with respect to, the Excluded Assets.  For all purposes of and under this Agreement, and as the same may be amended pursuant to Section 2.5, the term "Excluded Assets" shall mean:

(a)     the proceeds of any Acquired Assets sold or otherwise disposed of by Seller, in the ordinary course of Seller's business prior to the Closing Date not in violation of this Agreement;

(b)     Seller's certificates of incorporation and articles of incorporation or, as applicable, formation, qualifications to conduct business as a foreign corporation or, as applicable, limited liability company, taxpayer and other identification numbers, seals, stock transfer books, blank stock certificates, corporate books and records of internal corporate or limited liability company proceedings, Tax and accounting records, work papers and other records relating to the organization or maintenance of corporate or limited liability company existence of Seller and any other records that Seller is required by Law to retain; provided, however, that copies of the foregoing items shall be provided by Seller to Purchaser following the Closing Date upon Purchaser's request at Purchaser's sole expense;

(c)     the rights of Seller under this Agreement and the Ancillary Agreements and all consideration payable or deliverable to Seller under this Agreement, but excluding cash flows under any Purchased Contract;

(d)     all rights and interests in connection with, and assets of, any Employee Benefit Plan other than the Assumed Plans;

(e)     the capital stock of or other equity interests in Seller;

(f)     all rights under or arising out of insurance policies that are determined by a court of competent jurisdiction to be non-assignable as a matter of Law;

4392908-v16A\CHIDMS1                                          14

(g)    the assets listed on Schedule 2.2(g);

(h)    all Excluded Contracts;

(i)    all rights (including rights under insurance policies), claims or causes of action exclusively with respect to or arising exclusively in connection with Excluded Assets; all deposits (including, with respect to the Excluded Assets, customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise) and prepaid charges and expenses of Seller that relate exclusively to the Excluded Assets to the extent such deposits, prepaid charges or expenses are rightfully and legally offset against corresponding accounts payable of Seller arising prior to the Petition Date;

(j)    the stock and all other equity interests in Continuum Media Networks, Inc., owned by Seller, and in any other Subsidiary of Seller other than the Acquired Subsidiary;

(k)    all cash (including undeposited checks and uncleared checks), cash equivalents and short-term investments; and

(l)    any other assets or properties of Seller or any of its Subsidiaries that Purchaser advises Seller in writing prior to Closing that it does not wish to acquire, it being understood and agreed that there will be no reduction in the Purchase Price as a result of Purchaser's election to exclude any asset or property pursuant to this Section 2.2(l).

2.3    Assumption of Liabilities.  Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge the following Liabilities (the "Assumed Liabilities"):

(a)    all of Seller's Liabilities arising after the Closing under the Purchased Contracts (but excluding, for the avoidance of doubt, any Excluded Liabilities described in Section 2.4(a)(iii); provided, however, that Purchaser's obligations with respect to monetary defaults under any Purchased Contract upon the assumption thereof by Purchaser shall be limited to Cure Costs, subject to the terms of Section 2.5;

(b)    [Intentionally omitted];

(c)    all Liabilities relating to the Assumed Plans, if any;

(d)    [Intentionally omitted]; and

(e)    the Liabilities of the Acquired Subsidiary set forth on Schedule 2.3(e), and all Liabilities of the Acquired Subsidiary to indemnify the Acquired Subsidiary Director as required pursuant to the Acquired Subsidiary's articles of association and in accordance with applicable Law.

2.4    Excluded Liabilities.

(a)    Notwithstanding anything to the contrary in this Agreement or otherwise,

(a)    Purchaser shall not assume or for any reason be deemed to have assumed or be liable for any Claims, Liens, Encumbrances, Interests or Liabilities of Seller or any of its Subsidiaries of any nature whatsoever, whether presently in existence or arising hereafter (other than the Assumed Liabilities), including, but not limited to, the following (collectively, the "Excluded Liabilities"):

(i)    all Claims or Liabilities of Seller that relate to any of the Excluded Assets (including under any Excluded Contracts);

(ii)    the Excluded Environmental Liabilities (regardless of whether such Liabilities are technically Liabilities of Seller);

(iii)    any Liability relating to (A) events or conditions occurring or existing in connection with, or arising out of, (1) the Business as operated prior to the Closing or (2) any other business as operated by Seller at any time, or (B) the ownership, possession, use, operation or sale or other disposition (1) prior to the Closing of any Acquired Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing, with the Business) or (2) of any other assets, properties, rights or interests associated, at any time, with any other business of Seller;

(iv)    any Liability relating to the Acquired Assets or the Business based on events or conditions occurring or existing prior to the Closing Date and connected with, arising out of or relating to: (A) claims relating to employee health and safety, including claims for injury, sickness, disease or death of any Person or (B) compliance with any applicable Law relating to any of the foregoing, except to the extent the Sale Order expressly provides that the sale pursuant to this Agreement is not free and clear of such Liability;

(v)    all Claims or Liabilities of Seller or for which Seller or any Affiliate of Seller could be liable relating to Taxes that are not expressly assumed by Purchaser under Schedule 2.3(d);

(vi)    all Claims or Liabilities for any legal, accounting, investment banking, brokerage or similar fees or expenses incurred by Seller or any predecessor of Seller in connection with, resulting from or attributable to the Bankruptcy Case or the transactions contemplated by this Agreement or otherwise;

(vii)    all Indebtedness of Seller, including, but not limited to, the DIP Obligations;

(viii)    all Liabilities of Seller related to the right to or issuance of any capital stock or other equity interest of Seller, including any stock options or warrants;

(ix)    all Liabilities of Seller resulting from, caused by or arising out of, or which relate to, directly or indirectly, the ownership, lease or license of any properties or assets or any properties or assets previously used by Seller or any predecessor of Seller at any time, or other actions, omissions or events occurring prior to the Closing and

16

which (A) constitute, may constitute or are alleged to constitute a tort, breach of contract or violation of any rule, regulation, treaty or other similar authority or (B) relate to any and all Claims, Proceedings, Liabilities, damages, accounts, costs, expenses, setoffs, contributions, attorneys' fees or causes of action of whatever kind or character against Seller, whether past, present, future, known or unknown, liquidated or unliquidated, accrued or unaccrued, pending or threatened;

(x)    any Liability (A) arising out of any Proceeding commenced against Seller or any predecessor of Seller after the Closing or arising out of, or relating to, any occurrence or event happening prior to the Closing or (B) any fees, costs and expenses incurred in connection with any of the foregoing;

(xi)    all Claims or Liabilities with respect to the Employees or former employees (or their representatives) of Seller or any predecessor of Seller based on any action or inaction occurring prior to and including on the Closing Date, including payroll, vacation, sick leave, workers' compensation, unemployment benefits, pension benefits, employee stock option or profit sharing plans, health care plans or benefits (including COBRA), claims under the WARN Act, and any other employee plans or benefits or other compensation of any kind to any employee;

(xii)    any Liability arising under any Employee Benefit Plan or any other employee benefit plan, policy, program, agreement or arrangement (other than an Assumed Plan) at any time maintained, sponsored or contributed to by Seller or any ERISA Affiliate, or with respect to which Seller or any ERISA Affiliate has any Liability including with respect to any underfunded pension Liability; provided, that for the avoidance of doubt, all Liabilities arising under the Assumed Plans shall be assumed by Purchaser pursuant to Section 2.3(c).

(xiii)    any Liability (A) arising out of or relating to services or products of Seller to the extent performed, marketed, sold or distributed prior to the Closing or (B) any fees, costs and expenses incurred in connection with any of the foregoing;

(xiv)    any Liability under any Excluded Contract;

(xv)    any Liability under any employment, collective bargaining agreement, severance, retention or termination agreement with any employee, consultant or contractor (or their representatives) of Seller, except if an Assumed Liability;

(xvi)    any Liability arising out of or relating to any grievance by current or former employees of Seller, whether or not the affected employees are hired by Purchaser;

(xvii)    any Liability to any shareholder or other equity holder of Seller, which Liability relates to such Person's capacity as a shareholder or other equity holder of Seller;

(xviii)   any Liability to indemnify, or to advance or reimburse the fees, costs and expenses in relation to indemnifiable claims of, any directors, officers, employees or agents of Seller or any of its Subsidiaries;

(xix)   any Liability arising out of or resulting from non-compliance or alleged non-compliance with any Law, ordinance, regulation or treaty by Seller;

(xx)   any Liability for infringement or misappropriation of any Intellectual Property arising out of or relating to any conduct of Seller or operation of the Business on or before the Closing;

(xxi)   any Liability of Seller under this Agreement or any Ancillary Agreements;

(xxii)   any other Liabilities of Seller not expressly assumed by Purchaser pursuant to Section 2.3; and

(xxiii)   the KERP Payment.

(b)   The parties acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement shall not create an Assumed Liability or other Liability of Purchaser, except where such disclosed Liability has been expressly assumed by Purchaser as an Assumed Liability in accordance with the provisions of Section 2.3.

2.5   Real Property Lease and Contract Designation; Cure Costs.

(a)   Designated Contracts.   Schedule 2.5(a) sets forth the list of Contracts that the Purchaser has designated as the Designated Contracts.

(b)   [Intentionally omitted].

(c)   Seller's Actions.  Seller shall use reasonable best efforts, subject to entry of an Assumption Order by the Bankruptcy Court, to assume and assign the Designated Contracts to Purchaser or Purchaser's Designee at no additional cost or expense to Purchaser (other than payment of the Cure Costs), and shall otherwise take all requisite actions (including actions required under § 363 and/or 365 of the Bankruptcy Code, as applicable) to assume and assign such Designated Contracts to Purchaser or its Designee.

Seller shall use reasonable best efforts to obtain the entry of an Assumption Order by the Bankruptcy Court approving the assumption and assignment of the Designated Contracts to Purchaser or its Designee and fixing the Cure Costs relating to each of such Designated Contracts as set forth on that schedule Seller filed with the Bankruptcy Court on January 15, 2019 [Docket No. 278] (the "Contract & Cure Schedule").  Promptly following the entry of an Assumption Order by the Bankruptcy Court, Purchaser shall and shall cause its Designees to assume from Seller the Purchased Contracts pursuant to Section 365 of the Bankruptcy Code and an Assignment and Assumption Agreement.

(d)     Bankruptcy Court Matters.  Without the prior written consent of Purchaser, Seller shall not reject any Designated Contracts or amend, modify, or supplement the Contract & Cure Schedule such that any Cure Costs referenced therein relating to any Designated Contract are increased.

(e)     Cure Costs; Adequate Assurance.  To the extent that any Designated Contract requires the payment of Cure Costs in order to be assigned to Purchaser and assumed pursuant to Section 363 and 365 of the Bankruptcy Code, the Cure Costs related to such Designated Contract shall be paid by the Purchaser or its Designees.  Purchaser shall not be required to make any payment of Cure Costs for, or otherwise have any Liabilities with respect to, any Contract that is not a Purchased Contract.

Purchaser will provide adequate assurance of future performance on its behalf and on behalf of its Designees as required under the Bankruptcy Code, including Section 365(f)(2)(B) thereof.  Purchaser and the Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under each Purchased Contract, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making Purchaser's and the Seller's employees and representatives available to testify before the Bankruptcy Court, as necessary.

(f)     Non-Assignable Contracts.  To the extent that any Purchased Contract is not capable of being assigned under Section 365 of the Bankruptcy Code (or, if inapplicable, pursuant to other applicable Laws or the terms of such Contract) to Purchaser or a Designee without the consent of the other party thereto or any Person (including a Governmental Authority), and such consent has not been obtained (collectively, the "Non-Assignable Contracts"), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless any such consent is obtained.  Any payment to be made in order to obtain any consent required by the terms of any Non-Assignable Contract shall be the responsibility of Purchaser or its Designees.  If, however, any such payment exceeds the amount of the Cure Costs set forth on the Contract & Cure Schedule, then Purchaser may elect in its sole discretion to treat such Contract as an Excluded Contract for all purposes of this Agreement.

If, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code, such consent is required but not obtained, the Seller shall cooperate with Purchaser in any reasonable arrangement designed to provide for Purchaser the benefits and obligations of or under any such Non-Assignable Contract, including enforcement for the benefit of Purchaser of any and all rights of the Seller against a third party thereto arising out of the breach or cancellation thereof by such third party.  Any assignment to Purchaser of any Purchased Contract that shall, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent of any third party for such assignment as aforesaid shall be made subject to such consent being obtained on terms acceptable to Purchaser.  Any contract that would be a Purchased Contract but is not assigned in accordance with the terms of this Section 2.5(f) shall not be considered a "Purchased Contract" for purposes hereof unless and until such Contract is assigned to Purchaser following the Closing Date upon receipt of the requisite consents to assignment and Bankruptcy Court approval.

## ARTICLE 3
## CONSIDERATION

3.1     Purchase Price.  The purchase price (the "Purchase Price") for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to and under the Acquired Assets to Purchaser or its Designees shall consist of (i) cash in an amount equal to $11,250,000; and (ii) the assumption by Purchaser of the Assumed Liabilities.

3.2     Allocation of Purchase Price.  If the transaction contemplated by this Agreement is an "Applicable Asset Acquisition" as defined in Section 1060(c) of the Code as determined by Purchaser, then by the date that is sixty (60) days after the Closing Date, Purchaser shall prepare and deliver to Seller a statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items among the Acquired Assets in accordance with Section 1060 of the Code (such statement, the "Allocation Statement"), and the Allocation Statement shall be finalized upon reasonable consultation with Seller.  Except as otherwise required by applicable Law, the parties shall follow the Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not voluntarily take any position inconsistent therewith.  If the IRS or any other taxation authority proposes a different allocation, Seller or Purchaser, as the case may be, shall promptly notify the other party of such proposed allocation.  Seller or Purchaser, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such Proceedings) as may be reasonably requested by such other party to carry out the purposes of this section.  Except as otherwise required by applicable Law or pursuant to a "determination" under Section 1313(a) of the Code (or any comparable provision of United States state, local, or non-United States Law), (i) the transactions contemplated by Article 2 of this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this Section 3.2; and (ii) neither party (nor any of their Affiliates) will take any position inconsistent with this Section 3.2 in any Tax Return, in any refund claim, in any litigation or otherwise.  Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Acquired Assets or the allocation of the value of the Acquired Assets in any plan of reorganization or liquidation that may be proposed.

3.3     Assignment to Affiliates or Subsidiaries of Purchaser.  Prior to the Closing, Purchaser shall have the right to assign its rights to receive all or any part of the Acquired Assets and its obligations to assume all or any part of the Assumed Liabilities, in each case, to one or more Affiliates or Subsidiaries of Purchaser (each, a "Designee") by providing written notice to SMI and each such Designee shall be deemed to be a Purchaser for all purposes hereunder and under the Ancillary Agreements, except that no such assignment shall relieve Purchaser of any of its obligations hereunder.

3.4     Withholding.  Purchaser will be entitled, solely in accordance with applicable Law, to deduct and withhold from the amounts otherwise payable by it pursuant to this Agreement such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code, or any provision of state, local or foreign Tax Law; provided, however, that Purchaser will promptly (and in any event no later than five (5) Business Days prior to the date on which such payment is made) notify Seller of any intention to so deduct and

withhold with respect to any payment to Seller and provide Seller a reasonable opportunity to provide any statement, form, or other documentation that would reduce or eliminate any such requirement to deduct and withhold. In addition, Purchaser will (a) remit and report any such amount required to be deducted and withheld to the applicable Governmental Authority in accordance with applicable Law; (b) upon request, promptly provide to Seller a certificate, receipt or other documentation of proof of such remittance reasonably acceptable to Seller; and (c) cooperate with Seller, as reasonably requested, with respect to the filing of any Tax Return or conduct of any claim relating to any available refund of such amount remitted. To the extent that amounts are so withheld and paid to the appropriate Governmental Authority by Purchaser, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to Seller.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Subject to the exceptions noted in the disclosure schedules delivered by Seller concurrently herewith (the "Schedules"), Seller represents and warrants to Purchaser as follows:

4.1    Organization, Qualification and Corporate Power.  Seller is a corporation duly organized, validly existing and in good standing under the Laws of the state of Delaware and is in good standing under the Laws of each jurisdiction where such qualification is required, except where the lack of such qualification would not reasonably be expected to have a Material Adverse Effect. Seller has all necessary power and authority to own and operate its properties and to carry on its business as it is now being conducted. Seller has the power and authority to execute and deliver and, subject to an order of the Bankruptcy Court, perform its obligations under this Agreement and the other Transaction Documents, and to undertake the transactions contemplated hereby and thereby. As used herein, the term "Transaction Documents" means this Agreement and all other agreements, documents and instruments executed in connection herewith or required to be executed and/or delivered by Seller in accordance with the provisions of this Agreement. Seller has provided to Purchaser true, correct and complete copies of the certificate of incorporation and bylaws or other organizational documents of the Acquired Subsidiary, each as in effect on the Execution Date.  Schedule 4.1 sets forth a correct and complete list of the current officers and directors of the Acquired Subsidiary.

4.2    Subsidiaries and Investments.  Except as set forth in Schedule 4.2, Seller does not, directly or indirectly, own, of record or beneficially, any outstanding voting securities, membership interests or other equity interest in any Person. Other than the Acquired Subsidiary and Continuum Media Networks, Inc., none of the Persons listed or required to be listed on Schedule 4.2 have any employees. Other than the Acquired Subsidiary, none of the Persons listed or required to be listed on Schedule 4.2 own or have rights to use any Intellectual Property or other assets that are used in the operation of the Acquired Assets or conduct of the Business and that do not constitute Acquired Assets other than any such rights that may have been granted by Seller and which, following the Closing, may be terminated by Purchaser in its sole discretion without the consent of or notice to any Person (other than by notice from Purchaser to any Person listed on Schedule 4.2) and without any cost or Liability to Purchaser.

4.3    Authorization of Agreement. Subject to entry of the Sale Order and authorization as is required by the Bankruptcy Court:

(a)    Seller has, or at the time of execution will have, all necessary power and authority to execute and deliver this Agreement and each Ancillary Agreement to which Seller is or will become a party and to perform its obligations hereunder and thereunder;

(b)    The execution, delivery and performance of this Agreement and each Ancillary Agreement to which Seller is or will become a party and the consummation of the transactions contemplated hereby and thereby have been, or at the time of execution will be, duly authorized by all necessary action on the part of Seller and no other proceedings (shareholder, member or otherwise) on the part of Seller are necessary to authorize such execution, delivery and performance; and

(c)    This Agreement and each Ancillary Agreement to which Seller is or will become a party have been, or when executed will be, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto or thereto) this Agreement and each Ancillary Agreement to which Seller is or will become a party constitutes, or will constitute, when executed and delivered and subject to the entry of the Sale Order, Seller's valid and binding obligation, enforceable against Seller in accordance with its respective terms except as may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights, or by general equity principles, including principles of commercial reasonableness, good faith and fair dealing.

4.4    Conflicts; Consents of Third Parties.

(a)    Except as set forth on Schedule 4.4(a), subject to entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and each Ancillary Agreement, the consummation of the transactions contemplated hereby and thereby, and compliance by Seller with any of the provisions hereof or thereof do not, or will not, result in the creation of any Lien, Claim, Interest or Encumbrance upon the Acquired Assets or the assets of the Acquired Subsidiary and do not, or will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, acceleration or cancellation under any provisions of:

(i)    Seller's or the Acquired Subsidiary's certificates of incorporation, bylaws or comparable organizational documents;

(ii)    any material Purchased Contract or Permit to which Seller or the Acquired Subsidiary is a party or by which any of the Acquired Assets or the assets of the Acquired Subsidiary are bound;

(iii)    any order, writ, injunction, judgment or decree of any Governmental Authority applicable to Seller, the Acquired Subsidiary or any of the Acquired Assets; or

22

(iv)    any applicable Law.

(b)    Subject to entry of the Sale Order, and except as set forth on <u>Schedule 4.4(b)</u>, no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Seller in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement to which it is or will become a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the assignment or conveyance of the Acquired Assets.

4.5    <u>Title to Acquired Assets</u>.  Except as set forth on <u>Schedule 4.5(a)</u>, Seller has good, and marketable title to, or a valid and marketable leasehold interest in, the Acquired Assets, and, subject to entry of the Sale Order, Purchaser will be vested, to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code, with good and marketable title to, and a valid and marketable leasehold interest in, the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances, other than Permitted Liens.  Except as set forth on <u>Schedule 4.5(b)</u>, the Acquired Subsidiary has good, and marketable title to, or a valid and marketable leasehold interest in, its assets, free and clear of all Liens, Claims, Interests and Encumbrances, other than Permitted Liens

4.6    <u>Contracts</u>.  A Contract is considered material if it (a) subjects the Seller or the Acquired Subsidiary to any Liability exceeding $25,000 per year or (b) is with any customer of the Seller or the Acquired Subsidiary who has provided net revenues in excess of $25,000 in the year ended December 31, 2018.  Schedule 4.6 is a correct and complete list of every material written or oral Contract (other than employment Contracts set forth on Schedule 4.10(a)), barter Contract, agreement, relationship or commitment, to which the Seller or the Acquired Subsidiary is a party or by which the Seller or the Acquired Subsidiary is bound, as they relate (in the case of the Seller) to the Business or the Acquired Assets (the Contracts required to be so listed, the "<u>Material Contracts</u>"), correct and complete copies or disclosures of which previously have been furnished to Purchaser. Except as set forth on Schedule 4.6, neither the Seller nor the Acquired Subsidiary is in default, and no event has occurred which with the giving of notice or the passage of time or both would constitute a default by the Seller or the Acquired Subsidiary, under any Material Contract or any other obligation owed by the Seller or the Acquired Subsidiary, and no event has occurred which with the giving of notice or the passage of time or both would constitute such a default by the Seller or the Acquired Subsidiary under any such Material Contract or obligation.

4.7    <u>Leased Real Property</u>.

(a)    Neither Seller nor the Acquired Subsidiary owns any Real Property. Neither Seller nor the Acquired Subsidiary is party to any real property leases other than the Real Property Leases which is further described in <u>Schedule 4.7(a)-1</u>.  Except as would not have a Material Adverse Effect, each Real Property Lease is valid and enforceable in accordance with its terms. Except as set forth on <u>Schedule 4.7(a)-2</u>, (i) neither Seller nor any of its Subsidiaries has received written notice that it is in default under any Real Property Lease other than as has been cured or would be cured pursuant to this Agreement and the entry of the Sale Order, (ii) to Seller's Knowledge, no circumstances exist which, with notice, the passage of time or both, would

reasonably be expected to constitute a default by Seller or any of its Subsidiaries under any Real Property Lease other than defaults that may be alleged to have occurred by the landlord under the Real Property Lease as a result of the initiation of the Bankruptcy Case and (iii) to Seller's Knowledge, no other party to such Real Property Lease is in default thereunder.

(b)    Other than as set forth in the Real Property Leases, and other than the right of Purchaser pursuant to this Agreement, there are no other options or rights of first offer or rights of first refusal or similar rights or options to purchase, lease or otherwise acquire any interest in the Leased Real Properties that have been granted by Seller or any of its Subsidiaries to any Person (other than Purchaser) that are enforceable.

(c)    Except as set forth on Schedule 4.7(c), Seller has not made or given any security deposit to or for the benefit of any landlord or sublandlord in respect of any Leased Real Property and none is required.

4.8    Intellectual Property.

(a)    Schedule 4.8(a) sets forth a complete and accurate list of all (i) United States and non-United States Patents and Patent applications owned by Seller or the Acquired Subsidiary; (ii) United States and non-United States Trademark registrations and Internet domain registrations, Trademark applications and material unregistered Trademarks owned by Seller or the Acquired Subsidiary; (iii) United States and non-United States Copyright and mask work registrations, Copyright applications and material unregistered Copyrights owned by Seller or the Acquired Subsidiary; (iv) Software developed or under development by or on behalf of Seller or the Acquired Subsidiary; and (v) all Intellectual Property that any third party has licensed or sublicensed to Seller or the Acquired Subsidiary or otherwise authorized Seller or the Acquired Subsidiary to use (the Intellectual Property referred to in this clause (v), the "Third Party Intellectual Property"), provided Seller need not separately list Software licensed to Seller or the Acquired Subsidiary under generally available retail shrinkwrap or clickwrap licenses and used in Seller's business, but not incorporated into Software, products or services licensed or sold, or anticipated to be licensed or sold, by Seller or the Acquired Subsidiary to customers or otherwise resold or distributed by Seller or the Acquired Subsidiary.

(b)    Schedule 4.8(b) sets forth a complete and accurate list of all (i) Contracts pursuant to which Seller or the Acquired Subsidiary has licensed or otherwise granted rights in any Seller Intellectual Property to any Person (the "Outbound IP Licenses") and (ii) Contracts to which Seller or the Acquired Subsidiary is a party or otherwise bound granting Seller or the Acquired Subsidiary the right to use any Intellectual Property or restricting Seller's or the Acquired Subsidiary's rights to use any Intellectual Property, including license agreements, development agreements, distribution agreements, settlement agreements, consent to use agreements, and covenants not to sue (the "Inbound IP Licenses" and collectively with the Outbound IP Licenses, the "License Agreements"), provided Seller need not separately list Inbound IP Licenses of Software licensed to Seller or the Acquired Subsidiary under generally available retail shrinkwrap or clickwrap licenses and used in Seller's or the Acquired Subsidiary's business, but not incorporated into Software, products or services licensed or sold, or anticipated to be licensed or sold, by Seller or the Acquired Subsidiary to customers or otherwise resold or distributed by Seller or the Acquired Subsidiary). Neither Seller nor the Acquired Subsidiary has licensed or

sublicensed its rights in any Intellectual Property other than pursuant to the License Agreements. Other than rights in Owned Intellectual Property arising under an Outbound IP License disclosed in Schedule 4.8(b), no Person other than Seller has any rights in or to any Owned Intellectual Property, including through grant of any option, license, co-ownership interest, assignment or agreement of any kind.

(c)     Except as set forth on Schedule 4.8(c), Seller or the Acquired Subsidiary owns the sole right, title and interest in and to all Owned Intellectual Property material to the conduct of the Business, free and clear of all Encumbrances, except for Permitted Encumbrances, and possesses valid and enforceable contractual rights or licenses to use all Third Party Intellectual Property material to the conduct of the Business.  All registrations with and applications to Governmental Authorities set forth on Schedule 4.8(a) are in full force and effect, have not lapsed, expired or been abandoned, are not the subject of any opposition or other action challenging the ownership, validity or scope thereof filed with the United States Patent and Trademark Office or any other applicable Intellectual Property registry, court of law, or tribunal.

(d)     To Seller's Knowledge, no present or former employee, officer or director of Seller or the Acquired Subsidiary, or agent, outside contractor or consultant of Seller or the Acquired Subsidiary, holds any right, title or interest, directly or indirectly, in whole or in part, in or to any Intellectual Property and necessary for the conduct of the Business.  Other than with respect to copyrightable works Seller hereby represents to be "works made for hire" within the meaning of Section 101 of the Copyright Act of 1976 owned by Seller or the Acquired Subsidiary, Seller or the Acquired Subsidiary has obtained from all individuals who participated in any respect in the invention or authorship of any Intellectual Property created by or for Seller or the Acquired Subsidiary and necessary for the conduct of the Business, as consultants, as employees of consultants or otherwise, effective waivers of any and all ownership rights of such individuals in the Owned Intellectual Property and/or written assignments to Seller or the Acquired Subsidiary of all rights with respect thereto.

(e)     As of the date hereof, neither Seller nor the Acquired Subsidiary has received any written notice and to Seller's Knowledge no verbal notice, that it is currently in default (or with the giving of notice or lapse of time or both, would be in default) under any License Agreements.  Except as set forth in Schedule 4.8(e), neither Seller nor the Acquired Subsidiary has received any written notice of any claim within the six (6) years prior to the date hereof, and no claims or Proceedings are pending or, to Seller's Knowledge, threatened, against Seller or the Acquired Subsidiary by any Person (i) with respect to the ownership, validity, enforceability, effectiveness or use in its business of any Seller Intellectual Property, (ii) contesting the right of Seller or the Acquired Subsidiary to use any of its products, processes or services currently or previously used by Seller or the Acquired Subsidiary or (iii) alleging infringement, misappropriation or violation of the Intellectual Property rights of any other Person in any material respect.  Except as set forth on Schedule 4.8(e), to Seller's Knowledge, no material Intellectual Property rights of Seller or the Acquired Subsidiary are being infringed, misappropriated, violated or used unlawfully or without authorization by any other Person.

(f)     To Seller's Knowledge, no Software material to the Business contains source code that requires as a condition of use, modification or distribution of such source code that such source code or other Intellectual Property incorporated into, derived from or distributed

with such source code (i) be disclosed or distributed in source code form; (ii) be licensed for the purpose of making derivative works, as that term is defined by U.S. Copyright Law; or (iii) be redistributed at no charge.

(g)     The consummation of the transactions contemplated by this Agreement will not impair any right of Purchaser or the Acquired Subsidiary to own or use any material Seller Intellectual Property and, immediately after the Closing, Purchaser and the Acquired Subsidiary will have all, right, title and interest in and to material Seller Intellectual Property on identical terms and conditions as enjoyed by Seller and its Subsidiaries immediately prior to the Closing.

(h)     To Seller's Knowledge, Seller and the Acquired Subsidiary have the right to bring actions against any Person that is infringing any Owned Intellectual Property and to retain for itself any damages recovered in any such action. None of Seller or any of its Subsidiaries has entered into any agreement granting any third party the right to bring infringement actions or otherwise to enforce rights with respect to the Owned Intellectual Property.

4.9     Taxes.

(a)     All material Tax Returns required to be filed with respect to the Acquired Subsidiary have been timely filed. Each such Tax Return was true, correct and complete in all material respects. All material Taxes with respect to the Acquired Subsidiary (whether or not shown on any Tax Return) that are due and payable have been timely paid. The Acquired Subsidiary is not currently the beneficiary of any extension of time within which to file any Tax Return, nor has the Acquired Subsidiary made any request for such extensions that is currently pending. No claim has been made by a Governmental Authority in a jurisdiction where the Acquired Subsidiary does not file Tax Returns that it is or may be subject to taxation by that jurisdiction. There are no Liens, Claims or Encumbrances (other than Permitted Liens) on any of the Acquired Assets or assets of the Acquired Subsidiary that arose in connection with any failure to pay any Tax.

(b)     Neither Seller nor the Acquired Subsidiary has received any outstanding notice of audit, and is not undergoing any audit, of Tax Returns relating to the Business and has never received any written notice of deficiency or assessment from any Tax Authority with respect to Liability for Taxes relating to the Business which has not been fully paid or finally settled. Each of Seller and the Acquired Subsidiary has complied in all material respects with all applicable Laws, rules and regulations relating to the payment and withholding of Taxes and has withheld all amounts required by Law to be withheld from the wages or salaries of employees and independent contractors of the Business and neither Seller nor the Acquired Subsidiary is liable for any Taxes with respect to the employees and independent contractors of the Business for failure to comply with such Laws, rules and regulations, except for such Liabilities that would not be reasonably expected to be material to the Business or the Acquired Assets after the Closing, taken as a whole. There is no outstanding waiver of any statute of limitations in respect of Taxes relating to the Acquired Subsidiary.

(c)     The Acquired Subsidiary is in compliance in all material respects with all applicable transfer pricing Laws and regulations, including the execution and maintenance of contemporaneous documentation substantiating its transfer pricing practices and methodology.

The Acquired Subsidiary is not a party to or bound by any Tax sharing agreement, Tax indemnity obligation or similar Contract with respect to Taxes or otherwise liable for the Taxes of another Person. The Acquired Subsidiary has not, and has never had, a place of management, branch, office (or any other place of business), operations or employees, agent with binding authority or any other activities, in each case that could give rise to a permanent establishment or taxable presence in any country other than the country of its organization.

4.10    No Collective Bargaining Agreements, Employment Agreements, etc.

(a)    None of Seller or any of its Subsidiaries is a party to any union, collective bargaining, works council or employee representative agreement or arrangement or other similar agreements or arrangements.    Schedule 4.10(a) is a description of all written employment, independent contractor and consulting agreement to which Seller or the Acquired Subsidiary is a party.

(b)    None of Seller, the Acquired Subsidiary or, to Seller's Knowledge, any other party thereto, has breached or otherwise failed to comply in any material respect with any provision of any agreement set forth on Schedule 4.10(a). Except as set forth on Schedule 4.10(b), neither Seller nor the Acquired Subsidiary is in violation, in any material respect, and neither Seller nor the Acquired Subsidiary has received within the last two (2) years written notice of any claim with respect to a material violation or alleged material violation, of any federal or state civil rights Law, the Fair Labor Standards Act, as amended, the Age Discrimination in Employment Act, as amended, the National Labor Relations Act, as amended, the Occupational Safety and Health Act, as amended, the Americans with Disabilities Act, as amended, ERISA (with respect to any Employee Benefit Plan), or the Vocational Rehabilitation Act of 1973, as amended, any applicable state, local or non-United States Laws analogous to the federal Laws listed above or any other employee protective Law of any jurisdiction and, to the best of Seller's Knowledge, no claim referred to in this Section 4.10(b) is planned, pending or threatened.

(c)    For each current Employee and employee of the Acquired Subsidiary, Schedule 4.10(c) sets forth each such Employee's and employee's name, title, date of hire, annualized compensation, bonus, and commission.

4.11    Employee Benefit Plans. Seller has provided to Purchaser summaries of all material Employee Benefit Plans covering Employees, directors or consultants or former employees, directors or consultants in, or related to, the Business. Seller has provided to Purchaser true and complete summaries of all such material Employee Benefit Plans, including summaries of written descriptions thereof which have been distributed to Seller's or the Acquired Subsidiary's employees and for which Seller or the Acquired Subsidiary has copies, all annuity Contracts or other funding instruments relating thereto, and a summary description of all Employee Benefit Plans which are not in writing. Neither Seller nor any ERISA Affiliate has incurred any Liability with respect to any Employee Benefit Plan, which may create, or result in any Liability to Purchaser. As used herein, the term "Employee Benefit Plans" means any "employee benefit plan" (as defined in Section 3(3) of ERISA) and any other plan, Contract or arrangement involving direct or indirect compensation, including insurance coverage, severance benefits, deferred compensation, bonuses, stock options, stock purchase, phantom stock, stock appreciation or other forms of incentive compensation or post-retirement compensation

maintained or contributed to by Seller or any ERISA Affiliate for the benefit of any current or former director, officer, employee or consultant of Seller or any ERISA Affiliate, or with respect to which Seller or any ERISA Affiliate has or may have any Liability.

4.12    Environmental Matters. Neither Seller nor the Acquired Subsidiary has received any notice or claim (and is not aware of any facts that would form a reasonable basis for any claim), or entered into any negotiations or agreements with any other Person, and, to Seller's Knowledge, neither Seller nor the Acquired Subsidiary is the subject of any investigation by any governmental or regulatory authority, domestic or foreign, in each case, relating to any material or potentially material Liability or remedial action under any Environmental Laws. There is no pending or, to Seller's Knowledge, threatened, actions, suits or Proceedings against Seller or any of its Affiliates, properties, assets or operations asserting any such material Liability or seeking any material remedial action in connection with any Environmental Laws.    To Seller's Knowledge, each of Seller and the Acquired Subsidiary is in compliance with all applicable Environmental Laws, except to the extent non-compliance would not have a Material Adverse Effect.

4.13    Financial Statements.  The Financial Statements present fairly in all material respects, the consolidated financial condition of Seller as of the dates set forth therein, and the consolidated results of operations and cash flows for the periods covered thereby, in conformity with United States generally accepted accounting principles ("GAAP") applied on a consistent basis except as may be indicated in the notes thereto, subject, in the case of the Unaudited Financial Statements, to the absence of notes and normal year-end audit adjustments and to any other adjustments set forth therein. Schedule 4.13 sets forth unaudited consolidation schedules in respect of each of the Unaudited Financial Statements described in clause (a) of the definition of Unaudited Financial Statements.

4.14    No Brokers or Finders.  No agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, any of Seller in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement, other than as set forth on Schedule 4.14, the fees and expenses of which Seller shall bear, is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transaction.

4.15    Affiliate Transactions.  Schedule 4.15 sets forth all transactions, Contracts, arrangements or understandings between Seller, on the one hand, and the Seller's Affiliates on the other hand.

4.16    Litigation; Proceedings.  Except as set forth on Schedule 4.16, there is no claim, action, suit, Proceeding, complaint, charge, hearing, grievance or arbitration pending or, to Seller's Knowledge, threatened against or related to the Business, the Acquired Assets or the Acquired Subsidiary, whether at Law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor are there any investigations relating to the Business, pending or, to Seller's Knowledge, threatened by or before any arbitrator or any Governmental Authority, which could reasonably be expected to result in a Material Adverse Effect, and none of the Acquired Assets or assets of the Acquired Subsidiary is subject to any judgment, injunction, order, consent, or decree of any Governmental Authority or any settlement

4392908-v16A\CHIDMS1                28

agreement with any Person, which could reasonably be expected to result in a Material Adverse Effect.

4.17   Compliance with Laws.   To Seller's Knowledge, Seller's and the Acquired Subsidiary's conduct of the Business and operation of the Acquired Assets and the assets of the Acquired Subsidiary is, and at all times has been, in compliance with all Laws applicable to Seller and the Acquired Subsidiary or to the conduct and operations of the Business or relating to or affecting the Acquired Assets or the assets of the Acquired Subsidiary, except for such failures to comply that would not, individually or in the aggregate, have or be reasonably expected to have a Material Adverse Effect. Neither Seller nor the Acquired Subsidiary has received any written notice to the effect that, or otherwise has been advised of, and, to Seller's Knowledge, there has not occurred with respect to the Acquired Assets, the Business or the Acquired Subsidiary (a) any actual, alleged, possible or potential violation of, or failure to comply with, any such Laws, or (b) any actual, alleged, possible or potential obligation on the part of Seller or the Acquired Subsidiary to undertake, or to bear all or any portion of the cost of, any remedial action of any nature, except for any such violations or failures to comply that would not, individually or in the aggregate, have or be reasonably expected to have a Material Adverse Effect.

4.18   Accounts Receivable.   The accounts receivable reflected on the most recent Audited Financial Statements and the accounts receivable arising after the date thereof (a) have arisen from bona fide transactions entered into by Seller or the Acquired Subsidiary involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; and (b) constitute only valid, undisputed claims of Seller or the Acquired Subsidiary not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice. Additionally, the material accounts receivable reflected on the most recent Audited Financial Statements, subject to a reserve for bad debts shown in the most recent Audited Financial Statements, and the material accounts receivable arising after the date thereof subject to a reserve for bad debts on the accounting records of the Business, are due within 90 days after billing. The reserve for bad debts shown on the most recent Audited Financial Statements or, with respect to accounts receivable arising after the date of such Audited Financial Statements, on the accounting records of the Business have been determined in accordance with GAAP, consistently applied, subject to normal year-end adjustments and the absence of disclosures normally made in footnotes.

4.19   Inventory.   All Inventory of Seller and all inventory of the Acquired Subsidiary, whether or not reflected on the most recent Audited Financial Statements, consists of items of a quality useable or saleable in the ordinary course of business, for the purposes for which they are intended, subject to normal and customary allowances for damage and obsolescence and assuming sufficient market demand. Neither Seller nor the Acquired Subsidiary holds any Inventory or other inventory on consignment.

4.20   Warranties Are Exclusive.   EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY CERTIFICATE DELIVERED HEREUNDER, SELLER MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE BUSINESS, THE ACQUIRED

SUBSIDIARY OR ANY OF THEIR ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR OPERATIONS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

5.1    Organization.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of Delaware and has all requisite limited liability company power and authority to own its properties and assets and to conduct its business as now conducted.

5.2    Authorization and Validity.  Purchaser has, or at the time of execution will have, all necessary limited liability company power and authority to execute and deliver this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and the performance of Purchaser's obligations hereunder and thereunder have been, or at the time of execution will be, duly authorized by all necessary action by Purchaser.  This Agreement and each Ancillary Agreement to which Purchaser is or will become a party have been, or at the time of execution will be, duly executed by Purchaser and constitute, or will constitute, when executed and delivered and subject to the entry of the Sale Order, Purchaser's valid and binding obligations, enforceable against it in accordance with their respective terms except as may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights, or by general equity principles, including principles of commercial reasonableness, good faith and fair dealing.

5.3    No Conflict or Violation.  The execution, delivery and performance by Purchaser of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party do not or will not at the time of execution (a) violate or conflict with any provision of the organizational documents of Purchaser, (b) violate any provision of applicable Law, or any order, writ, injunction, judgment or decree of any Governmental Authority applicable to Purchaser, or (c) violate or result in a breach of or constitute (with due notice or lapse of time, or both) an event of default or default under any Contract to which Purchaser is party or by which Purchaser is bound or to which any of Purchaser's properties or assets are subject.

5.4    Consents and Approvals.  No consent, waiver, authorization or approval of any Person and no declaration to or filing or registration with any Governmental Authority is required in connection with the execution and delivery by Purchaser of this Agreement and each Ancillary Agreement to which Purchaser is or will become a party or the performance by Purchaser of its obligations hereunder or thereunder, except for applicable requirements under

the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended, the entry of the Sale Order and authorizations as required by the Bankruptcy Court.

5.5     No Brokers or Finders.  No agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, Purchaser in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transaction.

5.6     Financial Wherewithal.  Purchaser has, or at the time of Closing will have access to, all assets necessary to pay the Purchase Price pursuant to Section 3.1.

5.7     Litigation; Proceedings.  As of the date hereof, there is no claim, action, suit, Proceeding, complaint, charge, hearing, grievance or arbitration pending or, to the Purchaser's knowledge, threatened against the Purchaser, whether at Law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor are there any investigations relating to the Purchaser pending or, to the Purchaser's knowledge, threatened by or before any arbitrator or any Governmental Authority, which could reasonably be expected to result in a material adverse effect on the Purchaser's ability to consummate the transactions contemplated hereby or would reasonably be expected to prevent, restrict or delay the consummation of the transactions contemplated in this Agreement or the Ancillary Agreements.

5.8     As Is Transaction, No other Representations and Warranties.  Except for the representations, warranties and covenants of Seller expressly contained herein, in any Ancillary Agreement or in any certificate delivered hereunder, neither Seller nor its representatives, nor any other Person, makes any other express or implied warranty (including, without limitation, any implied warranty of merchantability or fitness for a particular purpose) on behalf of Seller, including, without limitation, (a) the probable success or profitability of ownership, use or operation of the Acquired Assets by Purchaser after the Closing, (b) the probable success or results in connection with the Bankruptcy Court and the Sale Order, (c) the value, use or condition of the Acquired Assets, which are being conveyed hereby on an "As Is", "Where Is" condition at the Closing Date, with all faults and without any warranty whatsoever (including, without limitation, any implied warranty of merchantability or fitness for a particular purpose).

## ARTICLE 6
## COVENANTS AND OTHER AGREEMENTS

6.1     Pre-Closing Covenants of Seller.  Seller covenants to Purchaser that, during the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

(a)     Cooperation.  Seller shall use reasonable best efforts to obtain, and assist Purchaser in obtaining, at no cost to Purchaser (other than Cure Costs payable at or after the Closing in accordance with Section 2.5(e)), such consents, waivers or approvals of any third party or Governmental Authority required for the consummation of the transactions contemplated hereby, including the sale and assignment of the Acquired Assets. Seller shall take, or cause to be taken, all commercially reasonable actions and do, or cause to be done, all things necessary or

appropriate, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby.

(b)      Access to Records and Properties.  Seller shall (i) provide Purchaser and its Related Persons reasonable access, upon reasonable notice and during normal business hours, to the Facilities, offices and personnel of Seller and to the books and records of Seller, related to the Business or the Acquired Assets as reasonably requested by Purchaser; (ii) furnish Purchaser with such financial and operating data and other information with respect to the condition (financial or otherwise), businesses, assets, properties or operations of Seller related to the Business as Purchaser shall reasonably request; and (iii) permit Purchaser to make such reasonable inspections and copies thereof as Purchaser may require.

(c)      Notification of Certain Matters.  The Seller shall give written notice to the Purchaser promptly after becoming aware of (i) the occurrence of any event, which would be likely to cause any condition set forth in Section 9.2 to be unsatisfied in any material respect at any time from the date hereof to the Closing Date or (ii) any notice or other communication from (A) any Person alleging that the consent of such Person is or may be required in connection with any of the transactions contemplated by this Agreement or (B) any Governmental Authority in connection with any of the transactions contemplated by this Agreement; provided, however, that the delivery of any notice pursuant to this Section 6.1(c) shall not limit or otherwise affect the remedies available hereunder to the Purchaser.

(d)      Disclosure Schedules and Supplements.  Seller shall notify Purchaser of, and shall supplement or amend the Schedules to this Agreement with respect to any matter that makes it necessary to correct any information in the Schedules to this Agreement or in any material representation, warranty or covenant of Seller that has been rendered materially inaccurate thereby; provided, however, that the Seller may not supplement or amend any Schedule which adds or deletes, directly or indirectly, any asset as an "Acquired Asset," adds or deletes, directly or indirectly, any Liability as an "Assumed Liability" or deletes, directly or indirectly, any Liability as an "Excluded Liability." Each such notification and supplementation, to the extent known, shall be made promptly after discovery thereof and no later than three (3) days before the date set for the Closing. The Schedules shall be deemed not to be amended by any such supplements and amendments and all such supplements and amendments will be disregarded for all purposes (including for purposes of determining whether the conditions set forth in Section 9.2(a) of this Agreement have been satisfied), and will be deemed not to have cured any failure of any representation or warranty contained in this Agreement for purposes of this Agreement.

(e)      Conduct of Business Prior to Closing.  From the Execution Date through the Closing Date or the earlier termination of this Agreement, except as expressly contemplated by this Agreement or with Purchaser's prior written consent, and except for any limitations directly imposed on Seller as a result of, and related to, its status as debtor-in-possession in the Bankruptcy Case, and except to the extent expressly required under the DIP Credit Agreement, the Bankruptcy Code, other applicable Law or any ruling or order of the Bankruptcy Court:

(i)      Seller shall not take, and shall cause its Subsidiaries not to take, any action that would reasonably be expected to result in an Event of Default (as defined therein) under the DIP Credit Agreement;

(ii)    Seller shall not, and shall cause its Subsidiaries not to, directly or indirectly sell, lease, transfer or otherwise dispose of, or offer, agree or commit (in writing or otherwise) to sell, lease, transfer or otherwise dispose of, any of the Acquired Assets or the assets of the Acquired Subsidiary other than (A) the sale of Inventory (or the sale of inventory of the Acquired Subsidiary) in the ordinary course of business, (B) the use of cash collateral in accordance with the DIP Credit Agreement or the DIP Orders or (C) pursuant to any Alternate Transaction entered into in accordance with the Bidding Procedures Order and subsequently approved by the Bankruptcy Court;

(iii)    Seller shall not, and shall cause its Subsidiaries not to, permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets or the assets of the Acquired Subsidiary to become subject, directly or indirectly, to any Lien, Claim, Interest or Encumbrance, except for Permitted Liens;

(iv)    Seller shall notify Purchaser promptly in writing of any Material Adverse Effect;

(v)    Seller shall not, and shall cause its Subsidiaries not to, (1) increase the annual level of compensation payable or to become payable by Seller or the Acquired Subsidiary to any of its directors or Employees or employees of the Acquired Subsidiary, other than increases in the ordinary course of business to an Employee or employee of the Acquired Subsidiary with a base salary of less than $50,000 per year, (2) grant, or establish or modify any targets, goals, pools or similar provisions in respect of, any bonus, benefit or other direct or indirect compensation to or for any director or Employee or employee of the Acquired Subsidiary, or increase the coverage or benefits available under any (or create any new) Employee Benefit Plan or otherwise adopt, amend, modify or terminate any Employee Benefit Plan, (3) accelerate the payment or vesting of amounts or benefits or amounts payable or to become payable under any Employee Benefit Plan, or fail to make any required contribution to any Employee Benefit Plan or (4) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which Seller or the Acquired Subsidiary is a party or involving a director or Employee of Seller or employee of the Acquired Subsidiary, except, in each case, as required by Law, with respect to the KERP Payment, or as required by any plans, programs or agreements existing on the Execution Date and disclosed on Schedule 4.10(a);

(vi)    Seller shall, and shall cause its Subsidiaries to, comply in all material respects with all Laws applicable to Seller or the Acquired Subsidiary or having jurisdiction over the Business or any Acquired Asset or any asset of the Acquired Subsidiary;

(vii)    Seller shall not, and shall cause its Subsidiaries not to (1) enter into any Contract (other than in the ordinary course of business) that would constitute a Material Contract, if in effect on the Execution Date, (2) assume, amend, modify, accelerate, cancel or terminate any Material Contract to which Seller or the Acquired Subsidiary is a party or by which Seller or the Acquired Subsidiary is bound and that is used in or related to the Business or the Acquired Assets or the assets of the Acquired

Subsidiary (including any Purchased Contract), or fail to exercise any renewal right with respect to any Material Contract (including any Real Property Lease) that by its terms would otherwise expire, or (3) adopt any labor, collective bargaining, works council or employee representative agreement or arrangement or other similar agreements or arrangements;

(viii)    Seller shall not, and shall cause its Subsidiaries not to, cancel or compromise any material debt or claim or waive or release (A) any right of Seller that constitutes an Acquired Asset or (B) any right of the Acquired Subsidiary;

(ix)    Seller shall not, and shall cause its Subsidiaries not to, enter into any commitment for capital expenditures, except pursuant to the Budget, and Seller shall not, and shall cause its Subsidiaries not to, incur, assume or guarantee any Indebtedness that would be an Assumed Liability or Indebtedness of the Acquired Subsidiary;

(x)    Seller shall not, and shall cause its Subsidiaries not to, assign, sublet, pledge, encumber, terminate (other than those Real Property Leases that will terminate by their terms), amend or modify in any manner any Real Property Lease;

(xi)    Seller shall use, and shall cause its Subsidiaries to use, reasonable efforts to pay all accounts payable and collect all accounts receivable in the ordinary course of business and Seller shall not, and shall cause the Acquired Subsidiary not to, change the Acquired Subsidiary's methods of accounting or accounting practice, except as required by changes in GAAP as agreed to by its independent public accountants;

(xii)    Seller shall at all times maintain, and shall cause its Subsidiaries at all times to maintain, all of the tangible Acquired Assets and tangible assets of the Acquired Subsidiary, used, held for use or useful in the conduct of the Business and keep the same in good repair, working order and condition (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with past practice;

(xiii)    Seller file, and shall cause the Acquired Subsidiary to file, all material Tax Returns and pay or deposit all material Taxes on a timely basis and in accordance with past practice;

(xiv)    Seller shall not, and shall cause the Acquired Subsidiary not to make or change any election, change an annual accounting period, adopt or change any accounting method, file any amended Tax Return, enter into any closing agreement, settle any Tax claim or assessment relating to Seller or the Acquired Subsidiary, surrender any right to claim a refund of Taxes, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment relating to Seller or the Acquired Subsidiary, or take any other similar action relating to the filing of any Tax Return or the payment of any Tax;

(xv)    Seller shall not, and shall cause its Subsidiaries not to, settle, pay or discharge, or admit liability or consent to nonmonetary or monetary relief in

connection with, any Proceeding or threatened Proceeding related to the Business or that involves any Acquired Asset or asset of the Acquired Subsidiary that would materially impact Purchaser's ability to use such Acquired Asset or asset of the Acquired Subsidiary as currently used in the Business;

(xvi)    Seller shall not, and shall cause the Acquired Subsidiary not to change, amend or restate the certificate of incorporation, bylaws or similar constituent documents of the Acquired Subsidiary;

(xvii)    Seller shall not, and shall cause the Acquired Subsidiary not to, declare, set aside or pay any dividend or other distribution (whether in cash, securities or other property) in respect of its capital stock or other equity interests;

(xviii)    Seller shall, and shall cause its Subsidiaries to, maintain insurance coverage with respect to the Acquired Assets, the assets of the Acquired Subsidiary and the Business in amounts and scope consistent with past practice; and

(xix)    Seller shall not, and shall cause its Subsidiaries not to, take, or agree, commit or offer (in writing or otherwise) to take, any actions in violation of the foregoing.

6.2    Pre-Closing Covenants of Purchaser.    Purchaser covenants to Seller that, during the period from the Execution Date through and including the Closing or the earlier termination of this Agreement, Purchaser shall take, or cause to be taken, all commercially reasonable actions and to do, or cause to be done, all things necessary or appropriate, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby; provided that the foregoing shall not require Purchaser to participate as a bidder in the Auction.

6.3    Transfer of Permits.    Except for those Permits that are not transferable by Law, Seller shall use reasonable best efforts to cause the issuance or transfer of all Permits included in the Acquired Assets to Purchaser on or before the Closing Date.  Seller shall give and make all notices and reports Seller is required to make to the appropriate Governmental Authorities and other Persons with respect to the Permits that may be necessary for the sale of the Acquired Assets to Purchaser at the Closing.

6.4    Employment Covenants and Other Undertakings.

(a)    Employment.  Purchaser may offer to employ, on such terms and conditions of employment as determined by Purchaser in its sole discretion, substantially all of the Employees of Seller that are employed by Seller immediately prior to the Closing.  Only Employees of Seller who are offered and then accept such offer of employment with Purchaser will become a Purchaser Employee after the Closing.  Notwithstanding the foregoing, nothing in this Agreement will, after the Closing Date, impose on Purchaser any obligation to retain any Purchaser Employee in its employment.  Except as described in the remaining sentences of this Section 6.4, the employment of each such Purchaser Employee with Purchaser will commence immediately after the Closing.  In the case of any individual who is offered employment by Purchaser and accepts such offer, but

who is absent from active employment and receiving short-term disability or workers' compensation benefits, the employment of any such individual with Purchaser would commence upon his or her return to active work, and such individual would become a Purchaser Employee as of such date. Purchaser Employees will be given full credit for years of service with Seller for purposes of any Employee Benefit Plan, program, policy or arrangement of Purchaser to the same extent and purpose as such service was taken into account by Seller immediately prior to the Closing Date and credit Purchaser Employees for any earned or accrued paid time off.

(b)     Other Obligations.  Except as otherwise required by Law, specified in this Agreement, or otherwise agreed in writing by Purchaser or its Affiliates, neither Purchaser nor its Affiliates shall be obligated to provide any severance, separation pay, or other payments or benefits, including any key employee retention payments, to any Employee on account of any termination of such Employee's employment on or before the Closing Date, and such benefits (if any) shall remain obligations of Seller.

(c)     Forms W-2 and W-4.  Seller and Purchaser shall adopt the "standard procedure" for preparing and filing IRS Forms W-2 (Wage and Tax Statements) and Forms W-4 (Employee's Withholding Allowance Certificate) regarding the Purchaser Employees. Under this procedure established by Revenue Procedure 2004-53, Seller (so long as they remain in existence) shall keep on file all IRS Forms W-4 provided by the Purchaser Employees for the period required by applicable Law concerning record retention and Purchasers will obtain new IRS Forms W-4 with respect to each Purchaser Employee.

(d)     No Right to Continued Employment.  Nothing contained in this Agreement shall confer upon any Purchaser Employee any right with respect to continuance of employment by Purchaser, nor shall anything herein interfere with the right of Purchaser to terminate the employment of any Purchaser Employees at any time, with or without notice, or restrict Purchaser, in the exercise of its business judgment in modifying any of the terms or conditions of employment of the Purchaser Employees after the Closing.

(e)     Employee Communications.   Prior to making any written or oral communications to the Employees pertaining to their employment, termination, compensation, benefit or other terms and conditions of employment that are affected by the transactions contemplated by this Agreement, Seller shall consult with Purchaser and provide Purchaser with a copy of the intended communication.

(f)     Employee Benefit Plans. As of the Closing, all of the Purchaser Employees will cease participation in any of the Employee Benefit Plans that such Purchaser Employees participated in immediately prior to the Closing that are not Assumed Plans. In accordance with Treasury Regulation Section 54.4980B-9 Q&A-7, as of the Closing Date, Purchaser will assume all liability for providing and administering all required notices and benefits under Section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA (usually referred to as "COBRA") to all Employees and former employees of Seller (including Purchaser Employees). Prior to the Closing Date, Seller shall provide to Purchaser detailed information reasonably requested by Purchaser (including all pertinent information concerning individuals who have elected or continue to have a right to elect COBRA continuation coverage and/or any COBRA subsidy pursuant to the American Recovery and Reinvestment Act of 2009) sufficient to enable Purchaser to carry out its obligations

4392908-v16A\CHIDMS1                                  36

under this Section 6.4(f). Seller will have no COBRA Liability to such Employees and former employees of Seller after the Closing Date, except with respect to any violations of Law that occurred prior to the Closing Date.

(g)    Assumed Plans.    Purchaser shall notify Seller in writing no later than two (2) Business Days prior to the Closing as to which Employee Benefit Plans Purchaser shall adopt and assume, if any (the "Assumed Plans"). With respect to each Assumed Plan, Purchaser or, any entity designated by Purchaser, will be substituted for the applicable Seller as the plan sponsor under any such Assumed Plan and Purchaser shall have all rights of Seller thereunder, including full authority to maintain, amend or terminate any such Assumed Plan at any time, in Purchaser's sole discretion. Seller agrees to cooperate with Purchaser in adopting and effectuating any plan amendments to the Assumed Plans reasonably requested by Purchaser, so long as such amendments are effective as of, or after, the Closing Date and are consistent with applicable Law and other agreements under which Seller is obligated. The parties agree to cooperate in all respects and take any actions necessary to implement the assumption by Purchaser of the Assumed Plans. Before, or as soon as administratively practicable after, the Closing, Seller will provide Purchaser with (i) all records concerning participation, vesting, accrual of benefits, payment of benefits, and election forms of benefits under each Assumed Plan, and (ii) any other information reasonably requested by Purchaser as necessary or appropriate for the administration of each Assumed Plan, each subject to the provision of consent by any Purchaser Employee to the extent and in the manner required by Law. Purchaser will make all required filings or reports with or to the IRS, or any other governmental agency, and the participants and their beneficiaries with respect to each Assumed Plan on a timely basis for all plan years ending before, on or after the Closing Date or as may be required with respect to such Assumed Plan, provided the initial deadline for such filing or report is after the Closing Date. All parties recognize that a reasonable transition period may be necessary after the Closing Date and prior to Purchaser's implementation of its assumption of the Assumed Plans before full compliance with this Section 6.4 is achieved, during which some or all of the Purchaser Employees and other participants and beneficiaries of the Assumed Plans may not be able to (i) make (and Purchaser may not be able to process) elective deferral contributions, loan repayments, investment changes, distribution requests, benefit payment requests or reimbursement requests or (ii) exercise or enjoy other rights or features of the Assumed Plans, and that during such transition period Purchaser shall not be considered to be in violation of this Section 6.4. Notwithstanding the foregoing, Purchaser shall not assume or succeed to any of Seller's past, current or future Liabilities (including any withdrawal liability, termination liability or mass withdrawal liability) with respect to any multiemployer plan to which Seller or any ERISA Affiliate contributes or has ever contributed.

(h)    Compliance with WARN Act.    With respect to the Employees, Seller will have full responsibility under the WARN Act caused by any action of Seller. Seller shall be responsible for all WARN Act Liabilities relating to the periods prior to and on the Closing Date, including any such Liabilities that result from Employees' separation of employment from Seller and/or Employees not becoming Purchaser Employees pursuant to this Section 6.4.

(i)    Successor Employer Status.    To the extent required by Law, Seller shall provide Purchaser with all necessary records and documentation required by Purchaser as a "successor employer" within the meaning of Sections 3121 and 3306 of the Code.

6.5     Casualty.  Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, (a) all or any portion of the Acquired Assets is condemned or taken by eminent domain, or (b) a material portion is damaged or destroyed by fire or other casualty, Seller shall notify Purchaser promptly in writing of such fact, and (i) in the case of condemnation or taking, Seller shall assign or pay, as the case may be, any proceeds thereof to Purchaser at the Closing, and (ii) in the case of fire or other casualty, Seller shall, at the option of Purchaser, either use any insurance proceeds to restore such damage or assign such insurance proceeds therefrom to the Purchaser at Closing.  Notwithstanding the foregoing, the provisions of this Section 6.5 shall not in any way modify the Purchaser's other rights under this Agreement, including any applicable right to terminate this Agreement if any condemnation, taking, damage or other destruction resulted in a Material Adverse Effect.

6.6     Name Change.  Within ten (10) days after the Closing Date, Seller and their Subsidiaries shall take such corporate and other actions necessary to change their corporate and company names to ones that are not similar to, or confusing with, their current names, including any necessary filings required by applicable Law.

6.7     Transition Services.  The Parties shall cooperate with each other, and shall use their reasonable best efforts to cause their respective Related Persons to cooperate with each other, to provide an orderly transition of the Business from Seller to Purchaser and to minimize the disruption to the Business resulting from the transactions contemplated hereby as requested by any Party, including facilitating the transition of the business key partner/client relationships.

6.8     Alternate Transactions.  Nothing in this Agreement shall restrict Seller's right to pursue one or more Alternate Transactions, including marketing Seller's assets or providing due diligence materials, solely to the extent permitted by the Bidding Procedures Order.

6.9     Post-Closing Access.  On and after the Closing Date, upon reasonable advance notice, Purchaser will afford promptly to Seller (and its successors and assigns) and their counsel, advisors and other agents reasonable access during normal business hours to Purchaser's properties, books, records, employees, auditors and counsel to the extent related to the Acquired Assets, Assumed Liabilities or Business and necessary for financial reporting and accounting matters, employee benefits matters, the preparation and filing of any Tax returns, reports or forms, the defense of any Tax audit, Claim or assessment, the reconciliation of Claims in the Bankruptcy Case, to permit Seller to determine any matter relating to its rights and obligations hereunder, or in connection with addressing any other issues arising in connection with or relating to the Bankruptcy Case; provided, however, that any such access by Seller shall not unreasonably interfere with the conduct of the business of Purchaser; provided, further, that, subject to applicable Law, Purchaser may destroy materials relating to the Acquired Assets and Business after the two year anniversary of Closing provided that it gives written notice to Seller, to the extent that Seller is still in existence, with respect to its intent to do so and gives Seller the opportunity to make copies of the same prior to destruction thereof.

6.10    Release of Claims.  After the Closing, neither Seller nor Purchaser shall have any claims against the other to reduce, offset, modify, recoup or adjust the consideration paid by Purchaser and received by Seller for the transfer of the Acquired Assets that are the subject of this Agreement.

6.11   <u>Business Confidential Information.</u>   Until the earlier of (a) the entry by the Bankruptcy Court of a final decree closing the Bankruptcy Case and (b) the first (1st) anniversary of the Closing Date, Seller shall keep, and shall use its reasonable best efforts to cause its Related Persons to keep, any confidential and proprietary information that is related to the Business (the "<u>Business Confidential Information</u>") confidential, with at least the same degree of care that Seller applies to its own confidential and proprietary information pursuant to its applicable policies and procedures in effect on the Closing Date and shall not disclose such Business Confidential Information to any Person; <u>provided</u>, <u>however</u>, that each such Person may disclose such information that (a) is or becomes publicly available other than by disclosure by such Person or any of its Affiliates, or (b) such Person is required to disclose by applicable Law, provided that such Person gives Purchaser adequate advance notice so that Purchaser may seek a protective order or take other reasonable actions to preserve the confidentiality of such information; <u>provided</u> <u>further</u> that Seller may disclose such information to its officers, directors, employees, accountants, counsel, advisors and agents so long as such Persons are informed by Seller of the confidential nature of such information and are directed by Seller to treat such information confidentially.

## ARTICLE 7
## TAXES

7.1   <u>Tax Matters.</u>

(a)   Purchaser and the Seller agree that the Purchase Price is exclusive of any Transfer Taxes.  Purchaser shall promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the transactions contemplated by this Agreement.

(b)   In the event that Seller elects to file a plan of reorganization or liquidation in conjunction with the Bankruptcy Case, Purchaser and Seller covenant and agree that they will use their reasonable best efforts to obtain an order from the Bankruptcy Court pursuant to section 1146 of the Bankruptcy Code exempting, to the maximum extent possible, the transfer of the Acquired Assets from Seller to Purchaser from any and all Transfer Taxes.  To the extent the transactions contemplated by this Agreement or any portion of the transactions contemplated by this Agreement are not exempt from Transfer Taxes under section 1146 of the Bankruptcy Code, Purchaser shall be responsible for and shall pay all Transfer Taxes in accordance with <u>Section 7.1</u>. Purchaser and Seller shall cooperate in providing each other with any appropriate certification and other similar documentation relating to exemption from Transfer Taxes (including any appropriate resale exemption certifications), as provided under applicable Law.

(c)   Purchaser and Seller agree to furnish, or cause their Affiliates to furnish, to each other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets or the Business (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, and making of any election related to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or Proceeding relating to any Tax Return.  Purchaser and Seller shall cooperate, and cause their

Affiliates to cooperate, with each other in the conduct of any audit or other Proceeding related to Taxes and each shall execute and deliver such powers of attorney and other documents as are reasonably necessary to carry out the intent of this Section 7.1(b) . Purchaser and Seller shall provide, or cause their Affiliates to provide, timely notice to each other in writing of any pending or threatened Tax audits, assessments or litigation with respect to the Acquired Assets or the Business for any taxable period for which the other party may have liability under this Agreement. Purchaser and Seller shall furnish, or cause their respective Affiliates to furnish, to each other copies of all correspondence received from any taxing authority in connection with any Tax audit or information request with respect to any taxable period for which the other party or its Affiliates may have liability under this Agreement.

(d)     Real and personal property Taxes and assessments, and all rents, utilities and other charges, on the Acquired Assets for any taxable period commencing on or prior to the Closing Date and ending after the Closing Date (the "Straddle Period Property Tax") shall be prorated on a per diem basis between Purchaser and Seller as of the Closing Date; provided, however, that Seller shall not be responsible for, or benefit from, any increased or decreased assessments on real or personal property resulting from the transactions contemplated hereby. All such prorations of Straddle Period Property Taxes shall be allocated so that items relating to time periods ending on or prior to the Closing Date shall be allocated to Seller and items relating to time periods beginning after the Closing Date shall be allocated to Purchaser. The amount of all such prorations shall be settled and paid on the Closing Date. If any of the rates for the Straddle Period Property Taxes for any taxable period commencing on or prior to the Closing Date and ending after the Closing Date are not established by the Closing Date, the prorations shall be made on the basis of such rates in effect for the preceding taxable period. The apportioned obligations under this Section 7.1(d) shall be timely paid and all applicable filings made in the same manner as set forth for the apportioned Transfer Taxes in Section 7.1(a) and Section 7.1(b).

## ARTICLE 8
## BANKRUPTCY COURT MATTERS

8.1     Sale Order. Seller shall use reasonable best efforts to obtain entry of the Sale Order approving the transactions contemplated by this Agreement and such Sale Order shall be in form and substance satisfactory to Purchaser in its sole discretion granting, among other things, that (i) such sale shall be, to the fullest extent permitted by the Bankruptcy Code, pursuant to Sections 105, 363(b) and 363(f) of the Bankruptcy Code, free and clear of all Claims, Liens and Liabilities, other than Permitted Liens and Assumed Liabilities; (ii) all Contracts required to be assumed by Seller and assigned to Purchaser are so assumed and assigned free and clear of all Claims, Liens and Liabilities, other than Permitted Liens and Assumed Liabilities, to the fullest extent permitted by Section 365 of the Bankruptcy Code; (iii) Purchaser is deemed to have purchased the Acquired Assets in good faith pursuant to Section 363(m) of the Bankruptcy Code; and (iv) Seller is authorized and directed to execute, upon request by Purchaser, one or more assignments in form, substance, and number reasonably acceptable to Purchaser, evidencing the conveyance of the Acquired Assets to Purchaser and/or its Designees.

8.2     Procedure. Subject to its obligations as debtor-in-possession and its rights to seek an Alternative Transaction, Seller shall promptly make any filings, take all actions and use reasonable best efforts to obtain any and all relief from the Bankruptcy Court that is necessary or

appropriate to consummate the transactions contemplated by this Agreement and the Ancillary Agreements. Seller shall provide Purchaser with drafts of any and all pleadings and proposed orders to be filed or submitted in connection with this Agreement for Purchaser's prior review and comment and shall cooperate with Purchaser to make reasonable changes. Seller agrees to diligently prosecute the entry of the Sale Order. In the event (i) the entry of the Sale Order shall be appealed or (ii) a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any of the Orders, Seller shall use its reasonable best efforts to defend such appeal, petition, or motion and use its reasonable best efforts to obtain an expedited resolution of any such appeal, petition, or motion. Notwithstanding the foregoing, any resulting changes to this Agreement or any Ancillary Agreement or any resulting changes to the Orders shall be subject to Purchaser's approval in its sole discretion.

## ARTICLE 9
## CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES

9.1    Conditions Precedent to Performance by Seller. The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 9.1(c) and Section 9.1(d)) may be waived by Seller, in its sole discretion:

(a)    Representations and Warranties of Purchaser. The representations and warranties of Purchaser made in this Agreement that are qualified by a materiality standard, in each case, shall be true and correct in all respects on and as of the Closing Date (except for any such representation or warranty of Purchaser made as of a specific date, which shall be true and correct in all respects as of such specific date), and the representations and warranties of Purchaser made in this Agreement that are not qualified by a materiality standard, in each case, shall be true and correct in all material respects on and as of the Closing Date (except for any such representation or warranty of Purchaser made as of a specific date, which shall be true and correct in all material respects as of such specific date).

(b)    Performance of the Obligations of Purchaser. Purchaser shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which it is party that are to be performed by it at or before the Closing (except with respect to (i) the obligation to pay the Purchase Price in accordance with the terms of this Agreement (which shall be paid at the Closing) and (ii) any obligations qualified by a materiality standard, which obligations shall be performed in all respects as required under this Agreement).

(c)    Bankruptcy Court Approval. The Sale Order shall have been entered by the Bankruptcy Court, shall not have been modified, amended, rescinded or vacated in any respect and shall not be subject to a stay.

(d)    No Violation of Orders. No preliminary or permanent injunction or other order of any Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

4392908-v16A\CHIDMS1                                                41

(e)    <u>Bidding Procedures Order</u>.  The Bidding Procedures Order shall not have been (i) materially modified or amended, (ii) rescinded or vacated in any respect, or (iii) subject to a stay.

(f)    <u>Assumption and Assignment of Contracts</u>.  The  Contracts designated hereunder as Designated Contracts shall be so assumed and assigned to Purchaser by order of the Bankruptcy Court such that they become Purchased Contracts.

(g)    <u>Deliveries</u>.  Purchaser shall have made the deliveries referenced in Section 10.3.

9.2    <u>Conditions Precedent to the Performance by Purchaser</u>.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in <u>Section 9.2(c)</u> and <u>Section 9.2(d)</u>, except as expressly provided therein) may be waived by Purchaser, in its sole discretion:

(a)    <u>Representations and Warranties of Seller</u>.  The representations and warranties of Seller made in this Agreement that are qualified by a materiality standard, in each case, shall be true and correct in all respects on and as of the Closing Date (except for any such representation or warranty of Seller made as of a specific date, which shall be true and correct in all respects as of such specific date), and the representations and warranties of Seller made in this Agreement that are not qualified by a materiality standard, in each case, shall be true and correct in all material respects on and as of the Closing Date (except for any such representation or warranty of Seller made as of a specific date, which shall be true and correct in all material respects as of such specific date).

(b)    <u>Performance of the Obligations of Seller</u>.  Seller shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which it is party that are to be performed by it at or before the Closing (except with respect to any obligations qualified by a materiality standard, which obligations shall be performed in all respects as required under this Agreement).

(c)    <u>Bankruptcy Court Approval</u>.  The Sale Order shall have been entered in form and substance reasonably acceptable to Purchaser by the Bankruptcy Court, shall not have been modified, amended, rescinded or vacated in any respect and shall not be subject to a stay.

(d)    <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other order of any Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)    <u>Bidding Procedures Order</u>.  The Bidding Procedures Order shall not have been (i) materially modified or amended, (ii) rescinded or vacated in any respect, or (iii) subject to a stay.

(f)    <u>Material Adverse Effect</u>.  There shall not have occurred a Material Adverse Effect.

(g)    Assumption and Assignment of Contracts.    Subject to Section 2.5, the Contracts designated hereunder as Purchased Contracts shall be so assumed and assigned to Purchaser by order of the Bankruptcy Court reasonably satisfactory to Purchaser.

(h)    Consents and Approvals.    All consents and approvals listed on Schedule 9.2(j) or waivers thereof shall have been obtained.

(i)    Deliveries.    Seller shall have made the deliveries referenced in Section 10.2.

## ARTICLE 10
## CLOSING AND DELIVERIES

10.1    Closing.    The consummation and effectuation of the transactions contemplated hereby pursuant to the terms and conditions of this Agreement (the "Closing") shall be held on or before February 15, 2019 (the "Closing Date") (except for closing conditions that by their terms can only be satisfied on the Closing Date) or, if applicable, waived by the appropriate party or parties, at 10:00 a.m., local time, at the offices of Cohne Kinghorn, P.C., 111 East Broadway, Salt Lake City, Utah, or on such other date or at such other place and time as may be mutually agreed to in writing by the parties. All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

10.2    Seller's Deliveries.    At the Closing:

(a)    the sale, transfer, assignment, conveyance and delivery by Seller of the Acquired Assets to Purchaser shall be effected by the execution and delivery by Seller of (i) the Bill of Sale, (ii) the Assignment and Assumption Agreement and (iii) such other Ancillary Agreements (including additional bills of sale, endorsements, Intellectual Property assignments in recordable form, stock certificates, stock powers, and other instruments of transfer and conveyance) as requested by Purchaser in form and substance reasonably satisfactory to Purchaser (including the share certificates for the capital stock of the Acquired Subsidiary (or an indemnity in respect of any lost share certificate(s) duly executed by Seller) accompanied by duly executed instruments of transfer, evidence of any required approvals by the boards of directors (or similar governing body) of the Acquired Subsidiary in approved form, and the stock books and ledgers of the Acquired Subsidiary);

(b)    Seller shall deliver to Purchaser an officer's certificate, duly executed by an officer of Seller, certifying the matters set forth in Section 9.2(a) and Section 9.2(b), in form and substance reasonably satisfactory to Purchaser;

(c)    resignations effective as of the Closing Date of each member of the board of directors (or similar management body under local Law) and each officer of the Acquired Subsidiary as Purchaser may have requested in writing not less than two (2) Business Days prior to the Closing Date;

4392908-v16A\CHIDMS1                                        43

(d)    Seller shall deliver to Purchaser the Mutual Release, duly executed by an officer of Seller; and

(e)    Seller shall deliver a certified copy of the Sale Order.

10.3    <u>Purchaser's Deliveries</u>.  At the Closing:

(a)    Purchaser shall pay the Purchase Price;

(b)    Purchaser shall deliver to Seller an officer's certificate, duly executed by an officer of Purchaser, certifying the matters set forth in <u>Section 9.1(a)</u> and <u>Section 9.1(b)</u>, in form and substance reasonably satisfactory to Seller;

(c)    Purchaser shall deliver to Seller the Mutual Release, duly executed by an officer of its Affiliate, Gracenote, Inc.; and

(d)    Purchaser shall execute and deliver to Seller the Assignment and Assumption Agreement.

# ARTICLE 11
## TERMINATION

11.1    <u>Conditions of Termination</u>.  This Agreement may be terminated only in accordance with this <u>Section 11.1</u>.  This Agreement may be terminated at any time before the Closing as follows:

(a)    by mutual written consent of Seller and Purchaser;

(b)    automatically and without any action or notice by either Seller to Purchaser, or Purchaser to Seller, immediately upon:

(i)    the issuance of a final and nonappealable order, decree or ruling by a Governmental Authority to restrain, enjoin or otherwise prohibit the transfer of the Acquired Assets contemplated hereby;

(ii)    the acceptance by Seller of an Alternate Transaction if, and only if, Purchaser is not designated as the backup bidder at the completion of the Auction; or

(iii)    the consummation of an Alternate Transaction.

(c)    by Purchaser by written notice given before the Closing:

(i)    if the Auction has not commenced by February 7, 2019 (or such later date as set in accordance with the Bidding Procedures Order);

(ii)    if the Bankruptcy Court has not entered the Sale Order by February 13, 2019, (or such later date as Purchaser may have agreed in writing to Seller);

(iii)    if there has been a material violation or breach by Seller of any representation, warranty or covenant contained in this Agreement which (x) has rendered the satisfaction of any condition to the obligations of Purchaser impossible or is not curable or, if curable, has not been cured within ten (10) Business Days following receipt by Seller of written notice of such breach from Purchaser, and (y) has not been waived by Purchaser; provided that Purchaser shall not have the right to terminate this Agreement under this Section 11.1(c)(iii) if Purchaser is then in material breach of this Agreement;

(iv)    if the Closing shall not have occurred by close of business on February 18, 2019 and such failure to close is not caused by or the result of Purchaser's breach of this Agreement;

(v)    if, prior to the Closing Date, Seller's Bankruptcy Case shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed;

(vi)    if any Event of Default (as defined in the DIP Credit Agreement) shall have occurred, subject to any applicable cure period;

(vii)    if any consent or approval listed on Schedule 9.2(h) has not been obtained (or the receipt thereof has not been waived by Purchaser);

(viii)    if there shall be excluded from the Acquired Assets any Purchased Contract that is not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Seller, to the extent that such consent shall not have been given prior to the Closing and the exclusion of such Purchased Contract would reasonably be expected to have a Material Adverse Effect; or

(ix)    if Seller discloses, or Purchaser otherwise discovers, the existence of a Material Adverse Effect.

(d)    by Seller by written notice given before the Closing if there has been a violation or breach by Purchaser of any agreement or any representation or warranty contained in this Agreement which (A) has rendered the satisfaction of any condition to the obligations of Seller impossible or is not curable or, if curable, has not been cured within ten (10) Business Days following receipt by Purchaser of written notice of such breach from Seller, and (B) has not been waived by Seller; provided that Seller shall not have the right to terminate this Agreement under this Section 11.1(d) if Seller is then in material breach of this Agreement.

11.2    Effect of Termination. In the event of termination pursuant to Section 11.1, this Agreement shall become null and void and have no effect and neither party shall have any Liability to the other (other than this Section 11.2 and Article 12 (except for Section 12.15 (Specific Performance)), except that Purchaser or Seller shall be liable to the other party for any damages suffered by such party on account of any prior material or willful breach hereof by Purchaser or Seller, as applicable.

## ARTICLE 12
## MISCELLANEOUS

12.1    Survival. Except for the provisions of Article 12, no representations, warranties, covenants and agreements of Seller and Purchaser made in this Agreement shall survive the Closing Date except where, and only to the extent that, the terms of any such covenant or agreement expressly provide for obligations extending after the Closing.

12.2    Further Assurances. At the request and the sole expense of the requesting party, Purchaser or Seller, as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as Purchaser or Seller, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements. Each party shall use reasonable best efforts to take, or cause to be taken, all other actions and to do, or cause to be done, all other things reasonably necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated hereby.

12.3    Successors and Assigns.

(a)    In accordance with Section 3.3, Purchaser shall have the right prior to Closing to assign its rights to receive all or any part of the Acquired Assets and its obligations to assume all or any part of the Assumed Liabilities, in each case, to one or more Designees, provided that no such assignment shall relieve Purchaser of any of its obligations hereunder.

(b)    Seller shall not without the prior written consent of Purchaser assign this Agreement or any of its rights or obligations hereunder and any such assignment shall be void and of no effect. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto, including any trustee appointed in the Bankruptcy Case or a subsequent Chapter 7 case.

12.4    Governing Law; Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of Utah (without application of principles of conflicts of law). In connection with any controversy arising out of or related to this Agreement, Seller and Purchaser hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Case has been closed or lacks subject matter jurisdiction, the courts of the State of Utah or, if it has or can acquire jurisdiction, in the United States District Court for the District of Utah. Seller and Purchaser each irrevocably consent to service of process out of the aforementioned courts and waive any objection which it may now or hereafter have to the laying of venue of any action or Proceeding arising out of or in connection with this Agreement brought in the aforementioned courts.

12.5    Expenses. Except as otherwise provided in this Agreement, each of the parties shall pay their own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal and accounting fees and commissions or finder's fees, whether or not the transactions contemplated hereby are consummated.

12.6    Severability. In the event that any part of this Agreement is declared by any Governmental Authority to be null, void or unenforceable, a suitable and equitable provision

shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable and the application of any provision so substituted, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of (a) the Execution Date and (b) the date this Agreement was last amended.

12.7    Notices.

(a)    All notices, requests, demands, consents and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service addressed to the party to whom notice is to be given, if served via Federal Express or similar overnight courier or Express Mail service; (iii) on the date sent by facsimile or email, with confirmation of transmission (and receipt if sent by email), if sent during normal business hours of the recipient, if not, then on the next Business Day; or (iv) on the third day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:    SMI
Gil A. Miller, Chief Restructuring Officer
Rocky Mountain Advisors, LLC
215 South State Street, Suite 200
Salt Lake City, UT 84111
Fax: (801) 428-1610
Email: gmiller@rockymountainadvisory.com

With a copy to (which shall not constitute notice):

Cohne Kinghorn, P.C.
111 East Broadway, 11th Floor
Salt Lake City, Utah 84111
Attn: George Hofmann
Fax: (801) 363-4378
Email: ghofmann@cohnekinghorn.com

If to Purchaser:    The Nielsen Company (US), LLC
85 Broad Street
New York, New York 10004
Attn: Legal Department
Email: Legal.Notices@nielsen.com

With a copy to (which shall not constitute notice):

Baker & McKenzie LLP
452 Fifth Avenue
New York, New York 10018
Attn: Debra A. Dandeneau
Fax: (212) 310-1600
Email: Debra.Dandeneau@bakermckenzie.com

(b)    Any party may change its address or facsimile number for the purpose of this Section 12.7 by giving the other parties written notice of its new address in the manner set forth above.

12.8    Amendments; Waivers.  This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by Purchaser and Seller, or in the case of a waiver, by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

12.9    Entire Agreement.  This Agreement and the Ancillary Agreements, including all Schedules and Exhibits hereto and thereto, contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions.

12.10    Seller Disclosures.  After notice to and consultation with Purchaser, Seller shall be entitled to disclose, if required by applicable Law or by order of the Bankruptcy Court, this Agreement and all information provided by Purchaser in connection herewith to the Bankruptcy Court, the United States Trustee, parties in interest in the Bankruptcy Case and other Persons bidding on assets of Seller.  Other than statements made in the Bankruptcy Court (or in pleadings filed therein), Seller shall not issue (prior to, on or after the Closing) any press release or make any public statement or public communication with respect to this Agreement or the transactions contemplated hereby without the prior written consent of Purchaser, which consent shall not be unreasonably withheld, delayed or conditioned.  The foregoing shall not prevent Seller from publishing or disclosing the existence or terms of this Agreement (or this Agreement itself) as necessary in connection with approval of the Sale Order.

12.11    Headings.  The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

12.12    Electronic Delivery; Counterparts.  This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, may be executed in one or more counterparts, all of which shall constitute one and the same instrument.  Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .jpg or similar attachment to electronic mail (any such delivery, an

4392908-v16A\CHIDMS1                                                        48

"Electronic Delivery") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto, each other party hereto shall re-execute the original form of this Agreement and deliver such form to all other parties. No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

12.13   Waiver of Jury Trial.

(a)   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION, ACTION, PROCEEDING, CROSS-CLAIM, OR COUNTERCLAIM IN ANY COURT (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF, RELATING TO OR IN CONNECTION WITH (i) THIS AGREEMENT OR THE VALIDITY, PERFORMANCE, INTERPRETATION, COLLECTION OR ENFORCEMENT HEREOF OR (ii) THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, AUTHORIZATION, EXECUTION, DELIVERY, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS, HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL.

(b)   THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT WITHOUT A JURY.

12.14   Third Party Beneficiaries. No provision of this Agreement (including Section 6.4) is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

12.15   Specific Performance. Seller and Purchaser agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, Seller and Purchaser shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, in addition to any other remedy to which they are entitled at Law or in equity.

12.16   Non-Recourse. Notwithstanding anything to the contrary herein, (i) the rights of Purchaser and its Affiliates and its and their directors, officers and employees, and the successors and assigns of the foregoing (collectively, the "Purchaser Group Members") under this

Agreement may be enforced only against, and any Proceeding based upon, arising out of or related to a breach or alleged breach of this Agreement by Seller may be made only against, Seller and (ii) the rights of Seller and its Affiliates and its and their directors, officers and employees, and the successors and assigns of the foregoing (collectively, the "Seller Group Members") under this Agreement may be enforced only against, and any Proceeding based upon, arising out of or related to a breach or alleged breach of this Agreement by Purchaser may be made only against, Purchaser. In addition, (x) none of Seller's Affiliates, nor any current, former or future directors, officers, employees, agents, partners, managers, members, stockholders, equity holders, assignees or representatives of Seller or any of its Affiliates shall have any liability to Purchaser or any Purchaser Group Member for any of the liabilities or obligations of Seller or any other party pursuant to this Agreement and (y) none of Purchaser's Affiliates, nor any current, former or future directors, officers, employees, agents, partners, managers, members, stockholders, equity holders, assignees or representatives of Purchaser or any of its Affiliates shall have any liability to Seller or any Seller Group Member for any of the liabilities or obligations of Purchaser or any other party pursuant to this Agreement. Notwithstanding the foregoing and for the avoidance of doubt, nothing in this Agreement shall operate as a waiver of, or otherwise modify, limit or restrict, the rights or claims of any party or their Affiliates with respect to the matters disclosed in items one and two of Schedule 4.16 (other than the rights of Purchaser solely with respect to the representations and warranties in this Agreement), and such rights and claims shall not be affected by this Agreement.

12.17    Interpretation. As both parties have participated in the drafting of this Agreement, any ambiguity shall not be construed against either party as the drafter. Unless the context of this Agreement clearly requires otherwise, (a) "or" has the inclusive meaning frequently identified with the phrase "and/or," (b) "including" has the inclusive meaning frequently identified with the phrase "including, but not limited to" and (c) references to "hereof," "hereunder" or "herein" or words of similar import relate to this Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written,

**PURCHASER**:

The Nielsen Company (US), LLC

By:_____

    Name:  Salvador Karottki
    Title:   SVP/Intellectual Property

**SELLER**:

Sorenson Media, Inc.

By: _____

    Name:  Scott Klossner
    Title:   Chief Financial Officer

*(Signature Page to Asset Purchase Agreement)*

## EXHIBIT A

### FORM OF

### ASSIGNMENT AND ASSUMPTION AGREEMENT

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment"), is made on this ___ day of February, 2019, by and between Sorenson Media, Inc., a Delaware corporation ("Assignor"), and The Nielsen Company (US), LLC, Delaware Limited liability company ("Assignee").

WHEREAS, this Assignment is made and entered into in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of February 13, 2019 (the "Asset Purchase Agreement"), by and between Assignor, as Seller, and Assignee, as Purchaser, pursuant to which, among other things, Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from Assignor, the Purchased Contracts;

WHEREAS, this Assignment, as duly executed by Assignor and Assignee, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing; and

WHEREAS, all capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Assignment and Assumption. Upon and subject to the terms and conditions of the Asset Purchase Agreement, Assignor does hereby sell, assign, transfer, convey and deliver to Assignee, its successors and assigns, and Assignee, its successors and assigns, does hereby purchase, acquire and accept from Assignor, all of the right, title and interest of Assignor in, to and under the Purchased Contracts free and clear of all Liens, Claims, Interests or Encumbrances other than the Permitted Liens and Assumed Liabilities. Notwithstanding the foregoing, nothing in this Assignment shall constitute or be construed as selling, assigning, transferring, conveying or delivering to Assignee, and Assignee shall not purchase, acquire or accept hereby, any right, title or interest to or in any of the Excluded Assets (including the Excluded Contracts), and Assignee shall not assume (and shall not be deemed to have assumed) or otherwise be liable in respect of, or responsible for, any of the Excluded Liabilities.

2.    Terms of the Asset Purchase Agreement and the Sale Order. This Assignment is in all respects subject to the provisions of the Asset Purchase Agreement and the Sale Order and is not intended in any way to supersede, limit, or qualify any provision of the Asset Purchase Agreement or the Sale Order. In the event of any conflict between the terms and conditions of this Assignment and the terms and conditions of the Asset Purchase Agreement or the Sale Order, the terms of the Asset Purchase Agreement or Sale Order, as applicable, shall supersede, govern and control.

3.    Successors and Assigns. This Assignment and the covenants and agreements herein contained shall inure to the benefit of and shall bind the respective parties hereto and their respective successors and permitted assigns.

4.    Governing Law. This Assignment shall be construed and governed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the State of Utah (without giving reference to the principles of conflicts of law).

{00425345.DOCX /}
4405523-v3\CHIDMS1

1

5.      Counterparts. This Assignment may be executed in any number of counterparts, all of which, taken together, shall constitute one document. Counterparts of this Assignment (or applicable signature pages hereof) that are manually signed and delivered by facsimile or other electronic transmission shall be deemed to constitute signed original counterparts hereof and shall bind the parties signing and delivering in such manner.

6.      Modification. This Assignment may only be modified by a written agreement duly signed by the parties hereto.

7.      Severability. The parties hereto agree that the assignment of each of the Assigned Contracts shall be construed as being separable and divisible from the assignment of every other Assigned Contract. The unenforceability or invalidity of this Assignment with respect to any one Assigned Contract shall not limit the enforceability or validity, in whole or in part, with respect to any other Assigned Contract.

8.      Further Assurances. The parties hereto agree to execute and deliver such further documentation, instruments, and the like and to take such further action as is reasonably required to carry out the intentions or to facilitate the performance of the terms of this Assignment.

[Signature Page Follows]

[Signature Page to Assignment and Assumption Agreement]

EXECUTED on the date set forth in the acknowledgments below to be effective for all purposes as of the Effective Date.

ASSIGNOR:

SORENSON MEDIA, INC.
a Delaware corporation

By: _____
        Scott Klossner
        Chief Financial Officer

ASSIGNEE:

THE NIELSEN COMPANY (US), LLC.
a Delaware limited liability company

By: _____
        Salvador Karottki
        SVP/Intellectual Property

{00425345.DOCX /}

Acknowledgement of Sorenson Media, Inc.

| | | |
|---|---|---|
| STATE OF UTAH | | ) |
| | ) ss | |
| COUNTY OF SALT LAKE | | ) |

The foregoing instrument was acknowledged before me this _____ day of _____, 2019 by Scott Klossner, as Chief Financial Officer of Sorenson Media, Inc., a Delaware corporation, on behalf of said corporation.

Witness my hand and official seal.

Notary Public_____

My commission expires: _____

Acknowledgement of The Nielsen Company (US), LLC

| | | |
|---|---|---|
| STATE OF _____ | | ) |
| | ) ss | |
| COUNTY OF _____ | | ) |

The foregoing instrument was acknowledged before me this _____ day of _____ 2019 by Salvador Karottki, as SVP/Intellectual Property of The Nielsen Company (US), LLC, a Delaware limited liability company, on behalf of said limited liability company.

Witness my hand and official seal.

Notary Public_____

My commission expires: _____

{00425345.DOCX /}

## EXHIBIT B

### FORM OF SALE ORDER

George Hofmann (10005)
Patrick E. Johnson (10771)
**Cohne Kinghorn, P.C.**
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
Telephone: (801) 363-4300

Attorneys for Sorenson Media, Inc.

---

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Bankruptcy No. 18-27740 (WTT) |
| SORENSON MEDIA, INC., | Chapter 11 |
| Debtor. | |

**ORDER: (A) AUTHORIZING THE SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (B) WAIVING THE 14-DAY STAY OTHERWISE APPLICABLE UNDER BANKRUPTCY RULES 6004 AND 6006; AND (C) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

This matter is before the Court on the motion of the Sorenson Media, Inc., debtor

and debtor-in-possession (the "**Debtor**") for the entry of an order pursuant to sections

105, 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and

Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"): (a) approving the sale (the "**Sale**") of certain of the Debtor's

assets (as described and defined in the APA, the "**Acquired Assets**"), pursuant to the

terms of that certain Asset Purchase Agreement,[1] dated as of February 13, 2019 (the "**APA**"), between the Debtor and The Nielsen Company (US), LLC ("**Purchaser**"), free and clear of all liens, claims, encumbrances and other interests; (b) approving the assumption and assignment of certain executory contracts and unexpired leases that are to be assumed and assigned as part of the Sale (as described and defined in the APA, the "**Purchased Contracts**"); and (c) granting related relief [Dkt. No. 171] (the "**Sale Motion**"). As noted below, other aspects of the Sale Motion have been approved previously by separate order of the Court.

The Court having considered the Sale Motion, having heard statements of counsel and the evidence presented in support of the relief requested by the Debtor in the Sale Motion at a hearing before the Court on February 13, 2019 (the "**Sale Hearing**"), and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

THE COURT HEREBY FINDS AND DETERMINES THAT:

I. **Jurisdiction, Final Order and Statutory Predicates**

A. The Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the APA, a copy of which is attached hereto as Exhibit A.

2

B.    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order and cause exists to waive all applicable stays and expressly directs entry of judgment as set forth herein.

C.    The statutory predicates for the relief requested in the Sale Motion are sections 105(a), 363(b), (f), and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004(a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9007 and 9014.

D.    The Court entered the *Order Approving Bid Procedures for Sale of Substantially All of Debtor's Assets* on December 26, 2018 [Dkt. No. 252] (the "**Sale Procedures Order**"), pursuant to which the Court approved certain procedures for the Debtor with its professionals to, among other things, market and provide notice of a sale of the Debtor's assets and the potential assumption and assignment of executory contracts and unexpired leases to interested parties (the "**Sale Procedures**").

E.    The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

F.    To the extent any of the following findings of fact constitute conclusions of law, they are hereby adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are hereby adopted as such. Findings of fact and

3

conclusions of law stated by the Court on the record at the Sale Hearing are hereby

incorporated, to the extent they are not inconsistent herewith.

      G.      In the absence of a stay pending appeal, Purchaser will be acting in good

faith pursuant to section 363(m) of the Bankruptcy Code in closing the transaction

contemplated by the APA (as such term is defined herein) at any time on or after entry

of this Order, and cause has been shown as to why this Order should not be subject to

the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

## II.      Notice of the Sale, Auction and the Cure Costs

      A.      Actual written notice of the Sale Hearing, the Auction, the Sale Motion, the

Sale, the assumption, assignment and sale of the Purchased Contracts (as described

and defined in the APA) and a reasonable opportunity to object or be heard with respect

to the Sale Motion and the relief requested therein and granted by this Order has been

afforded to all known interested persons and entities, including, but not limited to the

following parties (the "**Notice Parties**"): (i) the United States Trustee; (ii) counsel to JLS

Holdings, LLC; (iii) counsel to the Official Committee of Unsecured Creditors appointed

in the Case (the "**Committee**"), (iv) counsel to all known parties asserting an interest in

or lien on the Acquired Assets; and (vi) all parties that have requested special notice

pursuant to Bankruptcy Rule 2002.

      B.      In accordance with the provisions of the Sale Procedures Order, the

Debtor filed and served an *Amended Notice Regarding Executory Contracts and*

*Unexpired Leases and Deadline to Object to Cure Amount and Related Matters; and*

*Notice of Hearing* on January 15, 2019 (the "**Cure Notice**") [Dkt. No. 278], upon certain

non-debtor parties to contracts or leases of the Debtor, (the "**Contract**

4

**Counterparties**"): (i) giving notice of certain executory contracts and unexpired leases (the "**Executory Contracts**") that the Debtor may seek to assume and sell and assign in connection with the Sale to the extent the purchaser elects to acquire such Executory Contracts (as); (ii) giving notice of the relevant Cure Costs; and (iii) giving notice of the provision of adequate assurances of future performance. Pursuant to Bankruptcy Rule 6006(c), the Court finds that the service of such Cure Notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of establishing a cure amount for the Purchased Contracts. The Contract Counterparties have had an opportunity to object to the Cure Costs set forth in the Cure Notice, and no objections were filed.

C.      The Debtor has articulated good and sufficient reasons for the Court to grant the relief requested in the Sale Motion regarding the Sale and the sale process.

D.      The Cure Notice provided the Contract Counterparties with proper notice of the potential assumption and sale and assignment of the Purchased Contracts, any cure amount relating thereto, and the provision of adequate assurances of future performance, and the procedures set forth therein with regard to any such cure amount to satisfy the provisions of Bankruptcy Code section 365 and Bankruptcy Rule 6006.

E.      As evidenced by the certificates of service previously filed with the Court [Dkt. Nos. 171, 178, 205, 252, 256, 274, 279], proper, timely, adequate, and sufficient notice of the Sale Motion, Sale Procedures, Auction, Sale Hearing, and Sale has been provided to all interested parties in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and all applicable Local Rules of Practice of the United States Bankruptcy Court for the District of Utah

5

(the "**Local Rules**").  The Debtor also has complied with all obligations to provide notice of the Auction, Sale Hearing, and Sale required by the Sale Procedures Order.  The notices described in paragraphs A to D above and this paragraph E were good, sufficient and appropriate under the circumstances, and no other or further notice of the Sale Motion, Auction, Sale Hearing, Sale, or assumption, assignment and sale of the Purchased Contracts is required.

F.    The disclosures made by the Debtor concerning the Sale Motion, APA, Auction, Sale, and Sale Hearing, including but not limited to those provided through the testimony received at the Sale Hearing, are good, complete and adequate.

III.    **Good Faith of Purchaser**

A.    Purchaser submitted the APA in accordance with the Sale Procedures. Purchaser is not an "insider" or "affiliate" of the Debtor, as those terms are defined in the Bankruptcy Code.  Purchaser did not collude with others in violation of section 363(n) of the Bankruptcy Code.

B.    The APA, as amended as a result of Purchaser's participation in the Auction, provides for the following consideration: (a) cash payment in the amount of $11,250,000, (b) the assumption of certain liabilities (as described and defined in the APA, the "**Assumed Liabilities**"); (c) payment of Cure Costs; and (d) waiver of claims of Purchaser's affiliate Gracenote, Inc. ("**Gracenote**"), including any administrative expense claims as a result of the Debtor's postpetition infringement of certain of Gracenote's patents, as memorialized by that certain *Settlement and Mutual Release Agreement* (the "**Mutual Release Agreement**"), by and between the Debtor and Gracenote, which is an ancillary document to the APA.

6

C.     Purchaser is purchasing the Acquired Assets in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and is, therefore, entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this bankruptcy case in that, inter alia: (i) Purchaser recognized that the Debtor was free to deal with any other party interested in acquiring the Acquired Assets; (ii) Purchaser complied with the provisions in the Sale Procedures Order; (iii) all payments to be made by Purchaser and other agreements or arrangements entered into by Purchaser in connection with the Sale have been disclosed; (iv) Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (v) no common identity of directors or controlling equity holders exists between Purchaser and the Debtor; (vi) Purchaser participated in good faith at the Auction; and (vii) the Debtor and Purchaser engaged in substantial arm's length negotiations, in good faith, and the APA is the product of this bargaining among the parties.

## IV.   Highest or Best Offer

A.     The Debtor solicited offers to acquire the Acquired Assets from a wide variety of parties.  In addition to such solicitations, the Debtor scheduled an auction in accordance with the provisions of the Sale Procedures Order.  The Auction afforded a full, fair and reasonable opportunity for any Qualified Bidder as defined in the Sale Procedures Order, to make a higher or otherwise better offer to purchase the Acquired Assets.  The Auction was duly noticed and commenced at 10:00 a.m. on February 7, 2019.

B.       The Auction (i) was held as provided in the Sale Procedures Order on
February 7, 2019 and then, in the business judgment of the Debtor and in consultation
with the Committee, was continued to February 8, 2019; (ii) was conducted pursuant to
procedures established in good faith and in compliance with the Sale Procedures Order,
and (iii) afforded a full, fair, and reasonable opportunity for any Qualified Bidder to make
a higher or otherwise better offer for the Acquired Assets than that of Purchaser.  At the
conclusion of the Auction, the Debtor, in consultation with the Committee, determined
that Purchaser's bid for the Acquired Assets, as described in the APA, as modified by
the Purchase Price fixed at Auction and any other modifications stated on the record at
the Auction, was the highest and best bid to purchase the Acquired Assets.
Accordingly, the Purchaser was declared the Successful Bidder (as defined in the Sale
Procedures). The Debtor, in consultation with the Committee, further determined that
the next highest and/or otherwise best bid was made by JLS Holdings, LLC (the
"**Alternate Bidder**").

C.       The APA constitutes the highest and best offer for the Acquired Assets,
and it will provide a greater recovery for the Debtor's estate than would be provided by
any other available alternative.  The Debtor's determination that the APA constitutes the
highest and best offer for the Acquired Assets constitutes a valid and sound exercise of
the Debtor's business judgment.

D.       The APA represents a fair and reasonable offer to purchase the Acquired
Assets under the circumstances of this bankruptcy case.  No other person or entity or
group of entities has offered to purchase the Acquired Assets for greater economic
value to the Debtor's estate, considering all relevant factors, than Purchaser.

8

E.    Approval of the Sale Motion and the APA and the consummation of the transactions contemplated thereby is in the best interests of the Debtor, its creditors, its estate and other parties in interest.

F.    The Debtor has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification to enter into the APA, sell the Acquired Assets pursuant thereto and assume and assign the Purchased Contracts and such actions are an appropriate and reasonable exercise of the Debtor's business judgment. The Debtor has also demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization or liquidation.

**V.    No Fraudulent Transfer**

A.    The consideration provided by Purchaser pursuant to the APA, including without limitation the assumption of the Assumed Liabilities, is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia in exchange for the Acquired Assets.

**VI.    Validity of Transfer**

A.    The Debtor has full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, including the Mutual Release Agreement, and no further consents or approvals are required for the Debtor to consummate the transactions contemplated by the APA, except as otherwise set forth in the APA.

9

B.     The transfer of each of the Acquired Assets by the Debtor to Purchaser will be as of the Closing Date a legal, valid, and effective transfer of such asset, and vests or will vest Purchaser with all right, title, privilege and interest of the Debtor to the Acquired Assets free and clear of all Liens, Claims, Interests, and Encumbrances accruing, arising or relating to any time prior to the Closing Date, except for certain permitted liens (as described and defined in the APA, the "**Permitted Liens**") and the Assumed Liabilities.

**VII.     Section 363(f) Is Satisfied**

A.     The Debtor may sell the Acquired Assets free and clear of all Liens, Claims, Interests, and Encumbrances against the Debtor, its estate or any of the Acquired Assets (except for any Assumed Liabilities and Permitted Liens under the APA) if, in each case, one or more of the following standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied: (a) applicable non-bankruptcy law permits the sale of such property free and clear of such interest (section 363(f)(1)); (b) the entity holding the alleged lien, claim, interest, or encumbrance consents (section 363(f)(2)); (c) such interest is a lien, and the price at which such property is to be sold is greater than the aggregate value of all liens on such property (section 363(f)(3)); (d) such lien, claim, interest, or encumbrance is subject to a *bona fide* dispute (section 363(f)(4)); or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such lien, claim, interest, or encumbrance (section 363(f)(5)).

B.     For the following reasons, the provisions of section 363(f) of the Bankruptcy Code have been satisfied:

10

a.  No alleged holders of Liens, Claims, Interests, or Encumbrances objected to the transaction contemplated by the APA and are deemed to have consented.

b.  The Debtor is not aware of any remaining interests in the Acquired Assets, and, if any such interests exist, they are in *bona fide* dispute as to the extent, validity, perfection and viability of those interests.

c.  Any other parties could be compelled to accept a money satisfaction of their Liens, Claims, Interests, or Encumbrances.

C.  Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Acquired Assets will be transferred to Purchaser free and clear of all Liens, Claims, Interests and Encumbrances (except and only to the extent expressly provided in the APA with respect to the Assumed Liabilities and Permitted Liens) with all such Liens, Claims, Interests, and Encumbrances attaching to the proceeds of the Sale to the same extent and with the same validity and priority as such Liens, Claims, Interests, and Encumbrances enjoyed as of the Petition Date.

D.  Purchaser would not have entered into the APA and would not consummate the transactions contemplated thereby (by paying the Purchase Price, assuming the Assumed Liabilities and having its affiliate Gracenote enter into the Mutual Release Agreement) if the sale of the Acquired Assets by the Debtor to Purchaser, and the assumption, assignment and sale of the Purchased Contracts to Purchaser, were not, except as otherwise provided in the APA with respect to the Assumed Liabilities and Permitted Liens, free and clear of all Liens, Claims, Interests,

11

and Encumbrances of any kind or nature whatsoever, or if Purchaser would, or in the

future could (except and only to the extent expressly provided in the APA with respect to

the Assumed Liabilities and Permitted Liens), be liable for any of such Liens, Claims,

Interests, and Encumbrances.

**VIII.   No Successor Liability**

A.      Purchaser is not holding itself out to the public as a continuation of the

Debtor, is not an "insider" or "affiliate" of the Debtor, as those terms are defined in the

Bankruptcy Code, and no common identity of incorporators, directors or stockholders

exists now or has ever existed between Purchaser, on the one hand, and the Debtor, on

the other.  Purchaser and the Debtor are not entering into the APA fraudulently or in

order to escape liability for the Debtor's obligations.

B.      The conveyance of the Acquired Assets does not amount to a

consolidation, merger or *de facto* merger of Purchaser and the Debtor and/or the

Debtor's estate, there is no substantial continuity between Purchaser and the Debtor,

there is no continuity of enterprise between the Debtor and Purchaser, Purchaser is not

a mere continuation of the Debtor or its estate, and Purchaser does not constitute a

successor to the Debtor or its estate.  Purchaser's acquisition of the Acquired Assets

will be free and clear of any "successor liability" claims of any nature whatsoever,

whether known or unknown and whether asserted or unasserted as of the Closing Date.

Purchaser's operations are not a continuation of the Debtor's business as a result of the

acquisition of the Acquired Assets.

12

IX. **Assumption and Assignment of the Executory Contracts and Unexpired Leases**

C.     The assumption and assignment of the Purchased Contracts pursuant to the terms of this Order is integral to the APA and is in the best interests of the Debtor and its estate, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtor.

D.     The amounts set forth on the Cure Notice are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all monetary defaults and pay all actual pecuniary losses under the Purchased Contracts (the "**Cure Costs**").

E.     Pursuant to the terms of the APA, Purchaser will: (i) cure and/or provide adequate assurance of cure of any Cure Costs under any of the Purchased Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (ii) provide adequate assurance of its future performance under the relevant Purchased Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

X. **Compelling Circumstances for an Immediate Sale**

A.     To enhance the Debtor's level of liquidity, to reduce the amount of post-petition debtor-in-possession financing borne by the Debtor, and to maximize the amount of funding available to provide for a timely exit from this chapter 11 case, it is essential that the Sale of the Acquired Assets occur within the time constraints set forth in the APA.  Time is of the essence in consummating the Sale.

13

B.      As of the Sale Hearing, the DIP Financing was almost fully drawn.  The Debtor currently does not have access to any additional financing.  As a result, the Debtor and its estate have an immediate need to close the Sale as soon as possible and will be harmed if this Order is not entered and all applicable stays respecting the effect and enforcement of this Order are not waived permitting the Closing to occur promptly following the entry of this Order.

C.      Given all of the circumstances of this bankruptcy case and the adequacy and fair value of the Purchase Price under the APA, the proposed Sale of the Acquired Assets to Purchaser constitutes a reasonable and sound exercise of the Debtor's business judgment and should be approved.

D.      The consummation of the Sale is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the transaction.

NOW, THEREFORE, IT IS HEREBY **ORDERED, ADJUDGED AND DECREED** THAT:

**General Provisions**

1.      The relief requested in the Sale Motion is granted and approved, and the Sale contemplated thereby in light of the results of the Auction is approved as set forth in this Order.

2.      This Court's findings of fact and conclusions of law, set forth in the Sale Procedures Order, are incorporated herein by reference.

3.      No party objected to the Sale Motion or the relief requested therein, and

14

any reservation of rights filed by any party with respect to the relief requested in the

Sale Motion have either been waived or have been rendered moot given the outcome of

the Auction, as no such party objects to the Sale to the Purchaser.

**Approval of the APA**

4.      The APA and all other ancillary documents, including the Mutual Release

Agreement, and all of the terms and conditions thereof, are hereby approved.

5.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is

authorized, empowered and directed to take any and all actions necessary or

appropriate to (i) consummate the Sale of each of the Acquired Assets to Purchaser

pursuant to and in accordance with the terms and conditions of the APA, (ii) close the

Sale as contemplated in the APA and this Order, and (iii) execute and deliver, perform

under, consummate, implement and close fully the APA, together with all additional

instruments, documents and actions that may be reasonably necessary or desirable to

implement the APA and the Sale, including any other ancillary documents (including the

Mutual Release Agreement), or as may be reasonably necessary or appropriate to the

performance of the obligations as contemplated by the APA and such other ancillary

documents.

6.      This Order and the APA (and all rights and obligations hereunder and

thereunder along with any ancillary documents, including the Mutual Release

Agreement) shall be binding in all respects upon the Debtor, its estate, any holders of

Liens, Claims, Interests, or Encumbrances (whether known or unknown) against the

Debtor or against or on all or any portion of the Acquired Assets sold by the Debtor, all

Contract Counterparties, Purchaser and all successors and assigns of Purchaser, the

15

Acquired Assets and any trustees, if any, subsequently appointed in the Debtor's

chapter 11 case or upon a conversion to chapter 7 under the Bankruptcy Code of the

Debtor's case.  This Order and the APA shall inure to the benefit of the Debtor, its

estate, its creditors, Purchaser and their respective successors and assigns.

**Transfer of the Acquired Assets**

7.        Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the

Bankruptcy Code, the Debtor is authorized, empowered and directed to transfer the

Acquired Assets owned by the Debtor on the Closing Date.  Such Acquired Assets shall

be transferred to Purchaser upon and as of the Closing Date and such transfer shall

constitute a legal, valid, binding and effective transfer of such Acquired Assets

conveying good, marketable and insurable title to Purchaser, and upon the Debtor's

receipt of the Purchase Price, shall be free and clear of all Liens, Claims, Interests, and

Encumbrances, except Assumed Liabilities and Permitted Liens under the APA.  Any

Liens, Claims, Interests, and Encumbrances that exist on or in any of the Acquired

Assets shall attach to the proceeds of the Sale to the same extent and with the same

validity and priority as such Liens, Claims, Interests, and Encumbrances enjoyed as of

the Petition Date.  Upon the Closing, Purchaser shall take title to and possession of the

Acquired Assets subject only to the Assumed Liabilities and Permitted Liens.  Pursuant

to section 363(f) of the Bankruptcy Code, the transfer of title to the Acquired Assets

owned by the Debtor and the Purchased Contracts shall be free and clear of any and all

Liens, Claims, Encumbrances, and Interests, including, without limitation, any and all

Liens, Claims, Interests, or Encumbrances pursuant to any successor or successor-in-

interest liability theory or otherwise, under the Purchased Contracts arising prior to the

16

Closing Date, or any liabilities calculable by reference to the Debtor or its assets or

operations or relating to continuing conditions existing at or prior to the Closing Date;

provided, however, that Purchaser shall not be relieved of liability with respect to the

Assumed Liabilities or Permitted Liens, including any obligations accruing under the

Purchased Contracts from and after the Closing.

       8.     Except as expressly provided by the APA with respect to Assumed

Liabilities and Permitted Liens, all persons and entities holding Liens, Claims, Interests,

or Encumbrances in all or any portion of the Acquired Assets arising under or out of, in

connection with, or in any way relating to the Debtor, the Acquired Assets, the operation

of the Debtor's business prior to the Closing Date or the transfer of the Acquired Assets,

hereby are forever barred, estopped and permanently enjoined from asserting against

Purchaser or its successors or assigns, their property or the Acquired Assets, such

persons' or entities' Liens, Claims, Interests, or Encumbrances against the Debtor or in

and to the Acquired Assets sold by the Debtor to Purchaser, and all such persons or

entities holding such Liens, Claims, Interests, or Encumbrances shall be deemed to

have released the Acquired Assets to Purchaser and limit the assertion of their Liens,

Claims, Interests, or Encumbrances to the sale proceeds the Debtor receives for the

sale of the Acquired Assets and any other available property of the Debtor's estate that

does not constitute Acquired Assets.

       9.     All persons and entities are hereby forever prohibited and enjoined from

taking any action that would adversely affect or interfere with the ability of the Debtor to

sell and transfer the Acquired Assets to Purchaser and Purchaser taking title to, and the

use and enjoyment of the Acquired Assets, in accordance with the terms of the APA

and this Order.

10.    All persons and entities that are in possession of some or all of the Acquired Assets sold by the Debtor on the Closing Date are directed to surrender possession of such Acquired Assets to Purchaser or its assignee at the Closing. Purchaser is acquiring as an Acquired Asset all accounts receivables and notes receivable of the Debtor.  All account and note debtors are directed to remit payment on account thereof after the Closing to Purchaser.

11.    A certified copy of this Order may be filed with the appropriate clerk and/or recorded, with the recorder to act to cancel any of the Liens, Claims, Interests or Encumbrances of record.

12.    If any person or entity which has filed statements, instruments or other documents or agreements evidencing Liens or Encumbrances on, Claims or Interests in, all or any portion of the Acquired Assets shall not have delivered to the Debtor or Purchaser prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to Purchaser for the purpose of documenting the release of all Liens, Claims, Interests, or Encumbrances, which the person or entity has or may assert with respect to all or any portion of such Acquired Assets, the Debtor is hereby authorized and directed, and Purchaser is hereby authorized, to execute, record and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to such Acquired Assets.

13.    This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title

18

companies, recorders of mortgages and deeds of trust, recorders of deeds, registrars of

deeds, registrars of patents, trademarks or other intellectual property, administrative

agencies, governmental departments, secretaries of state, federal, state, and local

officials, and all other persons and entities who may be required by operation of law, the

duties of their office, or contract, to accept, file, register or otherwise record or release

any documents or instruments, or who may be required to report or insure any title or

state of title in or to any lease; and each of the foregoing persons and entities is hereby

directed to accept for filing any and all of the documents and instruments necessary and

appropriate to consummate the transactions contemplated by the APA.  Gil Miller and

Scott Klossner are authorized and directed to sign and deliver any and all documents

and instruments or take any other further actions by the Debtor necessary or desirable

to consummate the transactions contemplated by the APA or otherwise comply with the

APA or this Order, including, if applicable, paying, whether before or after the Closing,

any expenses or costs that are required to be paid in order to consummate the

transactions contemplated by the APA or to perform its obligations under the APA or

any related agreements.

**Purchased Contracts**

14.     Upon the Closing of the Sale, the Debtor is authorized and directed to

assume and assign and sell the Purchased Contracts to Purchaser free and clear of all

Liens, Claims, Interests, and Encumbrances, as described herein.  The payment of the

applicable Cure Costs (if any) by Purchaser shall (a) effect a cure of all defaults existing

thereunder as of the Closing Date, (b) compensate for any actual pecuniary loss to such

Contract Counterparty resulting from such default, and (c) together with the assumption

19

of the Purchased Contracts by Purchaser and any statements of counsel or other evidence presented at the Sale Hearing, constitute adequate assurance of future performance thereof.  The Debtor shall then have assumed the Purchased Contracts and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtor to Purchaser of such Purchased Contracts shall not be a default thereunder.  After the payment of the relevant Cure Costs by Purchaser, neither the Debtor nor Purchaser shall have any further liabilities to the Contract Counterparties other than Purchaser's obligations under the Purchased Contracts that accrue and become due and payable on or after the Closing Date.

15.    Any provisions in any Purchased Contract that prohibit or condition the assignment of such Purchased Contract or allows the party to such Purchased Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Purchased Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment and sale to Purchaser of the Purchased Contracts have been satisfied.  Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtor under the Purchased Contracts and shall enjoy all of the rights and benefits under each such Purchased Contract as of the Closing without the necessity of obtaining the Contract Counterparty's written consent to the assumption or assignment of the relevant Purchased Contract.

20

16.     Upon the Closing and the payment of the relevant Cure Costs, if any, Purchaser shall be deemed to be substituted for the Debtor as a party to the applicable Purchased Contract and the Debtor shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Purchased Contracts.

17.     Upon the payment of the applicable Cure Costs, if any, the Purchased Contracts will remain in full force and effect, and no default shall exist under the Purchased Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

18.     There shall be no rent accelerations, assignment or consent fees, increases (including advertising rates) or any other fees charged to Purchaser or the Debtor as a result of the assumption and assignment and sale of the Purchased Contracts.

19.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all Contract Counterparties are forever barred and permanently enjoined from raising or asserting against Purchaser any assignment or consent fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Purchased Contracts existing as of the Closing Date or arising by reason of the Closing.

20.     To the extent the Closing does not occur and the APA is terminated, the assumption and assignment of the Purchased Contracts will not be effectuated.

**Other Provisions**

21.     Effective upon the Closing Date and except as otherwise provided by stipulations filed with or announced to the Court with respect to a specific matter (if any), to the fullest extent permitted by applicable law, all persons and entities are forever

21

prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against Purchaser, its successors and assigns, or the Acquired Assets, with respect to any (a) Lien, Claim, Interest, or Encumbrance arising under, out of, in connection with or in any way relating to the Debtor, Purchaser, the Acquired Assets, or the operation of the Acquired Assets prior to the Closing of the Sale (other than Assumed Liabilities and Permitted Liens), or (b) successor liability, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against Purchaser, its successors or assigns, assets or properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against Purchaser, its successors or assigns, assets or properties including Purchaser Employees; (iii) creating, perfecting or enforcing any Lien, Claim, Interest, or Encumbrance against Purchaser, its successors or assigns, assets or properties; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due Purchaser or its successors or assigns; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with the Acquired Assets.

22.     Except for the Assumed Liabilities and Permitted Liens as expressly provided in the APA, Purchaser shall not have any liability or other obligation of the Debtor arising under or related to any of the Acquired Assets or the Debtor's operations

or use of the Acquired Assets. Without limiting the generality of the foregoing, and except for the Assumed Liabilities and Permitted Liens expressly provided in the APA, Purchaser shall not be liable for any Liens, Claims, Interests, or Encumbrances against the Debtor or any of its predecessors or affiliates, and Purchaser shall have no successor or vicarious liabilities of any kind or character, by reason of any theory of law or equity including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Acquired Assets by the Debtor prior to the Closing. Purchaser has given substantial consideration under the APA for the benefit of the holders of any Liens, Claims, Interests, or Encumbrances. The consideration given by Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of Purchaser, which releases shall be deemed to have been given in favor of Purchaser by all holders of Liens, Claims, Interests, or Encumbrances against or interests in the Debtor or any of the Acquired Assets owned by the Debtor.

23.     Without limiting the generality of the foregoing, and except as otherwise expressly provided in the APA with respect to the Assumed Liabilities and the Permitted Liens, Purchaser shall not be liable or responsible, as a successor or otherwise, for the Claims, Liens, Interests, or Encumbrances, whether calculable by reference to the

23

Debtor or its operations or under or in connection with (a) any employment or labor

agreements, (b) any pension, welfare, compensation, fringe benefit or other employee

benefit plans, trust arrangements, agreements, practices and programs, including,

without limitation, any pension plan of the Debtor, any medical, welfare and pension

benefits payable after retirement or other termination of employment or any

responsibility as a fiduciary, plan sponsor or otherwise for making any contribution to, or

in respect of the funding, investment or administration of any employee benefit plan,

arrangement or agreement (including, without limitation, pension plans) or the

termination of or withdrawal from any such plan, arrangement or agreement; (c) the

cessation of the Debtor's operations, dismissal of employees or termination of

employment or labor agreements or pension, welfare, compensation or other employee

benefit plans, agreements, practices and programs, obligations that might otherwise

arise or pursuant to (i) the Employee Retirement Income Security Act of 1974, as

amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964,

(iv) the Age Discrimination and Employment Act of 1967, (v) the Federal Rehabilitation

Act of 1973, (vi) the National Labor Relations Act, or (vii) the Consolidated Omnibus

Budget Reconciliation Act of 1985; (d) worker's compensation, occupational disease, or

unemployment or temporary disability insurance Claims; (e) environmental Claims,

Liens, or Encumbrances arising from conditions first existing on or prior to the Closing

Date (including, without limitation, the presence of hazardous, toxic, polluting, or

contaminating substances or waste) that may be asserted on any basis, including,

without limitation, under the Comprehensive Environmental Response Compensation

and Liability Act, 42 U.S.C. § 9601 *et seq.*; (f) any bulk sales or similar law; (g) any tax

24

statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; or (h) any litigation.

24.    To the fullest extent permitted by applicable law, neither Purchaser nor its affiliates, successors or assigns shall, as a result of the consummation of the transactions set forth in the APA: (i) be a successor to the Debtor or the Debtor's estate; (ii) have, de facto or otherwise, merged or consolidated with or into the Debtor or the Debtor's estate; (iii) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor; or (iv) be a joint employer or co-employer with, or successor employer of the Debtor. Purchaser shall not assume, other than the Assumed Liabilities and Permitted Liens, nor be deemed to assume or in any way be responsible for any Claim, Lien, Encumbrance, liability or obligation of the Debtor and/or its estate.

25.    The transactions contemplated by the APA are undertaken by Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment and sale of the Purchased Contracts), unless such authorization and such Sale are duly stayed pending such appeal. Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

26.    The sale of the Acquired Assets pursuant to the APA, all covenants in and conditions thereto (including any ancillary document to the APA, including the Mutual Release Agreement), and all relief requested in the Sale Motion and this Order are an

25

integrated transaction, meaning that each component is an essential part of every other component and that the entire transaction can be consummated only if all of its components are consummated. Accordingly, the entire transaction is subject to, and is protected by, the provisions of section 363(m) of the Bankruptcy Code.

27.    To the greatest extent available under applicable law, Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtor with respect to the Acquired Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been transferred to Purchaser as of the Closing Date.

28.    Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (i) this bankruptcy case, (ii) any subsequent chapter 7 case into which any such chapter 11 case may be converted, or (iii) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the APA or the terms of this Order.

29.    Notwithstanding Bankruptcy Rules 7062, 9014, 6004(h) and 6006(d) or any applicable Local Rules, this Order shall be effective immediately upon entry and the Debtor and Purchaser are authorized to close the Sale immediately upon entry of this Order.

30.    No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

31.    The failure specifically to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

26

32.    The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

33.    The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

34.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

35.    To the extent the Closing does not occur, the findings of fact and conclusions of law set forth herein in this Order shall have no further force or effect.

36.    If Purchaser fails to consummate the approved Sale because of a breach or failure to perform on the part of Purchaser, then the Alternate Bidder will be deemed to be Purchaser for all purposes under this Order, and the Debtor is authorized, but not required, without further notice or a hearing, to consummate the Sale with the Alternate Bidder.  In that event, and unless otherwise specified herein, all references to Purchaser and the APA herein shall be deemed to apply to the Alternate Bidder and the asset purchase agreement it last proposed at the Auction and entered into with the Debtor.



--------END OF ORDER--------

27

**EXHIBIT A**

## EXHIBIT C

## FORM OF BILL OF SALE

## BILL OF SALE

THIS BILL OF SALE (this "Bill of Sale") is made on this ___ day of February, 2019, by and between Sorenson Media, Inc., a Delaware corporation ("Assignor"), and The Nielsen Company (US), LLC, Delaware Limited liability company ("Assignee").

WHEREAS, this Bill of Sale is made and entered into in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of February 13, 2019 (the "Asset Purchase Agreement"), by and between Assignor, as Seller, and Assignee, as Purchaser, pursuant to which, among other things, Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from Assignor, the Acquired Assets; and

WHEREAS, the United States Bankruptcy Court for the District of Utah presiding over Assignor's bankruptcy case entered the Sale Order approving and authorizing the sale of the Acquired Assets to Assignee on the terms and conditions set forth in the Asset Purchase Agreement and the Sale Order.

NOW, THEREFORE, pursuant to the Asset Purchase Agreement and in consideration of the mutual promises it contains, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### TRANSFER:

1. _Defined Terms_. Capitalized terms used herein but not otherwise defined in this Bill of Sale shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

2. _Sale and Transfer of Acquired Assets_. Upon and subject to the terms and conditions of the Asset Purchase Agreement, Assignor does hereby sell, transfer, assign, convey and deliver to Assignee, and Assignee does hereby purchase, acquire and accept from Assignor, all of Assignor's right, title, and interest in, to and under all of the Acquired Assets, free and clear of all Liens, Claims, Interests or Encumbrances other than Permitted Liens and Assumed Liabilities.

3. _Excluded Assets and Excluded Liabilities_. Notwithstanding anything in this Bill of Sale to the contrary, Assignor is retaining ownership and possession of, and is not selling, transferring, assigning, conveying or delivering to Assignee hereunder or otherwise, any right, title or interest, legal or equitable, of Assignor in, to or under any of the Excluded Assets or the Excluded Liabilities, and Assignee shall not assume (and shall not be deemed to have assumed) or otherwise be liable in respect of, or responsible for, any of the Excluded Assets or the Excluded Liabilities.

4. _Power of Attorney_. Assignor hereby constitutes and appoints Assignee as Assignor's true and lawful agent and attorney-in-fact, with full power of substitution and resubstitution, in whole or in part, in the name and stead of Assignor but on behalf and for the benefit of Assignee and its successors and assigns, to demand, receive and collect any and all of the Acquired Assets and to give receipts and releases for and in respect of the same, and from time to time to institute and prosecute in Assignor's name, or otherwise for the benefit of Assignee and its successors and assigns, any and all proceedings at law, in equity or otherwise, which Assignee or its successors or assigns may deem proper for the collection or recovery of any of the Acquired Assets or for the collection and enforcement of any claim or right of any kind hereby sold, assigned, conveyed and transferred, or intended so to be, and to take any other actions and make, sign, execute, acknowledge and deliver any documents and instruments as may

from time to time be necessary or appropriate to assign to Assignee and its successors and assigns the Acquired Assets and all rights granted to Assignee under the Asset Purchase Agreement. Assignor declares that the foregoing powers are coupled with an interest and are and will be irrevocable by Assignor or by its dissolution or in any manner or for any reason whatsoever. Nothing in the Section 4 will be deemed a waiver of any remedies otherwise available.

5.    Asset Purchase Agreement and Sale Order Controls. This Bill of Sale is in all respects subject to the provisions of the Asset Purchase Agreement and the Sale Order and nothing in this Bill of Sale shall be deemed to supersede, enlarge or modify any provision of the Asset Purchase Agreement or the Sale Order, all of which survive the execution and delivery of this Bill of Sale as provided in and subject to the limitations set forth in the Asset Purchase Agreement and the Sale Order. In the event of any conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Asset Purchase Agreement or Sale Order, the terms and conditions of the Asset Purchase Agreement or Sale Order, as applicable, shall supersede, govern and control.

6.    Governing Law. This Bill of Sale is to be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the state of Utah shall govern, without giving effect to the choice of law principles thereof (except for any laws of that state which would render such choice of laws ineffective), including all matters of construction, validity and performance.

7.    Further Assurances. Assignor hereby covenants that, at any time or from time to time after the date hereof, and without further consideration, Assignor will take all further actions and execute and deliver all further documents as Assignee may reasonably request to sell, transfer, convey, assign, and deliver to Assignee and to confirm its right, title and interest in, to and under the Acquired Assets, and to put Assignee in actual possession of such rights, title and interest in, to and under the Acquired Assets and to assist Assignee in exercising all rights with respect thereto.

8.    Successors and Assigns. This Bill of Sale and the covenants and agreements contained herein shall inure to the benefit of and be binding upon the respective parties hereto and their respective successors and permitted assigns.

9.    Closing Date. This Bill of Sale is to be effective as of the Closing Date.

10.    Counterparts. This Bill of Sale may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

11.    Amendment and Waiver. This Bill of Sale may not be amended or modified in any manner other than by an agreement in writing signed by the parties hereto or their respective successors or permitted assigns. No waiver under this Bill of Sale shall be valid or binding unless set forth in a writing duly executed and delivered by the party against whom enforcement of such waiver is sought. Neither the waiver by any of the parties of a breach or default under any of the provisions of this Bill of Sale, nor the failure by any of the parties, on one or more occasions, to enforce any of the provisions of this Bill of Sale or to exercise any right or privilege hereunder, shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.

12.    Notices. Any notice given pursuant to this Bill of Sale shall be given in the same manner as stated in Section 12.7 of the Asset Purchase Agreement.

[Signature Pages Follow]

[Signature Page to Bill of Sale]

EXECUTED on the date set forth in the acknowledgments below to be effective for all purposes as of the Effective Date.

ASSIGNOR:

SORENSON MEDIA, INC.
a Delaware corporation

By: _____
　　　　Scott Klossner
　　　　Chief Financial Officer

ASSIGNEE:

THE NIELSEN COMPANY (US), LLC.
a Delaware limited liability company

By: _____
　　　　Salvador Karottki
　　　　SVP/Intellectual Property

Acknowledgement of Sorenson Media, Inc.

STATE OF UTAH                          )
                                       ) ss
COUNTY OF SALT LAKE                    )

The foregoing instrument was acknowledged before me this _____ day of _____, 2019 by Scott Klossner, as Chief Financial Officer of Sorenson Media, Inc., a Delaware corporation, on behalf of said corporation.

Witness my hand and official seal.

Notary Public_____

My commission expires: _____

Acknowledgement of The Nielsen Company (US), LLC

STATE OF _____           )
                                       ) ss
COUNTY OF _____              )

The foregoing instrument was acknowledged before me this _____ day of _____, 2019 by Salvador Karottki, as SVP/Intellectual Property of The Nielsen Company (US), LLC, a Delaware limited liability company, on behalf of said limited liability company.

Witness my hand and official seal.

Notary Public_____

My commission expires: _____

**EXHIBIT D**

**FORM OF MUTUAL RELEASE**

# SETTLEMENT AGREEMENT
# AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release (this "*Agreement*") is entered into by and between Gracenote, Inc., a Delaware corporation ("*Gracenote*") and Sorenson Media, Inc., a Delaware corporation, as debtor and debtor in possession ("*SMI*") (each referred to herein as a "*Party*," and collectively as the "*Parties*").

## RECITALS

WHEREAS, on September 12, 2016, Gracenote commenced a civil action in the United States District Court for the District of Utah (the "*District Court*"), captioned *Gracenote, Inc. v. Sorenson Media, Inc.*, No. 2:16-cv-00950 (the "*SMI Patent Infringement Litigation*"), against SMI to enjoin SMI from infringing certain of Gracenote's patents and for damages as a result of such infringement;

WHEREAS, on October 16, 2018 (the "*Petition Date*"), SMI commenced a case under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") by filing a voluntary petition for relief (the "*Bankruptcy Case*") with the United States Bankruptcy Court for the District of Utah (the "*Bankruptcy Court*"), Case No. 18-27740;

WHEREAS, as a result of SMI's commencement of the Bankruptcy Case, the SMI Patent Infringement Litigation is currently stayed;

WHEREAS, on December 19, 2018, Gracenote commenced a civil action in the District Court, captioned *Gracenote, Inc. v. Sorenson Media LTD.*, No. 2:18-cv-00959 (the "*SML Patent Infringement Litigation*"), against Sorenson Media LTD. ("*SML*"), an affiliate of SMI, to enjoin SML from infringing certain of Gracenote's patents and for damages as a result of such infringement;

WHEREAS, SMI conducted a sale process in the Bankruptcy Case to sell substantially all of its assets, held an auction, and determined, in consultation with the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case, that a bid submitted by The Nielsen

Company (US), LLC (the "*Purchaser*"), an affiliate of Gracenote, was the highest and best offer

and, therefore, the winning bid;

WHEREAS, SMI and the Purchaser entered into that certain Asset Purchase Agreement,

dated February 13, 2019 (the "*APA*"), pursuant to which SMI has agreed to sell, transfer, and

assign to Purchaser, and Purchaser has agreed to purchase and assume, pursuant to sections 363

and 365 of the Bankruptcy Code, the Acquired Assets[1] and the Assumed Liabilities from SMI,

upon the terms and subject to the conditions contained in the APA, including obtaining an order

of the Bankruptcy Court pursuant to sections 105, 363 and 365 of the Bankruptcy Code

authorizing the transactions contemplated by the APA;

WHEREAS, this Agreement is made, entered into, and delivered in connection with the

Closing of the transactions contemplated by APA and is only effective as of the Closing; and

WHEREAS, the Bankruptcy Court entered the Sale Order (i) approving and authorizing

the sale and transfer of the Acquired Assets to the Purchaser on the terms and conditions set forth

in the APA and the Sale Order and (ii) authorizing and approving SMI to enter into this

Agreement.

NOW THEREFORE, in consideration of the mutual covenants and undertakings set forth

below and other good and valuable consideration, the receipt and sufficiency of which is hereby

acknowledged, the Parties agree as follows:

1.    **RELEASES**.  The Parties grant the following releases:

For good and valuable consideration, the receipt and sufficiency of which is hereby

acknowledged by Gracenote, and in further consideration of the release of SMI by Gracenote

herein, Gracenote, for itself, its predecessors, successors, assigns, subsidiaries, affiliates, parents,

directors, officers, employees, partners, agents, representatives, attorneys, all whether past or

present, does hereby forever release, acquit, and discharge SMI, its subsidiaries, parents, and

---

[1] Terms used but not defined in this Agreement shall have the meanings ascribed to such terms in the APA.

affiliates, and their respective current and former officers, directors, shareholders, owners, employees, agents and attorneys, of and from any and all claims, demands, obligations, actions, causes of action, rights, damages, costs, and expenses, whether at law or in equity, known or unknown, that Gracenote has, had or may have at any time in the past, present or future, arising out of or relating to events that occurred prior to the execution of this Agreement.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by SMI, and in further consideration of the release of Gracenote by SMI, SMI, for itself, its predecessors, successors, assigns, subsidiaries, affiliates, parents, directors, officers, employees, partners, agents, representatives, attorneys, all whether past or present, does hereby forever release, acquit, and discharge Gracenote, its subsidiaries, parents, and affiliates, and their respective current and former officers, directors, shareholders, owners, employees, agents and attorneys, of and from any and all claims, demands, obligations, actions, causes of action, rights, damages, costs, and expenses, including any derivative claims, asserted or assertable on behalf of SMI or its bankruptcy estate (including, any causes of action arising under chapter 5 of the Bankruptcy Code) whether at law or in equity, known or unknown, that SMI has, had or may have at any time in the past, present or future arising out of or relating to events that occurred prior to the execution of this Agreement. **For avoidance of doubt and notwithstanding the releases set forth in this section 1, (i) no obligations of any parties under the APA, the ancillary documents to the APA, or the Sale Order are released, including, but not limited to, any obligations of SMI or the Purchaser, and (ii) the Parties do not release their ability to assert any claims that may arise under this Agreement.**

2.      **DISMISSAL OF PATENT INFRINGEMENT LITIGATION**.   After the consummation of the transactions set forth in the APA, as soon as is reasonably practicable, (i) Gracenote's counsel will execute a stipulation of dismissal substantially in the form attached hereto as Exhibit A that dismisses the SMI Patent Infringement Litigation, with prejudice, and

- 3 -

once SMI's counsel executes such stipulation of dismissal, Gracenote's counsel will cause such stipulation of dismissal to be filed with the District Court, and (ii) Gracenote's counsel will cause the SML Patent Infringement Litigation to be withdrawn with prejudice. The Parties will bear their own fees and costs.

3.    **REPRESENTATION OF COMPREHENSION**. The Parties expressly warrant and represent that before executing this Agreement they have received independent legal advice from attorneys of their choice with respect to the advisability of making the above Agreement, or have had full and fair opportunity to do so, that they have fully informed themselves of its terms, contents, conditions, and effect, and that they voluntarily agree to the terms of this Agreement. The Parties agree that this instrument is executed as their voluntary act and deed.

4.    **CORPORATE ENTITIES**. With respect to each corporate entity referenced herein, this Agreement shall be binding upon and inure to the benefit of the representatives, successors and assigns, trustees, agents, attorneys, and legal representatives of the corporate entity, as well as its officers, directors, and employees.

5.    **COUNTERPARTS**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same Agreement.

6.    **ENTIRE AGREEMENT**. This Agreement contains the entire agreement between the Parties with regard to the matters set forth herein and may only be amended, modified or waived by a written instrument executed by each of the Parties hereto. The terms of this Agreement are contractual and not merely recitals. The mutual obligations and undertakings of the Parties expressly set forth in this Agreement are the sole and only consideration for this Agreement, and no representations, promises, or inducements of any nature whatsoever have been made by the Parties other than those expressly appearing in this Agreement. Each Party and counsel for each Party has reviewed and revised this Agreement, and accordingly, the rule of construction that any

ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

7.     **WAIVER**.  The Parties agree that a waiver of any term or condition of this Agreement will not be deemed to be, and may not be construed as, a waiver of any other term or condition hereof.

8.     **GOVERNING LAW**.  This Agreement shall be governed by and construed and enforced in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the State of Utah, without giving reference to the principles of conflicts of law.

9.     **AUTHORIZATION**.  The Person who enters into and executes this Agreement on behalf of a Party warrants and represents that she or he has been duly authorized to do so.

**[SIGNATURES ON FOLLOWING PAGE]**

- 5 -

Dated:  February __, 2019

**GRACENOTE, INC.**
a Delaware Corporation

By:  _____
Name:  Salvador Karottki
Title:   SVP/Intellectual Property


**SORENSON MEDIA, INC.**
a Delaware Corporation

By:  _____
Name:  Scott Klossner
Title:   Chief Financial Officer

## Exhibit A

**Asset Purchase Agreement**
**Dated as of February 13, 2019**
**Between**
**Sorenson Media, Inc., Debtor-In-Possession**
**and**
**The Nielsen Company (US), LLC**

# SCHEDULES

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Schedule 1,1*
*Acquired Subsidiary Director*

1. Steven Michael Cormie

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Schedule 2.1(d)*
*Purchased Contracts*

1. Supply Partner Connection & Media Agreement dated as of April 17, 2017, by and between Seller and Bidswitch GmbH
2. Data Integration Agreement dated as of October 1, 2018, by and between Seller and dataxu, inc
3. Master Services Agreement dated as of February 28, 2018, by and between Seller and Rainbow Media Holdings LLC
4. Sublease, dated as of April 18, 2017, by and between Seller and Kirton McConkie PC, as amended by that Amendment to Sublease, dated as of August 1, 2018 by and between Seller and Kirton McConkie PC

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 2.1(g)*
*Purchased Intellectual Property*

(i)     List of Patents attached
(ii)    List of Software attached

Schedule 2.1(g) - All Patents Patent applications, including the following:

| Country | Appl. No. | Filing Date | Pat. No. | Issue Date | Title | Inventor(s) |
|---|---|---|---|---|---|---|
| US | 14/820476 | 8/6/2015 | 9641870 | 5/2/2017 | Content management of a content feed | Cormie, Steven M.; Liassides, Stefan |
| US | 14/839339 | 8/28/2015 | 9628830 | 4/18/2017 | Automatic content recognition (ACR) fingerprinting and video encoding | Ashbacher, Andrew; Liassides, Marcus |
| US | 15/457483 | 3/13/2017 | | | Automatic content recognition (ACR) fingerprinting and video encoding | Ashbacher, Andrew; Liassides, Marcus |
| US | 14/820490 | 8/6/2015 | 9743153 | 8/22/2017 | Content replacement with onscreen displays | Holyoak, Mitchell M. |
| US | 15/683345 | 7/24/2017 | 10057657 | 8/21/2018 | Content replacement with onscreen displays | Holyoak, Mitchell M. |
| CN | 201680043941.0 | 5/26/2016 | | | Detecting channel change in automatic content recognition fingerprint matching | Chen, Juikun |
| EP | 16808025.7 | 5/26/2016 | | | Detecting channel change in automatic content recognition fingerprint matching | Chen, Juikun |
| JP | P2018-517124 | 5/26/2016 | | | Detecting channel change in automatic content recognition fingerprint matching | Chen, Juikun |
| KR | 10-2018-7001098 | 5/26/2016 | | | Detecting channel change in automatic content recognition fingerprint matching | Chen, Juikun |
| US | 14/815256 | 7/31/2015 | 9516377 | 12/6/2016 | Detecting channel change in automatic content recognition fingerprint matching | Chen, Juikun |
| US | 15/266524 | 9/15/2016 | 9706261 | 7/11/2017 | Detecting channel change in automatic content recognition fingerprint matching | Chen, Juikun |
| US | 15/617591 | 6/8/2017 | 9877085 | 1/23/2018 | Detecting channel change in automatic content recognition fingerprint matching | Chen, Juikun |
| WO | PCT/US2016/034401 | 5/26/2016 | | | Detecting channel change in automatic content recognition fingerprint matching | Chen, Juikun |
| US | 14/820484 | 8/6/2015 | 9380325 | 6/28/2016 | Overlay content and aggregation of viewing data | Cormie, Steven M.; Liassides, Stefan |

Schedule 2.1(g) - All Patents Patent applications, including the following:

| Country | Appl. No. | Filing Date | Pat. No. | Issue Date | Title | Inventor(s) |
|---|---|---|---|---|---|---|
| US | 15/182229 | 6/14/2016 | 9661385 | 5/23/2017 | Overlay content and aggregation of viewing data | Cormie, Steven M.; Liassides, Stefan |
| US | 15/483762 | 4/10/2017 | 9912991 | 3/6/2018 | Overlay content and aggregation of viewing data | Cormie, Steven M.; Liassides, Stefan |
| US | 15/895775 | 2/13/2018 | | | Overlay content and aggregation of viewing data | Cormie, Steven M.; Liassides, Stefan |
| CN | 201680063089.3 | 9/27/2016 | | | Sequentially overlaying media content | Grover, Matthew |
| GB | 1805115.1 | 9/27/2016 | | | Sequentially overlaying media content | Grover, Matthew |
| KR | 10-2018-7012371 | 9/27/2016 | | | Media content overlaid sequentially | Grover, Matthew |
| MX | MX/a/2018/003808 | 9/27/2016 | | | Sequentially overlaying media content | Grover, Matthew |
| US | 15/130823 | 4/15/2016 | 9848214 | 12/19/2017 | Sequentially overlaying media content | Grover, Matthew |
| US | 15/842750 | 12/14/2017 | | | Sequentially overlaying media content | Grover, Matthew |
| WO | PCT/US2016/053996 | 9/26/2016 | | | Sequentially overlaying media content | Grover, Matthew |
| CN | 201680062705.3 | 9/27/2016 | | | Frequency capping for multimedia content | Grover, Matthew |
| GB | 1805116.9 | 9/27/2016 | | | Frequency capping for multimedia content | Grover, Matthew |
| KR | 10-2018-7012363 | 9/27/2016 | | | Frequency capping for media content | Grover, Matthew |
| MX | MX/a/2018/003807 | 9/27/2016 | | | Frequency capping for multimedia content | Grover, Matthew |
| US | 15/164682 | 5/25/2016 | 9723347 | 8/1/2017 | Frequency capping for media content | Grover, Matthew |
| US | 15/641796 | 7/5/2017 | 10187682 | 1/22/2019 | Frequency capping for media content | Grover, Matthew |
| WO | PCT/US2016/053997 | 9/27/2016 | | | Frequency capping for multimedia content | Grover, Matthew |
| CN | 2016800576761 | 8/16/2016 | | | Dynamic video advertisement replacement | Liassides, Stefan |
| GB | 1805117.7 | 8/16/2016 | | | Dynamic video advertisement replacement | Liassides, Stefan |
| KR | 10-2018-7009915 | 8/16/2016 | | | Replace dynamic video ads | LIASSIDES MARCUS; LIASSIDES STEFAN |
| MX | MX/a/2018/002966 | 8/16/2016 | | | Dynamic video advertisement replacement | Liassides, Marcus; Liassides, Stefan |
| US | 15/058750 | 3/2/2016 | 9743154 | 8/22/2017 | Dynamic video advertisement replacement | Liassides, Marcus; Liassides, Stefan |
| US | 15/650425 | 7/14/2017 | 10110969 | 10/23/2018 | Dynamic video advertisement replacement | Liassides, Marcus; Liassides, Stefan |

Schedule 2.1(g) - All Patents Patent applications, including the following:

| Country | Appl. No. | Filing Date | Pat. No. | Issue Date | Title | Inventor(s) |
|---|---|---|---|---|---|---|
| US | 16/144361 | 9/27/2018 | | | Dynamic video advertisement replacement | Liassides, Marcus; Liassides, Stefan |
| WO | PCT/US2016/047203 | 8/16/2016 | | | Dynamic video advertisement replacement | Liassides, Marcus; Liassides, Stefan |
| US | 15/058819 | 3/2/2016 | 9854326 | 12/26/2017 | Creating and fulfilling dynamic advertisement replacement inventory | Liassides, Marcus; Liassides, Stefan |
| US | 15/831838 | 1/25/2017 | | | Creating and fulfilling dynamic advertisement replacement inventory | Liassides, Marcus; Liassides, Stefan |
| CN | 201680062405.5 | 9/27/2016 | | | Media content matching and indexing | Ashbacher, Andrew |
| GB | 1085125.0 | 9/27/2016 | | | Media content matching and indexing | Ashbacher, Andrew |
| KR | 10-2018-7014587 | 9/27/2016 | | | Media content matching and indexing | Ashbacher, Andrew |
| MX | MX/a/2018/003806 | 9/27/2016 | | | Media content matching and indexing | Ashbacher, Andrew |
| US | 15/081738 | 3/25/2016 | 9813781 | 11/7/2017 | Media content matching and indexing | Ashbacher, Andrew |
| US | 15/728687 | 10/10/2017 | 10187705 | 1/22/2019 | Media content matching and indexing | Ashbacher, Andrew L. |
| US | 16/217980 | 12/12/2018 | | | Media content matching and indexing | Ashbacher, Andrew L. |
| WO | PCT/US2016/053998 | 9/27/2016 | | | Media content matching and indexing | Ashbacher, Andrew L. |
| CN | 201680054373.4 | 9/13/2016 | | | Digital overlay offers on connected media devices | Evans, David John; Greenway, Thomas; Spicer, Martin Ian |
| GB | 1805114.4 | 9/13/2016 | | | Digital overlay offers on connected media devices | Evans, David John; Greenway, Thomas; Spicer, Martin Ian |
| KR | 10-2018-7010846 | 9/13/2016 | | | Digital overlay offers on connected media devices | Evans, David John; Greenway, Thomas; Spicer, Martin Ian |
| MX | MX/a/2018/003399 | 9/13/2016 | | | Digital overlay offers on connected media devices | Evans, David John; Greenway, Thomas; Spicer, Martin Ian |
| US | 15/130639 | 4/15/2016 | 10075755 | 9/11/2018 | Digital overlay offers on connected media devices | Evans, David John; Greenway, Thomas; Spicer, Martin Ian |
| US | 15/418439 | 1/27/2017 | | | Digital overlay offers on connected media devices | Evans, David John; Greenway, Thomas; Spicer, Martin Ian |
| US | 16/052267 | 8/1/2018 | | | Digital overlay offers on connected media devices | Evans, David John; Greenway, Thomas; Spicer, Martin Ian |

Schedule 2.1(g) - All Patents Patent applications, including the following:

| Country | Appl. No. | Filing Date | Pat. No. | Issue Date | Title | Inventor(s) |
|---|---|---|---|---|---|---|
| WO | PCT/US2016/051532 | 9/13/2016 | | | Digital overlay offers on connected media devices | Evans, David John; Greenway, Thomas; Spicer, Martin Ian |
| US | 15/098135 | 4/13/2016 | 9848235 | 12/19/2017 | Video Fingerprinting Based on Fourier Transform of Histogram | Chen, Juikun |
| US | 15/826044 | 11/29/2017 | | | Video Fingerprinting Based on Fourier Transform of Histogram | Chen, Juikun |
| WO | PCT/US2017/017797 | 2/14/2017 | | | Video Fingerprinting media content using Transform of Histogram | Chen, Juikun |
| US | 15/138678 | 4/26/2016 | 9906831 | 2/27/2018 | Fingerprinting media content using hashing | Chen, Juikun |
| US | 15/886848 | 2/2/2018 | 10116987 | 10/30/2018 | Fingerprinting media content using hashing | Chen, Juikun |
| WO | PCT/US2017/018189 | 2/16/2017 | | | Fingerprinting media content using hashing | Chen, Juikun |
| US | 15/243658 | 8/22/2016 | 10063917 | 8/28/2018 | Fingerprint layouts for content | Chen, Juikun |
| US | 16/035051 | 7/13/2018 | | | Fingerprinting | Chen, Juikun |
| US | 14/881852 | 10/13/2015 | 10194177 | 1/29/2019 | Fingerprint Layouts For Content | Chen, Juikun |
| WO | PCT/US2017/021690 | 3/9/2017 | | | Fingerprint Layouts For Content | Chen, Juikun |
| US | 16/217852 | 12/12/2018 | | | Interweaving Media Content | Andrew L. Ashbacher |
| US | 14/736158 | 6/10/2015 | | | Automatic Content Recognition Search Optimization | William Brimley |
| CN | 201680023388.4 | 4/21/2016 | | | Automatic content recognition fingerprint sequence matching | Chen, Juikun |
| EP | 16783829.1 | 4/21/2016 | | | Automatic content recognition fingerprint sequence matching | Chen, Juikun |
| KR | 10-2017-7033908 | 4/21/2016 | | | Automatic content recognition fingerprint sequence matching | Chen, Juikun |
| JP | P2018-506796 | 4/21/2016 | 6438826 | 12/19/2018 | Automatic contents recognition fingerprints sequence collation | Chen, Juikun |
| US | 14/813416 | 7/30/2015 | | | Automatic Content Recognition with Local Matching | Chen, Juikun |
| WO | PCT/US2016/028583 | 4/21/2016 | | | Automatic content recognition fingerprint sequence matching | Chen, Juikun |

Schedule 2.1(g) - All Patents Patent applications, including the following:

| Country | Appl. No. | Filing Date | Pat. No. | Issue Date | Title | Inventor(s) |
|---|---|---|---|---|---|---|
| CN | 201680023473.0 | 4/25/2016 | | | Automatic content recognition fingerprint sequence matching | Pavel A Koshevoy |
| EP | 16784091.7 | 4/25/2016 | | | Automatic content recognition fingerprint sequence matching | Pavel A Koshevoy |
| WO | PCT/US2016/029221 | 4/25/2016 | | | Automatic content recognition fingerprint sequence matching | Pavel A Koshevoy |
| US | 15/164714 | 5/25/2016 | | | Content Comparison Testing on Linear Media Streams | Grover, Matthew |
| WO | PCT/US2017/016666 | 2/6/2017 | | | Content Comparison Testing on Linear Media Streams | Grover, Matthew |
| US | 15/938049 | 3/28/2018 | | | Interactive Overlays to Determine Viewer Data | Grover, Matthew |
| WO | PCT/US2018/024740 | 3/28/2018 | | | Interactive Overlays to Determine Viewer Data | Grover, Matthew |
| US | 15/938167 | 3/28/2018 | | | Targeted Content Placement Using Overlays | Grover, Matthew |
| WO | PCT/US2018/024756 | 3/28/2018 | | | Targeted Content Placement Using Overlays | Grover, Matthew |
| US | 15/933899 | 3/23/2018 | | | Employing Automatic Content Recognition to Allow Resumption of Watching Interrupted Media Program from Television Broadcast | Grover, Matthew |
| WO | PCT/US2018/024035 | 3/23/2018 | | | Employing Automatic Content Recognition to Allow Resumption of Watching Interrupted Media Program from Television Broadcast | Grover, Matthew |
| US | 15/934753 | 3/23/2018 | 10182263 | 1/15/2019 | Enabling interactive control of live television broadcast streams | Grover, Matthew |
| WO | PCT/US2018/024165 | 3/23/2018 | | | Enabling interactive control of live television broadcast streams | Grover, Matthew |
| US | 15/725260 | 10/4/2017 | | | Obtaining Viewer Demographics Through Advertisement Selections | Richard Smith |
| US | 15/703684 | 9/13/2017 | | | Cold Matching by Automatic Content Recognition | Chen, Juikun |
| WO | PCT/US2018/050230 | 9/10/2018 | | | Cold Matching by Automatic Content Recognition | Chen, Juikun |

Page 5 of 6

Schedule 2.1(g) - All Patents Patent applications, including the following:

| Country | Appl. No. | Filing Date | Pat. No. | Issue Date | Title | Inventor(s) |
|---|---|---|---|---|---|---|
| US | 15/703391 | 9/13/2017 | | | Flagging Advertisement Frames for Automatic Content Recognition | Chen, Juikun |
| WO | PCT/US2018/050184 | 9/18/2018 | | | Flagging Advertisement Frames for Automatic Content Recognition | Chen, Juikun |
| US | 16/023555 | 6/29/2018 | | | Frame Certainty for Automatic Content Recognition | Ashbacher, Andrew L. |
| WO | PCT/US2018/040371 | 6/29/2018 | | | Frame Certainty for Automatic Content Recognition | Ashbacher, Andrew L |
| US | 15/726987 | 10/6/2017 | | | Scene Frame Matching for Automatic Content Recognition | Chen, Juikun |

US 8,296,649 Method, graphical interface and computer-readable medium for generating a preview of a reformatted preview segment

US 7,975,219 Method, graphical interface and computer-readable medium for reformatting data

US 7,885,979 Method, graphical interface and computer-readable medium for forming a batch job

US 7,583,286 System and method for collection and redistribution of video conferences

US 6,909,748 Method and system for image compression using block size heuristics

chedule 2.1(g) - All Software, including the following:

| repo | Name | Project | SM Project | Default Branch | Language | Size | Footprint | LOC |
|---|---|---|---|---|---|---|---|---|
| libbucket | confluence-rest-ruby | | #N/A | master | ruby | 226 | 0.23MB | 291 |
| libbucket | google-calendar-tipchat | | #N/A | master | ruby | 184 | 0.18MB | 449 |
| libbucket | outlook-migration | | #N/A | master | ruby | 266 | 0.20MB | 285 |
| libbucket | release-planner | | #N/A | master | ruby | 222 | 0.41MB | 2,197 |
| libbucket | spark-client-ruby | AA | #N/A | master | ruby | 216 | 0.21MB | 420 |
| libbucket | spark-services-ruby | AA | #N/A | master | ruby | 167 | 0.21MB | 167 |
| libbucket | spark-account-manager-ruby | AA | #N/A | master | ruby | 268 | 0.26MB | 873 |
| libbucket | spark-sd-xide-ruby | AA | #N/A | master | ruby | 328 | 0.32MB | 1,705 |
| libbucket | spark-n-ruby | AA | #N/A | master | ruby | 192 | 0.19MB | 342 |
| libbucket | spark-va-ruby | AA | #N/A | master | ruby | 328 | 0.22MB | 744 |
| libbucket | spark-video-confluence-helper | AA | #N/A | master | ruby | 292 | 0.29MB | 765 |
| libbucket | spark-video-confmarcandi | AA | #N/A | master | ruby | 324 | 0.20MB | 785 |
| libbucket | spark-video-ruby | AA | #N/A | master | python | 19824 | 18.38MB | 8,606 |
| libbucket | acceptance_tests | AP | Ad Suite | master | ruby | 232 | 0.23MB | 537 |
| libbucket | adsmissable-acceptance-tests | AP | Ad Suite | master | ruby | 504412 | 492.59MB | 771,418 |
| libbucket | adsuite_performance_testing | AP | Ad Suite | master | ruby | | 0.23MB | 897 |
| libbucket | adsuite-crowdformation | AP | Ad Suite | master | python | 272 | 0.27MB | 380 |
| libbucket | adsuite_system_tests | AP | Ad Suite | master | nodejs | 464 | 0.27MB | 2,024 |
| libbucket | adsuite-codeformation | AP | Ad Suite | master | ruby | 224 | 0.22MB | 814 |
| libbucket | adsuite-docs | AP | Ad Suite | develop | nodejs | 2252 | 2.20MB | 57,285 |
| libbucket | adsuite-infrastructure | AP | Ad Suite | master | nodejs | 172 | 0.17MB | 281 |
| libbucket | adsuite-log-analyzer | AP | Ad Suite | develop | nodejs | 194 | 0.19MB | |
| libbucket | adsuite-migrations | AP | Ad Suite | master | nodejs | 11338 | 1.07MB | 89,893 |
| libbucket | adsuite-kv-tests | AP | Ad Suite | master | nodejs | 528 | 0.26MB | 1,102 |
| libbucket | adsdata | AP | Ad Suite | master | nodejs | 380 | 0.52MB | 7,770 |
| libbucket | channel-updater | AP | Ad Suite | develop | nodejs | 284 | 0.27MB | 424 |
| libbucket | crackd-importer | AP | Ad Suite | master | ruby | 280 | 0.30MB | 1,343 |
| libbucket | cognitive-app | AP | Ad Suite | master | ruby | 324 | 0.32MB | 1,274 |
| libbucket | dac_schedule_export_cookbook | AP | Ad Suite | master | ruby | 712 | 0.70MB | 1,047 |
| libbucket | dbr-details-export | AP | Ad Suite | develop | nodejs | 204 | 0.20MB | 532 |
| libbucket | demo-nj-setup | AP | Ad Suite | develop | nodejs | 236 | 0.22MB | 848 |
| libbucket | deno-proxy | AP | Ad Suite | master | nodejs | 324 | 0.32MB | 512 |
| libbucket | device-status-page | AP | Ad Suite | develop | javascript | 588 | 1.57MB | 8,276 |
| libbucket | element-table | AP | Ad Suite | master | javascript | 220 | 0.21MB | 686 |
| libbucket | enhage-pre-loader | AP | Ad Suite | develop | nodejs | 184 | 0.18MB | 135 |
| libbucket | graphite-mock | AP | Ad Suite | master | nodejs | 180 | 0.17MB | 35 |
| libbucket | harvesting-dtis | AP | Ad Suite | master | nodejs | 192 | 0.19MB | 35 |
| libbucket | hhn-mock-server | AP | Ad Suite | master | nodejs | 624 | 0.61MB | 9,605 |
| libbucket | indexer-d-n-mock | AP | Ad Suite | master | nodejs | 404 | 0.39MB | 5,392 |
| libbucket | ipanweb-acceptance-tests | AP | Ad Suite | develop | nodejs | 776 | 0.70MB | 4,791 |
| libbucket | ipanweb-metrics-getter | AP | Ad Suite | master | nodejs | 478 | 0.20MB | 234 |
| libbucket | jpolymake-app | AP | Ad Suite | develop | javascript | 224 | 0.22MB | 848 |
| libbucket | js-models | AP | Ad Suite | master | nodejs | 3072 | 3.00MB | 10,150 |
| libbucket | kafka-streams | AP | Ad Suite | master | nodejs | 268 | 0.26MB | |
| libbucket | kpi-dashboard | AP | Ad Suite | develop | other | 1720 | 1.58MB | 19,616 |
| libbucket | lambdas | Don't count | Don't count | develop | javascript | 520 | 0.51MB | 1,266 |
| libbucket | linear-automation | Don't count | Don't count | master | javascript | 466 | 0.45MB | 638 |
| libbucket | linear-infrastructure | Don't count | Don't count | master | ethnol | 348 | 0.34MB | 1 |
| libbucket | linear-portal | Don't count | Ad Suite | develop | nodejs | 6144 | 6.00MB | 81,898 |
| libbucket | linear-system-tests | AP | Ad Suite | develop | other | 146748 | 143.31MB | 504,432 |
| libbucket | linear-toolbox | AP | Ad Suite | master | ruby | 272 | 0.21MB | 164 |
| libbucket | logging-engine | AP | Ad Suite | master | javascript | 244 | 0.23MB | |
| libbucket | nubo | AP | Ad Suite | master | javascript | 248 | 0.24MB | |
| libbucket | oe-chepk-tool | AP | Ad Suite | master | chert | 172 | 0.17MB | |
| libbucket | oe-latency-monitor | AP | Ad Suite | master | javascript | 372 | 0.36MB | 2,705 |
| libbucket | ons_page_objects | AP | Ad Suite | master | ruby | 540 | 0.53MB | 4,504 |
| libbucket | open-sans-wolf | AP | Ad Suite | develop | javascript | 2758 | 2.69MB | 5,053 |
| libbucket | overlay | AP | Ad Suite | develop | nodejs | 452 | 0.44MB | 2,089 |
| libbucket | overlay-automation | AP | Ad Suite | develop | nodejs | 834 | 0.86MB | 2,323 |
| libbucket | overlay-creatives | AP | Ad Suite | develop | javascript | 116512 | 0.31MB | 1,728 |
| libbucket | overlay-demo | AP | Ad Suite | develop | nodejs | 74384 | 74.39MB | 238,609 |
| libbucket | overlay-engine | AP | Ad Suite | develop | javascript | 84384 | 84.43MB | 290,096 |
| libbucket | overlay-managemal-system | AP | Ad Suite | develop | javascript | 14356 | 14.02MB | 33,848 |
| libbucket | overlay-management-system-eis | AP | Ad Suite | master | javascript | 24320 | 23.75MB | 620,938 |
| libbucket | overlay-system-status-page | AP | Ad Suite | develop | nodejs | 452 | 0.44MB | |
| libbucket | performance-dashboard | AP | Ad Suite | develop | nodejs | 116512 | 113.78MB | 70,635 |
| libbucket | performance_tests | AP | Ad Suite | master | nodejs | 239512 | 238.52MB | 239,660 |
| libbucket | phoneconfig-creatives | AP | Ad Suite | develop | nodejs | 98484 | 96.64MB | 84,744 |
| libbucket | presd_system_tests | AP | Ad Suite | develop | ruby | 47504 | 46.78MB | 815,492 |
| libbucket | samsung-h3-test | AP | Ad Suite | develop | nodejs | 426632 | 416.63MB | 1,650MB |
| libbucket | samsungatesuite | AP | Ad Suite | develop | ruby | 1688 | 1.65MB | 18,774 |

| Projects | Num Repositories | Total Footprint | Total LOC |
|---|---|---|---|
| Account Manager | 2 | 13.68MB | 105,504 |
| Ad Suite | 67 | 1,664.33MB | 3,690,768 |
| CEH | 13 | 286.84MB | 420,768 |
| CEH Integration | 5 | 432.24MB | 1,536,675 |
| Core CoTerl | 10 | 343.10MB | 343,103 |
| DMP | 17 | 351.50MB | 1,577,283 |
| DMP Analytics | 26 | 27.45MB | 295,820 |
| Engine | 36 | 931.32MB | 1,605,750 |
| QA | 22 | 45.69MB | 430,728 |
| Spark Analytics | 41 | 131.79MB | 1,486,492 |
| Spark Core | 29 | 788.84MB | 1,874,292 |
| Spark Plug | 25 | 1,319.70MB | 721,356 |
| Spark Video | 25 | 3,527.89MB | 1,411,443 |
| User Interface | 24 | 84.99MB | 580,726 |
| Grand Total | 327 | 9,522.71MB | 16,041,900 |

Marked some items as "Don't count"
Many of the "tests" repos contain large generated test files

| Owner | Repository | Group | Category | Branch | Language | Count | Size | Lines |
|---|---|---|---|---|---|---|---|---|
| bitbucket | schedule-mock | AP | Ad Suite | develop | nodejs | 332 | 0.32MB | 1,735 |
| bitbucket | smalls-utils | AP | Ad Suite | develop | javascript | 378 | 0.37MB | 3,003 |
| bitbucket | sonsrison_selenium_helper | AP | Ad Suite | master | ruby | 340 | 0.33MB | 1,463 |
| bitbucket | spark-core-manual-ingestion-mock | AP | Ad Suite | develop | nodejs | 234 | 0.20MB | 1,701 |
| bitbucket | spark-core-enhance-tests | AP | Ad Suite | develop | ruby | 737304 | 7080MB | 1,149,131 |
| bitbucket | ssp-rules-evaluator | AP | Ad Suite | master | nodejs | 380 | 0.35MB | 3,043 |
| bitbucket | system-test-mock-server | AP | Ad Suite | develop | nodejs | 198 | 0.19MB | 259 |
| bitbucket | system-tests-indexer-mock | AP | Ad Suite | develop | nodejs | 204 | 0.20MB | 213 |
| bitbucket | temp-terraform-workshop | AP | Ad Suite | 2 | shell | 172 | 0.17MB | 122 |
| bitbucket | temporary-report-scripts | AP | Ad Suite | master | nodejs | 198 | 0.19MB | 431 |
| bitbucket | tin-balancer-suite | AP | Ad Suite | master | nodejs | 226 | 0.22MB | 431 |
| bitbucket | test-data-generator | AP | Ad Suite | develop | nodejs | 272 | 0.27MB | 1,434 |
| bitbucket | tv-test-harness | AP | Ad Suite | develop | nodejs | 296 | 0.29MB | 365 |
| bitbucket | uk-grid-project | AP | Ad Suite | master | ruby | 200 | 0.20MB | 948 |
| bitbucket | uk-codebooks | AP | Ad Suite | master | ruby | 1416 | 1.38MB | 4,919 |
| bitbucket | vu-codebooks | AP | Ad Suite | master | ruby | 184 | 0.18MB | 149 |
| bitbucket | winston-chill | CC | Core Control | master | javascript | 1250460 | 1230MB | 214,288 |
| bitbucket | anable-playbooks | CC | Core Control | master | | 3492 | 3.80MB | 10,138 |
| bitbucket | build-docker | CC | Core Control | master | | 640 | 0.63MB | 4,143 |
| bitbucket | cemi-asbuise-asset | CC | Core Control | master | | 296 | 0.28MB | 979 |
| bitbucket | cemi-asbuise-build-docker | CC | Core Control | master | | 284 | 0.26MB | 572 |
| bitbucket | cemi-assbuite-proxy | CC | Core Control | master | | 12480 | 12.20MB | 56,674 |
| bitbucket | cemi-bot-log | CC | Core Control | master | | 15008 | 14.95MB | 53,393 |
| bitbucket | cemi-core-client | CC | Core Control | develop | nodejs | 452 | 0.44MB | 2,834 |
| bitbucket | cemi-conserver-docker | CC | Core Control | master | | 316 | 0.31MB | 848 |
| bitbucket | cemi-library | CC | Core Control | master | | 280 | 0.27MB | 895 |
| bitbucket | cemi-oventry | CC | Core Control | master | | 316 | 0.31MB | 948 |
| bitbucket | cemi-semirassdsvite | CC | Core Control | master | python | 34340 | 33.54MB | 101,622 |
| bitbucket | devops-scripts | CC | Core Control | master | | 851212 | 845.71MB | 1,343,365 |
| bitbucket | owl | CEM | CEM Integration | master | | 188 | 0.18MB | 85 |
| bitbucket | tims | CEM | CEM Integration | master | | 224 | 0.21MB | 754 |
| bitbucket | best_fit_audio_classifier_poc | CEM | CEM Integration | master | ruby | 26984 | 25.33MB | 287,560 |
| bitbucket | build-core-xv-fsert | CEM | CEM Integration | master | | 148464 | 141.50MB | 228,273 |
| bitbucket | build-core-openssl-docker | CEM | CEM Integration | master | c++ | 852424 | 832.45MB | 1,604,553 |
| bitbucket | build-core-xv-serial-docker | Don't count | #N/A | master | | 192 | 0.19MB | 288 |
| bitbucket | cassandra-benchmark | CEM | CEM Integration | master | | 172 | 0.16MB | 312 |
| bitbucket | cem-toolchains | CEM | CEM Integration | develop | | 452 | 0.44MB | 2,094 |
| bitbucket | cemi-core-client | CEM | CEM Integration | master | nodejs | 1496 | 1.46MB | 7,396 |
| bitbucket | core-common | Don't count | #N/A | master | javascript | 61600 | 60.16MB | 316,119 |
| bitbucket | core-client | CEM | CEM Integration | master | python | 113000 | 110.35MB | 379,190 |
| bitbucket | core-cnfra-interview | CEM | CEM Integration | master | | 256 | 0.25MB | 575 |
| bitbucket | core-cnfra-test | CEM | CEM Integration | master | | 222030 | 217.54MB | 534,427 |
| bitbucket | core-js | CEM | CEM Integration | master | shell | 256 | 0.25MB | 407 |
| bitbucket | core-oventry | CEM | CEM Integration | master | c++ | 176 | 0.17MB | 73 |
| bitbucket | cemi-semirassdsvite | Don't count | #N/A | master | | 179 | 0.17MB | 54 |
| bitbucket | core-server-common | Don't count | #N/A | master | | 256 | 0.23MB | 41 |
| bitbucket | core-server | CORE | Spark Core | master | go | 176 | 0.17MB | 482 |
| bitbucket | core-vcr | CORE | Spark Core | develop | | 2907592 | 2848.49MB | 5,250,308 |
| bitbucket | etete | Don't count | #N/A | master | | 224 | 0.22MB | 398 |
| bitbucket | dns | CORE | Spark Core | master | | 145108 | 141.71MB | 229,374 |
| bitbucket | events | CORE | Spark Core | develop | c++ | 548 | 0.54MB | 3,855 |
| bitbucket | empty_firstsgare | CORE | Spark Core | master | | 8324 | 8.13MB | 28,110 |
| bitbucket | pipeline_test | CORE | Spark Core | master | go | 148400 | 142.99MB | 440,577 |
| bitbucket | pid | CORE | Spark Core | develop | python | 300 | 0.29MB | 733 |
| bitbucket | piki-chef | CORE | Spark Core | master | | 180 | 0.18MB | 31 |
| bitbucket | role-server | CORE | Spark Core | master | go | 4124 | 4.03MB | 30,838 |
| bitbucket | samsung-code | CORE | Spark Core | master | | 172 | 0.17MB | 44 |
| bitbucket | spark-common-cf | CORE | Spark Core | master | go | 528 | 0.52MB | 3,567 |
| bitbucket | spark-core-chef | CORE | Spark Core | develop | python | 10948 | 10.69MB | 73,514 |
| bitbucket | spark-core-incluster | CORE | #N/A | master | | 268 | 0.27MB | 970 |
| bitbucket | spark-comr-ctrsy1d-docker | CORE | Spark Core | master | c++ | 434624 | 424.63MB | 1,518,285 |
| bitbucket | spark-core-crtsy14s-docker | CORE | Spark Core | master | ruby | 132 | 0.19MB | 69 |
| bitbucket | spark-core-research | CORE | Spark Core | master | | 716 | 0.70MB | 2,986 |
| bitbucket | | CORE | Spark Core | master | gp | 296 | 0.28MB | 875 |
| bitbucket | | CORE | Spark Core | master | gp | 7036 | 6.87MB | 21,419 |
| bitbucket | | CORE | Spark Core | master | c++ | 7652 | 7.45MB | 22,167 |
| bitbucket | | CORE | Spark Core | master | | 177472 | 173.31MB | 2,833,047 |
| bitbucket | | CORE | Spark Core | master | | 443 | 0.44MB | 7,550 |
| bitbucket | | CORE | Spark Core | master | | 1058 | 1.04MB | 7,283 |
| bitbucket | | CORE | Spark Core | stage | | 31468 | 30.73MB | 61,524 |
| bitbucket | | CORE | Spark Core | master | | 478928 | 467.70MB | 880,026 |
| bitbucket | | CORE | #N/A | master | | 479568 | 468.32MB | 883,215 |
| bitbucket | spark-core-research | CORE | #N/A | master | | 1772 | 1.73MB | 14,403 |

| Repo | Name | Type | | #N/A | Branch | Lang | Count | Size | Count2 |
|---|---|---|---|---|---|---|---|---|---|
| lsbucket | spark-core-terraform | CORE | | | master | | 160 | 0.18MB | 38 |
| lsbucket | spark-core-testing | CORE | | | master | | 772 | 0.75MB | 5,645 |
| lsbucket | spark-core-t2dpen16-docker | CORE | Spark Core | #N/A | master | c++ | -89888 | 165.91MB | 358,026 |
| lsbucket | spark-core-t2dpen16-docker | Don't count | Spark Core | #N/A | master | | 685124 | 645.71MB | 1,343,652 |
| lsbucket | spark-core-t2dpen16-docker | Don't count | | #N/A | master | | 685124 | 494.75MB | 1,112,341 |
| lsbucket | spark-core-t2dpen17-docker | CORE | | #N/A | master | | 224380 | 219.10MB | 580,571 |
| lsbucket | spark-core-docs | CORE | | #N/A | master | | 38632 | 35.77MB | 85,184 |
| lsbucket | spark-plug | CORE | | #N/A | master | | 269104 | 251.82MB | 537,926 |
| lsbucket | spark-plug-build | CORE | | #N/A | master | | 441775 | 431.42MB | 614,664 |
| lsbucket | tizen2015_firstzone | CORE | | #N/A | master | | 466224 | 455.30MB | 445,834 |
| lsbucket | tizen2015_buildzone | Don't count | | #N/A | master | | 359280 | 328.98MB | 611,344 |
| lsbucket | tizen2017_buildzone | Don't count | | #N/A | master | | 192 | 0.23MB | 233 |
| lsbucket | tizen2017_firstzone | Don't count | | #N/A | master | | 184 | 0.19MB | 181 |
| lsbucket | depvi2 | CORE | | #N/A | master | | 184 | 0.18MB | 185 |
| lsbucket | dpm-impressions | DA | | #N/A | master | | 238 | 0.23MB | 104 |
| lsbucket | dpm-reporting | DA | | #N/A | master | | 175 | 0.17MB | 924 |
| lsbucket | dar-schedule | DA | | #N/A | master | | 232 | 0.25MB | 8 |
| lsbucket | dar-reporting | DA | | #N/A | master | | 172 | 0.17MB | 8 |
| lsbucket | dar-utils | DA | | #N/A | master | | | | |
| lsbucket | stas-ramficups | DA | | #N/A | master | | | | |
| lsbucket | network-keys | DM | | #N/A | master | | | | |
| lsbucket | dmm-api | DM | | #N/A | master | | 78916 | 77.07MB | 154,006 |
| lsbucket | broadcaster-log-processing | DP | DMP | #N/A | master | | 389 | 0.38MB | 1,098 |
| lsbucket | dmp-cookbooks | DP | DMP | #N/A | master | | 444 | 0.43MB | 1,144 |
| lsbucket | msdm-cloud | DP | DMP | #N/A | master | | 796 | 0.78MB | 820 |
| lsbucket | nxsm-migrations | DP | DMP | #N/A | master | python | 700 | 0.88MB | 12,708 |
| lsbucket | schedule-api | DP | DMP | #N/A | master | | 207872 | 233.00MB | 1,030,480 |
| lsbucket | surimer-cloud | DP | DMP | #N/A | master | python | 916 | 1.04MB | 4,242 |
| lsbucket | surimer-containers | DP | DMP | #N/A | master | | 1064 | 0.89MB | 5,291 |
| lsbucket | surimer-testing | DP | | #N/A | master | | 400 | 0.40MB | 2,760 |
| lsbucket | surimer-works | DP | | #N/A | master | | 1980 | 1.90MB | 15,409 |
| lsbucket | terraform-aws-broadcaster-data-api | DP | | #N/A | master | | 1320 | 1.29MB | 8,399 |
| lsbucket | hvdb-database-api | DP | | #N/A | master | | 364 | 0.38MB | 2,760 |
| lsbucket | hvdb-samsung-iponweb-migrations | DP | | #N/A | master | | 755 | 0.74MB | 3,027 |
| lsbucket | hvdb-samsung-iponweb-migrations | DP | | #N/A | master | | 34632 | 33.82MB | 272,561 |
| lsbucket | hvdb-samsung-iponweb-reporting-migrations | DP | | #N/A | master | | | | |
| lsbucket | hvdb-samsung-iponweb-performance-task-list | DP | | #N/A | master | go | | | |
| lsbucket | hvdb-testing-system-python | DP | | #N/A | master | python | 3389 | 0.99MB | 882,928 |
| lsbucket | hvdb-deploy | DP | DMP | #N/A | master | scala | 1012 | 0.99MB | 2,949 |
| lsbucket | bi-gpib-director | DPI | DMP | #N/A | master | | -68132 | 154.19MB | 15,007 |
| lsbucket | cbd-tunnel-singular | DPI | DMP | #N/A | master | | 1855800 | 1812.08MB | 12 |
| lsbucket | dp_source | DPI | DMP | #N/A | master | | -39592 | 127.52MB | 32,230 |
| lsbucket | dpi-apps | DPI | DMP | #N/A | master | | 7284 | 7.11MB | 37,230 |
| lsbucket | dpi-demo | DPI | DMP | #N/A | master | | 1464 | 1.43MB | 7,500 |
| lsbucket | dpi-gyb-symbols | DPI | DMP | #N/A | master_temp | | 650680 | 835.43MB | 191,204 |
| lsbucket | adsi-lhesir-air-report | DT | | #N/A | master | | 4080 | 4.59MB | 12,326 |
| lsbucket | audience_sizing | DT | | #N/A | master | | 172 | 0.17MB | 603 |
| lsbucket | boxsoldata-event-root | DT | | #N/A | master | | 212 | 0.21MB | 115 |
| lsbucket | dar_success_fridays | DT | | #N/A | master | | 8824 | 6.98MB | 75,386 |
| lsbucket | dma_tableau_snapshot | DT | | #N/A | master | | 428 | 0.40MB | 2,060 |
| lsbucket | dt-323-exsid-p-gmo-bannisi-cms-state | DT | | #N/A | master | | -43456 | 98.42MB | 202,276 |
| lsbucket | experiandeqcombo | DT | | #N/A | master | | -38060 | 140.05MB | 279,473 |
| lsbucket | experianspark | DT | | #N/A | master | | 2203 | 2.15MB | 265,016 |
| lsbucket | experianspecification | DT | | #N/A | master | | 180 | 0.16MB | 54 |
| lsbucket | gift-resin-schedule-de-move | DT | | #N/A | master | | 1490016 | 1459.00MB | 6,797,470 |
| lsbucket | hsparsi-cdemgnshahbeakkdown | DT | | #N/A | master | | 3327 | 3227.48MB | 64 |
| lsbucket | homeord_investigation | DT | | #N/A | master | | 4626 | 4.55MB | 12,626 |
| lsbucket | impressions_unload | DT | | #N/A | master | | 9128 | 5.91MB | 15,934 |
| lsbucket | kemo_share_drop_investigation | DT | | #N/A | master | | 7828 | 7.45MB | 81,906 |
| lsbucket | non_exploded_share | DT | | #N/A | master | | 27216 | 26.58MB | 48,551 |
| lsbucket | refigs_phase_3 | DT | | #N/A | master | | 594 | 0.50MB | 3,478 |
| lsbucket | rafingsrefinement | DT | | #N/A | master | | 450 | 0.36MB | 269,190 |
| lsbucket | reports | DT | | #N/A | master | | 80924 | 78.93MB | 6,256 |
| lsbucket | samsung_lp_ifesjan_analysis | DT | | #N/A | master | | 292 | 0.29MB | 239,463 |
| lsbucket | share-stizomg-analysis | DT | | #N/A | master | | | | 917 |
| lsbucket | sorenson | DT | | #N/A | master | | 172 | 0.17MB | 46,328,812 |
| lsbucket | tms_processing | DT | | #N/A | master | | 2564 | 2.57MB | 12,626 |
| lsbucket | tms_vizio_experian_game_exploration | DT | | #N/A | master | | 316 | 0.36MB | 52,694 |
| lsbucket | tresolleation | DT | | #N/A | master | | 3357856 | 3278.56MB | 22,143 |
| lsbucket | typical_viewer_behaviour | DT | | #N/A | master | | 34808 | 33.95MB | 171,734 |
| lsbucket | videogameexdatecramieiacount | DT | | #N/A | master | | 1324 | 1.29MB | 2,075 |
| lsbucket | vizio-data-daily-inttsari-viewsenip | DT | | #N/A | master | | 82312 | 80.38MB | 158,169 |
| lsbucket | | | | | | | 9844 | 3.85MB | 7,628 |
| lsbucket | | | | | | | 200 | 0.20MB | 852 |

| Org | Repository | Cat | Sub | Branch | Extra | Lang | # | Size | LOC |
|---|---|---|---|---|---|---|---|---|---|
| itbucket | elastic_search_api_soak | EN | N/A | master | | | 172 | 0.17MB | 28 |
| itbucket | engine-elastic-logging-api | EN | N/A | master | | | 424 | 0.41MB | 1,085 |
| itbucket | engine-cluster-scm-rpi | EN | N/A | master | | | 5100 | 4.98MB | 53,598 |
| itbucket | engine-manager | EN | N/A | master | | | 224 | 1.27MB | 446 |
| itbucket | elastic-rock-plugins | EN | N/A | master | ETETT5-Core_Plugin | | 1304 | 1.27MB | 935 |
| itbucket | engine-update-service | EN | N/A | master | | | 935 | 0.17MB | 28 |
| itbucket | hardware-monitor | EN | N/A | master | | | 172 | 0.17MB | 7 |
| itbucket | idex_recorder | EN | N/A | master | | | 200 | 0.20MB | 311 |
| itbucket | resource_monitor | EN | N/A | master | | | 336 | 0.33MB | 1,083 |
| itbucket | simple_server | EN | N/A | master | | | 203 | 0.20MB | 411 |
| itbucket | soak-logstash | EN | N/A | master | SOAK_LOGSTASH_SETUP | | 248 | 0.24MB | 844 |
| itbucket | bamboo-downloader | EN | N/A | master | | | 212 | 0.21MB | 243 |
| itbucket | blueldp4444-support | EN | N/A | master | | | 75564 | 73.79MB | 155,059 |
| itbucket | engine-docker | EN | N/A | master | | | 208 | 0.20MB | 196 |
| itbucket | engine-elastic-assets | ENGINE | Engine | master | | | 1571503 | 1534.68MB | 2,966,894 |
| itbucket | engine-elastic-dispatcher | ENGINE | Engine | master | | | 84008 | 82.04MB | 726,009 |
| itbucket | engine-module-config-watcher | ENGINE | Engine | master | | | 212 | 0.21MB | 379 |
| itbucket | engine-testing | ENGINE | Engine | master | | shell | 400 | 0.39MB | 1,871 |
| itbucket | elefe-api | ENGINE | Engine | master | | git | 2204 | 2.15MB | 12,558 |
| itbucket | elefe-sdk-api | ENGINE | Engine | master | | | 358316 | 349.82MB | 342,892 |
| itbucket | inscape-app-plugin | ENGINE | Engine | master | | | 312 | 0.30MB | 12,354 |
| itbucket | json-sprint | ENGINE | Engine | master | | | 4036 | 3.54MB | 12,354 |
| itbucket | libzorin-indexer | ENGINE | Engine | master | | | 31212 | 30.40MB | 3,466 |
| itbucket | sensor-core-plugin | ENGINE | Engine | master | | | 3448 | 3.79MB | 10,924 |
| itbucket | sorensor-engine | ENGINE | Engine | master | | | 1948 | 1.22MB | 694 |
| itbucket | sorensor-core-plugin | ENGINE | Engine | master | | | 268 | 0.26MB | 47,446 |
| itbucket | spark-video-plugin | ENGINE | Engine | master | | | 8132 | 5.59MB | 10,962 |
| itbucket | basesquarepp | ENGINE | Engine | master | | | 836 | 0.91MB | 233,189 |
| itbucket | thirdparty | ENGINE | Engine | develop | | | 10868 | 10.96MB | 753,131 |
| itbucket | harvester_file_watcher | BNL | N/A | master | Harvester=File_Watcher | c++ | 180088 | 168.92MB | 286,204 |
| itbucket | harvester_uploader | BNL | N/A | master | | c++ | 358988 | 383.81MB | 188 |
| itbucket | engine-updater | ENU | Engine | master | | | 388 | 0.21MB | 383 |
| itbucket | engine-scripts | ENU | Engine | master | | | 218 | 0.21MB | 331 |
| itbucket | engine-logstash | ENU | Engine | master | logstash_poc | ruby | 276 | 0.22MB | 542 |
| itbucket | masteer | ENU | Engine | develop | | | 224 | 0.23MB | 385 |
| itbucket | python-scm-recorder | ENU | Engine | master | | | 256 | 0.27MB | 210 |
| itbucket | videochat | ENU | Engine | master | | | 196 | 0.15MB | 865 |
| itbucket | accounts-association-user-get | FDN | N/A | master | | nodejs | 228 | 0.22MB | 326 |
| itbucket | accounts-association-user-update | FDN | N/A | master | | | 204 | 0.19MB | 395 |
| itbucket | ad-harvesting-kidsutils | FDN | N/A | master | | | 212 | 0.21MB | 803 |
| itbucket | analytics_node-js_server | FDN | N/A | master | | nodejs | 172 | 0.19MB | 1,108 |
| itbucket | analytics-dynamo-export | FDN | N/A | master | | | 294 | 0.29MB | 11 |
| itbucket | analytics-sqs-consumer | FDN | N/A | master | | nodejs | 172 | 0.17MB | 221 |
| itbucket | analytics-sqs-worker | FDN | N/A | master | | nodejs | 204 | 0.20MB | 64 |
| itbucket | analytics-transfing-export | FDN | N/A | master | | nodejs | 180 | 0.18MB | 140 |
| itbucket | artifovdb-scripts | FDN | N/A | master | | | 198 | 0.19MB | 4,770 |
| itbucket | baozon-proximity-demo | FDN | N/A | master | | android | 172 | 0.17MB | 865 |
| itbucket | cloud_formation_script | FDN | N/A | master | | | 252 | 0.25MB | 210 |
| itbucket | conversion-snap-export | FDN | N/A | master | | nodejs | 258 | 0.25MB | 542 |
| itbucket | coupon-delivery-engine | FDN | N/A | master | | nodejs | 212 | 0.21MB | 326 |
| itbucket | coupons-web-client | FDN | N/A | master | | javascript | 232 | 0.23MB | 995 |
| itbucket | discovery-elb-controller | FDN | N/A | master | | | 184 | 0.18MB | 134 |
| itbucket | elastic-search-setup | FDN | N/A | master | | | 276 | 0.27MB | |
| itbucket | etheros33rparty lib | FDN | N/A | master | | | 40720 | 38.77MB | 801,734 |
| export-integration-tata-b-elastic-search | | FDN | N/A | master | | | 2648 | 2.59MB | 6,459 |
| itbucket | foundry-analytics-scale-sqs-consumer | FDN | N/A | master | | | 2408 | 2.33MB | 21,378 |
| itbucket | foundry-analytics-tracking-pixel | FDN | N/A | master | | | 280 | 0.28MB | 1,822 |
| itbucket | foundry-core-client | FDN | N/A | master | | | 188 | 0.19MB | 6,724 |
| itbucket | foundry-scripts | FDN | N/A | master | | | 456 | 0.48MB | 2,140 |
| itbucket | foundry-vcdb-cloudformation | FDN | N/A | master | | | 15238 | 14.93MB | 156,465 |
| itbucket | foundry-vcdb-ed | FDN | N/A | master | | | 12438 | 17.59MB | 147,855 |
| itbucket | foundry-vcdb-formations | FDN | N/A | master | | | 492 | 1.28MB | 3,063 |
| itbucket | foundry-vcdb-migrations | FDN | N/A | master | | | 198 | 0.29MB | 1,222 |
| itbucket | foundry-vcdb-utils | FDN | N/A | master | | | 448400 | 141.41MB | 227,733 |
| itbucket | google-away-bos-pending-lambda | FDN | N/A | master | | nodejs | 200 | 0.20MB | 223 |
| itbucket | gmlab-cdn-root | FDN | N/A | master | | | 204 | 0.20MB | 438 |
| gmlab-alexa | | FDN | #N/A | master | | | | | |
| gmlab-analytics | | FDN | #N/A | master | | java | | | |
| gmlab-android | | FDN | #N/A | master | | android | | | |
| gmlab-brain | | FDN | #N/A | master | | nodejs | | | |
| gmlab-composite-io-composer | | FDN | #N/A | master | | | | | |

| Bucket | Repo | Team | | Branch | Language | Count | Size | Lines |
|---|---|---|---|---|---|---|---|---|
| itbucket | grabh-cookbooks | FOUN | #N/A | master | ruby | 1652 | 1.81MB | 11,027 |
| itbucket | grabh-demo-overlays | FOUN | #N/A | master | htmlcss | 2208 | 2.16MB | 10,505 |
| itbucket | grabh-dynamodb-export | FOUN | #N/A | master | nodejs | 228 | 0.22MB | 777 |
| itbucket | grabh-engine-integration-export | FOUN | #N/A | master | nodejs | 1430 | 1.40MB | 21,091 |
| itbucket | grabh-engine-request-module | FOUN | #N/A | master | nodejs | 1184 | 1.14MB | 19,738 |
| itbucket | grabh-gqrpc-service | FOUN | #N/A | master | javascript | 30428 | 28.71MB | 185,058 |
| itbucket | grabh-gqrpc-services | FOUN | #N/A | master | javascript | 868 | 0.85MB | 11,102 |
| itbucket | grabh-models | FOUN | #N/A | master | nodejs | 596 | 0.58MB | 7,224 |
| itbucket | grabh-parse-service | FOUN | #N/A | master | javascript | 340 | 0.33MB | 1,931 |
| itbucket | grabh-pixel-tracker | FOUN | #N/A | master | nodejs | 220 | 0.21MB | 461 |
| itbucket | grabh-subcd-composer | FOUN | #N/A | master | javascript | 250 | 0.20MB | 234 |
| itbucket | grabh-subcd-services | FOUN | #N/A | master | javascript | 296 | 0.29MB | 876 |
| itbucket | grabh-utils | FOUN | #N/A | master | nodejs | 360 | 0.35MB | 2,487 |
| itbucket | harp-step-functions | FOUN | #N/A | master | javascript | 400 | 0.39MB | 5,276 |
| itbucket | harvester-api | FOUN | #N/A | master | nodejs | 472 | 0.46MB | 3,845 |
| itbucket | image-optimisation | FOUN | #N/A | master | nodejs | 324 | 0.32MB | 1,078 |
| itbucket | insight-audiocsamplifier/ingestionservice | FOUN | #N/A | master | csf | 1403 | 1.38MB | 14,898 |
| itbucket | insight-datastream | FOUN | #N/A | master | csf | 694 | 0.67MB | 6,407 |
| itbucket | insight-fpmatbourtservice | FOUN | #N/A | master | csf | 1860 | 1.84MB | 20,678 |
| itbucket | insight-fpwell | FOUN | #N/A | master | java | 672 | 0.66MB | 9,142 |
| itbucket | insight-fpmetaservice | FOUN | #N/A | master | asp | 24650 | 23.89MB | 201,289 |
| itbucket | insight-metadashboard | FOUN | #N/A | master | asp | 42712 | 41.71MB | 400,199 |
| itbucket | insight-sprmhost | FOUN | #N/A | master | java | 36284 | 35.43MB | 345,686 |
| itbucket | insight-screening | FOUN | #N/A | master | csf | 604 | 0.59MB | 1,... |
| itbucket | insight-scrapting | FOUN | #N/A | master | csf | 2864 | 2.78MB | 19,652 |
| itbucket | insight-surveyadmin | FOUN | #N/A | master | csf | 3760 | 3.67MB | 51,041 |
| itbucket | insight-surveydashboard | FOUN | #N/A | master | csf | 14028 | 13.70MB | 111,776 |
| itbucket | insight-surveypage | FOUN | #N/A | master | csf | 40086 | 39.73MB | 189,526 |
| itbucket | insight-surveyplatform | FOUN | #N/A | master | csf | 18024 | 17.80MB | 86,518 |
| itbucket | insight-surveymodel | FOUN | #N/A | master | csf | 31448 | 31.41MB | 52,278 |
| itbucket | insight-surveyservice | FOUN | #N/A | master | csf | 1176 | 1.15MB | 16,478 |
| itbucket | insight-systemmonitor | FOUN | #N/A | master | csf | 1624 | 1.59MB | 63,668 |
| itbucket | ibatebuilds-kbs | FOUN | #N/A | master | csf | 6832 | 6.67MB | 5,057 |
| itbucket | ibatebuilds | FOUN | #N/A | master | android | 1588 | 1.55MB | 16,322 |
| itbucket | mylife | FOUN | #N/A | master | csf | 3948 | 3.76MB | 430,389 |
| itbucket | loading_agent | FOUN | #N/A | master | objective-c | 11034 | 10.75MB | 107,998 |
| itbucket | overlay-organisation-association-service | FOUN | #N/A | master | nodejs | 255 | 0.25MB | 557 |
| itbucket | parse-export-lambda | FOUN | #N/A | master | nodejs | 152 | 0.19MB | 220 |
| itbucket | paperwhole | FOUN | #N/A | master | javascript | 944 | 0.92MB | 4,270 |
| itbucket | platform_japs | FOUN | #N/A | master | nodejs | 598532 | 582.96MB | 147,630 |
| itbucket | playdough | FOUN | #N/A | master | javascript | 420156 | 410.31MB | 362,199 |
| itbucket | rewards-android-client | FOUN | #N/A | master | android | 804 | 0.79MB | 12,625 |
| itbucket | rewards-ios-client | FOUN | #N/A | master | other | 124430 | 118.05MB | 785,109 |
| itbucket | rewards-lambda | FOUN | #N/A | master | javascript | 319176 | 311.70MB | 285,650 |
| itbucket | rewards-parse-dashboard | FOUN | #N/A | master | javascript | 372 | 0.36MB | 1,578 |
| itbucket | rewards-parse-server | FOUN | #N/A | master | javascript | 512 | 0.50MB | 3,689 |
| itbucket | rewards-trending-google-analytics | FOUN | #N/A | master | kotlin | 3480 | 3.35MB | 2,367 |
| itbucket | rewards-web-client | FOUN | #N/A | master | typescript | 19544 | 18.58MB | 94,494 |
| itbucket | tibkit | FOUN | #N/A | master | typescript | 18676 | 18.14MB | 65,018 |
| itbucket | tibkit_dependencies | FOUN | #N/A | master | nodejs | 62048 | 60.79MB | 435,268 |
| itbucket | tibkit_snapshots | FOUN | #N/A | master | python | 172 | 0.17MB | 1 |
| itbucket | savel-demo-service | FOUN | #N/A | master | htmlcss | 3925188 | 3833.19MB | 742,752 |
| itbucket | temporal-engine | FOUN | #N/A | master | javascript | 188 | 0.18MB | 1 |
| itbucket | temporal-result-client | FOUN | #N/A | master | nodejs | 384 | 0.37MB | 1,506 |
| itbucket | testrepo | FOUN | #N/A | master | nodejs | 654 | 0.63MB | 17,382 |
| itbucket | universal-spike | FOUN | #N/A | master | typescript | 1544 | 1.51MB | 3,380 |
| itbucket | vagrant_script_ansible | FOUN | #N/A | master | | 232 | 0.23MB | 228 |
| itbucket | valoss-response-lambda | FOUN | #N/A | master | | 188 | 0.19MB | 318 |
| itbucket | victory-onsystem-lambda | FOUN | #N/A | master | | 1896 | 1.68MB | 657 |
| itbucket | website-sitemap-generator | FOUN | #N/A | master | | 244 | 0.24MB | 14 |
| itbucket | ctovreport | LAMMY | #N/A | master | | 176 | 0.17MB | 771 |
| itbucket | adops-tools | OPS | #N/A | master | | 800 | 0.59MB | 7,783 |
| itbucket | avail_reporting | OPS | #N/A | master | | 224 | 0.22MB | 422 |
| itbucket | awstagger | OPS | #N/A | master | | 288 | 0.26MB | 1,760 |
| itbucket | bamboo-scripts | OPS | #N/A | master | | 172 | 0.17MB | 132 |
| itbucket | bbb | OPS | #N/A | master | | 400 | 0.39MB | 5,905 |
| itbucket | datatracker | OPS | #N/A | master | | 10898 | 10.64MB | 40,868 |
| itbucket | deploy-source | OPS | #N/A | master | | | | |
| itbucket | devops-tools | OPS | #N/A | master | | | | |
| icinga | icinga | OPS | #N/A | master | | 1854 | 1.82MB | 30,140 |
| icinga2 | icinga2 | OPS | #N/A | master | | 444 | 0.43MB | 1,673 |

| Repo | Name | Cat | Type | Branch | Lang | | Size | |
|---|---|---|---|---|---|---|---|---|
| itbucket | icinga2-checks | OPS | #N/A | master | python | 192 | 0.19MB | 167 |
| itbucket | k8s-configs | OPS | #N/A | master | | 1052 | 1.01MB | 6,666 |
| itbucket | monitoring_tools | OPS | #N/A | master | | 288 | 0.28MB | 1,284 |
| itbucket | net-debug | OPS | #N/A | master | | 240 | 0.23MB | 861 |
| itbucket | ops-automation | OPS | #N/A | master | | 1870 | 1.80MB | 24,490 |
| itbucket | ops-cookbooks | OPS | #N/A | master | | 2038 | 2.04MB | 12,498 |
| itbucket | ops-elasticstart | OPS | #N/A | master | | 172 | 0.17MB | 1 |
| itbucket | ops-monitoring-scripts | OPS | #N/A | master | | 164 | 0.18MB | 98 |
| itbucket | ops-portal | OPS | #N/A | master | | 24624 | 24.05MB | 206,889 |
| itbucket | ops-scripts | OPS | #N/A | master | | 172 | 0.17MB | 34 |
| itbucket | ops-tamfrom | OPS | #N/A | master | | 544 | 0.53MB | 2,932 |
| itbucket | ops-tamfrom | OPS | #N/A | master | | 788 | 0.77MB | 4,392 |
| itbucket | smi-def-mango/odb | OPS | #N/A | master | | 460 | 0.45MB | 2,562 |
| itbucket | smi-config-master | OPS | #N/A | master | | 354 | 0.36MB | 1,335 |
| itbucket | smi-confium-platform | OPS | #N/A | master | | 198 | 0.19MB | 211 |
| itbucket | smi-zookeeper-platform | OPS | #N/A | master | | 272 | 0.27MB | 1,501 |
| itbucket | sco-connectwise | OPS | #N/A | master | | 228 | 0.22MB | 808 |
| itbucket | sco-crunchler | OPS | #N/A | master | | 316 | 0.31MB | 1,361 |
| itbucket | sco-remailer | OPS | #N/A | master | | 509 | 0.50MB | 4,819 |
| itbucket | sco-systemd-utils | OPS | #N/A | master | | 176 | 0.17MB | 60 |
| itbucket | scp-pysur | OPS | #N/A | master | | 268 | 0.26MB | 972 |
| itbucket | sci-sandalrevtools | OPS | #N/A | master | | 289 | 0.29MB | 450 |
| itbucket | terraform-3rd-party-bucket-management | OPS | #N/A | master | | 258 | 0.25MB | 2 |
| itbucket | terraform-aws-data-harvesting-encoders | OPS | #N/A | master | | 204 | 0.20MB | 125 |
| itbucket | terraform-aws-cassandra | OPS | #N/A | master | | 194 | 0.18MB | 200 |
| itbucket | terraform-aws-config | OPS | #N/A | master | | 164 | 0.17MB | 102 |
| itbucket | terraform-aws-core-control | OPS | #N/A | master | | 2480 | 2.42MB | 10,210 |
| itbucket | terraform-aws-cmp-linear-postings | OPS | #N/A | master | ruby | 288 | 0.28MB | 1,236 |
| itbucket | terraform-aws-kube | OPS | #N/A | master | | 320 | 0.31MB | 390 |
| itbucket | terraform-aws-module-vpc | OPS | #N/A | master | | 812 | 0.79MB | 2,289 |
| itbucket | terraform-aws-rds | OPS | #N/A | master | | 400 | 0.39MB | 2,673 |
| itbucket | terraform-aws-tableau-load-test | OPS | #N/A | master | | 198 | 0.19MB | 134 |
| itbucket | terraform-aws-user-management | OPS | #N/A | master | | 240 | 0.23MB | 429 |
| itbucket | terraform-aws-vault | OPS | #N/A | master | | 264 | 0.26MB | 210 |
| itbucket | terraform-aws-video-service | OPS | #N/A | master | | 172 | 0.17MB | 28 |
| itbucket | terraform-aws-vpc | OPS | #N/A | master | | 898 | 0.88MB | 7,027 |
| itbucket | terraform-nexus-monitoring | OPS | #N/A | master | | 308 | 0.30MB | 389 |
| itbucket | terraform-prometheus-monitoring | OPS | #N/A | master | | 288 | 0.28MB | 391 |
| itbucket | tf-chef-private-supermarket | OPS | #N/A | master | | 164 | 0.18MB | 149 |
| itbucket | tf-s3-datasta-cmo | OPS | #N/A | master | | 172 | 0.17MB | 2 |
| itbucket | vagrant | OPS | #N/A | master | | 280 | 0.27MB | 713 |
| itbucket | vault-helper | OPS | #N/A | master | python | 268 | 0.26MB | 439 |
| itbucket | vault-helper-python-client | OPS | #N/A | master | python | 204 | 0.20MB | 125 |
| itbucket | vault-v4 | OPS | #N/A | master | python | 194 | 0.18MB | 125 |
| itbucket | h-winrd/ioimacesdresstest | OPS | #N/A | master | python | 924 | 0.91MB | 5,427 |
| itbucket | h-xygbom-system-tests | PLUG | Spark Plug | master | ruby | 3480 | 3.40MB | 38,913 |
| itbucket | b-xjcorrelsm/chainconfig | PLUG | Spark Plug | master | | 1162054 | 1134.83MB | 282,300 |
| itbucket | b-yorginsgeneral/jobs-test | PLUG | Spark Plug | master | | 612 | 0.60MB | 1,818 |
| itbucket | b-yrobotresm/chaysetcdprototype | PLUG | Spark Plug | master | android | 35241 | 34.34MB | 59,187 |
| itbucket | b-z-stb-library | PLUG | Spark Plug | master | android | 3640 | 3.55MB | 13,380 |
| itbucket | b-ztb-android-library | PLUG | Spark Plug | master | java | 624 | 0.61MB | 1,463 |
| itbucket | h-stb-android_remote_key_licanser | PLUG | Spark Plug | master | | 552 | 0.54MB | 868 |
| itbucket | h-stb-android-companion-app | PLUG | Spark Plug | master | android | 3520 | 3.44MB | 10,873 |
| itbucket | h-stb-html-in | PLUG | Spark Plug | master | | 516 | 0.50MB | 1,005 |
| itbucket | h-stb-html-in-in | PLUG | Spark Plug | master | android | 492 | 0.48MB | 3,291 |
| itbucket | h-stb-audio-website | PLUG | Spark Plug | master | java | 608 | 0.59MB | 1,361 |
| itbucket | h-stb-embrace-library | PLUG | Spark Plug | master | | 1684 | 1.64MB | 27,675 |
| itbucket | h-stb-boradcast-website | PLUG | Spark Plug | master | android | 20304 | 19.83MB | 10,246 |
| itbucket | h-stb-html-in-new-firmware | PLUG | Spark Plug | master | | 19788 | 19.32MB | 36,913 |
| itbucket | h-stb-launcher | PLUG | Spark Plug | master | android | 2200 | 1.95MB | 5,427 |
| itbucket | h-stb-client | PLUG | Spark Plug | master | | 12772 | 12.48MB | 28,888 |
| itbucket | h-stb-sparkv-android | PLUG | Spark Plug | master | java | 17972 | 17.55MB | 63,811 |
| itbucket | h-stb-sparkv-schedule | PLUG | Spark Plug | master | | 39880 | 38.95MB | 86,186 |
| itbucket | h-stb-update-android-app | PLUG | Spark Plug | master | | 608 | 0.59MB | 1,818 |
| itbucket | h-stb-update-script | PLUG | Spark Plug | master | | 1328 | 1.30MB | 14,710 |
| itbucket | h-stb-utility-library | DevCourt | Spark Plug | master | | 20238 | 19.76MB | 39,970 |
| itbucket | h-stb-recloud-service-tests | PLUG | Spark Plug | master | | 675 | 0.66MB | 1,477 |
| itbucket | h-stb-recloud/acceleration | PLUG | Spark Plug | master | | 34708 | 33.89MB | 5,565 |
| itbucket | h-visualion-library | PLUG | Spark Plug | master | | 175 | 0.17MB | 8 |
| itbucket | add-a3-channels-b-organization | PROJ | #N/A | master | ruby | 180 | 0.18MB | 24 |
| itbucket | boardown | PROJ | #N/A | master | android | 224 | 0.22MB | 253 |
| itbucket | bower-stack-n-learn | PROJ | #N/A | master | javascript | 596 | 0.58MB | 748 |
| itbucket | branchile | PROJ | #N/A | master | javascript | 178 | 0.17MB | 8 |
| itbucket | cfg-firewall | PROJ | #N/A | master | | | | |

| Bucket | Name | Cat | Team | Branch | Lang | Count | Size | Count2 |
|---|---|---|---|---|---|---|---|---|
| tbucket | clip-edit | PROJ | #N/A | master | javascript | 15738 | 15.37MB | 96,077 |
| tbucket | channel-manager | PROJ | #N/A | master | | 938 | 1.91MB | 9,851 |
| tbucket | channel-manager-lambda | PROJ | #N/A | master | | 460 | 0.45MB | 3,867 |
| tbucket | codecout | PROJ | #N/A | master | | 466 | 0.48MB | 2,302 |
| tbucket | confluum-reporting-suite | PROJ | #N/A | master | | 3928 | 3.86MB | 33,318 |
| tbucket | creamout | PROJ | #N/A | master | javascript | 9344 | 3.54MB | 33,543 |
| tbucket | cross-platform-mobile-video-streaming-app | PROJ | #N/A | master | | 3120 | 3.05MB | 9,45* |
| tbucket | data-map | PROJ | #N/A | master | nodejs | 458 | 0.43MB | 1,057 |
| tbucket | defunct-beacon-blaster-save | PROJ | #N/A | master | | 220 | 0.21MB | 522 |
| tbucket | dev-server | PROJ | #N/A | master | | 400 | 0.39MB | 704 |
| tbucket | encodetool | PROJ | #N/A | master | | 196 | 0.19MB | 127 |
| tbucket | feedback-spike | PROJ | #N/A | master | | 10136 | 9.91MB | 17,421 |
| tbucket | fest_transfer | PROJ | #N/A | master | | 1428 | 1.39MB | 9,485 |
| tbucket | ford-targeting | PROJ | #N/A | master | | 1160 | 1.13MB | 3,247 |
| tbucket | genreach_file_player | PROJ | #N/A | master | android | 18620 | 18.44MB | 88,085 |
| tbucket | hubot | PROJ | #N/A | master | | 294 | 0.28MB | 758 |
| tbucket | j-metrics | PROJ | #N/A | master | | 916 | 0.89MB | 3,894 |
| tbucket | j2g-metrics | PROJ | #N/A | master | | 216 | 0.21MB | 531 |
| tbucket | jmbx | PROJ | #N/A | master | | 218 | 0.21MB | 30 |
| tbucket | mockup-framework | PROJ | #N/A | master | javascript | 348 | 0.34MB | 371 |
| tbucket | mulitcast-master-sandbox | PROJ | #N/A | master | | 332 | 0.32MB | 963 |
| tbucket | overlay-minscripts | PROJ | #N/A | master | | 168 | 0.16MB | 67 |
| tbucket | overlay-dashhost | PROJ | #N/A | master | | 252 | 0.25MB | 374 |
| tbucket | overlay-bash | PROJ | #N/A | master | | 252 | 0.25MB | 0 |
| tbucket | plost7 | PROJ | #N/A | prototype | shell | 284 | 0.28MB | 3,851 |
| tbucket | sampleplayer | PROJ | #N/A | master | java | 71056 | 69.39MB | 254,148 |
| tbucket | schedule-log-manager | PROJ | #N/A | master | javascript | 226 | 0.22MB | 672 |
| tbucket | sorenson-elastic-image-scripts | PROJ | #N/A | master | | 200 | 0.20MB | 152 |
| tbucket | spark-enhance-load-test | PROJ | #N/A | master | | 202 | 0.20MB | 27 |
| tbucket | spark-enhance-gs-scripts | PROJ | #N/A | master | | 176 | 0.17MB | 14* |
| tbucket | spark-style-guide | PROJ | #N/A | master | | 658 | 0.65MB | 1,799 |
| tbucket | status | PROJ | #N/A | master | | 892 | 0.87MB | 9,568 |
| tbucket | toshiba-client-environment | PROJ | #N/A | master | html/css | 212 | 0.21MB | 153 |
| tbucket | tv-code-prototype | PROJ | #N/A | master | javascript | 20004 | 19.54MB | 40,978 |
| tbucket | upload-eval | PROJ | #N/A | master | | 178984 | 174.77MB | 210,188 |
| tbucket | visualologle | PROJ | #N/A | master | android | 297948 | 291.* | 218,723 |
| tbucket | vue-player | PROJ | #N/A | master | | 10100 | 9.86MB | 20,733 |
| tbucket | webcam-alt | QA | #N/A | master | c++ | 256 | 0.25MB | 1,779 |
| tbucket | account-manager-cucumber-tests | QA | QA | master | | 412 | 0.40MB | 1,496 |
| tbucket | advanced-dare-2e-tests | QA | QA | master | | 192 | 0.18MB | 27 |
| tbucket | bug_metrics | QA | QA | master | ruby | 184 | 0.18MB | 268 |
| tbucket | fingerprint-distance-calculator | QA | QA | master | ruby | 300 | 0.29MB | 85 |
| tbucket | sam_page_objects | QA | QA | master | | 14152 | 13.72MB | 30,010 |
| tbucket | raycom-rtv | RTV | #N/A | master | ruby | 256 | 0.25MB | 183,004 |
| tbucket | raycom-rtv-player-javadoc | RTV | #N/A | master | | 34864 | 34.05MB | 254,571 |
| tbucket | raycom-rtv-sdk-javadoc | RTV | #N/A | master | | 15256 | 14.90MB | 30,370 |
| tbucket | di-babbin-insert-archived | SADEP | #N/A | master | nodejs | 1904 | 1.86MB | 30,542 |
| tbucket | di-cookbooks | SADEP | #N/A | master | javascript | 464 | 0.45MB | 10,449 |
| tbucket | di-csv-importer-archived | SADEP | #N/A | master | javascript | 304 | 0.30MB | 1,661 |
| tbucket | di-csv-ingest-archived | SADEP | #N/A | master | ruby | 304 | 0.30MB | 430 |
| tbucket | di-daily-cluster-hours-ingestd | SADEP | #N/A | master | | 19618 | 19.16MB | 212,407 |
| tbucket | di-database-migrations | SADEP | #N/A | master | javascript | 284 | 0.28MB | 1,158 |
| tbucket | di-flume-archived | SADEP | #N/A | master | | 272 | 0.27MB | 996 |
| tbucket | di-health-monitor | SADEP | #N/A | master | other | 240 | 0.23MB | 30 |
| tbucket | di-reustall-file-transfer | SADEP | #N/A | master | python | 174 | 0.17MB | 501 |
| tbucket | di-query-generator | SADEP | #N/A | master | | 372 | 0.36MB | 1,224 |
| tbucket | di-equailtum-migration | SADEP | #N/A | master | | 500 | 0.49MB | 501 |
| tbucket | di-s1-ingestor | SADEP | #N/A | master | | 764 | 0.75MB | 7,888 |
| tbucket | auth-server | SAM | Account Manager | master | javascript | 13504 | 13.19MB | 104,448 |
| tbucket | a)_mill_to_csv_record_parse | SDA | DMP Analytics | master | ruby | 272 | 0.27MB | 2,044 |
| tbucket | api7279_ksql | SDA | DMP Analytics | master | | 2208 | 2.16MB | 10,201 |
| tbucket | cadp-emr | SDA | DMP Analytics | master | | 352 | 0.34MB | 1,838 |
| tbucket | cadp-performance-tests | SDA | DMP Analytics | master | | 828 | 0.80MB | 3,608 |
| tbucket | cadp-summer-cap | SDA | DMP Analytics | master | | 546 | 0.54MB | 5,558 |
| tbucket | cadp-api | SDA | DMP Analytics | master | | 256 | 0.25MB | 292 |
| tbucket | oocio-performance-tests | SDA | DMP Analytics | master | | 258 | 0.25MB | 30 |
| tbucket | oocio-subml-cookbooks | SDA | DMP Analytics | master | python | 240 | 0.23MB | 501 |
| tbucket | tvdb-api | SDA | DMP Analytics | master | other | 372 | 0.36MB | 1,224 |
| tbucket | tvdb-api-performance-tests | SDA | DMP Analytics | master | | 500 | 0.49MB | 501 |
| tbucket | tvdb-celery-cookbooks | SDA | DMP Analytics | master | nodejs | 764 | 0.75MB | 7,888 |
| tbucket | tvdb-cloudformation | SDA | DMP Analytics | master | nodejs | 1196 | 1.17MB | 9,230 |

| Repo | Name | Category | Branch | Language | Count | Size |
|---|---|---|---|---|---|---|
| itbucket | ltd-common-api | SDA | master | | 308 | 0.30MB |
| itbucket | ltd-data-pipeline | SDA | master | | 220 | 0.21MB |
| itbucket | ltd-etl | SDA | master | | 1,088 | 1.04MB |
| itbucket | ltd-formations | SDA | master | | 512 | 0.50MB |
| itbucket | ltd-resources | SDA | master | | 196 | 0.19MB |
| itbucket | ltd-requirements | SDA | master | | 778 | 0.76MB |
| itbucket | ltd-migrations | SDA | master | python | 11,383 | 11.38MB |
| itbucket | ltd-rose-pgs8 | SDA | master | | 192 | 0.19MB |
| itbucket | ltd-service-configuration | SDA | master | | 194 | 0.19MB |
| itbucket | ltd-sql | SDA | master | | 232 | 0.23MB |
| itbucket | ltd-standard-data-tools | SDA | master | | 216 | 0.21MB |
| itbucket | ltd-testing | SDA | master | | 65 | 0.06MB |
| itbucket | ltd-kve-etl | SDA | master | | 232 | 0.23MB |
| itbucket | ltd-kve-entr | SDA | master | | 345 | 0.33MB |
| itbucket | ltd-kve-vf | SDA | master | | 198 | 0.19MB |
| itbucket | ltd-kve-migration | SDA | master | | 860 | 0.86MB |
| itbucket | ltd-kve-migration-aggregates | SDA | master | | 4,080 | 3.92MB |
| itbucket | assatless | SI | master | | 235 | 0.23MB |
| itbucket | filk-copy-solution | SLM | master | | 316 | 0.20MB |
| itbucket | sfm-client-node | SCA | master | | 204 | 0.19MB |
| itbucket | squaeze | SQUEEZ | master | nodejs | 19316 | 18.80MB |
| itbucket | squeeze_Spiketest | SQUEEZ | master | sd | 2620 | 2.56MB |
| itbucket | sawcashowtoapp | SQUEEZ | master | #NA | 341.14MB | 341.14MB |
| itbucket | technical_datalss | SQUEEZ | master | #NA | 346828 | 340.24MB |
| itbucket | vidorvault | SQUEEZ | master | #NA | 49388 | 408.391MB |
| itbucket | vidfu | SQUEEZ | master | | 169 | 0.16MB |
| itbucket | whyme | SQUEEZ | master | shell | 81000 | 79.10MB |
| itbucket | analytics-page-objects | STVA | master | | 1232 | 1.28MB |
| itbucket | aws-playground | STVA | master | ruby | 220 | 0.22MB |
| itbucket | dm-ecdta | STVA | master | nodejs | 252 | 0.23MB |
| itbucket | dm-cluster-management | STVA | master | sd | 1072 | 1.05MB |
| itbucket | dm-configurations | STVA | master | nodejs | 1096 | 1.07MB |
| itbucket | dm-broadcast-data-import | STVA | master | nodejs | 37588 | 36.71MB |
| itbucket | dm-email-metrics | STVA | master | javascript | 240 | 0.23MB |
| itbucket | dm-email-monitoring | STVA | master | nodejs | 598 | 0.58MB |
| itbucket | dm-email-templates | STVA | master | nodejs | 224 | 0.22MB |
| itbucket | dm-email-verification-tests | STVA | master | nodejs | 218 | 0.21MB |
| itbucket | dm-build-scripts | STVA | master | shell | 240 | 0.23MB |
| itbucket | dm-cloudformation | STVA | master | javascript | 444 | 0.43MB |
| itbucket | dm-environment-discovery | STVA | master | nodejs | 234 | 0.22MB |
| itbucket | dm-generator | STVA | master | nodejs | 430 | 0.42MB |
| itbucket | dm-grunt-build | STVA | master | javascript | 17928 | 17.51MB |
| itbucket | org.um-build | STVA | master | javascript | 304 | 0.30MB |
| itbucket | org.um-data-uri | STVA | master | shai | 352 | 0.34MB |
| itbucket | org.um-processor | STVA | master | nodejs | 296 | 0.29MB |
| itbucket | dm-grunt-packages-lint | STVA | master | nodejs | 244 | 0.24MB |
| itbucket | dm-integration-utils | STVA | master | nodejs | 328 | 0.30MB |
| itbucket | dm-resource-discovery | STVA | master | nodejs | 312 | 0.30MB |
| itbucket | dm-scripts | STVA | master | nodejs | 260 | 0.25MB |
| itbucket | dm-standard-data-tools | STVA | master | python | 404 | 0.39MB |
| itbucket | dm-system-tests | STVA | master | ruby | 3638 | 3.56MB |
| itbucket | dm-test-utils | STVA | master | nodejs | 224 | 0.22MB |
| itbucket | dm-performance-tests-sitespeed | STVA | master | javascript | 2052 | 2.00MB |
| itbucket | dm-portal | STVA | master | nodejs | 638 | 0.67MB |
| itbucket | dm-promo-data | STVA | master | nodejs | 250052 | 244.49MB |
| itbucket | dm-threshold-alerting-ingestor | STVA | master | javascript | 672 | 0.66MB |
| itbucket | dm-transformation-utils | STVA | master | nodejs | 246 | 0.23MB |
| itbucket | dm-backend | STVA | master | | 860 | 0.86MB |
| itbucket | oops | SDA | master | | 1884 | 1.84MB |
| itbucket | l2que-environment | DMP Analytics | #NA | | 4012 | 3.92MB |
| itbucket | asint-config-spark-analytics | DMP Analytics | master | | 252 | 0.25MB |
| itbucket | mm/glue-backend | Spark Analytics | master | | 252 | 0.24MB |
| itbucket | rm-utils | User Interface | master | | 1308 | 1.28MB |
| itbucket | sm-scripts-toolbar | User Interface | UI | | 212 | 0.21MB |
| itbucket | sm-core-notifications | User Interface | UI | | 252 | 0.24MB |
| itbucket | sm-core-confirmable | User Interface | UI | | 226 | 0.22MB |
| itbucket | sm-core-authentication | User Interface | UI | | 238 | 0.23MB |
| itbucket | sm-antecedos | User Interface | UI | | 244 | 0.24MB |

| Source | Repository | Category | Branch | Language | Count | Size | Lines |
|---|---|---|---|---|---|---|---|
| bitbucket | smi-ci-loops | Don't count | master | sass | 168548 | 182.18MB | 1,296,884 |
| bitbucket | smi-ci-palette | #N/A | master | | 184 | 0.18MB | 113 |
| bitbucket | smi-ui-webfronts | UI | master | html/css | 29156 | 23.47MB | 181,166 |
| bitbucket | smc-framework | User Interface | master | | 220 | 0.21MB | 360 |
| bitbucket | smi-service-components | User Interface | master | javascript | 28468 | 27.42MB | 182,365 |
| bitbucket | smi-screens | User Interface | master | javascript | 3,686 | 3.40MB | 3,685 |
| bitbucket | sorenson_ui_slack | User Interface | master | javascript | 216 | 0.21MB | 335 |
| bitbucket | sorenson-engine-ui | User Interface | master | javascript | 2940 | 2.48MB | 11,866 |
| bitbucket | sorenson-webfronts | User Interface | master | javascript | 3720 | 3.93MB | 41,746 |
| bitbucket | sorenson-??? | User Interface | master | javascript | 2544 | 2.49MB | 10,343 |
| bitbucket | spark-ui-components | User Interface | master | html/css | 244 | 0.24MB | 985 |
| bitbucket | spark-ui-react | User Interface | master | javascript | 488 | 0.45MB | 2,822 |
| bitbucket | squarezz-360-ui | User Interface | master | html/css | 750 | 0.74MB | 6,034 |
| bitbucket | su_app | User Interface | master | | 884 | 0.86MB | 14,035 |
| bitbucket | su_components | User Interface | master | javascript | 2528 | 2.57MB | 31,272 |
| bitbucket | su-webfronts | User Interface | master | javascript | 172 | 0.17MB | 2 |
| bitbucket | sorenson-mudd-samsung-tv-remote | UI | master | javascript | 1956 | 1.91MB | 20,488 |
| bitbucket | suite_ui | UI | master | | 1980 | 6.83MB | 34,521 |
| bitbucket | logisonwizard | UI | master | javascript | 34,521 | 2.79MB | 10,772 |
| bitbucket | mongothommandidgr | QA | master | | 244 | 0.24MB | 1,134 |
| bitbucket | encode-cluster-load-test | QA | master | | 288 | 0.28MB | 881 |
| bitbucket | ffmpeg_filter | QA | master | | 456 | 0.45MB | 208 |
| bitbucket | smooomp | QA | master | | 296 | 0.29MB | 513 |
| bitbucket | spark-video-channel-ci | QA | master | Spark Video | 218 | 0.21MB | 523,001 |
| bitbucket | spark-video-count-user-testing | Spark Video | master | | 228 | 0.22MB | 316 |
| bitbucket | spark-video-service-config | Spark Video | master | | 3325076 | 3047.79MB | 53,834 |
| bitbucket | video-service-chef | Spark Video | master | | 220 | 0.21MB | 445,638 |
| bitbucket | video-service-capture-config | Spark Video | master | | 23500 | 23.34MB | 2,265 |
| bitbucket | squeeze-360-app | Spark Video | master | | 63590 | 59.46MB | 15,708 |
| bitbucket | squeeze-360-d?annel-monitor | Spark Video | master | | 428 | 0.42MB | 3,417 |
| bitbucket | tiny-engine | ruby | master | ruby | 1568 | 1.53MB | 3,880 |
| bitbucket | sequencres-360-ui-modules | #N/A | master | | 504 | 0.49MB | 184,363 |
| bitbucket | video-service-no-api | #N/A | master | c++ | 1108 | 1.08MB | 3,187 |
| bitbucket | video-service-capture | VIDEO | master | c++ | 102724 | 102.27MB | 66,147 |
| bitbucket | video-service-capture-app | VIDEO | master | Ruby | 752 | 0.73MB | 1,735 |
| bitbucket | video-service-capture-config | VIDEO | master | Ruby | 68904 | 67.23MB | 7,619 |
| bitbucket | video-service-chef | VIDEO | master | Ruby | 336 | 0.33MB | 2,604 |
| bitbucket | video-service-cmaster | VIDEO | master | Ruby | 472 | 0.46MB | 4,772 |
| bitbucket | video-service-docker | VIDEO | master | Ruby | 2176 | 2.13MB | 8,513 |
| bitbucket | video-service-encoder | VIDEO | master | Ruby | 640 | 0.83MB | 1,391 |
| bitbucket | video-service-srv | #N/A | master | Ruby | 892 | 0.87MB | 4,876 |
| bitbucket | video-service-land-testing | Spark Video | master | Ruby | 880 | 0.88MB | 1,970 |
| bitbucket | video-service-testing | Spark Video | master | Ruby | 478 | 0.46MB | 1,072 |
| bitbucket | video-service-wireframes | Spark Video | master | python | 284 | 0.26MB | 927 |
| bitbucket | videojs-framefly-frame | Spark Video | master | JavaScript | 1392 | 1.32MB | 677,689 |
| bitbucket | vsimpiy-gsdownload | Spark Video | master | ActionScript | 416 | 0.41MB | 41,325 |
| github | 360_test_confcements | Spark Video | master | JavaScript | 458 | 0.48MB | 1,904 |
| github | 360_operations_utilities | #N/A | master | JavaScript | 3975086 | 3784.27MB | 330 |
| github | 360_services | #N/A | master | PHP | 6299 | 5.02MB | 8,723 |
| github | 360_services_api | #N/A | master | PHP | 58930 | 57.69MB | 70,463 |
| github | 350_wordpress_plugin | #N/A | master | PHP | 187448 | 183.52MB | 1,874 |
| github | android_apk_update_script | #N/A | master | Python | 79216 | 77.36MB | 109,969 |
| github | Android-Spike1 | #N/A | master | Python | 6015 | 0.60MB | 47,896 |
| github | blog-corporate | #N/A | master | PHP | 97824 | 95.53MB | 734,186 |
| github | brazen | #N/A | master | Java | 15536 | 16.15MB | 61,404 |
| github | cweb-corporate | #N/A | master | Makefile | 202552 | 197.50MB | 272,784 |
| github | cweb-images | #N/A | master | Ruby | 69260 | 60.01MB | 165,699 |
| github | cweb-marketing | #N/A | master | Ruby | 58590 | 54.61MB | 1,233 |
| github | developer-application-exercise | #N/A | master | CSS | 16734 | 16.34MB | 576,394 |
| github | forum | #N/A | master | JavaScript | 620 | 0.59MB | 330 |
| github | gfcart-gen-env | #N/A | master | JavaScript | 252816 | 275.59MB | 8,723 |
| github | guides | #N/A | master | JavaScript | 296 | 0.29MB | 330 |
| github | market-map | #N/A | master | JavaScript | 1969 | 1.92MB | 70,463 |
| github | oper-suite-wolf | #N/A | master | Ruby | 3304 | 3.23MB | 4,225 |
| github | operations-dashboard | #N/A | master | Ruby | 7030 | 6.91MB | 5,053 |
| github | osml | #N/A | master | Ruby | 13392 | 13.13MB | 92,054 |
| github | package-test | #N/A | master | C++ | 232 | 0.23MB | 24 |
| github | php-advicerecord | PHP | master | PHP | 1664 | 1.62MB | 14,979 |

| Org | Repository | | Branch | Language | Count | Size | Objects |
|---|---|---|---|---|---|---|---|
| hub | pupnet-nginx | | master | Ruby | 1080 | 1.03MB | 2,563 |
| hub | reach-website | master | | | 216 | 0.211MB | 4 |
| hub | reload-tv-website | #N/A | master | CSS | 231/216 | 225.52MB | 233,682 |
| hub | fancue_io_cloudwatch | #N/A | master | Ruby | 360 | 0.36MB | 611 |
| hub | robotframework-redistlibrary | #N/A | master | Python | 712 | 0.70MB | 1,410 |
| hub | selfie-support-tool | #N/A | master | Ruby | 964 | 0.98MB | 3,042 |
| hub | sss_bundling_clay | #N/A | master | Ruby | 312 | 0.30MB | 147 |
| thub | sss_bundling_ruby | #N/A | master | Ruby | 9972 | 9.45MB | 20,681 |
| thub | sss_branded_webapp | #N/A | master | JavaScript | 390512 | 381.36MB | 812,409 |
| thub | sss_titanium_mobile | #N/A | master | | 255 | 0.25MB | 24 |
| thub | sm-public-keys | #N/A | master | Ruby | 3344 | 3.27MB | 22,777 |
| thub | sorenson_server_scripts | #N/A | master | PHP | 388 | 0.38MB | 882 |
| thub | sorenson-360-php | #N/A | master | Java | 2338 | 2.28MB | 14,710 |
| thub | SparkTV-AMJLogicUpdate | #N/A | master | Java | 36824 | 35.96MB | 50,998 |
| thub | spark-tv-android | #N/A | master | Java | 131728 | 12.82MB | 12,926 |
| thub | sparktv-andonoid-issues | #N/A | master | JavaScript | 1000 | 0.98MB | 6,761 |
| thub | spark-tv-schedule | #N/A | master | Ruby | 272 | 0.27MB | 232 |
| thub | squeeze-server-ruby | #N/A | master | Ruby | 555 | 0.52MB | 732 |
| thub | squeeze-stream-tools | #N/A | master | JavaScript | 4712 | 4.60MB | 19,933 |
| thub | store-and-share | #N/A | master | Ruby | 71088 | 69.42MB | 175,464 |
| thub | strapi | #N/A | master | JavaScript | 588 | 0.55MB | 874 |
| lthub | stretch | #N/A | master | Ruby | 1816 | 1.77MB | 12,194 |
| lthub | stretch_shutterfly_video | #N/A | master | Ruby | 23768 | 23.21MB | 39,407 |
| lthub | test | #N/A | master | C# | 544 | 0.53MB | 2,061 |
| lthub | ThreeSixtyServices-internal | | master | Ruby | | | |
| | | | | | 6851428 | 6674.44MB | 111,935,682 |

## ASSET PURCHASE AGREEMENT

### Sorenson Media, Inc. (Seller)
### The Nielsen Company (US), LLC (Purchaser)

### Schedule 2.2(g)
### Excluded Assets

All furniture owned by Seller under the Workspace Element furniture agreement that is secured pursuant to the Equipment Finance Agreement Dated March 11, 2016, between U.S. Bank National Association and Seller is located at a storage facility located at 14039 Minuteman Drive, Draper, UT 84020 or at the Seller's corporate offices in Lehi, Utah.

The Landlord of the storage facility is Prime Storage (not affiliated with Seller).  The storage lease is on a monthly basis at a price of $200.00 per month.

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Schedule 2.2(h)*
*Excluded Contracts*

|  | Partner / Vendor | Contract Provided in APA Data Room | Type of Contract | Description[1] |
|---|---|---|---|---|
| 1 | Circle Computer Resources, Inc. | Yes | Technology Service Provider | Professional Services Agreement, dated December 10, 2014, as amended by that Amendment to Professional Service Agreement, dated March 9, 2016 |
| 2 | Method Communications, Inc. | Yes | PR Consultant | Services agreement, dated April 23, 2013 |
| 3 | Sinclair Television Group, Inc. | Yes | Technology Partner | Sorenson Media Master Software License, Support and Services Agreement, dated December 29, 2017 |
| 4 | T-Stat Five, LLC | Yes | Lease | Office Lease Agreement, dated April 25, 2017, as amended by that Amendment to Lease Agreement, dated October 18, 2017 |
| 5 | TP Building VI, LLC | Yes | Lease | Lease agreement, dated January 27, 2016 |
| 6 | U.S. Bank National Association | Yes | Loan | Equipment Finance Agreement, dated March 11, 2016 |
| 7 | Amlogic Co. Ltd. | Yes | Software License | Software License Agreement, dated July 31 2014 |
| 8 | Shenzhen Geniatech Inc, Ltd | Yes | Software License | Software Development and License Agreement, dated August 12 2014 |
| 9 | Shenzhen Geniatech Inc, Ltd | Yes | Software License | Product Manufacturing Agreement, dated September 8 2014 |
| 10 | Reycom AG | Yes | Software License | Software License Agreement, dated September 22 2016 |
| 11 | Rovi Data Solutions Inc | Yes | Software License | Data License and Service Agreement, dated February 10, 2017, as amended by the First Amendment to Data License and Service Agreement, dated April 20, 2017 |
| 12 | Tribune Media Services, LLC | Yes | Software License | Licensed Data Agreement, dated September 1, 2014 |
| 13 | Moelis & Company LLC | Yes | Financial Advisor | Engagement letter, dated August 21, 2018 |

---

[1] Except as otherwise indicated, each Contract is between the Partner/Vendor listed in the column at left and the Seller.

| 14 | Adaptive Insights, Inc. | Yes | Software License | Order Form and Agreement, dated July 27, 2017 |
|----|----|----|----|----|
| 15 | GBS Compliance Services | Yes | Employment Benefits | COBRA Service Agreement, dated July 1, 2017 |
| 16 | FSA Health Plan | Yes | Employment Benefits | Sorenson Media Cafeteria Plan, dated January 1, 2018 |
| 17 | Voya Retirement Insurance and Annuity Company | Yes | Employment Benefits | Application for Funding Agreement, dated April 26, 2017 |
| 18 | Voya Retirement Insurance and Annuity Company | Yes | Employment Benefits | Adoption Agreement, dated June 20, 2017 |
| 19 | Discovery Communications, LLC | Yes | Advertising Inventory Sale | Master Services Agreement, dated May 11, 2018 |
| 20 | Pop Media Networks, LLC | Yes | Advertising Inventory Sale | Term Sheet, dated May 11, 2018 |
| 21 | Iponweb GmbH | Yes | Software License | Master Services Agreement, dated May 9, 2017 |
| 22 | Iponweb GmbH | Yes | Software License | Establishment Service Order, dated May 9, 2017 |
| 23 | Iponweb GmbH | Yes | Software License | Monthly Operational Services Service Order, dated May 9, 2017 |
| 24 | Iponweb GmbH | Yes | Software License | Variation Service Order dated June 29, 2018 |
| 25 | Digital Envoy, Inc. | Yes | Software License | Product - Electronic Database and License Agreement, dated April 6, 2017, as amended by that First Amendment to the Product - Electronic Database and License Agreement, dated April 6, 2018 |
| 26 | Atlassian | No, Online Subscription | Software License | Collaboration tool agreement (subscribed online) |
| 27 | Concur | No, Online Subscription | Software License | Expenses management tool (subscribed online) |
| 28 | Dolby | No, not available | Software License | Software license (unable to obtain / find agreement) |
| 29 | eMarketer | No, Online Subscription | Software License | Research tool (subscribed online) |
| 30 | Gracenote Media Services | No, not available | Software License | Software license (unable to obtain / find agreement) |
| 31 | Market Track / Competitive Track | No, Online Subscription | Software License | Research tool (subscribed online) |
| 32 | Microsoft 365 | No, Online Subscription | Software License | Collaboration tool (subscribed online) |
| 33 | Pluralsight | No, Online Subscription | Software License | Education tool (subscribed online) |
| 34 | S&P Global Market Intelligence | No, Online Subscription | Software License | Research tool (subscribed online) |
| 35 | Salesforce | No, not available | Software License | Software license (unable to obtain / find agreement) |

| 36 | Verizon | No, Online Subscription | Technology Service Provider | Subscription for Wi-Fi hot spots (subscribed online) |

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Schedule 2.3(e)*
*Assumed Liabilities of the Acquired Subsidiary*

| Vendor | Service | Contract in place | Post-Auction Debt Position Forecast | |
|---|---|---|---|---|
| | Payroll | N/A | £ | - |
| | PAYE | Direct Debit - 22nd | -£ | 42,000.00 |
| | Pensions | Direct Debit - 18th | -£ | 7,000.00 |
| LSH - Landlords | Electricity Carlyle House | Break served to vacate 17th Feb | -£ | 11,759.85 |
| FSG | M&E contract Number 9 | ✓ | -£ | 2,832.80 |
| Knight Frank Promise | Health & Safety Checks | Ended - final payment owed | -£ | 1,200.00 |
| RiskWise | Part of Knight Frank Promise | Ended - final payment owed | -£ | 660.00 |
| UTILITA | Electricity and Gas Number 9 | N/A | -£ | 2,528.48 |
| Virgin Media | Line Rental and ADSL line | Direct Debit | -£ | 72.74 |
| EE | Mobile phone contracts | Direct Debit | -£ | 187.18 |
| Berry Cleaning | Cleaning | ✓ | -£ | 1,248.00 |
| HMRC | Annual P11 (PSA) | Monthly Installment Payment Plan | -£ | 113,609.11 |
| Staff expenses | | N/A | -£ | 300.00 |
| Barclaycard | Credit card | Direct Debit | -£ | 1,200.00 |
| Blake Morgan | Lawyers | N/A | -£ | 2,924.33 |
| Parc Deli | Caterers | Ended - final payment owed | -£ | 1,296.00 |
| Plant Care | Plant Care | NOT CLOSED - Nov due | -£ | 1,710.00 |
| VBS | Payroll Account fee | Direct Debit | -£ | 267.92 |
| Cardiff County Council | Rates | N/A | -£ | 2,399.00 |
| **TOTALS** | | | **-£** | **193,195.41** |

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Schedule 2.5(a)*
*Designated Contracts*

| Non-Debtor Party | Contract or Lease Description[2] | Proposed Cure Amount |
|---|---|---|
| BidSwitch GmbH | Supply Partner Connection & Media Agreement, dated April 17, 2017 | $0.00 |
| dataxu, inc | Data Integration Agreement, dated October 1, 2018 | $0.00 |
| Rainbow Media Holdings LLC | Master Services Agreement, dated February 28, 2018 | $0.00 |
| Kirton McConkie PC | Sublease, dated April 18, 2017, as amended by Amendment to Sublease, dated August 1, 2018 | $0.00 |

---

[2] Except as otherwise indicated, each Contract is between the Non-debtor Party listed in the column at left and the Seller.

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.1*
*Directors & Officers of the Acquired Subsidiary*

1. Steven Michael Cormie

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.2*
*Subsidiaries*

| Subsidiaries | FEIN | Direct owner of 100% of the equity interests of the Subsidiary listed in the first Column |
|---|---|---|
| Sorenson Media Limited | 82-1575205 | Sorenson Media, Inc. |
| Sorenson Media NL BV | 82-2378339 | Sorenson Media, Inc. |
| Sorenson Media Korea Limited | 315-88-00725 | Sorenson Media, Inc. |
| Attrix, Inc. | 82-1575205 | Sorenson Media, Inc. |
| Freewire, LLC | 82-2378339 | Sorenson Media, Inc. |
| Continuum Media Networks, Inc. | 81-1700370 | Sorenson Media, Inc. |

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.4(a)*
*Conflicts*

None

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.4(b)*
*Consents of Third Parties*

None

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.5(a)*
*Title to Acquired Assets of Seller*

1. **Gracenote, Inc. IP Infringement Complaint** - Case No. 2;16-cv-00950-CW-DBP – Claim of IP infringement against Seller on the following patents: U.S. Patent No. 9,143,718; U.S. Patent No. 9,414,008; and U.S. Patent No. 6,230,192.

2. **Inscape / Vizio, Inc. IP Infringement Complaint** – On December 18, 2018, Inscape/Vizio, Inc. filed a motion with the U.S. Bankruptcy Court for the District of Utah to request a removal of the automatic stay to allow Inscape/Vizio, Inc. to file a claim of IP infringement against Seller on the following patents: U.S. Patent No. 8,595,781; U.S. Patent No. 9,055,309; and U.S. Patent No. 9,838,753.

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.5(b)*
*Title to Assets of the Acquired Subsidiary*

1. **Gracenote, Inc. IP Infringement Claim** – Case No. 2:18-cv-00959-DAK - Claim of IP infringement against Sorenson Media Limited on the following patents: U.S. Patent No. 9,143,718; U.S. Patent No. 9,414,008, and U.S. Patent No. 6,230,192.

### ASSET PURCHASE AGREEMENT

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.6*
*Contracts*

| Non-debtor Party | Contract or Lease Description[3] |
|---|---|
| Experian Marketing Solutions, LLC | Order #1 dated, May 11, 2017; Data Services Agreement, dated May 11, 2017 |
| Iponweb GmbH | Master Services Agreement, dated May 9, 2017; Establishment Service Order, dated May 9, 2017; Monthly Operational Services Service Order, dated May 9, 2017; Variation Service Order dated May 9, 2017 |
| Digital Envoy, Inc. | Product Electronic Database and License Agreement dated April 6, 2017, as amended by that First Amendment to the Product - Electronic Database and License Agreement, dated April 6, 2018 |
| Samsung Electronics Corporation, Co. Ltd. | Commercial Agreement, dated September 22, 2016; Amendment 1 dated July 26, 2017; Amendment 2 dated March 14, 2018; Data Processing Agreement & Data Protection Requirements dated April 8, 2016; Samsung Service Level Agreement dated April 8, 2016 |
| BidSwitch GmbH | Supply Partner Connection & Media Agreement, dated April 17, 2017 |
| dataxu, inc | Data Integration Agreement, dated October 1, 2018 |
| Element TV Company, LP | Consumer Electronics Manufacturer Agreement, dated March 29, 2018 |
| Discovery Communications, LLC | Master Services Agreement, dated May 11, 2018 |
| Rainbow Media Holdings LLC | Master Services Agreement, dated February 28, 2018 |
| Cobra Service Agreement | Cobra Services Agreement, dated July 1, 2017 |
| FSA Health Plan | Sorenson Media Cafeteria Plan, dated January 1, 2018 |
| Voya Financial Retirement Insurance and Annuity Company | Application for Funding Agreement as of April 26, 2017; Non-Standardized 401k Profit Sharing Plan as of June 20, 2017 |
| Welsh Ministers | Guarantee and Indemnity dated May 23, 2014 |
| Welsh Ministers | Award of Non-Repayable Business Financing Funding to Aid for Job Creation Funding dated May 23, 2014, by and between Sorenson Media Limited and the Welsh Government, as amended by that Variance Letter dated May 22, 2017, by and between Sorenson Media Limited and the Welsh Government |
| T-State Five, LLC | Lease Agreement, dated April 25, 2017, as amended by that First Amendment to Lease, dated October 18, 2017 |

---

[3] Except as otherwise indicated, each Contract is between the Partner/Vendor listed in the column at left and the Seller.

| TP Building VI, LLC | Office Lease Agreement, dated January 27, 2016 |
|---|---|
| Kirton McConkie PC | Sublease, dated April 18, 2017, as amended by Amendment to Sublease, dated August 1, 2018 |
| Baran Group Limited | Lease, dated 2016, by and between Sorenson Media Limited and Baran Group Limited |
| Baran Group Limited | Lease, dated 2017, by and between Sorenson Media Limited and Baran Group Limited |

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.7(a)*
*Leased Real Property*

Schedule 4.7(a)-1

1. Sublease, dated April 18, 2017, by and between Seller and Kirton McConkie PC, as amended by that Amendment to Sublease, dated August 1, 2018, by and between Seller and Kirton McConkie PC.
2. Lease, dated 2017, by and between Sorenson Media Limited and Baran Group Limited
3. Lease, dated 2016, by and between Sorenson Media Limited and Baran Group Limited

Schedule 4.7(a)-2

None

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.7(c)*
*Security Deposits*

1. $19,469.33 pursuant to that Sublease, dated April 18, 2017, by and between Seller and Kirton McConkie PC, as amended by that Amendment to Sublease, dated August 1, 2018, by and between Seller and Kirton McConkie PC.

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.8(a)*
*Intellectual Property*

(i)    List of all Patents attached

(ii)    List of all Trademarks:

|   | Trademark # | Trademark |
|---|---|---|
| 1 | US TM 2,235,065 | Sorenson Video |
| 2 | US TM 2,714,373 | Sorenson Squeeze |
| 3 | US TM 2,729,675 | Sorenson Media |
| 4 | US TM 2,769,101 | Sorenson Spark |
| 5 | US TM 2,843,365 | Sorenson Design |
| 6 | US TM 3,250,180 | Squeeze |
| 7 | US TM 3,917,610 | Bloom Logo Design |
| 8 | US TM 3,920,411 | Sorenson 360 |

List of all Internet domain registrations attached

(iii)    List of all Copyrights attached

(iv)    List of all Software attached

(v)    List of all Third Party Intellectual Property attached

Schedule 4.8(a)(i) - Issued Patents and Pending Patent Applications

| Country | Appl. No. | Filing Date | Pat. No. | Issue Date | Title | Inventor(s) |
|---|---|---|---|---|---|---|
| US | 14/820476 | 8/6/2015 | 9641870 | 5/2/2017 | Content management of a content feed | Cornie, Steven M.; Liassides, Stefan |
| US | 14/839339 | 8/28/2015 | 9628830 | 4/18/2017 | Automatic content recognition (ACR) fingerprinting and video encoding | Ashbacher, Andrew; Liassides, Marcus |
| US | 15/457483 | 3/13/2017 | | | Automatic content recognition (ACR) fingerprinting and video encoding | Ashbacher, Andrew; Liassides, Marcus |
| US | 14/820490 | 8/6/2015 | 9743153 | 8/22/2017 | Content replacement with onscreen displays | Holyoak, Mitchell M. |
| US | 15/658345 | 7/24/2017 | 10057657 | 8/21/2018 | Content replacement with onscreen displays | Holyoak, Mitchell M. |
| CN | 201680043941.0 | 5/26/2016 | | | Detecting channel change in automatic content recognition fingerprint matching | Chen, Juikun |
| EP | 16808025.7 | 5/26/2016 | | | Detecting channel change in automatic content recognition fingerprint matching | Chen, Juikun |
| JP | P2018-517124 | 5/26/2016 | | | Detecting channel change in automatic content recognition fingerprint matching | Chen, Juikun |
| KR | 10-2018-7001098 | 5/26/2016 | | | Detecting channel change in automatic content recognition fingerprint matching | Chen, Juikun |
| US | 14/815256 | 7/31/2015 | 9516377 | 12/6/2016 | Detecting channel change in automatic content recognition fingerprint matching | Chen, Juikun |
| US | 15/266524 | 9/15/2016 | 9706261 | 7/11/2017 | Detecting channel change in automatic content recognition fingerprint matching | Chen, Juikun |
| US | 15/617591 | 6/8/2017 | 9877085 | 1/23/2018 | Detecting channel change in automatic content recognition fingerprint matching | Chen, Juikun |
| WO | PCT/US2016/034401 | 5/26/2016 | | | Detecting channel change in automatic content recognition fingerprint matching | Chen, Juikun |
| US | 14/820484 | 8/6/2015 | 9380325 | 6/28/2016 | Overlay content and aggregation of viewing data | Cornie, Steven M.; Liassides, Stefan |

Schedule 4.8(a)(i) - Issued Patents and Pending Patent Applications

| Country | Appl. No. | Filing Date | Pat. No. | Issue Date | Title | Inventor(s) |
|---|---|---|---|---|---|---|
| US | 15/182229 | 6/14/2016 | 9661385 | 5/23/2017 | Overlay content and aggregation of viewing data | Cormie, Steven M.; Lliassides, Stefan |
| US | 15/483762 | 4/10/2017 | 9912991 | 3/6/2018 | Overlay content and aggregation of viewing data | Cormie, Steven M.; Lliassides, Stefan |
| US | 15/895775 | 2/13/2018 | | | Overlay content and aggregation of viewing data | Cormie, Steven M.; Lliassides, Stefan |
| CN | 201680063089.3 | 9/27/2016 | | | Sequentially overlaying media content | Grover, Matthew |
| GB | 1805115.1 | 9/27/2016 | | | Sequentially overlaying media content | Grover, Matthew |
| KR | 10-2018-7012371 | 9/27/2016 | | | Media content overlaid sequentially | Grover, Matthew |
| MX | MX/a/2018/003808 | 9/27/2016 | | | Sequentially overlaying media content | Grover, Matthew |
| US | 15/130823 | 4/15/2016 | 9848214 | 12/19/2017 | Sequentially overlaying media content | Grover, Matthew |
| US | 15/842750 | 12/14/2017 | | | Sequentially overlaying media content | Grover, Matthew |
| WO | PCT/US2016/053996 | 9/26/2016 | | | Sequentially overlaying media content | Grover, Matthew |
| CN | 201680062706.3 | 9/27/2016 | | | Frequency capping for multimedia content | Grover, Matthew |
| GB | 1805116.9 | 9/27/2016 | | | Frequency capping for multimedia content | Grover, Matthew |
| KR | 10-2018-7012363 | 9/27/2016 | | | Frequency capping for multimedia content | Grover, Matthew |
| MX | MX/a/2018/003807 | 9/27/2016 | | | Frequency capping for media content | Grover, Matthew |
| US | 15/164882 | 5/25/2016 | 9723347 | 8/1/2017 | Frequency capping for media content | Grover, Matthew |
| US | 15/641796 | 7/5/2017 | 10187682 | 1/22/2019 | Frequency capping for media content | Grover, Matthew |
| WO | PCT/US2016/053997 | 9/27/2016 | | | Frequency capping for multimedia content | Grover, Matthew |
| CN | 201680057676.1 | 8/16/2016 | | | Dynamic video advertisement replacement | Lliassides, Marcus; Lliassides, Stefan |
| GB | 1805117.7 | 8/16/2016 | | | Dynamic video advertisement replacement | Lliassides, Marcus; Lliassides, Stefan |
| KR | 10-2018-7009915 | 8/16/2016 | | | Replace dynamic video ads | LIASSIDES MARCUS; LIASSIDES STEFAN |
| MX | MX/a/2018/002966 | 8/16/2016 | | | Dynamic video advertisement replacement | Lliassides, Marcus; Lliassides, Stefan |
| US | 15/058750 | 3/2/2016 | 9743154 | 8/22/2017 | Dynamic video advertisement replacement | Lliassides, Marcus; Lliassides, Stefan |
| US | 15/650425 | 7/14/2017 | 10110969 | 10/23/2018 | Dynamic video advertisement replacement | Lliassides, Marcus; Lliassides, Stefan |

Schedule 4.8(a)(i) - Issued Patents and Pending Patent Applications

| Country | Appl. No. | Filing Date | Pat. No. | Issue Date | Title | Inventor(s) |
|---|---|---|---|---|---|---|
| US | 16/144361 | 9/27/2018 | | | Dynamic video advertisement replacement | Llassides, Marcus; Llassides, Stefan |
| WO | PCT/US2016/047203 | 8/16/2016 | | | Dynamic video advertisement replacement | Llassides, Marcus; Llassides, Stefan |
| US | 15/058819 | 3/2/2016 | 9854326 | 12/26/2017 | Creating and fulfilling dynamic advertisement replacement inventory | Llassides, Marcus; Llassides, Stefan |
| US | 15/631838 | 1/25/2017 | | | Creating and fulfilling dynamic advertisement replacement inventory | Llassides, Marcus; Llassides, Stefan |
| CN | 201680062405.5 | 9/27/2016 | | | Media content matching and indexing | Ashbacher, Andrew |
| GB | 1085125.0 | 9/27/2016 | | | Media content matching and indexing | Ashbacher, Andrew |
| KR | 10-2018-7014587 | 9/27/2016 | | | Media content matching and indexing | Ashbacher, Andrew |
| MX | MX/a/2018/003806 | 9/27/2016 | | | Media content matching and indexing | Ashbacher, Andrew |
| US | 15/081738 | 3/25/2016 | 9813781 | 11/7/2017 | Media content matching and indexing | Ashbacher, Andrew |
| US | 15/726687 | 10/10/2017 | 10187705 | 1/22/2019 | Media content matching and indexing | Ashbacher, Andrew L. |
| US | 16/217980 | 12/12/2018 | | | Media content matching and indexing | Ashbacher, Andrew L. |
| WO | PCT/US2016/053998 | 9/27/2016 | | | Media content matching and indexing | Ashbacher, Andrew L. |
| CN | 201680054373.4 | 9/13/2016 | | | Digital overlay offers on connected media devices | Evans, David John; Greenway, Thomas; Spicer, Martin Ian |
| GB | 1805114.4 | 9/13/2016 | | | Digital overlay offers on connected media devices | Evans, David John; Greenway, Thomas; Spicer, Martin Ian |
| KR | 10-2018-7010846 | 9/13/2016 | | | Digital overlay offers on connected media devices | Evans, David John; Greenway, Thomas; Spicer, Martin Ian |
| MX | MX/a/2018/003399 | 9/13/2016 | | | Digital overlay offers on connected media devices | Evans, David John; Greenway, Thomas; Spicer, Martin Ian |
| US | 15/130639 | 4/15/2016 | 10075755 | 9/11/2018 | Digital overlay offers on connected media devices | Evans, David John; Greenway, Thomas; Spicer, Martin Ian |
| US | 15/418439 | 1/27/2017 | | | Digital overlay offers on connected media devices | Evans, David John; Greenway, Thomas; Spicer, Martin Ian |
| US | 16/052267 | 8/1/2018 | | | Digital overlay offers on connected media devices | Evans, David John; Greenway, Thomas; Spicer, Martin Ian |

Schedule 4.8(a)(i) - Issued Patents and Pending Patent Applications

| Country | Appl. No. | Filing Date | Pat. No. | Issue Date | Title | Inventor(s) |
|---|---|---|---|---|---|---|
| WO | PCT/US2016/051532 | 9/13/2016 | | | Digital overlay offers on connected media devices | Evans, David John; Greenway, Thomas; Spicer, Martin Ian |
| US | 15/098135 | 4/13/2016 | 9848235 | 12/19/2017 | Video Fingerprinting Based on Fourier Transform of Histogram | Chen, Juikun |
| US | 15/826044 | 11/29/2017 | | | Video Fingerprinting Based on Fourier Transform of Histogram | Chen, Juikun |
| WO | PCT/US2017/017797 | 2/14/2017 | | | Video Fingerprinting Based on Fourier Transform of Histogram | Chen, Juikun |
| US | 15/138678 | 4/26/2016 | 9906831 | 2/27/2018 | Fingerprinting media content using hashing | Chen, Juikun |
| US | 15/886848 | 2/2/2018 | 10116987 | 10/30/2018 | Fingerprinting media content using hashing | Chen, Juikun |
| WO | PCT/US2017/018189 | 2/16/2017 | | | Fingerprinting media content using hashing | Chen, Juikun |
| US | 15/243658 | 8/22/2016 | 10063917 | 8/28/2018 | Fingerprint layouts for content | Chen, Juikun |
| US | 16/035051 | 7/13/2018 | | | Fingerprinting | Chen, Juikun |
| WO | PCT/US2017/021690 | 3/9/2017 | | | Fingerprint Layouts For Content | Chen, Juikun |
| US | 14/881852 | 10/13/2015 | 10194177 | 1/29/2019 | Interweaving Media Content | Andrew L. Ashbacher |
| US | 16/217852 | 12/12/2018 | | | Interweaving Media Content | Andrew L. Ashbacher |
| US | 14/736158 | 6/10/2015 | | | Automatic Content Recognition Search Optimization | William Brimley |
| CN | 201680023388.4 | 4/21/2016 | | | Automatic content recognition fingerprint sequence matching | Chen, Juikun |
| EP | 16783829.1 | 4/21/2016 | | | Automatic content recognition fingerprint sequence matching | Chen, Juikun |
| KR | 10-2017-7033908 | 4/21/2016 | | | Automatic content recognition fingerprint sequence matching | Chen, Juikun |
| JP | P2018-506796 | 4/21/2016 | 6438628 | 12/19/2018 | Automatic contents recognition fingerprints sequence collation | Chen, Juikun |
| US | 14/813416 | 7/30/2015 | | | Automatic Content Recognition with Local Matching | Chen, Juikun |
| WO | PCT/US2016/028583 | 4/21/2016 | | | Automatic content recognition fingerprint sequence matching | Chen, Juikun |

Schedule 4.8(a)(i) - Issued Patents and Pending Patent Applications

| Country | Appl. No. | Filing Date | Pat. No. | Issue Date | Title | Inventor(s) |
|---|---|---|---|---|---|---|
| CN | 201680023473.0 | 4/25/2016 | | | Automatic content recognition fingerprint sequence matching | Pavel A Koshevoy |
| EP | 16784091.7 | 4/25/2016 | | | Automatic content recognition fingerprint sequence matching | Pavel A Koshevoy |
| WO | PCT/US2016/029221 | 4/25/2016 | | | Automatic content recognition fingerprint sequence matching | Pavel A Koshevoy |
| US | 15/164714 | 5/25/2016 | | | Content Comparison Testing on Linear Media Streams | Grover, Matthew |
| WO | PCT/US2017/016666 | 2/6/2017 | | | Content Comparison Testing on Linear Media Streams | Grover, Matthew |
| US | 15/938049 | 3/28/2018 | | | Interactive Overlays to Determine Viewer Data | Grover, Matthew |
| WO | PCT/US2018/024740 | 3/28/2018 | | | Interactive Overlays to Determine Viewer Data | Grover, Matthew |
| US | 15/938167 | 3/28/2018 | | | Targeted Content Placement Using Overlays | Grover, Matthew |
| WO | PCT/US2018/024756 | 3/28/2018 | | | Targeted Content Placement Using Overlays | Grover, Matthew |
| US | 15/933899 | 3/23/2018 | | | Employing Automatic Content Recognition to Allow Resumption of Watching Interrupted Media Program from Television Broadcast | Grover, Matthew |
| WO | PCT/US2018/024035 | 3/23/2018 | | | Employing Automatic Content Recognition to Allow Resumption of Watching Interrupted Media Program from Television Broadcast | Grover, Matthew |
| US | 15/934753 | 3/23/2018 | 10182263 | 1/15/2019 | Enabling interactive control of live television broadcast streams | Grover, Matthew |
| WO | PCT/US2018/024165 | 3/23/2018 | | | Enabling interactive control of live television broadcast streams | Grover, Matthew |
| US | 15/725260 | 10/4/2017 | | | Obtaining Viewer Demographics Through Advertisement Selections | Richard Smith |
| US | 15/703684 | 9/13/2017 | | | Cold Matching by Automatic Content Recognition | Chen, Jiukun |
| WO | PCT/US2018/050230 | 9/10/2018 | | | Cold Matching by Automatic Content Recognition | Chen, Jiukun |

Page 5 of 6

Schedule 4.8(a)(i) - Issued Patents and Pending Patent Applications

| Country | Appl. No. | Filing Date | Pat. No. | Issue Date | Title | Inventor(s) |
|---|---|---|---|---|---|---|
| US | 15/703391 | 9/13/2017 | | | Flagging Advertisement Frames for Automatic Content Recognition | Chen, Juikun |
| WO | PCT/US2018/050184 | 9/18/2018 | | | Flagging Advertisement Frames for Automatic Content Recognition | Chen, Juikun |
| US | 16/023555 | 6/29/2018 | | | Frame Certainty for Automatic Content Recognition | Ashbacher, Andrew L. |
| WO | PCT/US2018/040371 | 6/29/2018 | | | Frame Certainty for Automatic Content Recognition | Ashbacher, Andrew L |
| US | 15/726987 | 10/6/2017 | | | Scene Frame Matching for Automatic Content Recognition | Chen, Juikun |

US 8,296,649 Method, graphical interface and computer-readable medium for generating a preview of a reformatted preview segment

US 7,975,219 Method, graphical interface and computer-readable medium for reformatting data

US 7,885,979 Method, graphical interface and computer-readable medium for forming a batch job

US 7,583,286 System and method for collection and redistribution of video conferences

US 6,909,748 Method and system for image compression using block size heuristics

## Schedule 4.8(a)(ii) - Domain Name

acuhone.co.uk
acuhone.com
acuhone.de
acuhone.fr
acuhone.info
acuhone.it
acuhone.kr
acuhone.net
acuhone.org
acuhone.us
adhone.biz
adhone.co.uk
adhone.com
adhone.de
adhone.fr
adhone.info
adhone.it
adhone.kr
adhone.net
adhone.org
adhone.us
attrix.tv
continuummedia.tv
cmohone.biz
cmohone.co.uk
cmohone.com
cmohone.de
cmohone.fr
cmohone.info
cmohone.it
cmohone.kr
cmohone.net
cmohone.org
cmohone.us
GETSPARKTV.COM
hone.com
hone.fr
honeaddressable.biz
honeaddressable.co.uk
honeaddressable.com
honeaddressable.de
honeaddressable.fr
honeaddressable.info
honeaddressable.it
honeaddressable.kr
honeaddressable.net

honeaddressable.org
honeaddressable.us
honeads.biz
honeads.co.uk
honeads.com
honeads.de
honeads.fr
honeads.info
honeads.lt
honeads.kr
honeads.net
honeads.org
honeads.us
honecmo.biz
honecmo.co.uk
honecmo.com
honecmo.de
honecmo.fr
honecmo.info
honecmo.it
honecmo.kr
honecmo.net
honecmo.org
honecmo.us
honemark.biz
honemark.co.uk
honemark.com
honemark.de
honemark.fr
honemark.info
honemark.it
honemark.kr
honemark.net
honemark.org
honemark.us
honemedia.biz
honemedia.co.uk
honemedia.de
honemedia.fr
honemedia.info
honemedia.it
honemedia.kr
honemedia.net
honemedia.org
honemedia.us
honepoint.biz
honepoint.co.uk

honepoint.com
honepoint.de
honepoint.fr
honepoint.info
honepoint.it
honepoint.kr
honepoint.net
honepoint.org
honepoint.us
mediahone.biz
mediahone.co.uk
mediahone.com
mediahone.de
mediahone.fr
mediahone.info
mediahone.it
mediahone.kr
mediahone.net
mediahone.org
mediahone.us
MYSPARKTV.COM
SMART-BROADCAST.COM
SMART-BROADCAST.INFO
SMART-BROADCAST.ORG
SMART-BROADCAST.TV
SMARTBROADCAST.COM
SMARTBROADCAST.INFO
SMARTERTV.ORG
SMEDIABUGS.INFO
SORENSON-MEDIA.COM
SORENSON.MEDIA
SORENSONCLOUD.COM
sorensonmedia.at
sorensonmedia.be
sorensonmedia.ch
sorensonmedia.co.uk
SORENSONMEDIA.COM
sorensonmedia.de
sorensonmedia.dk
sorensonmedia.es
sorensonmedia.fr
sorensonmedia.kr
SORENSONMEDIA.NET
sorensonmedia.nl
SORENSONMEDIA.ORG
sorensonmedia.se
sorensonpromote.com

SORENSONREACH.COM
sorensonspark.com
sorensonspark.net
SORENSONSQUEEZE.COM
SORENSONSTORE.COM
sorensonsummer.com
SPARKENLIGHT.COM
SPARKENLIGHT.TV
SQUEEZEEXPRESS.COM
SQUEEZEFAST.COM
SQUEEZEZ.COM
VEEKEEPER.COM
VIDEODELIVERYSERVICE.COM
WE2GETHR.COM
WEGATHR.COM

Schedule 4.8(a)(x) - Software

| Repo | Name | Project | SM Project | Default Branch | Language | Size | Footprint | LOC |
|---|---|---|---|---|---|---|---|---|
| bitbucket | confluence-test-ruby | AA | #N/A | master | ruby | 236 | 0.23MB | 291 |
| bitbucket | google-calendar-sparklet | AA | #N/A | master | ruby | 235 | 0.23MB | 440 |
| bitbucket | nudose-migration | AA | #N/A | master | ruby | 194 | 0.19MB | 67 |
| bitbucket | reporting-base | AA | #N/A | master | ruby | 420 | 0.41MB | 2,197 |
| bitbucket | soterison-engine-ruby | AA | #N/A | master | ruby | 252 | 0.25MB | 393 |
| bitbucket | spark-account-manager-ruby | AA | #N/A | master | ruby | 216 | 0.21MB | 167 |
| bitbucket | spark-ad-suite-ruby | AA | #N/A | master | ruby | 328 | 0.32MB | 873 |
| bitbucket | spark-ruby | AA | #N/A | master | ruby | 328 | 0.32MB | 1,705 |
| bitbucket | spark-viva-ruby | AA | #N/A | master | ruby | 224 | 0.22MB | 342 |
| bitbucket | spark-video-confluence-helper | AA | #N/A | master | ruby | 172 | 0.17MB | 740 |
| bitbucket | spark-video-monitor-cli | AA | #N/A | master | ruby | 272 | 0.27MB | 785 |
| bitbucket | acceptance_tests | AA | Ad Suite | master | ruby | 324 | 0.32MB | 512 |
| bitbucket | addressable-acceptance-tests | AA | Ad Suite | master | ruby | 292 | 0.28MB | 6,606 |
| bitbucket | adsuite_performance_testing | AA | Ad Suite | develop | ruby | 19824 | 19.36MB | 537 |
| bitbucket | adsuite_system_tests | AA | Ad Suite | master | ruby | 232 | 0.23MB | 7,416 |
| bitbucket | adsuite-cloudformation | AA | Ad Suite | master | python | 504.22 | 492.40MB | 2 |
| bitbucket | adsuite-denki | AA | Ad Suite | master | ruby | 788 | 0.77MB | 397 |
| bitbucket | adsuite-docker | Don't count | Ad Suite | master | nodejs | 2226 | 2.17MB | 390 |
| bitbucket | adsuite-infrastructure | AP | Ad Suite | master | ruby | 172 | 0.17MB | 2,024 |
| bitbucket | adsuite-log-analyser | AP | Ad Suite | develop | nodejs | 212 | 0.21MB | 814 |
| bitbucket | adsuite-system_tests | AP | Ad Suite | master | ruby | 232 | 0.23MB | 57,283 |
| bitbucket | adsuite-hastis | AP | Ad Suite | master | nodejs | 464 | 0.45MB | 814 |
| bitbucket | adsuite-utils | AP | Ad Suite | master | ruby | 224 | 0.22MB | 390 |
| bitbucket | channel-updater | AP | Ad Suite | master | nodejs | 11336 | 11.07MB | 99,893 |
| bitbucket | cloosst-importer | AP | Ad Suite | master | ruby | 528 | 0.52MB | 1,102 |
| bitbucket | cognitive-app | AP | Ad Suite | master | nodejs | 280 | 0.28MB | 7,770 |
| bitbucket | ctr-details-export | AP | Ad Suite | develop | nodejs | 304 | 0.30MB | 1,343 |
| bitbucket | ctr_schedule_export_cookbook | AP | Ad Suite | develop | ruby | 268 | 0.25MB | 1,275 |
| bitbucket | demo-app | AP | Ad Suite | master | nodejs | 326 | 0.32MB | 1,047 |
| bitbucket | demo-rig-setup | AP | Ad Suite | develop | nodejs | 324 | 0.32MB | 171 |
| bitbucket | dev-proxy | AP | Ad Suite | master | nodejs | 200 | 0.20MB | 848 |
| bitbucket | device-status-page | AP | Ad Suite | develop | javascript | 598 | 0.57MB | 8,276 |
| bitbucket | elemants-slide | AP | Ad Suite | master | nodejs | 220 | 0.22MB | 532 |
| bitbucket | elemango-preloader | AP | Ad Suite | master | nodejs | 184 | 0.18MB | 33 |
| bitbucket | grasp-mock | AP | Ad Suite | master | nodejs | 180 | 0.18MB | 35 |
| bitbucket | harvesting-utils | AP | Ad Suite | develop | nodejs | 192 | 0.19MB | 158 |
| bitbucket | http-mock-server | AP | Ad Suite | develop | nodejs | 624 | 0.61MB | 9,605 |
| bitbucket | iceboxed-cli-mock | AP | Ad Suite | develop | nodejs | 404 | 0.39MB | 5,392 |
| bitbucket | lionweb-acceptance-tests | AP | Ad Suite | develop | nodejs | 712 | 0.70MB | 4,791 |
| bitbucket | lionweb-charts-grimar | AP | Ad Suite | master | nodejs | 206 | 0.20MB | 238 |
| bitbucket | lionweb-stub | AP | Ad Suite | develop | nodejs | 232 | 0.23MB | 479 |
| bitbucket | js-mobsts | AP | Ad Suite | master | nodejs | 348 | 0.34MB | 848 |
| bitbucket | kafka-streams | AP | Ad Suite | develop | nodejs | 2594 | 2.45MB | 41,882 |
| bitbucket | kpi-dashboard | AP | Ad Suite | master | nodejs | 3072 | 3.00MB | 10,150 |
| bitbucket | ssimboss | AP | Ad Suite | master | nodejs | 268 | 0.26MB | 656 |
| bitbucket | linear-infrastructure | AP | Don't count | master | other | 172 | 0.17MB | 1,916 |
| bitbucket | linear-eljs | AP | Don't count | master | javascript | 458 | 0.45MB | 2,323 |
| bitbucket | linear-portal | AP | Don't count | master | nodejs | 348 | 0.34MB | 806 |
| bitbucket | linear-system-tests | #N/A | Don't count | develop | nodejs | 148748 | 143.31MB | 504,432 |
| bitbucket | linear-toolbox | AP | Don't count | master | nodejs | 212 | 0.21MB | 164 |
| bitbucket | logging-engine | AP | Ad Suite | master | nodejs | 192 | 0.19MB | 1 |
| bitbucket | oe-check-tool | AP | Ad Suite | develop | coffeescript | 246 | 0.24MB | 1,688 |
| bitbucket | crm-latency-monitor | AP | Ad Suite | master | javascript | 172 | 0.17MB | 638 |
| bitbucket | crms_page_objects | AP | Ad Suite | master | javascript | 372 | 0.36MB | 2,765 |
| bitbucket | open-earns-wolf | AP | Ad Suite | master | ruby | 540 | 0.53MB | 4,504 |
| bitbucket | overlay | AP | Ad Suite | develop | javascript | 2796 | 2.69MB | 5,053 |
| bitbucket | overlay-automation | AP | Ad Suite | master | other | 316 | 0.31MB | 2,089 |
| bitbucket | overlay-creatives | AP | Ad Suite | develop | nodejs | 96692 | 94.43MB | 138,557 |
| bitbucket | overlay-demo | AP | Ad Suite | develop | nodejs | 24320 | 23.75MB | 250,099 |
| bitbucket | overlay-engine | AP | Ad Suite | develop | javascript | 452 | 0.44MB | 53,648 |
| bitbucket | overlay-management-system | AP | Ad Suite | develop | nodejs | 846 | 0.82MB | 620,938 |
| bitbucket | overlay-management-system-ejs | AP | Ad Suite | develop | nodejs | 1728 | 1.72MB | 2,323 |
| bitbucket | performance-dashboard | AP | Ad Suite | develop | nodejs | 23516 | 22.96MB | 238,629 |
| bitbucket | phone-verify-sys | AP | Ad Suite | master | nodejs | 862 | 0.87MB | 52,846 |
| bitbucket | phoneview4jays | AP | Ad Suite | master | nodejs | 11672 | 11.40MB | 84,744 |
| bitbucket | pmxt_system_tests | AP | Ad Suite | master | ruby | 4790 | 4.67MB | 4,79,492 |
| bitbucket | samsung-hls-test | AP | Ad Suite | master | ruby | 1688 | 1.65MB | 815,492 |
| bitbucket | santos-ingeststable | AP | Ad Suite | master | ruby | 332 | 1.65MB | 18,174 |
| bitbucket | schedule-mock | AP | Ad Suite | develop | ruby | | | 1,735 |

| Projects | Num Repositories | Total Footprint | Total LOC |
|---|---|---|---|
| Account Manager | 2 | 13.86MB | 103,564 |
| Ad Suite | 67 | 1,604.33MB | 3,091,759 |
| CRM Integration | 13 | 592.33MB | 1,838,678 |
| Core Control | 10 | 43.24MB | 343,109 |
| DMP | 17 | 351.50MB | 1,877,283 |
| DMP Analytics | 26 | 297.45MB | 295,820 |
| Engine | 36 | 931.32MB | 1,955,780 |
| QA | 12 | 45.50MB | 425,526 |
| Spark Analytics | 41 | 131.70MB | 1,466,492 |
| Spark Core | 23 | 738.84MB | 1,874,255 |
| Spark Plug | 25 | 721.385 | 721,385 |
| Spark Video | 25 | 3,527.89MB | 1,411,443 |
| User Interface | 24 | 84.99MB | 560,725 |
| Grand Total | 327 | 9,522.71MB | 16,041,900 |

Marked some items as "Don't count"
Many of the "noas" repos contain large generated test files

| Repo | Name | Category | Group | Branch | Language | Num | Size | Count |
|---|---|---|---|---|---|---|---|---|
| bitbucket | small-utils | AP+ | Ad Suite | develop | javascript | 378 | 0.37MB | 3,003 |
| bitbucket | somerset_selenium_helper | AP+ | Ad Suite | master | ruby | 340 | 0.33MB | 1,463 |
| bitbucket | spark-core-manual-ingestor-mock | AP+ | Ad Suite | master | nodejs | 204 | 0.20MB | |
| bitbucket | spark-core-serve-tests | AP | Ad Suite | master | ruby | 737354 | 720.00MB | 1,140,170 |
| bitbucket | ssn-das-evaluator | AP | Ad Suite | develop | nodejs | 350 | 0.35MB | 1,149,101 |
| bitbucket | ssn-das-evaluator | AP | Ad Suite | master | nodejs | 195 | 0.19MB | 259 |
| bitbucket | system-last-mock-server | AP | Ad Suite | master | nodejs | 204 | 0.20MB | 213 |
| bitbucket | system-tests-indexer-mock | AP | Ad Suite | master | javascript | 172 | 0.17MB | 2 |
| bitbucket | temp-terraform-workshop | AP | Ad Suite | develop | shell | 198 | 0.18MB | |
| bitbucket | temporary-export-scripts | AP | Ad Suite | master | nodejs | 204 | 0.20MB | 122 |
| bitbucket | test-channel-suite | AP | Ad Suite | master | nodejs | 172 | 0.17MB | 431 |
| bitbucket | test-date-generator | AP | Ad Suite | master | ruby | 277 | 0.27MB | 1,434 |
| bitbucket | tv-test-harness | AP | Ad Suite | master | nodejs | 239 | 0.23MB | 493 |
| bitbucket | uk-gmp-project | AP | Ad Suite | master | javascript | 200 | 0.20MB | 385 |
| bitbucket | vue-pocketbooks | AP | Ad Suite | develop | ruby | 1416 | 1.38MB | 149 |
| bitbucket | vwebsim-shell | AP | Ad Suite | master | | 184 | 0.18MB | 4,919 |
| bitbucket | wfe-control | AP | Core Control | master | | 10/68 | 10.25MB | 214,288 |
| bitbucket | wiretap | CC | Core Control | master | | 3490 | 3.80MB | 101,139 |
| bitbucket | build-docker | CC | Core Control | master | | 840 | 0.83MB | 8,143 |
| bitbucket | irestime-playbooks | CC | Core Control | master | | 238 | 0.23MB | 979 |
| bitbucket | semi-adsuite-asset | CC | Core Control | master | | 294 | 0.28MB | 572 |
| bitbucket | semi-adsuite-build-docker | CC | Core Control | master | python | 12488 | 12.20MB | 56,674 |
| bitbucket | semi-adsuite-proxy | CC | Core Control | master | | 15308 | 14.93MB | 53,393 |
| bitbucket | semi-box-log | CC | Core Control | master | | | 0.29MB | 1,587 |
| bitbucket | semi-coreserver-docker | CC | Core Control | master | | 280 | 0.27MB | 948 |
| bitbucket | semi-library | CC | Core Control | master | ruby | 318 | 0.31MB | 101,822 |
| bitbucket | semi-rhim | CC | Core Control | master | | 34340 | 33.54MB | 1,343,356 |
| bitbucket | semi-semsongs&suite | Don't count | CEM Integration | master | | 681212 | 645.71MB | 58 |
| bitbucket | devops-scripts | CEM | CEM Integration | master | | 181 | 0.18MB | 84 |
| bitbucket | owl | CEM | CEM Integration | master | shell | 228 | 3.80MB | 754 |
| bitbucket | ltms | CEM | CEM Integration | master | | 124 | 0.17MB | 287,560 |
| bitbucket | virtual-tv-client | CEM | CEM Integration | master | python | 26864 | 25.33MB | 220,273 |
| bitbucket | beat_TL_laundic_classifier_poc | CEM | CEM Integration | master | c++ | 144944 | 141.55MB | 1,604,953 |
| bitbucket | build-core-liprest-docker | CEM | CEM Integration | master | | 8520z4 | 832.45MB | 288 |
| bitbucket | build-core-openssl-docker | CEM | CEM Integration | master | | 132 | 0.18MB | 262 |
| bitbucket | build-core-xsmid-docker | Don't count | | master | nodejs | 138 | 0.13MB | 2,014 |
| bitbucket | cassandra-benchmark | CEM | CEM Integration | master | javascript | 1496 | 0.44MB | 7,356 |
| bitbucket | cem-dashboards | CEM | CEM Integration | develop | | 61600 | 60.16MB | 316,119 |
| bitbucket | ci-ci-dev | CEM | CEM Integration | master | | 113000 | 80.35MB | 379,190 |
| bitbucket | cove-client | CEM | CEM Integration | master | | 286 | 0.25MB | 575 |
| bitbucket | cove-common | CEM | CEM Integration | master | c++ | 222266 | 217.54MB | 534,437 |
| bitbucket | core-hffe-interview | CEM | CEM Integration | master | ruby | 270b | 0.25MB | 467 |
| bitbucket | core-h*ffa-test | CEM | | master | | 178 | 0.17MB | 64 |
| bitbucket | core-js | CEM | | master | | 176 | 0.17MB | 41 |
| bitbucket | core-svg | Don't count | | master | | 176 | 0.17MB | |
| bitbucket | cove-server | Don't count | Spark Core | master | go | 235 | 0.23MB | 482 |
| bitbucket | cove-server-common | Don't count | | master | | 2507356 | 2448.49MB | 5,280,308 |
| bitbucket | core-vcr | CORE | Spark Core | develop | | 294 | 0.28MB | 239 |
| bitbucket | dms | CORE | Spark Core | master | | 1451043 | 1.72MB | 229,374 |
| bitbucket | etcfa | Don't count | Spark Core | develop | go | 548 | 0.54MB | 3,858 |
| bitbucket | mwt_events | CORE | Spark Core | master | | 8324 | 8.13MB | 28,110 |
| bitbucket | omoku_trustzone | Don't count | Spark Core | master | javascript | 148408 | 142.98MB | 440,577 |
| bitbucket | pipeline_test | CORE | Spark Core | master | python | 300 | 0.29MB | 793 |
| bitbucket | pk | CORE | Spark Core | master | | 180 | 0.18MB | 31 |
| bitbucket | pk-chef | CORE | Spark Core | master | | 4124 | 4.03MB | 38,836 |
| bitbucket | samsung-code | Don't count | Spark Core | master | | 172 | 0.17MB | 44 |
| bitbucket | scp-server | CORE | Spark Core | master | go | 528 | 0.52MB | 3,567 |
| bitbucket | sonosserve | CORE | Spark Core | develop | | 172 | 0.17MB | 73,514 |
| bitbucket | spark-core-a* | CORE | Spark Core | python | | 10944 | 10.69MB | 970 |
| bitbucket | spark-core-chef | CORE | Spark Core | develop | | 2040 | 0.27MB | 1,518,255 |
| bitbucket | spark-core-indexer | CORE | RNA | master | c++ | 434824 | 424.63MB | 68 |
| bitbucket | spark-core-orsay14-docker | CORE | Spark Core | master | go | 192 | 0.19MB | 2,966 |
| bitbucket | spark-core-orsay14s-docker | CORE | Spark Core | master | ruby | 716 | 0.70MB | 679 |
| bitbucket | spark-core-orsay16-docker | CORE | Spark Core | master | c++ | 7035 | 6.87MB | 22,167 |
| bitbucket | spark-core-research\ | CORE | Spark Core | master | c++ | 7232 | 7.45MB | 231,419 |
| bitbucket | spark-core-termform | CORE | Spark Core | master | c++ | 1773316 | 173.31MB | 223,440 |
| bitbucket | | | RNA | master | | 448 | 0.44MB | 7,253 |
| bitbucket | | | Spark Core | master | | 1068 | 1.04MB | 7,550 |
| bitbucket | | | Spark Core | stage | | 31468 | 30.73MB | 61,524 |
| bitbucket | | | Spark Core | master | | 478928 | 467.70MB | 880,028 |
| bitbucket | | | Spark Core | master | | 10944 | 1.73MB | 893,715 |
| bitbucket | | | Spark Core | master | | 180 | 0.18MB | 38 |

| Source | Repository | Category | Engine | Branch | Language | | Size | |
|---|---|---|---|---|---|---|---|---|
| bitbucket | spark-core-testing | CORE | #N/A | master | c++ | 772 | 0.75MB | 5,645 |
| bitbucket | spark-core-tzam15-docker | CORE | #N/A | master | | 169858 | 155.91MB | 336,026 |
| bitbucket | spark-core-tzam15-docker | CORE | #N/A | master | | 661204 | 645.71MB | 1,343,052 |
| bitbucket | spark-core-tzam17-qdcoder | CORE | #N/A | master | | 848024 | 464.38MB | 1,012,341 |
| bitbucket | spark-core-tzam17-qdcoder | CORE | Spark Core | master | | 22683 | 219.10MB | 106,084 |
| bitbucket | spark-oug | CORE | Spark Core | master | | 36832 | 35.77MB | 85,184 |
| bitbucket | spark-oug | CORE | #N/A | master | | 268104 | 281.62MB | 537,926 |
| bitbucket | spark-plug-build | CORE | #N/A | master | | 441776 | 431.42MB | 814,864 |
| bitbucket | tazre20116_trustzone | Dont count | #N/A | master | | 468204 | 455.30MB | 445,834 |
| bitbucket | tzare2017_trustzone | Dont count | #N/A | master | c++ | 336260 | 328.38MB | 611,544 |
| bitbucket | dar-utils | DA | #N/A | master | | 260 | 0.23MB | 181 |
| bitbucket | dar-utils | DA | #N/A | master | | 192 | 0.18MB | 259 |
| bitbucket | dar-reporting | DA | #N/A | master | | 184 | 0.18MB | 155 |
| bitbucket | dar-schedule | DA | #N/A | master | | 236 | 0.23MB | 582 |
| bitbucket | itest-traffic-logs | DA | #N/A | master | | 175 | 0.17MB | 104 |
| bitbucket | renov4-bg8 | DA | #N/A | master | | 184 | 0.18MB | 824 |
| bitbucket | dmvo | COUPE | #N/A | master | | 236 | 0.23MB | 181 |
| bitbucket | dmvo | DM | #N/A | master | | 172 | 0.17MB | 8 |
| bitbucket | broadcaster-log-processing | DM | #N/A | master | | 78916 | 77.07MB | 154,008 |
| bitbucket | dmp-cookbooks | DMP | #N/A | master | | 368 | 0.38MB | 1,036 |
| bitbucket | mdm-cloud | DMP | #N/A | master | | 444 | 0.43MB | 1,144 |
| bitbucket | mdm-migrations | DMP | #N/A | master | | 796 | 0.78MB | 620 |
| bitbucket | scheduleadk | DMP | #N/A | master | | 27552 | 268.74MB | 153,704 |
| bitbucket | summer-cloud | DMP | #N/A | master | python | 1094 | 1.08MB | 7,070 |
| bitbucket | summer-containers | DMP | #N/A | master | python | 207872 | 203.00MB | 1,030,490 |
| bitbucket | summer-testing | DMP | #N/A | master | | 916 | 0.89MB | 5,291 |
| bitbucket | summer-works | DMP | #N/A | master | | 1094 | 1.04MB | 4,242 |
| bitbucket | loratiform-swe-broadcast-data-api | DP | #N/A | master | | 408 | 0.40MB | 1 |
| bitbucket | hvid-aisside-api | DP | #N/A | master | | 1998 | 1.95MB | 15,420 |
| bitbucket | hvid-samsung-api | DP | #N/A | master | | 1320 | 1.29MB | 8,359 |
| bitbucket | hvidb-samsung-p-ownweb-erf) | DP | #N/A | master | | 384 | 0.38MB | 2,760 |
| bitbucket | hvid-samsung-p-ownweb-migrations | DP | #N/A | master | go | 796 | 0.74MB | 3,027 |
| bitbucket | hvid-samsung-p-ownweb-performance-test-file | DP | #N/A | master | | 34832 | 33.92MB | 272,981 |
| bitbucket | hvid-samsung-p-ownweb-reporting-migrations | DP | #N/A | master | | 722 | 0.71MB | 44,012 |
| bitbucket | hvidb-testing-system-python | DP | #N/A | master | python | 1681732 | 584.19MB | 882,828 |
| bitbucket | ios-gqh-director | DPI | #N/A | master | scala | 1072 | 0.98MB | 15,007 |
| bitbucket | ios-gqh-lambda | DPI | #N/A | master | | *185086 | 1812.09MB | 2,949 |
| bitbucket | cos-funnel-singular | DPI | #N/A | master | | 132592 | 127.53MB | 423,269 |
| bitbucket | dpi-apps | DPI | #N/A | master | | 7284 | 7.11MB | 32,230 |
| bitbucket | dpi-demo | DPI | #N/A | master | | 1464 | 1.43MB | 7,560 |
| bitbucket | dpi-gqh-lambda | DPI | #N/A | master | | 650960 | 636.04MB | 1,919,504 |
| bitbucket | c-app | DPI | #N/A | master | | 172 | 0.17MB | 12,328 |
| bitbucket | asku-latencia-report | DT | #N/A | master | | 212 | 0.21MB | 115 |
| bitbucket | asku-latencia-collection | DT | #N/A | master | | 6824 | 6.86MB | 809 |
| bitbucket | audience_sizing | DT | #N/A | master | | 428 | 0.42MB | 75,386 |
| bitbucket | boarddatafatasennreport | DT | #N/A | master | | 101216 | 85.64MB | 2,004 |
| bitbucket | dmr_success_fridays | DT | #N/A | master | | 143458 | 140.09MB | 2,075 |
| bitbucket | dmr_emozions_reports | DT | #N/A | master | | 138060 | 134.00MB | 260,160 |
| bitbucket | dmr_tableau-snapshot | DT | #N/A | master | | 2208 | 2.18MB | 265,016 |
| bitbucket | ph-323-ps64-lp-pno-channel-cms-state | DT | #N/A | master | | 180 | 0.18MB | 54 |
| bitbucket | experienmonk | DT | #N/A | *master | - | *434016 | 1459.00MB | 6,797,470 |
| bitbucket | experiensesfication | DT | #N/A | master | | 172 | 0.17MB | 64 |
| bitbucket | gqh-sam-schedule-data-move | DT | #N/A | master | | 4650 | 4.55MB | 12,624 |
| bitbucket | hspanxcoinoorphidzohmedown | DT | #N/A | master | | 9129 | 8.91MB | 15,934 |
| bitbucket | hotmatori_investigation | DT | #N/A | master_temp | | 7628 | 7.45MB | 81,956 |
| bitbucket | impressions_unfixed | DT | #N/A | master | | 27216 | 28.55MB | 48,551 |
| bitbucket | samsung_exporter_matching | DT | #N/A | master | | 594 | 0.55MB | 3,478 |
| bitbucket | samsung_exportation-analysis | DT | #N/A | master | | 97932 | 95.04MB | 171,734 |
| bitbucket | xcronssion | DT | #N/A | master | | 456 | 0.46MB | 22,146 |
| bitbucket | tmscollection | DT | #N/A | master | | 90824 | 78.93MB | 239,463 |
| bitbucket | komo_share_drop_investigation | DT | #N/A | master | | 292 | 0.29MB | 917 |
| bitbucket | non_exploded_share | DT | #N/A | master | | 12019046 | 1137.35MB | 46,328,812 |
| bitbucket | ratings_phase_3 | DT | #N/A | master | | 3304944 | 3227.48MB | 6,394 |
| bitbucket | ratings_phase3 | DT | #N/A | master | | 28044 | 25.43MB | 82,694 |
| bitbucket | ratingsrefinement | DT | #N/A | master | | 3387056 | 0.98MB | 28,440 |
| bitbucket | reports | DT | #N/A | master | | 1324 | 3775.86MB | 171,734 |
| bitbucket | samsung_ip_lifespan_analysis | DT | #N/A | master | | 34608 | 3.30MB | 22,146 |
| bitbucket | share-studying-analysis | DT | #N/A | master | | 82312 | 1.23MB | 2,075 |
| bitbucket | vistragamesstablechannelscut | DT | #N/A | master | | 3944 | 80.30MB | 7,628 |
| bitbucket | vistic-data-daily-linear-viewership | DT | #N/A | master | | 920 | 3.85MB | 652 |
| bitbucket | elastic_search1_api_look | EN | #N/A | master | | 172 | 0.20MB / 0.17MB | 28 |

| Owner | Repository | Class | Engine | #N/A | Branch | Language | Count | Size | Total |
|---|---|---|---|---|---|---|---|---|---|
| bitbucket | engine-ebtb-logging-api | EN | Engine | #N/A | master | | 424 | 0.41MB | 1,065 |
| bitbucket | engine-ebtb-tide-rpi | EN | Engine | #N/A | master | | 5100 | 4.58MB | 63,568 |
| bitbucket | engine-manager | EN | Engine | #N/A | master | | 224 | 0.22MB | 446 |
| bitbucket | ebtb-mock-plugins | EN | Engine | #N/A | master | ETETE-Core_Plugin | 1304 | 1.27MB | 935 |
| bitbucket | ffmpeg-update-service | EN | Engine | #N/A | master | | 172 | 0.17MB | 28 |
| bitbucket | hardware-monitor | EN | Engine | #N/A | master | | 172 | 0.17MB | 3 |
| bitbucket | idea_recorder | EN | Engine | #N/A | master | | 200 | 0.20MB | 1 |
| bitbucket | resource_monitor | EN | Engine | #N/A | master | | 336 | 0.33MB | 311 |
| bitbucket | simple_server | EN | Engine | #N/A | master | | 200 | 0.20MB | 1,083 |
| bitbucket | scalx-logstash | EN | Engine | #N/A | master | | 248 | 0.24MB | 411 |
| bitbucket | bamboo-downloader | EN | Engine | #N/A | master | | 212 | 0.21MB | 844 |
| bitbucket | bluebird-x44-support | EN | Engine | #N/A | master | | 75954 | 73.73MB | 160,059 |
| bitbucket | engine-bamboo-scripts | ENGINE | Engine | #N/A | master | | 212 | 0.21MB | 196 |
| bitbucket | engine-docker | ENGINE | Engine | #N/A | master | | 84008 | 82.04MB | 128,009 |
| bitbucket | engine-ebtb-assets | ENGINE | Engine | #N/A | master | | 212 | 0.21MB | 379 |
| bitbucket | engine-ebtb-rittgoffter | ENGINE | Engine | #N/A | master | | 400 | 0.39MB | 1,971 |
| bitbucket | engine-scheduler-log-watcher | ENGINE | Engine | #N/A | master | | 2220 | 2.15MB | 12,658 |
| bitbucket | engine-seeding | ENGINE | Engine | #N/A | master | c# | 358316 | 349.92MB | 342,892 |
| bitbucket | ebtb-epi | ENGINE | Engine | #N/A | master | | 312 | 0.30MB | 912 |
| bitbucket | ebtb-ebtb-sql | ENGINE | Engine | #N/A | master | | 4036 | 3.94MB | 12,354 |
| bitbucket | lincape-ecr-plugin | ENGINE | Engine | #N/A | master | | 31212 | 30.48MB | 8,446 |
| bitbucket | john-spirit | ENGINE | Engine | #N/A | master | | 3446 | 3.37MB | 6,619 |
| bitbucket | libcore-master | ENGINE | Engine | #N/A | master | | 1248 | 1.22MB | 10,988 |
| bitbucket | sonerbow-core-plugin | ENGINE | Engine | #N/A | master | | 288 | 0.28MB | 694 |
| bitbucket | sonerbow-engine | ENGINE | Engine | #N/A | master | | 6132 | 5.99MB | 47,446 |
| bitbucket | spark-video-plugin | ENGINE | Engine | #N/A | develop | | 938 | 0.91MB | 10,982 |
| bitbucket | basessluzcer | ENGINE | Engine | #N/A | develop | | 59330 | 59.33MB | 233,169 |
| bitbucket | trinipeny | ENL | Engine | #N/A | master | | 160008 | 156.32MB | 733,131 |
| bitbucket | commercial/standardpicketector | Don't count | Engine | #N/A | master | | 397808 | 388.59MB | 884,859 |
| bitbucket | engine-logstash | ENU | Engine | #N/A | logstash_poc | | 216 | 0.21MB | 198 |
| bitbucket | engine-scripts | ENU | Engine | #N/A | master | | 276 | 0.27MB | 965 |
| bitbucket | engine-updater | ENU | Engine | #N/A | master | | 224 | 0.22MB | 383 |
| bitbucket | harvester_file_watcher | ENU | Engine | #N/A | Harvester-File_Watcher | | 238 | 0.23MB | 331 |
| bitbucket | maestro | ENU | Engine | #N/A | master | | 172 | 0.17MB | 210 |
| bitbucket | python-code-recorder | ENU | Engine | #N/A | master | ruby | 172 | 0.17MB | 1,108 |
| bitbucket | vitechub | ENU | Engine | #N/A | master | c++ | 284 | 0.28MB | 11 |
| bitbucket | accounts-association-user-get | FOUN | | #N/A | master | | 204 | 0.20MB | 221 |
| bitbucket | accounts-association-user-update | FOUN | | #N/A | master | | 204 | 0.20MB | 64 |
| bitbucket | asi-harvesting-absolute | FOUN | | #N/A | master | | 180 | 0.18MB | 140 |
| bitbucket | analytics_nodejs_server | FOUN | | #N/A | master | nodejs | 456 | 0.45MB | 4,702 |
| bitbucket | analytics-cmp-export | FOUN | | #N/A | master | | 172 | 0.17MB | 965 |
| bitbucket | analytics-dynamo-export | FOUN | | #N/A | master | | 229 | 0.22MB | 868 |
| bitbucket | analytics-scp-worker | FOUN | | #N/A | master | | 196 | 0.19MB | 210 |
| bitbucket | analytics-scp-consumer | FOUN | | #N/A | master | nodejs | 216 | 0.21MB | 542 |
| bitbucket | analytics-trending-export | FOUN | | #N/A | master | nodejs | 204 | 0.20MB | 355 |
| bitbucket | attrodemp-scripts | FOUN | | #N/A | master | nodejs | 212 | 0.21MB | 326 |
| bitbucket | beacon-proximity-demo | FOUN | | #N/A | master | | 808 | 0.79MB | 803 |
| bitbucket | cloud_formation_script | FOUN | | #N/A | master | | 293 | 0.28MB | 702 |
| bitbucket | conversion-drop-export | FOUN | | #N/A | master | | 196 | 0.19MB | 1,616 |
| bitbucket | croupon-delivery-engine | FOUN | | #N/A | master | | 40720 | 39.77MB | 801,734 |
| bitbucket | croupons-web-client | FOUN | | #N/A | master | | 2648 | 2.58MB | 8,469 |
| bitbucket | discovery-etb-controller | FOUN | | #N/A | master | javascript | 2408 | 2.35MB | 21,378 |
| bitbucket | ebb-search-setup | FOUN | | #N/A | master | | 288 | 0.28MB | 1,321 |
| bitbucket | enhance/strrawyhib | FOUN | | #N/A | master | android | 198 | 0.19MB | 6,724 |
| bitbucket | export-migration-data-to-elastic-search | FOUN | | #N/A | master | | 15288 | 14.93MB | 156,465 |
| bitbucket | foundry-analytics-scale-sqs-consumer | FOUN | | #N/A | master | nodejs | 498 | 0.48MB | 1,222 |
| bitbucket | foundry-analytics-tracking-pool | FOUN | | #N/A | master | | 13568 | 13.10MB | 2,140 |
| bitbucket | foundry-corre-client | FOUN | | #N/A | master | | 18000 | 17.58MB | 82,027 |
| bitbucket | foundry-scripts | FOUN | | #N/A | master | | 7848 | 7.47MB | 147,655 |
| bitbucket | foundry-ecb-cloudformation | FOUN | | #N/A | master | | 304 | 0.30MB | 983 |
| bitbucket | foundry-kvb-etl | FOUN | | #N/A | master | | 19432 | 18.98MB | 173,385 |
| bitbucket | foundry-kvb-formations | FOUN | | #N/A | master | | 1040 | 1.02MB | 15,747 |
| bitbucket | foundry-kvb-migrations | FOUN | | #N/A | master | | 224 | 0.20MB | 438 |
| bitbucket | foundry-kvb-utils | FOUN | | #N/A | master | | 1652 | 1.61MB | 11,027 |
| bitbucket | googlee-analytics-trending-lumbda | FOUN | | #N/A | master | | | | |
| bitbucket | grab/-alexa | FOUN | | #N/A | master | java | | | |
| bitbucket | grab/-analytics | FOUN | | #N/A | master | nodejs | | | |
| bitbucket | grab/-android | FOUN | | #N/A | master | android | | | |
| bitbucket | grab/-audini-food | FOUN | | #N/A | master | | | | |
| bitbucket | grab/-brain | FOUN | | #N/A | master | ruby | | | |
| bitbucket | grab/-composible-id-composer | FOUN | | #N/A | master | | | | |
| bitbucket | grab/-cookbooks | FOUN | | #N/A | master | | | | |

| repo | project | team | | branch | language | files | size | lines |
|---|---|---|---|---|---|---|---|---|
| bitbucket | grailsib-demo-overlays | FOUN | RNA | master | html/css | 2208 | 2.16MB | 10,505 |
| bitbucket | grailsib-dynamicsdb-export | FOUN | RNA | master | nodejs | 228 | 0.22MB | 777 |
| bitbucket | grailsib-engine-integration-module | FOUN | RNA | master | | 1435 | 1.40MB | 21,591 |
| bitbucket | grailsib-engine-request-module | FOUN | RNA | master | | 1154 | 1.14MB | 18,736 |
| bitbucket | grailsib-flyperf-service | FOUN | RNA | master | nodejs | 304040 | 289.71MB | 11,102 |
| bitbucket | grailsib-ingestion-service | FOUN | RNA | master | nodejs | 698 | 0.65MB | 7,224 |
| bitbucket | grailsib-ingestion-services | FOUN | RNA | master | | 598 | 0.58MB | 1,831 |
| bitbucket | grailsib-models | FOUN | RNA | master | nodejs | 340 | 0.33MB | 461 |
| bitbucket | grailsib-parse-service | FOUN | RNA | master | | 220 | 0.21MB | 234 |
| bitbucket | grailsib-pixel-tracker | FOUN | RNA | master | nodejs | 200 | 0.20MB | 2,487 |
| bitbucket | grailsib-parse-broker | FOUN | RNA | master | | 295 | 0.20MB | 876 |
| bitbucket | grailsib-sushi-composer | FOUN | RNA | master | javascript | 380 | 0.26MB | 5,276 |
| bitbucket | grailsib-svc-notification-service | FOUN | RNA | master | javascript | 400 | 0.35MB | 3,845 |
| bitbucket | grailsib-utils | FOUN | RNA | master | nodejs | 472 | 0.39MB | 1,078 |
| bitbucket | harp-step-functions | FOUN | RNA | master | javascript | 324 | 0.46MB | 14,936 |
| bitbucket | harvestar-api | FOUN | RNA | master | nodejs | 1419 | 0.32MB | 6,407 |
| bitbucket | image-optimisation | FOUN | RNA | master | nodejs | 694 | 1.38MB | 20,679 |
| bitbucket | insightsutilsexttemplatingsessionservice | FOUN | RNA | master | cf | 1880 | 0.67MB | 9,142 |
| bitbucket | insight-dashboardservice | FOUN | RNA | master | cf | 672 | 1.84MB | 51,041 |
| bitbucket | insight-dwell | FOUN | RNA | master | cf | 3760 | 0.54MB | 400,199 |
| bitbucket | insight-formatdashboard | FOUN | RNA | master | asp | 24560 | 0.68MB | 201,289 |
| bitbucket | insight-formattedservice | FOUN | RNA | master | cf | 42712 | 2.76MB | 345,696 |
| bitbucket | insight-maps | FOUN | RNA | master | cf | 3624 | 3.67MB | 6,903 |
| bitbucket | insight-sm_mparc | FOUN | RNA | master | java | 2854 | 23.93MB | 111,776 |
| bitbucket | insight-synthost | FOUN | RNA | master | java | 18232 | 41.71MB | 55,518 |
| bitbucket | insight-synthost | FOUN | RNA | master | cf | 10277 | 35.43MB | 52,278 |
| bitbucket | insight-nl-reporting | FOUN | RNA | master | cf | 40688 | 0.78MB | 195,626 |
| bitbucket | insight-reporting | FOUN | RNA | master | cf | 14028 | 17.80MB | 16,479 |
| bitbucket | insight-nl-dashboard | FOUN | RNA | master | cf | 1178 | 10.03MB | 63,668 |
| bitbucket | insight-nl-mrhost | FOUN | RNA | master | java | 1504 | 17.80MB | 5,087 |
| bitbucket | insight-surveydashboard | FOUN | RNA | master | cf | 5832 | 1.88MB | 16,322 |
| bitbucket | insight-surveysystem | FOUN | RNA | master | cf | 1508 | 1.15MB | 430,389 |
| bitbucket | insight-bevy-download | FOUN | RNA | master | cf | 3848 | 6.67MB | 557 |
| bitbucket | insight-bevy-service | FOUN | RNA | master | cf | 110544 | 1.55MB | 91 |
| bitbucket | insight-systemmonitor | FOUN | RNA | master | gif | 208 | 3.78MB | 220 |
| bitbucket | likadsuite | FOUN | RNA | master | android | 230 | 107.35MB | 4,270 |
| bitbucket | kbadsuite-os | FOUN | RNA | master | | 182 | 0.22MB | 147,680 |
| bitbucket | roylife | FOUN | RNA | master | cljs/emo-c | 944 | 0.20MB | 362,199 |
| bitbucket | rewardss-bidding_agent | FOUN | RNA | master | | 80 | 0.19MB | 122,423 |
| bitbucket | overlay-organisational-association-service | FOUN | RNA | master | nodejs | 420138 | 0.92MB | 265,650 |
| bitbucket | parse-export-lambda | FOUN | RNA | master | nodejs | 84 | 0.78MB | 783,100 |
| bitbucket | pigeonhole | FOUN | RNA | master | javascript | 1214 | 410.31MB | 1,578 |
| bitbucket | platform_deps | FOUN | RNA | master | javascript | 319176 | 0.79MB | 3,889 |
| bitbucket | poly-exagn | FOUN | RNA | master | android | 372 | 110.55MB | 2,367 |
| bitbucket | recruitation-client | FOUN | RNA | master | other | 512 | 311.70MB | 94,454 |
| bitbucket | rewards-android-client | FOUN | RNA | master | javascript | 360 | 0.36MB | 65,016 |
| bitbucket | rewards-client | FOUN | RNA | master | javascript | 1984 | 0.50MB | 435,268 |
| bitbucket | rewards-lambda | FOUN | RNA | master | kotlin | 13571 | 0.30MB | 1 |
| bitbucket | rewards-parse-dashboard | FOUN | RNA | master | typescript | 82248 | 19.38MB | 742,752 |
| bitbucket | rewards-parse-server | FOUN | RNA | master | | 172 | 18.14MB | 129 |
| bitbucket | rewards-sending-google-analytics | FOUN | RNA | master | nodejs | 3925108 | 50.79MB | 2,606 |
| bitbucket | rewards-web-client | FOUN | RNA | master | python | 188 | 0.17MB | 318 |
| bitbucket | rtwat | FOUN | RNA | master | | 394 | 3833.19MB | 17,011 |
| bitbucket | robot_dependencies | FOUN | RNA | master | | 799 | 0.18MB | 667 |
| bitbucket | robot_snapsnots | FOUN | RNA | master | | 329 | 0.25MB | 14 |
| bitbucket | saved-demo-service | FOUN | RNA | master | | 600 | 0.78MB | 2,586 |
| bitbucket | temporal-engine | FOUN | RNA | master | | 224 | 0.34MB | 7,793 |
| bitbucket | temporal-restttls-client | FOUN | RNA | master | | 268 | 0.59MB | 422 |
| bitbucket | teatrepo | FOUN | RNA | master | javascript | 172 | 0.22MB | 1,760 |
| bitbucket | universal-spike | FOUN | RNA | master | python | 564 | 0.28MB | 84 |
| bitbucket | viagrart_soript_arectile | FOUN | RNA | master | html/css | 1544 | 0.17MB | 17,392 |
| bitbucket | valuasa-response-lambda | FOUN | RNA | master | javascript | 186 | 8.38MB | 3,980 |
| bitbucket | wistiv-response-lambda | FOUN | RNA | master | | 232 | 1.51MB | 288 |
| bitbucket | wvasdb-dismiss-generator | FOUN | RNA | master | | 244 | 0.23MB | 771 |
| bitbucket | clientport | LAMMY | RNA | master | | 1596 | 0.19MB | 2 |
| bitbucket | adqus-tools | OPS | RNA | master | | 186 | 1.60MB | 5,505 |
| bitbucket | awslogger | OPS | RNA | master | | 175 | 0.24MB | 40,868 |
| bitbucket | bamboo-scripts | OPS | RNA | master | | 173 | 0.17MB | 30,140 |
| bitbucket | boto | OPS | RNA | master | | 288 | 0.17MB | 1,673 |
| bitbucket | bamboo-scripts | OPS | RNA | master | | 400 | 0.20MB | 167 |
| bitbucket | dartrpicker | OPS | RNA | master | | 10898 | 0.28MB | |
| bitbucket | deploy-source | OPS | RNA | master | | 404 | 10.64MB | |
| bitbucket | devops-tools | OPS | RNA | master | | 1884 | 0.39MB | |
| bitbucket | idcinga | OPS | RNA | master | | 644 | 1.82MB | |
| bitbucket | iicinga2-chronos | OPS | RNA | master | python | 162 | 0.43MB | |

| Host | Repository | Type | Branch | Language | | | |
|---|---|---|---|---|---|---|---|
| bitbucket | kfe-configs | OPS | master | | 1032 | 1.01MB | 6,656 |
| bitbucket | monitoring_tools | OPS | master | | 268 | 0.26MB | 1,264 |
| bitbucket | net-debug | OPS | master | | 240 | 0.23MB | 881 |
| bitbucket | ops-automation | OPS | master | | 1972 | 16.32MB | 24,910 |
| bitbucket | ops-cookbooks | OPS | master | | 2098 | 2.04MB | 12,595 |
| bitbucket | ops-elasticert | OPS | master | | 172 | 0.17MB | 98 |
| bitbucket | ops-monitoring-scripts | OPS | master | | 184 | 0.18MB | 98 |
| bitbucket | ops-portal | OPS | master | | 24524 | 24.05MB | 206,888 |
| bitbucket | ops-scripts | OPS | master | | 172 | 0.17MB | 34 |
| bitbucket | ops-terraform | OPS | master | | 544 | 0.53MB | 2,302 |
| bitbucket | sni-cgf-montpod | OPS | master | | 788 | 0.77MB | 4,528 |
| bitbucket | sni-confluent-platform | OPS | master | | 262 | 0.26MB | 881 |
| bitbucket | smk-zookeeper-platform | OPS | master | | 364 | 0.35MB | 1,335 |
| bitbucket | sso-commandset | OPS | master | | 196 | 0.19MB | 211 |
| bitbucket | sso-crandlefer | OPS | master | | 172 | 0.17MB | 1,501 |
| bitbucket | sso-emailer | OPS | master | | 272 | 0.27MB | 808 |
| bitbucket | sso-greenewalls | OPS | master | ruby | 228 | 0.22MB | 1,261 |
| bitbucket | sso-prewar | OPS | master | | 318 | 0.31MB | 4,819 |
| bitbucket | terraform-3rd-party-bucket-management | OPS | master | python | 509 | 0.50MB | 972 |
| bitbucket | terraform-awk-ad-harvesting-encoders | OPS | master | python | 176 | 0.17MB | 60 |
| bitbucket | terraform-awk-cassandra | OPS | master | | 233 | 0.23MB | 450 |
| bitbucket | terraform-awk-common-reporting-suite | OPS | master | | 172 | 0.17MB | 134 |
| bitbucket | terraform-awk-core-control | OPS | master | | 444 | 0.44MB | 1,136 |
| bitbucket | terraform-awk-dmp-linear-postings | OPS | master | | 320 | 0.31MB | 386 |
| bitbucket | terraform-awk-kube | OPS | master | | 812 | 0.79MB | 22,299 |
| bitbucket | terraform-aws-module-vpc | OPS | master | | 400 | 0.39MB | 2,673 |
| bitbucket | terraform-awk-vpc | OPS | master | | 895 | 0.88MB | 7,027 |
| bitbucket | terraform-awk-vpn-it | OPS | master | | 309 | 0.30MB | 28 |
| bitbucket | terraform-ruk-ngn-bags | OPS | master | | 194 | 0.19MB | 228 |
| bitbucket | terraform-monitless-monitoring | OPS | master | | 283 | 0.27MB | 389 |
| bitbucket | terraform-private-supermarket | OPS | master | | 172 | 0.17MB | 149 |
| bitbucket | tr-s3-database-drop | OPS | master | | 268 | 0.26MB | 391 |
| bitbucket | vagrant | OPS | master | | 240 | 0.23MB | 134 |
| bitbucket | vault-helper | OPS | master | | 292 | 0.28MB | 428 |
| bitbucket | vault-helper-python-client | OPS | master | | 282 | 0.27MB | 210 |
| bitbucket | vault-ui | OPS | master | | 172 | 0.17MB | 713 |
| bitbucket | wegroilmazut/zoostresstest | RNA | master | ruby | 298 | 0.28MB | 439 |
| bitbucket | wegeplum-system-tests | RNA | master | | 204 | 0.20MB | 125 |
| bitbucket | hv-googleanalyticstest | RNA | master | | 184 | 0.18MB | 200 |
| bitbucket | hv-buildmachineconfig | RNA | master | | 194 | 0.19MB | 102 |
| bitbucket | hv-cob/electic/dataytestprototype | RNA | master | | 260 | 0.24MB | 10,100 |
| bitbucket | hv-chennobs-android | RNA | master | android | 348 | 3.40MB | 6,234 |
| bitbucket | hv-vericreverse-android | RNA | master | android | 11820 | 0.64MB | 262,300 |
| bitbucket | foxalfform-awk-vpc | RNA | master | java | 612 | 0.60MB | 1,818 |
| bitbucket | hv-sensational_remote_key_listener | RNA | master | android | 35212 | 34.39MB | 59,187 |
| bitbucket | hv-tb-html-in-new-firmware | RNA | master | android | 3940 | 3.85MB | 180,630 |
| bitbucket | hv-tb-android-companion-app | RNA | master | java | 592 | 0.61MB | 1,458 |
| bitbucket | hv-tb-audible-magic-poc | RNA | master | | 652 | 0.64MB | 28 |
| bitbucket | hv-tb-beacon-website | RNA | master | | 958 | 0.54MB | |
| bitbucket | hv-tb-broadcaster | RNA | master | | 3520 | 3.44MB | 10,873 |
| bitbucket | hv-tb-readme-library | RNA | master | | 516 | 0.50MB | 1,005 |
| bitbucket | hv-tb-html-in | RNA | master | | 492 | 0.48MB | 3,291 |
| bitbucket | hv-tb-launcher | RNA | master | nodejs | 596 | 0.61MB | 20,835 |
| bitbucket | hv-tb-tdmiritancensproprototype | RNA | master | java | 568 | 1.64MB | 277,875 |
| bitbucket | hv-tb-clobe | RNA | master | android | 20304 | 19.83MB | 40,746 |
| bitbucket | hv-tb-poc-cam-resore | RNA | master | | 1692 | 1.65MB | 12,246 |
| bitbucket | hv-tb-spark-android | RNA | master | | 19768 | 19.32MB | 38,913 |
| bitbucket | hv-tb-spark3x-schedule | RNA | master | | 2000 | 1.95MB | 5,427 |
| bitbucket | hv-tb-update-android-etp | RNA | master | java | 17794 | 12.48MB | 33,911 |
| bitbucket | hv-tb-update-script | RNA | master | android | 33908 | 17.75MB | 21,968 |
| bitbucket | hv-utility-library | RNA | master | | 39980 | 38.95MB | 66,180 |
| bitbucket | hv-ps-consumer-tests | RNA | master | | 606 | 0.59MB | 6,791 |
| bitbucket | hv-solution-library | RNA | master | ruby | 1326 | 1.30MB | 14,710 |
| bitbucket | hv-visualization-b-organization | RNA | master | android | 575 | 0.56MB | 30,970 |
| bitbucket | boodown | Spark Plug | master | ruby | 652 | 0.64MB | 1,417 |
| bitbucket | booldown | Spark Plug | master | android | 34703 | 33.89MB | 5,505 |
| bitbucket | Don't_count | PLUG | master | | 180 | 0.17MB | 167,509 |
| bitbucket | branchie | PROJ | master | | 224 | 0.22MB | 24 |
| bitbucket | bower-snack-n-learn | PROJ | master | javascript | 586 | 0.58MB | 253 |
| bitbucket | cfg-firewall | PROJ | master | | 748 | | 8 |
| bitbucket | cfg-asit | PROJ | master | | 176 | | 8 |
| | | | | | -5736 | 15.37MB | 56,077 |

| Source | Repository | Team | Status | Tier | Language | Commits | Size | Files |
|---|---|---|---|---|---|---|---|---|
| bitbucket | channel-manager | PROJ | #N/A | master | javascript | 936 | 0.91MB | 9,851 |
| bitbucket | channel-manager-lambda | PROJ | #N/A | master | javascript | 460 | 0.45MB | 3,667 |
| bitbucket | coobooltb | PROJ | #N/A | master | | 496 | 0.48MB | 2,302 |
| bitbucket | continuum-reporting-suite | PROJ | #N/A | master | | 3988 | 0.32MB | 33,543 |
| bitbucket | masmaker | PROJ | #N/A | master | javascript | 948 | 0.89MB | 3,543 |
| bitbucket | cross-platform-mobile-video-streaming-app | PROJ | #N/A | master | javascript | 3120 | 3.05MB | 8,951 |
| bitbucket | data-map | PROJ | #N/A | master | nodejs | 436 | 0.45MB | 1,087 |
| bitbucket | defunct-beacon-blaster-cave | PROJ | #N/A | master | javascript | 220 | 0.21MB | 522 |
| bitbucket | dev-server | PROJ | #N/A | master | javascript | 400 | 0.39MB | 704 |
| bitbucket | emoticons | PROJ | #N/A | master | javascript | 19: | 0.38MB | 127 |
| bitbucket | facebook-apple | PROJ | #N/A | master | | 10152 | 9.91MB | 17,485 |
| bitbucket | fast_transfer | PROJ | #N/A | master | | 1423 | 1.39MB | 9,485 |
| bitbucket | ford-targeting | PROJ | #N/A | master | | 1160 | 1.13MB | 3,247 |
| bitbucket | gunsmash_hb_player | PROJ | #N/A | master | android | 18860 | 18.44MB | 68,056 |
| bitbucket | hubot | PROJ | #N/A | master | | 294 | 0.28MB | 758 |
| bitbucket | ik-clips | PROJ | #N/A | master | | 916 | 0.89MB | 3,994 |
| bitbucket | filaments | PROJ | #N/A | master | | 216 | 0.21MB | 30 |
| bitbucket | mibox | PROJ | #N/A | master | | 172 | 0.17MB | 371 |
| bitbucket | mock-api-framework | PROJ | #N/A | master | | 252 | 0.25MB | 983 |
| bitbucket | multitask-reader-sandbox | PROJ | #N/A | master | | 292 | 0.25MB | 67 |
| bitbucket | overlay-ind-scripts | PROJ | #N/A | master | | 148 | 0.32MB | 374 |
| bitbucket | overlay-bash | PROJ | #N/A | master | shell | 148 | 0.16MB | 0 |
| bitbucket | overlay-blackball | PROJ | #N/A | master | | 332 | 0.34MB | 3,851 |
| bitbucket | overlay-jimminge-grapher | PROJ | #N/A | prototype | | 236 | 0.23MB | 672 |
| bitbucket | pixa7 | PROJ | #N/A | master | | 200 | 0.20MB | 152 |
| bitbucket | sampleplayer | PROJ | #N/A | master | | 216 | 0.20MB | 217 |
| bitbucket | schedule-tag-manager | PROJ | #N/A | master | | 172 | 0.17MB | 140 |
| bitbucket | sonenson-elastic-image-scripts | PROJ | #N/A | master | javascript | 868 | 0.85MB | 11,799 |
| bitbucket | spark-enhance-load-test | PROJ | #N/A | master | java | 892 | 0.87MB | 9,563 |
| bitbucket | spark-enhance-ch-scripts | PROJ | #N/A | master | javascript | 212 | 0.21MB | 153 |
| bitbucket | spark-style-guide | PROJ | #N/A | master | | 212 | 0.19MB | 288 |
| bitbucket | status | PROJ | #N/A | master | shell | 192 | 0.19MB | 85 |
| bitbucket | toshiba-client-environment | PROJ | #N/A | master | javascript | 164 | 0.18MB | 30,000 |
| bitbucket | tv-boba-prototype | PROJ | #N/A | master | | 412 | 0.40MB | 1,496 |
| bitbucket | upload-vai | PROJ | #N/A | master | c++ | 256 | 0.25MB | 1,179 |
| bitbucket | visual-crawler | PROJ | #N/A | master | | 192 | 0.19MB | 268 |
| bitbucket | vu-player | PROJ | #N/A | master | html/less | 184 | 0.18MB | 1,474 |
| bitbucket | wabcam7v-ui | PROJ | #N/A | master | javascript/less | 300 | 0.29MB | 1,282 |
| bitbucket | account-manager-cucumber-tests | QA | QA | master | ruby | 34864 | 34.05MB | 163,004 |
| bitbucket | advanced-dir-e2e-tests | QA | QA | master | ruby | 15251 | 14.90MB | 254,571 |
| bitbucket | bug_metrics | QA | QA | master | | 1904 | 1.86MB | 30,370 |
| bitbucket | highperf-distances-calculator | QA | QA | master | | 464i | 0.45MB | 4,542 |
| bitbucket | mwf-efficiency | QA | QA | master | | 304 | 0.39MB | 4,69: |
| bitbucket | sam_page_objects | QA | QA | master | | 304 | 0.30MB | 1,839 |
| bitbucket | raysom-rtv-player-javadoc | RTV | #N/A | master | javascript | 18916 | 19.15MB | 212,467 |
| bitbucket | raysom-rtv-ols-javadoc | RTV | #N/A | master | javascript | 264 | 0.26MB | 1,158 |
| bitbucket | dr-aggregator | SAdEP | #N/A | master | ruby | 272 | 0.27MB | 956 |
| bitbucket | dr-csv-importer-archived | SAdEP | #N/A | master | other | 284 | 0.28MB | 501 |
| bitbucket | dr-cookbooks | SAdEF | #N/A | master | | 272 | 0.17MB | 501 |
| bitbucket | dr-csv-imported-archived | SAdEP | #N/A | master | python | 240 | 0.23MB | 501 |
| bitbucket | dr-csv-ngest-archived | SAdEP | #N/A | master | | 372 | 0.36MB | 1,224 |
| bitbucket | dr-daily-quarter-hours-ingestor | SAdEP | #N/A | master | | 500 | 0.49MB | 3,792 |
| bitbucket | d-database-migrations | SAdEF | #N/A | master | | 794 | 0.75MB | 7,686 |
| bitbucket | d-f-overseason-archived | SAdEP | #N/A | master | nodejs | 372 | 0.38MB | 939 |
| bitbucket | d-f-reinstate-archived | SAdEP | #N/A | master | nodejs | 14384 | 13.99MB | 26,861 |
| bitbucket | dr-health-monitor | SAdEP | #N/A | master | | 13554 | 13.19MB | 104,449 |
| bitbucket | dr-reinstate-file-transfer | SAdEP | #N/A | master | ruby | 272 | 0.27MB | 2,044 |
| bitbucket | dr-s3-ingester | SAM | #N/A | master | javascript | 2208 | 2.16MB | 10,201 |
| bitbucket | dr-query-generator | SAM | #N/A | master | | 352 | 0.34MB | 1,839 |
| bitbucket | dr-sequential-migration | Account Manager | #N/A | master | | 292 | 0.29MB | 5,558 |
| bitbucket | dr-validation-processing-archived | SAM | #N/A | master | | 548 | 0.54MB | 5,558 |
| bitbucket | adth-cookbooks | SDA | DMP Analytics | master | | 1584 | 1.55MB | 18,910 |
| bitbucket | adth-server | SDA | DMP Analytics | master | | 4998 | 4.87MB | 94,311 |
| bitbucket | auth-server | SDA | DMP Analytics | master | go | 296 | 0.29MB | 1,026 |
| bitbucket | ai_rtl_to_csv_mxord_parse | SDA | DMP Analytics | master | nodejs | 1198 | 1.17MB | 9,230 |
| bitbucket | tvdb-common-api | SDA | DMP Analytics | master | | 308 | 0.30MB | 1,146 |

| | Repo | Code | Team | Branch | Language | Files | Size | Lines |
|---|---|---|---|---|---|---|---|---|
| bitbucket | bb-dsb-pipeline | SDA | DMP Analytics | master | python | 220 | 0.21MB | 143 |
| bitbucket | hdfe-etl | SDA | DMP Analytics | master | | 1099 | 1.0MB | 5,213 |
| bitbucket | hdfe-formations | SDA | DMP Analytics | master | | 512 | 0.50MB | 3,510 |
| bitbucket | hdfe-regstar-requirements | SDA | DMP Analytics | master | | 198 | 0.19MB | |
| bitbucket | hdfe-migrations | SDA | DMP Analytics | master | | 78 | 0.78MB | 11,383 |
| bitbucket | hdfe-roster-pipjd | SDA | DMP Analytics | master | | 197 | 0.19MB | 232 |
| bitbucket | hdfe-service-configuration | SDA | DMP Analytics | master | | 184 | 0.18MB | 85 |
| bitbucket | hdfe-sql | SDA | DMP Analytics | master | | 232 | 0.23MB | 113 |
| bitbucket | hdfe-standard-data-tools | SDA | DMP Analytics | master | | 218 | 0.21MB | 345 |
| bitbucket | hdfe-testing | SDA | DMP Analytics | master | | 235 | 0.23MB | 198 |
| bitbucket | hdfe-kps-amr | SDA | DMP Analytics | master | ruby | 4560 | 4.4MB | 25,991 |
| bitbucket | hdfe-kps-etl | SDA | DMP Analytics | master | | 1936 | 1.84MB | 13,528 |
| bitbucket | hdfe-kps-migration | SDA | DMP Analytics | master | | 880 | 0.88MB | 5,343 |
| bitbucket | hdfe-kps-migration-aggregates | SDA | DMP Analytics | master | | 4012 | 3.92MB | 83,503 |
| bitbucket | adapters | SDA | #N/A | master | | 236 | 0.23MB | 503 |
| bitbucket | file-copy-solution | SI | #N/A | master | | 252 | 0.25MB | 1,161 |
| bitbucket | sim-client-node | SLM | #N/A | master | | 132 | 0.13MB | |
| bitbucket | squeeze | SI | #N/A | master | | 204 | 0.20MB | 316 |
| br | squeeze_sphktest | SQUEEZ | #N/A | master | | 19316 | 18.80MB | 385,322 |
| br | squeeze.training/app | SQUEEZ | #N/A | master | | 2220 | 2.36MB | 77,772 |
| br | swconfwebapp | SQUEEZ | #N/A | master | | 1096 | 1.07MB | 37,468 |
| bt | technicolor_Gillies | #N/A | #N/A | master | nodejs | 37588 | 36.71MB | 961,136 |
| bt | videdvolt | #N/A | #N/A | master | shell | 240 | 0.23MB | 386 |
| bt | voivu | SQUEEZ | #N/A | master | | 188 | 0.18MB | |
| bl | whyme | SQUEEZ | #N/A | master | ruby | 81000 | 79.10MB | 155,946 |
| bl | analytics-page-objects | STVA | Spark Analytics | master | nodejs | 1292 | 1.26MB | 12,239 |
| bl | aws-playground | STVA | Spark Analytics | master | | 228 | 0.22MB | 750 |
| bl | arcacia-data | STVA | Spark Analytics | master | sql | 1072 | 1.05MB | 2,892 |
| bl | dr-cloudformation | STVA | Spark Analytics | master | nodejs | 444 | 0.43MB | 4,307 |
| bl | dr-build-scripts | STVA | Spark Analytics | master | javascript | 240 | 0.23MB | 386 |
| bl | dr-broadcast-data-import | STVA | Spark Analytics | master | nodejs | 652 | 0.63MB | 5,286 |
| bl | dr-broadcast-data-utils | STVA | Spark Analytics | master | javascript | 296 | 0.28MB | 25,614 |
| bl | dr-email-monitoring | STVA | Spark Analytics | master | nodejs | 256 | 0.25MB | 500 |
| bl | dr-email-metrics | STVA | Spark Analytics | master | nodejs | 240 | 0.23MB | 966 |
| bl | dr-email-templates | STVA | Spark Analytics | master | node.js | 586 | 0.58MB | 3,999 |
| bl | dr-email-verification-tests | STVA | Spark Analytics | master | nodejs | 224 | 0.22MB | 530 |
| bl | dr-environment-discovery | STVA | Spark Analytics | master | nodejs | 216 | 0.21MB | 815 |
| bl | dr-generator | STVA | Spark Analytics | master | javascript | 428 | 0.42MB | 36,406 |
| bl | dr-grunt-build | STVA | Spark Analytics | master | nodejs | 17828 | 17.51MB | 438 |
| bl | dr-grunt-data-uri | STVA | Spark Analytics | master | shell | 304 | 0.30MB | 679 |
| bl | dr-grunt-package-lint | STVA | Spark Analytics | master | nodejs | 382 | 0.36MB | 777 |
| bl | dr-integration-dlls | STVA | Spark Analytics | master | nodejs | 295 | 0.25MB | 2,881 |
| bl | dr-integration-discovery | STVA | Spark Analytics | master | nodejs | 408 | 0.40MB | 1,481 |
| bl | dr-mailobs | STVA | Spark Analytics | master | ruby | 309 | 0.25MB | 1,293 |
| bl | dr-scripts | STVA | Spark Analytics | master | nodejs | 290 | 0.21MB | 594 |
| bl | dr-performance-tests-sitespeed | STVA | Spark Analytics | master | javascript | 220 | 0.69MB | 5,076 |
| bl | dr-portal | STVA | Spark Analytics | master | nodejs | 25052 | 24.45MB | 238,317 |
| bl | dr-promo-data | STVA | Spark Analytics | master | ruby | 404 | 0.39MB | 31,944 |
| bl | dr-queue-processor | STVA | Spark Analytics | master | python | 3638 | 3.55MB | 8,346 |
| bl | dr-reach-hug-dlls | STVA | Spark Analytics | master | nodejs | 889 | 0.87MB | 40,691 |
| bl | dr-transformation-dlls | STVA | Spark Analytics | master | javascript | 224 | 0.22MB | 676 |
| bl | dr-ui-integration-tests | STVA | Spark Analytics | master | nodejs | 2052 | 2.00MB | 8,130 |
| bl | dr-utils | STVA | Spark Analytics | master | javascript | 244 | 0.24MB | 1,304 |
| bl | eslint-config-spark-analytics | STVA | Spark Analytics | master | nodejs | 272 | 0.27MB | 43,000 |
| bl | local-environment | STVA | Spark Analytics | master | ruby | 1844 | 1.80MB | 12,991 |
| br | moose | STVA | Spark Analytics | master | nodejs | 1040 | 1.02MB | 142 |
| be | oogle | STVA | Spark Analytics | master | javascript | 212 | 0.21MB | 621 |
| bl | sm-core-authentication | STVA | Spark Analytics | master | nodejs | 292 | 0.29MB | 341 |
| bl | sm-core-confirmable | STVA | Spark Analytics | master | javascript | 1308 | 1.28MB | 659 |
| bl | sm-core-notifications | UI | User Interface | master | html/css | 228 | 0.23MB | 6,227 |
| bl | sm-core-throttler | UI | User Interface | master | javascript | 228 | 0.22MB | 437 |
| bl | sm-sefedcaza | UI | User Interface | master | html/css | 236 | 0.24MB | 447 |
| bl | sm-smd-vegas | Dart | #N/A | master | javascript | 244 | 0.24MB | 868 |
| bitbucket | sm-smd-vegas | UI | User Interface | master | | 228 | 0.22MB | 718 |

| Platform | Repo | Tag | Category | Branch | Language | Count | Size | Lines |
|---|---|---|---|---|---|---|---|---|
| bitbucket | sni-ui-palette | UI | User interface | master | sass | 184 | 0.18MB | 113 |
| bitbucket | sni-ui-webfonts | UI | User interface | master | html/css | 29156 | 23.47MB | 187,166 |
| bitbucket | smd-framework | UI | User interface | master | javascript | 220 | 0.21MB | 360 |
| bitbucket | smd-share-components | UI | User interface | master | javascript | 2948 | 27.80MB | 182,965 |
| bitbucket | smd-share-nightmare | UI | User interface | master | javascript | 190 | 0.42MB | 3,596 |
| bitbucket | sorenson_ujop | UI | User interface | master | javascript | 218 | 0.21MB | 355 |
| bitbucket | sorenson_ui_stack | UI | User interface | master | javascript | 2540 | 2.48MB | 11,866 |
| bitbucket | sorenson-engine-ui | UI | User interface | master | javascript | 3720 | 3.82MB | 41,746 |
| bitbucket | sorenson-webfonts | UI | User interface | master | html/css | 2844 | 2.48MB | 10,343 |
| bitbucket | sorenson-777 | UI | User interface | master | html/css | 453 | 0.45MB | 2,946 |
| bitbucket | sorenson-player | UI | User interface | master | javascript | 760 | 0.74MB | 6,003 |
| bitbucket | spark-ui-components | UI | User interface | master | html/css | 884 | 0.56MB | 14,035 |
| bitbucket | spark-ui-react | UI | User interface | master | javascript | 2928 | 2.57MB | 31,272 |
| bitbucket | squeeze-360-ui | UI | User interface | master | javascript | 172 | 0.17MB | 268 |
| bitbucket | sul_app | UI | User interface | master | javascript | 1955 | 1.91MB | 20,488 |
| bitbucket | sul_components | UI | User interface | master | javascript | 34541 | 33.45MB | 34,521 |
| bitbucket | sul_webfonts | UI | User interface | master | javascript | 2856 | 2.79MB | 10,772 |
| bitbucket | sula_ui | UI | User interface | master | javascript | 455 | 0.45MB | 1,134 |
| bitbucket | encoder-cluster-load-test | CA | CA | master | javascript | 295 | 0.29MB | 1,672 |
| bitbucket | logo/downloader | CA | CA | master | | 228 | 0.22MB | 208 |
| bitbucket | full-schedule-downloader | UKFT | CA | master | c++ | 3325978 | 3247.53MB | 523,001 |
| bitbucket | full-schedule-downloader-v2 | UKFT | CA | master | | 220 | 0.21MB | 316 |
| bitbucket | mono/thumbnailstar | UKFT | CA | master | | 23490 | 23.34MB | 53,984 |
| bitbucket | sorenson-media-samsung-A-remote | UKFT | CA | master | | 60976 | 59.45MB | 454,653 |
| bitbucket | teus.apoo | UKFT | CA | master | | 216 | 0.21MB | 568 |
| bitbucket | fmuraj_filter | UKFT | CA | master | | 296 | 0.29MB | 208 |
| github | smicomp | VIDEO | Spark Video | master | c++ | 1698 | 1.53MB | 15,708 |
| github | spark-video-channel-ui | VIDEO | Spark Video | master | ruby | 504 | 0.48MB | 3,417 |
| github | spark-video-cucumber-testing | VIDEO | Spark Video | master | html/css | 1108 | 1.08MB | 3,580 |
| github | spark-video-test-spider | VIDEO | Spark Video | master | Ruby | 104724 | 102.27MB | 194,893 |
| github | spark-video-playlist-analyzer | VIDEO | Spark Video | master | Ruby | 12054 | 11.78MB | 64,853 |
| github | squeeze-360-app | VIDEO | Spark Video | master | Ruby | 752 | 0.73MB | 3,187 |
| github | squeeze-360-channel-monitor | VIDEO | Spark Video | master | Ruby | 89804 | 87.29MB | 66,147 |
| github | squeeze-360-ui-mockups | VIDEO | Spark Video | master | Ruby | 335 | 0.33MB | 513 |
| github | tiny-engine | VIDEO | Spark Video | master | Ruby | 472 | 0.46MB | 1,733 |
| github | video-service-load-testing | VIDEO | Spark Video | master | Ruby | 2176 | 2.13MB | 7,619 |
| bitbucket | video-service-env | VIDEO | Spark Video | master | Ruby | 840 | 0.55MB | 2,204 |
| github | video-service-testing | VIDEO | Spark Video | master | Ruby | 892 | 0.87MB | 2,204 |
| github | videos-360-wireframes | VIDEO | Don't count | master | | 880 | 0.85MB | 4,772 |
| github | videos-js-framebythings | VIDEO | Spark Video | master | Ruby | 475 | 0.46MB | 8,513 |
| github | videos-js-download-ad | VIDEO | Spark Video | master | python | 284 | 0.28MB | 1,391 |
| github | video-service-capture | VIDEO | Spark Video | master | Ruby | 1352 | 1.30MB | 4,876 |
| github | video-service-capture-app | VIDEO | Spark Video | master | | 4/5 | 3.42MB | 19,670 |
| github | video-service-capture-config | VIDEO | Spark Video | master | JavaScript | 498 | 0.48MB | 1,072 |
| github | video-service-capture-updater | #N/A | #N/A | master | AdionScript | 5144 | 5.02MB | 41,325 |
| github | video-service-chef | #N/A | #N/A | master | Python | 583 | 0.57MB | 1,504 |
| github | video-service-common | #N/A | #N/A | master | Ruby | 8882 | 86.55MB | 225,724 |
| github | video-service-docker | #N/A | #N/A | master | JavaScript | 77975 | 75.15MB | 228,089 |
| github | 360_flask_components | #N/A | #N/A | master | PyPhon | 816 | 0.60MB | 1,874 |
| github | 360_operations_utilities | #N/A | #N/A | master | PHP | 97824 | 95.53MB | 103,969 |
| github | 360_services | #N/A | #N/A | master | Ruby | 18536 | 16.15MB | 47,896 |
| github | 360_web.site | #N/A | #N/A | master | Java | 202562 | 197.50MB | 734,169 |
| github | 360_wordpress_plugin | #N/A | #N/A | master | Makefile | 6203 | 6.05MB | 67,404 |
| github | android_apk_update_script | #N/A | #N/A | master | PHP | 55920 | 54.51MB | 275,765 |
| github | osmf | #N/A | #N/A | master | PHP | 167440 | 163.52MB | 165,999 |
| github | blogs-corporate | #N/A | #N/A | master | PHP | 79216 | 77.36MB | 473,443 |
| github | boxen | #N/A | #N/A | master | Ruby | 800 | 0.59MB | 1,233 |
| github | cweb | #N/A | #N/A | master | Ruby | 282816 | 275.98MB | 576,394 |
| github | cweb-images | #N/A | #N/A | master | JavaScript | 298 | 0.29MB | 330 |
| github | cweb-marketing | #N/A | #N/A | master | JavaScript | 1656 | 1.61MB | 8,723 |
| github | developer-applicant-exercise | #N/A | #N/A | master | JavaScript | 3304 | 3.23MB | 70,488 |
| github | forum | #N/A | #N/A | master | PHP | 7080 | 6.91MB | 5,053 |
| github | grunt-cdn-env | #N/A | #N/A | master | Ruby | 1392 | 1.36MB | 4,225 |
| github | guidelines | #N/A | #N/A | master | CSS | 13448 | 13.13MB | 92,054 |
| github | market-map | #N/A | #N/A | master | Ruby | 232 | 0.23MB | 24 |
| github | open-sans-woff | #N/A | #N/A | master | C++ | 1844 | 1.80MB | 14,379 |
| github | operations-dashboard | #N/A | #N/A | master | ActionScript | 927 | | |
| github | osmf | #N/A | #N/A | master | | | | |
| github | package-test | #N/A | #N/A | master | Ruby | 1080 | 1.05MB | 2,563 |
| github | php-activerecord | #N/A | #N/A | master | PHP | | | |
| github | puppet-nginx | #N/A | #N/A | master | Ruby | | | |

| name | | branch | language | count | size | |
|---|---|---|---|---|---|---|
| github | head-website | #N/A | master | CSS | 216 | 0.21MB | 4 |
| github | twoiosh-website | #N/A | master | Ruby | 231215 | 225.80MB | 233,882 |
| github | rescue_to_cloudwatch | #N/A | master | Python | 360 | 0.35MB | 611 |
| github | robotframework-redistiprary | #N/A | master | Ruby | 712 | 0.70MB | 1,410 |
| github | sas-support-box | #N/A | master | Ruby | 884 | 0.86MB | 3,042 |
| github | sas_binding_ruby | #N/A | master | Ruby | 312 | 0.30MB | 147 |
| github | sas_branded_webapp | #N/A | master | Ruby | 9872 | 8.45MB | 20,681 |
| github | sas_titanium_mobile | #N/A | master | JavaScript | 390512 | 381.36MB | 812,409 |
| github | smi-public-keys | #N/A | master | | 256 | 0.25MB | 74 |
| github | sonmson_server_scripts | #N/A | master | Ruby | 3244 | 3.27MB | 22,777 |
| github | sonmson-5ejph10 | #N/A | master | PHP | 388 | 0.38MB | 882 |
| github | SparkTV-AMLogicUpdate | #N/A | master | Java | 2936 | 2.28MB | 14,710 |
| github | sparktv-android | #N/A | master | Java | 36824 | 35.98MB | 50,999 |
| github | sparktv-android-issues | #N/A | master | Java | 13128 | 12.82MB | 12,926 |
| github | sparktv-sohodule | #N/A | master | JavaScript | 1000 | 0.98MB | 6,761 |
| github | squeeze-serve-ruby | #N/A | master | Ruby | 272 | 0.27MB | 232 |
| github | squeeze-stream-tools | #N/A | master | Ruby | 538 | 0.52MB | 732 |
| github | store-and-share | #N/A | master | Ruby | 4712 | 4.60MB | 19,833 |
| github | strapi | #N/A | master | JavaScript | 71088 | 69.42MB | 176,464 |
| github | stretch | #N/A | master | Ruby | 568 | 0.55MB | 674 |
| github | stretch_shutterfly_video | #N/A | master | Ruby | 1818 | 1.77MB | 12,194 |
| github | test | #N/A | master | C# | 23768 | 23.21MB | 39,407 |
| github | ThreeSixtyServices>Normal | #N/A | master | Ruby | 544 | 0.53MB | 2,061 |
| Totals | | | | | 68351428 | 66749.44MB | 111,935,682 |





*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.8(b)*
*License Agreements*

None

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.8(c)*
*Exceptions to IP Ownership*

None

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.8(e)*
*Infringement*

1. **Gracenote, Inc. IP Infringement Complaint** - Case No. 2:16-cv-00950-CW-DBP – Claim of IP infringement against Seller on the following patents: U.S. Patent No. 9,143,718; U.S. Patent No. 9,414,008; and U.S. Patent No. 6,230,192.

2. **Gracenote, Inc. IP Infringement Claim** – Case No. 2:18-cv-00959-DAK - Claim of IP infringement against Sorenson Media Limited on the following patents: U.S. Patent No. 9,143,718; U.S. Patent No. 9,414,008, and U.S. Patent No. 6,230,192

3. **Inscape / Vizio, Inc. IP Infringement Complaint** – On December 18, 2018, Inscape/Vizio, Inc. filed a motion with the U.S. Bankruptcy Court for the District of Utah to request a removal of the automatic stay to allow Inscape/Vizio, Inc. to file a claim of IP infringement against Seller on the following patents: U.S. Patent No. 8,595,781; U.S. Patent No. 9,055,309; and U.S. Patent No. 9,838,753.

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.10(a)*
*Employment Agreement*

None

## ASSET PURCHASE AGREEMENT

### Sorenson Media, Inc. (Seller)
### The Nielsen Company (US), LLC (Purchaser)

### Seller Disclosure Schedules

### Schedule 4.10(b)
### Defaults in Employment Agreement

None

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.10(c)*
*Employee Compensation*

See attached.

**Sorenson Media, Inc**
**Schedule 4.10(c) Employee Compensation**

| Position | Name | Salary | |
|---|---|---|---|
| **U.S.** | | | |
| CFO | Scott Klossner | $ | 300,000.00 |
| EVP CORPORATE DEVELOPMENT | Mark Bonham | $ | 232,000.00 |
| EVP PRODUCT STRATEGY | Stefan Maris | $ | 280,000.00 |
| SVP BIZ DEVELOPMENT | Rick Louder | $ | 180,000.00 |
| VP IT OPERATIONS | Allen Bettilyon | $ | 190,000.00 |
| ~~Sr. DEVOPS ENGINEER~~ | ~~Rob Jackson~~ | | Resigned |
| US VP OF ENGINEERING | Dave Oldroyd | $ | 195,000.00 |
| ~~ENGINEERING MANAGER~~ | ~~Richard Hill~~ | | Resigned |
| ~~SR. S/W ENGINEER~~ | ~~Dave Hulihan~~ | | Resigned |
| S/W ENGINEER | Will Martin | $ | 103,000.00 |
| PR. S/W ENGINEER | Mitch Holyoak | $ | 150,000.00 |
| QA ENGINEER | Joel Curl | $ | 84,000.00 |
| S/W ENGINEER | Jesse Anderson | $ | 80,000.00 |
| SR DIR PRODUCT | Andrew Ashbacher | $ | 160,000.00 |
| CONTROLLER | Dane Clark | $ | 155,000.00 |

| | | Conversion | | 1.32 |
|---|---|---|---|---|
| **United Kingdom** | | **Pounds** | | **Dollars** |
| Technical Product Specialist | Mathew Grover | £ | 66,000.00 | $ | 87,120.00 |
| EVP Product & Engineering | Steve Cormie | £ | 165,000.00 | $ | 217,800.00 |
| SVP Campaign & Yield Management / SVP EMEA | Brian Jentz | £ | 143,530.00 | $ | 189,459.60 |
| Sr. Scrum Master | Richard Markey | £ | 66,000.00 | $ | 87,120.00 |
| QA Manager | Elin Pendered | £ | 64,000.00 | $ | 84,480.00 |
| Developer In Test | Craig Moses | £ | 50,000.00 | $ | 66,000.00 |
| Developer In Test | Joe Bignell | £ | 30,000.00 | $ | 39,600.00 |
| Pr. S/W Engineer | David Latheron | £ | 66,600.00 | $ | 87,912.00 |
| Sr. S/W Engineer | Peter Barnes | £ | 53,400.00 | $ | 70,488.00 |
| S/W Engineer | Mathew Pearce | £ | 45,000.00 | $ | 59,400.00 |
| Pr. S/W Engineer | Kieran Wingfield | £ | 63,500.00 | $ | 83,820.00 |
| Pr. S/W Engineer | Nick Hammett | £ | 60,000.00 | $ | 79,200.00 |
| Sr. S/W Engineer | Nigel Craven | £ | 56,000.00 | $ | 73,920.00 |
| Sr. Product Director | Stefan Liassides | £ | 81,000.00 | $ | 106,920.00 |
| Technical Data Analyst | Russel Love | £ | 47,000.00 | $ | 62,040.00 |
| ~~Technical Data Analyst~~ | ~~Petra Mala~~ | | Resigned | | |
| HR Business Partner / Finance / Office Manager | Laura Owen | £ | 65,000.00 | $ | 85,800.00 |

| | |
|---|---|
| Total Headcount - UK | 16 |
| Retain - US | 12 |
| Total HC | 28 |

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.13*
*Financial Statements*

Attached are the following:

1. Unaudited Consolidated Balance Sheets FY 2016
2. Unaudited Consolidated Balance Sheets FY 2017
3. Unaudited Consolidated Balance Sheets FY 2018
4. Unaudited Profit and Loss Statements FY 2016
5. Unaudited Profit and Loss Statements FY 2017
6. Unaudited Profit and Loss Statements FY 2018

SORENSON MEDIA, INC.
BALANCE SHEET
12/31/2016

| | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | |
| TOTAL CURRENT ASSETS | $11,724,906 | $20,147,842 | $20,944,812 | $20,554,508 | $20,144,600 | $19,260,202 | $17,672,972 | $15,093,784 | $14,775,536 | $14,449,153 | $22,525,842 | $20,802,104 |
| PROPERTY, PLANT & EQUIPMENT PP&E NET | $558,701 | $631,371 | $781,861 | $1,039,571 | $1,240,448 | $1,858,822 | $1,985,456 | $1,661,534 | $1,848,679 | $1,820,519 | $1,982,021 | $1,904,596 |
| TOTAL OTHER ASSETS | $1,244,162 | $1,328,737 | $1,406,484 | $1,468,981 | $1,552,324 | $1,592,689 | $1,626,694 | $1,700,876 | $1,784,880 | $1,875,429 | $1,970,248 | $2,434,144 |
| TOTAL ASSETS | $13,527,770 | $22,107,951 | $23,133,157 | $23,063,061 | $22,937,371 | $22,811,713 | $21,285,123 | $18,756,193 | $18,409,095 | $18,205,100 | $26,478,111 | $25,140,844 |
| **LIABILITIES** | | | | | | | | | | | | |
| TOTAL CURRENT LIABILITIES | $3,880,017 | $3,549,397 | $4,127,927 | $5,389,420 | $7,838,367 | $8,171,441 | $8,310,075 | $7,430,390 | $8,869,725 | $10,747,181 | $20,865,492 | $26,232,660 |
| TOTAL LONG TERM LIABILITIES | $2,217,242 | $2,219,408 | $2,221,580 | $2,333,459 | $1,336,650 | $2,010,000 | $2,020,122 | $2,030,253 | $2,503,900 | $2,496,027 | $2,488,163 | $2,223,472 |
| TOTAL LIABILITIES | $6,097,259 | $5,768,803 | $6,349,507 | $7,722,879 | $9,175,017 | $10,181,441 | $10,330,197 | $9,460,643 | $11,373,625 | $13,243,208 | $23,473,655 | $28,456,132 |
| TOTAL EQUITY | $7,430,511 | $16,339,148 | $16,783,650 | $15,340,182 | $13,762,354 | $12,630,271 | $10,954,925 | $9,295,550 | $7,035,470 | $4,961,892 | $3,004,454 | ($3,315,287) |
| TOTAL LIABILITIES & EQUITY | $13,527,770 | $22,107,951 | $23,133,157 | $23,063,060 | $22,937,371 | $22,811,712 | $21,285,122 | $18,756,193 | $18,409,095 | $18,205,100 | $26,478,110 | $25,140,844 |

SORENSON MEDIA, INC.
BALANCE SHEET
12/31/2017

| | | | | | | 2017 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | January | February | March | April | May | June | July | August | September | October | November | December |
| TOTAL CURRENT ASSETS | $22,548,638 | $21,473,383 | $19,953,854 | $16,728,347 | $16,000,378 | $19,259,040 | $21,965,175 | $22,528,248 | $16,794,162 | $17,421,178 | $14,415,013 | $14,676,932 |
| PROPERTY, PLANT & EQUIPMENT PP&E NET | $2,078,405 | $2,055,157 | $2,056,652 | $2,254,260 | $2,287,484 | $2,275,909 | $2,340,134 | $2,379,396 | $2,467,060 | $2,471,677 | $2,601,275 | $711,301,587 |
| TOTAL OTHER ASSETS | $2,635,870 | $2,049,965 | $2,834,688 | $2,997,606 | $3,133,773 | $3,269,527 | $3,342,509 | $3,383,462 | $3,389,896 | $3,732,047 | $3,802,789 | $3,935,383 |
| TOTAL ASSETS | $27,262,914 | $25,178,505 | $24,895,594 | $23,980,222 | $24,421,636 | $24,795,486 | $27,648,838 | $28,089,125 | $22,881,117 | $23,624,902 | $20,819,074 | $29,913,912 |
| TOTAL CURRENT LIABILITIES | $31,187,077 | $32,254,234 | $33,137,543 | $35,086,660 | $38,144,051 | $42,209,489 | $48,655,814 | $57,417,066 | $60,374,820 | $69,527,677 | $75,580,059 | $84,888,897 |
| TOTAL LONG TERM LIABILITIES | $1,648,161 | $1,616,226 | $1,608,500 | $1,600,683 | $1,892,876 | $1,384,539 | $1,576,211 | $1,567,893 | $1,821,688 | $1,813,389 | $1,805,100 | $10,089,005 |
| TOTAL LIABILITIES | $32,835,238 | $33,870,560 | $34,746,043 | $36,687,343 | $39,736,927 | $43,754,008 | $50,231,825 | $58,984,959 | $62,196,507 | $71,340,966 | $77,385,159 | $94,987,702 |
| TOTAL EQUITY | (5,572,324) | (7,692,055) | (9,840,479) | (12,687,121) | (15,315,292) | (18,958,521) | (22,552,987) | (30,895,833) | (39,315,391) | (47,716,065) | (56,546,085) | (65,073,790) |
| TOTAL LIABILITIES & EQUITY | $27,262,914 | $26,178,505 | $24,905,564 | $23,980,222 | $24,421,636 | $24,795,486 | $27,648,838 | $28,089,125 | $22,881,117 | $23,624,902 | $20,819,074 | $29,913,912 |

**SORENSON MEDIA, INC.**
**BALANCE SHEET**
**9/30/2018**

| | January | February | March | April | May | June | July | August | September |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL CURRENT ASSETS | 2,204,101 | 4,936,885 | 3,148,930 | 2,681,002 | 2,764,222 | 2,680,243 | 2,380,314 | 2,161,036 | 1,922,188 |
| PROPERTY, PLANT & EQUIPMENT | 10,864,401 | 10,921,383 | 10,878,103 | 11,255,235 | 12,406,526 | 12,398,088 | 12,181,149 | 11,701,617 | 11,844,800 |
| TOTAL INTER-COMPANY PAYABLES | (1,381,223) | (687,432) | (1,526,034) | (1,805,919) | (2,158,167) | (1,981,308) | (427,921) | (366,286) | (314,991) |
| TOTAL OTHER ASSETS | 4,020,175 | 4,214,019 | 4,335,551 | 4,475,348 | 4,590,420 | 4,698,420 | 4,816,521 | 4,884,290 | 4,970,590 |
| TOTAL ASSETS | 15,827,454 | 19,383,855 | 16,837,551 | 16,905,665 | 17,603,001 | 17,696,442 | 18,950,664 | 18,380,648 | 18,422,587 |
| TOTAL CURRENT LIABILITIES | 78,371,924 | 87,936,269 | 92,808,467 | 101,501,689 | 110,272,043 | 117,151,789 | 125,036,624 | 131,304,648 | 135,563,611 |
| TOTAL LONG TERM LIABILITIES | 9,955,736 | 9,943,294 | 9,930,859 | 9,793,430 | 9,778,062 | 9,763,546 | 9,749,039 | 9,312,817 | 9,470,316 |
| TOTAL LIABILITIES | 88,327,680 | 97,879,564 | 102,739,326 | 111,295,119 | 120,050,106 | 126,915,334 | 134,785,663 | 140,617,465 | 146,033,927 |
| TOTAL EQUITY | (72,500,206) | (78,495,709) | (85,901,775) | (94,389,453) | (102,447,105) | (109,218,892) | (115,834,999) | (122,236,817) | (127,611,340) |
| TOTAL LIABILITIES & EQUITY | 15,827,454 | 19,383,855 | 16,837,551 | 16,905,665 | 17,603,001 | 17,696,442 | 18,950,664 | 18,380,648 | 18,422,587 |

SORENSON MEDIA, INC.
Summary of All Units
For the Twelve Months Ending Saturday, December 31, 2016

| | January | February | March | April | May | June | July | August | September | October | November | December | FY 2016 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Sales | $153,043 | $109,723 | $183,367 | $1,642,914 | $2,283,344 | $2,378,461 | $2,313,500 | $2,232,360 | $1,802,469 | $2,441,313 | $2,142,556 | $2,110,670 | $20,308,580 |
| Total Cost of Goods Sold | $226,113 | $220,998 | $377,346 | $1,505,434 | $2,364,433 | $2,276,570 | $2,474,417 | $2,072,363 | $1,879,950 | $2,501,547 | $2,165,281 | $2,402,877 | $20,414,339 |
| Gross Profit | ($73,070) | ($111,275) | ($123,378) | $137,480 | $163,911 | $59,890 | $159,083 | $160,027 | ($76,982) | ($55,754) | ($22,575) | ($252,017) | ($105,729) |
| **Operating Expenses** | | | | | | | | | | | | | |
| COMPENSATION & EMPLOYEE EXPENSES | 854,655 | 838,623 | 1,112,375 | 1,182,147 | 1,387,838 | 833,389 | 1,328,855 | 1,280,637 | 1,304,914 | 1,337,673 | 1,470,455 | 1,106,774 | 14,047,015 |
| TRAVEL & ENTERTAINMENT | 59,286 | 52,007 | 72,663 | 104,510 | 33,646 | 95,494 | 77,364 | 89,269 | 109,352 | 118,898 | 64,425 | 80,641 | 1,072,563 |
| PROFESSIONAL SERVICES | 49,343 | 22,641 | 99,123 | 128,246 | 51,380 | 188,011 | 167,980 | 224,237 | 438,763 | 255,900 | 222,987 | 220,298 | 2,066,888 |
| LICENSES & HOSTING | 1,169 | 5,085 | 19,483 | 83,836 | 78,127 | 75,101 | 101,785 | 77,539 | 78,647 | 87,882 | 112,984 | 96,477 | 792,196 |
| RENT & FACILITY SUPPORT | 27,819 | 29,241 | 41,384 | 42,626 | 61,534 | 66,035 | 80,037 | 63,798 | 70,953 | 74,652 | 67,137 | | 680,143 |
| MARKETING | 25,621 | 16,507 | 45,628 | 26,857 | 28,625 | 16,712 | 16,141 | 17,784 | 18,092 | 18,941 | 32,242 | 5,680 | 268,730 |
| GENERAL & ADMINISTRATIVE EXPENSES | 30,480 | 26,823 | 38,650 | 43,774 | 53,727 | 60,742 | 73,208 | 85,617 | 203,346 | 102,613 | 76,433 | 376,067 | 1,172,479 |
| Total Operating Expenses | 1,058,274 | 988,926 | 1,429,806 | 1,590,396 | 1,748,877 | 1,339,464 | 1,845,471 | 1,848,571 | 2,207,858 | 1,953,859 | 2,056,137 | 1,952,074 | 20,099,593 |
| Operating Income | (1,171,344) | (1,100,201) | (1,553,184) | (1,452,916) | (1,584,966) | (1,279,573) | (1,706,388) | (1,688,544) | (2,284,819) | (2,059,593) | (2,078,813) | (2,244,080) | (20,205,722) |
| TOTAL OTHER | 11,265 | (2,398) | (3,060) | (789) | (471) | 1,984 | 1,122 | 5,851 | 49,227 | 19,988 | | (4,275,491) | (4,347,691) |
| Net Income | (1,182,608) | (1,097,803) | (1,550,645) | (1,448,447) | (1,584,207) | (1,279,102) | (1,708,373) | (1,688,965) | (2,296,670) | (2,102,820) | (2,069,601) | (6,517,571) | (24,553,413) |

**SORENSON MEDIA, INC.**
Summary of All Units
For the Twelve Months Ending Sunday, December 31, 2017

| | January | February | March | April | May | June | July | August | September | October | November | December | FY 2017 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Sales | 2,783,873 | 2,892,158 | 3,336,800 | 3,638,316 | 2,731,594 | 2,636,477 | 3,540,401 | 3,805,725 | 4,165,721 | 3,950,959 | 4,058,316 | 3,975,735 | 41,516,075 |
| Total Cost of Goods Sold | 2,641,719 | 2,784,250 | 3,049,649 | 3,398,600 | 2,851,136 | 2,672,832 | 3,557,576 | 7,990,036 | 8,322,340 | 8,205,001 | 8,482,356 | 8,526,516 | 62,482,011 |
| Gross Profit | 142,154 | 107,908 | 287,151 | 239,716 | (119,542) | (36,355) | (17,175) | (4,184,311) | (4,156,619) | (4,254,042) | (4,424,040) | (4,550,781) | (20,965,936) |
| COMPENSATION & EMPLOYEE EXPENSES | 1,569,027 | 1,638,378 | 1,574,335 | 1,889,003 | 2,053,572 | 2,247,295 | 2,383,341 | 2,482,877 | 2,655,426 | 2,509,579 | 3,048,809 | 2,188,437 | 26,740,079 |
| TRAVEL & ENTERTAINMENT | 98,650 | 71,119 | 123,034 | 182,205 | 135,207 | 277,388 | 137,994 | 171,587 | 150,731 | 127,462 | 141,947 | 119,895 | 1,737,289 |
| PROFESSIONAL SERVICES | 240,008 | 203,890 | 379,401 | 447,349 | 458,423 | 561,174 | 500,962 | 764,412 | 769,923 | 368,260 | 499,451 | 272,194 | 5,463,246 |
| LICENSES & HOSTING | 94,586 | 106,018 | 122,580 | 123,020 | 134,315 | 115,134 | 152,125 | 170,908 | 172,548 | 152,773 | 180,683 | 203,152 | 1,740,841 |
| RENT & FACILITY SUPPORT | 84,333 | 76,911 | 83,543 | 102,582 | 108,651 | 115,143 | 119,851 | 155,400 | 169,156 | 167,731 | 170,580 | 162,105 | 1,516,185 |
| MARKETING | 199,732 | 23,274 | 9,598 | 63,783 | 20,780 | 38,470 | 31,931 | 19,368 | 32,216 | 58,233 | 40,485 | 87,339 | 625,189 |
| GENERAL & ADMINISTRATIVE EXPENSES | 116,261 | 114,616 | 144,552 | 161,748 | 182,708 | 246,932 | 150,623 | 260,703 | 277,983 | 334,318 | 251,829 | 656,087 | 3,089,910 |
| Total Operating Expenses | 2,404,595 | 2,238,207 | 2,537,043 | 2,969,690 | 3,071,656 | 3,600,825 | 3,476,797 | 4,025,238 | 4,227,994 | 4,129,335 | 4,333,773 | 3,899,208 | 40,912,749 |
| Operating Income | (2,262,841) | (2,128,299) | (2,249,891) | (2,729,974) | (3,191,198) | (3,637,180) | (3,493,972) | (8,209,549) | (8,384,583) | (8,383,398) | (8,757,813) | (8,449,989) | (61,878,685) |
| TOTAL OTHER (INCOME)/EXPENSES | 48,335 | 45,572 | 52,673 | 70,807 | (230,448) | 100,351 | 142,485 | 153,460 | 86,324 | 84,616 | 124,669 | 267,903 | 946,748 |
| Net Income | (2,311,176) | (2,173,871) | (2,302,564) | (2,800,781) | (2,960,750) | (3,737,531) | (3,636,457) | (8,363,007) | (8,470,906) | (8,468,014) | (8,882,482) | (8,717,893) | (62,825,439) |

SORENSON MEDIA, INC.
Summary of All Units
For the Nine Months Ending Sunday, September 30, 2018

| | January | February | March | April | May | June | July | August | September | FY 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Sales | 644,621 | 641,712 | 629,856 | 610,006 | 691,567 | 194,319 | 78,164 | 53,427 | 19,447 | 3,583,120 |
| Total Cost of Goods Sold | 3,517,384 | 2,546,163 | 3,981,988 | 5,298,509 | 5,293,815 | 4,012,111 | 3,431,953 | 3,268,457 | 3,211,159 | 34,561,534 |
| Gross Profit | (2,872,763) | (1,904,451) | (3,352,127) | (4,688,502) | (4,602,248) | (3,817,792) | (3,353,789) | (3,215,030) | (3,191,712) | (30,998,414) |
| COMPENSATION & EMPLOYEE EXPENSES | 2,843,368 | 2,861,600 | 3,850,812 | 2,601,571 | 2,182,475 | 1,979,215 | 2,068,394 | 1,937,527 | 988,276 | 21,303,237 |
| TRAVEL & ENTERTAINMENT | 138,657 | 96,395 | 133,618 | 91,142 | 49,306 | 48,436 | 26,900 | 21,103 | 17,394 | 622,951 |
| PROFESSIONAL SERVICES | 512,296 | 406,174 | 230,076 | 356,903 | 252,336 | 308,549 | 299,702 | 489,052 | 455,655 | 3,311,744 |
| LICENSES & HOSTING | 112,641 | 118,996 | 122,177 | 104,337 | 107,693 | (140,470) | 80,519 | 39,601 | 22,203 | 567,697 |
| RENT & FACILITY SUPPORT | 132,062 | 156,093 | 144,744 | 131,378 | 207,101 | 162,306 | 130,447 | 137,371 | 117,905 | 1,319,406 |
| MARKETING | 14,929 | 36,101 | 27,394 | 32,187 | 25,411 | 19,581 | 115,871 | 16,968 | 16,701 | 305,130 |
| GENERAL & ADMINISTRATIVE EXPENSES | 225,668 | 179,953 | 241,304 | 212,760 | 192,861 | 186,328 | 175,911 | 94,718 | 108,083 | 1,617,587 |
| Total Operating Expenses | 3,979,622 | 3,865,311 | 4,760,125 | 3,530,276 | 3,017,184 | 2,564,945 | 2,897,745 | 2,736,329 | 1,706,216 | 29,047,753 |
| Operating Income | (6,852,385) | (5,769,762) | (8,112,252) | (8,218,778) | (7,619,432) | (6,382,737) | (6,251,534) | (5,951,359) | (4,897,928) | (60,046,167) |
| TOTAL OTHER (INCOME)/EXPENSES | 242,579 | 285,802 | 312,733 | 374,598 | 383,863 | 457,451 | 433,037 | 518,924 | 545,080 | 3,554,047 |
| Net Income/(Loss) | (7,094,964) | (6,045,564) | (8,424,985) | (8,593,376) | (8,003,295) | (6,840,180) | (6,684,571) | (6,470,283) | (5,442,988) | (63,600,214) |

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.14*
*Brokers or Finders*

None

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.15*
*Affiliate Transactions[4]*

| Affiliate Transactions in FY2018 | Payments | Receipts | Desc. | Relationship |
|---|---|---|---|---|
| Jim Sorenson | $3,908 | $0.00 | Expense Reimbursement | Board Member |
| Scott Klossner | $45,000 | $0.00 | Consulting Fees | CFO |
| Sorenson Media Limited | $7,711,806 | $0.00 | Intercompany Service Payments | Subsidiary of Seller |
| Sorenson Media NL BV | $10,787 | $0.00 | Intercompany Service Payments | Subsidiary of Seller |
| Sorenson Media Limited Korea | $941,050 | $0.00 | Intercompany Service Payments | Subsidiary of Seller |
| Attrix, LLC | $0.00 | $0.00 | Intercompany Service Payments | Subsidiary of Seller |
| Freewire, LLC | $0.00 | $0.00 | Intercompany Service Payments | Subsidiary of Seller |
| Continuum | $11,897,881 | $12,194,986 | Intercompany Service Payments | Subsidiary of Seller |
| The Pointe VI Lease | $195,058 | $0.00 | Draper Office Lease Payments | J.Sorenson Owned Company |

---

[4] The heading "Payments" indicates payments made by Seller to the listed Affiliate and the heading "Receipts" indicates payments made by the listed Affiliate to Seller.

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 4.16*
*Litigation; Proceedings*

1. **Gracenote, Inc. IP Infringement Complaint** - Case No. 2:16-cv-00950-CW-DBP – Claim of IP infringement against Seller on the following patents: U.S. Patent No. 9,143,718; U.S. Patent No. 9,414,008; and U.S. Patent No. 6,230,192.

2. **Gracenote, Inc. IP Infringement Complaint**– Case No. 2:18-cv-00959-DAK - Claim of IP infringement against Sorenson Media Limited on the following patents: U.S. Patent No. 9,143,718; U.S. Patent No. 9,414,008, and U.S. Patent No. 6,230,192

3. **Inscape / Vizio, Inc. IP Infringement Complaint** – On December 18, 2018, Inscape/Vizio, Inc. filed a motion with the U.S. Bankruptcy Court for the District of Utah to request a removal of the automatic stay to allow Inscape/Vizio, Inc. to file a claim of IP infringement against Seller on the following patents: U.S. Patent No. 8,595,781; U.S. Patent No. 9,055,309; and U.S. Patent No. 9,838,753.

4. **Vizio Services, LLC - Breach of Contract Complaint** – Case No. 8:18-CV-001275 - On July 23, 2018, Inscape/Vizio, Inc. filed a complaint against Seller for breach of contract, goods and services rendered, and imposition of a constructive trust.

*ASSET PURCHASE AGREEMENT*

*Sorenson Media, Inc. (Seller)*
*The Nielsen Company (US), LLC (Purchaser)*

*Seller Disclosure Schedules*

*Schedule 9.2(h)*
*Required Consents and Approvals*

None

United States Bankruptcy Court
District of Utah

In re:                                                          Case No. 18-27740-WTT
Sorenson Media, Inc.                                            Chapter 11
        Debtor

## CERTIFICATE OF NOTICE

District/off: 1088-2        User: jtt          Page 1 of 1          Date Rcvd: Feb 14, 2019
                           Form ID: pdfor1     Total Noticed: 2

Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on
Feb 16, 2019.
aty            +Cheylynn Hayman,   Parr Brown Gee & Loveless,   101 South 200 East,   Suite 700,
                Salt Lake City, UT 84111-3105
sp             +Phillip Hudson, III,   Saul Ewing Arnstein & Lehr LLP,   200 S. Biscayne Boulevard, Suite 3600,
                Miami, FL 33131-2395

Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.
NONE.                                                                              TOTAL: 0

          ***** BYPASSED RECIPIENTS *****
NONE.                                                                              TOTAL: 0

Addresses marked '+' were corrected by inserting the ZIP or replacing an incorrect ZIP.
USPS regulations require that automation-compatible mail display the correct ZIP.

Transmission times for electronic delivery are Eastern Time zone.


I, Joseph Speetjens, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner
shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.

Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed. R. Bank. P. 2002(a)(1), a notice containing the complete Social
Security Number (SSN) of the debtor(s) was furnished to all parties listed.  This official court copy contains the redacted SSN as required
by the bankruptcy rules and the Judiciary's privacy policies.

Date: Feb 16, 2019                        Signature:   /s/Joseph Speetjens


## CM/ECF NOTICE OF ELECTRONIC FILING

The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email)
system on February 13, 2019 at the address(es) listed below:
          Brent D. Wride   on behalf of Creditor   Gracenote, Inc. bwride@rqn.com,
           docket@rqn.com;pbrown@rqn.com
          David E. Leta   on behalf of Creditor    JLS Holdings, LLC dleta@swlaw.com,
           wkalawaia@swlaw.com;csmart@swlaw.com
          Debra A. Dandeneau   on behalf of Creditor    Gracenote, Inc. debra.dandeneau@bakermckenzie.com,
           lori.seavey@bakermckenzie.com
          Ellen E Ostrow   on behalf of Creditor Committee   Official  Committee of Unsecured Creditors
           eeostrow@hollandhart.com,  intaketeam@hollandhart.com;lahansen@hollandhart.com
          Engels Tejeda   on behalf of Creditor Committee   Official  Committee of Unsecured Creditors
           ejtejeda@hollandhart.com,  tjones@hollandhart.com,slclitdocket@hollandhart.com;
           intaketeam@hollandhart.com
          Frank Grese   on behalf of Creditor   Gracenote, Inc. frank.grese@bakermckenzie.com
          George B. Hofmann   on behalf of Debtor   Sorenson Media, Inc. ghofmann@cohnekinghorn.com,
           dhaney@cohnekinghorn.com;mparks@cohnekinghorn.com
          Ira A. Reid   on behalf of Creditor   Gracenote, Inc.
          Jacob M. Kaplan   on behalf of Creditor   Gracenote, Inc.
          Jeff D. Tuttle   on behalf of Creditor   JLS Holdings, LLC jtuttle@swlaw.com,
           jpollard@swlaw.com;docket_slc@swlaw.com
          John T. Morgan tr   on behalf of U.S. Trustee    United States Trustee john.t.morgan@usdoj.gov,
           James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Suzanne.Verhaal@usdoj.gov
          Joseph R. Sgroi   on behalf of Debtor   Sorenson Media, Inc. jsgroi@honigman.com
          Mark C. Rose   on behalf of Creditor Guy  Beverlin mrose@mbt-law.com,  markcroselegal@gmail.com
          Michael R. Johnson   on behalf of Creditor   Gracenote, Inc. mjohnson@rqn.com,
           docket@rqn.com;dburton@rqn.com
          Michael Ronald Brown   on behalf of Creditor   VIZIO, Inc. mbrown@parsonsbehle.com
          P. Matthew Cox   on behalf of Creditor    SCP SMI Acquisition, LLC bankruptcy_pmc@scmlaw.com
          Patrick E Johnson   on behalf of Debtor   Sorenson Media, Inc. pjohnson@cohnekinghorn.com,
           jdannenmueller@cohnekinghorn.com
          Phillip M. Hudson, III   on behalf of Creditor   VIZIO, Inc.
          T. Edward Cundick   on behalf of Creditor   Sinclair Television Group, Inc. tec@princeyeates.com,
           docket@princeyeates.com;pam@princeyeates.com
          Tim Dance   on behalf of Creditor   JLS Holdings, LLC tdance@swlaw.com,
           docket_slc@swlaw.com;snielsen@swlaw.com;csmart@swlaw.com
          United States Trustee   USTPRegion19.SK.ECF@usdoj.gov
                                                                          TOTAL: 21